No. 25-1136

_____

IN THE UNITED STATES COURT
OF APPEALS FOR THE FOURTH CIRCUIT

_____

KIMBERLY ANN POLK,

*Appellant,*

v.

MONTGOMERY COUNTY PUBLIC SCHOOLS, *et al.*,

*Appellees.*

_____

*On Appeal from the United States District Court*
*the District of Maryland, No. 8:24-cv-1487 (Boardman, J.)*

_____

**APPELLANT'S OPENING BRIEF**

_____

Robert Flores
Gammon & Grange, P. C.
1945 Old Gallows Rd., Ste. 650
Vienna, Va. 22182
jeff@gg-law.com

Frederick W. Claybrook, Jr.
(Counsel of Record)
Claybrook LLC
655 15th St., NW, Ste. 425
Washington, D.C. 20005
(202) 250-3833
rick@claybrooklaw.com

Steven W. Fitschen
James A. Davids
National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 463-6133
sfitschen@nationallegalfoundation.org

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __25-1136__     Caption: __Kimberly Ann Polk v. Montgomery County Public Schools, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Kimberly Ann Polk__
(name of party/amicus)

_____

 who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: Frederick W. Claybrook, Jr.      Date:    March 26, 2025

Counsel for: Kimberly Ann Polk, Appellanbt

Print to PDF for Filing

Attorneys for Appellant

## Table of Contents

Table of Authorities...........................................................................i

Jurisdictional Statement ...................................................................1

Statement of the Issues......................................................................1

Statement of Facts ............................................................................1

Summary of Argument.......................................................................4

Argument...........................................................................................5

    I.      MCPS Violated Ms. Polk's Free Exercise Rights,
           and Strict Scrutiny Applies........................................................6

         A. The Supreme Court Has Effectively Abrogated *Smith*,
            and It Should Not Be Applied to Lessen MCPS's Burden
            to Justify Its Infringement of Ms. Polk's Free Exercise Rights ...........8

         B. *Smith* Does Not Apply Because MCPS Has Discretion
            in How to Handle Violations of the Guidelines by Teachers...............9

         C. *Smith* Does Not Apply Because the Guidelines Target
            Religious Exercise..............................................................10

    II.     MCPS Violated Ms. Polk's Free Speech Rights, and
           Strict Scrutiny Applies...........................................................13

         A. MCPS Compels Speech, an Egregious
            Free Speech Violation .........................................................14

         B. *Garcetti*'s "Government Speech"
            Exception Does Not Apply Here.............................................17

           1. *Garcetti* Doesn't Apply Because the Speech
               MCPS Compels Is Not Its Own, But the Child's.........................17

2. *Garcetti* Doesn't Apply Because Ms. Polk
   Refuses to Recite the Speech Demanded of Her ...........................20

3. *Garcetti* Doesn't Apply Because the Speech It
   Compels Is Not Part of a Teacher's Curricular or
   Administrative Duties ...................................................................21

4. *Garcetti* Doesn't Apply Because the Speech It
   Compels Is for an Illegitimate Purpose.........................................23

5. *Garcetti* Doesn't Apply Because the Speech It
   Compels Is in an Academic Setting ...............................................25

C. *Pickering* Balancing Does Not Excuse the Violation
   of Ms. Polk's Free Speech Rights .........................................................27

1. *Pickering* Doesn't Apply But, If It Does, It
   Demands Heightened Scrutiny......................................................27

2. This Case Involves More Than a "Private Concern"....................29

III. MCPS Has No Legitimate Interest in Violating Ms. Polk's
     Free Exercise and Free Speech Rights, Much Less
     a Compelling Interest ...............................................................................32

A. MCPS Has No Legitimate Interest Here in Restricting
   Pronoun Usage, in Part Because Ms. Polk Will Not Use Them .........34

B. MCPS Has No Legitimate Interest in Having Ms. Polk
   Hide Information from Parents About Their Children.......................36

C. Any *Pickering* Balance Favors Ms. Polk .............................................42

Conclusion .........................................................................................................43

Addendum ...........................................................................................................47

## Table of Authorities

<u>Cases</u>

*303 Creative, LLC v. Elenis*,
    600 U.S. 570 (2023).................................................................16

*Adams v. Trustees of the Univ. of N.C.-Wilmington*,
    640 F.3d 550 (4th Cir. 2011)..................................................26

*Agency for Int'l Dev. v. All. for*
    *Open Soc'y Int'l, Inc.*,
    570 U.S. 205 (2013).................................................................16

*Bowen v. Roy,*
    476 U.S. 693 (1986) ...............................................................12

*Brokaw v. Mercer Cnty.*,
    235 F.3d 1000 (7th Cir. 2000).................................................40

*Burwell v. Hobby Lobby Stores, Inc.*,
    573 U.S. 682 (2014).................................................................33

*Carroll Ind. Sch. Dist. v. U.S. Dep't of Educ.*,
    No. 4:24-cv-461-0 (N.D. Tex., Feb. 19, 2025) .....................34

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*,
    508 U.S. 520 (1993)......................................................... 10-12

*Coalition Life v. Carbondale*,
    No. 24-57 (Sp. Ct., Feb. 24, 2025),
    https://www.supremecourt.gov/opinions/
    24pdf/24-57_21p3.pdf .......................................................... 8-9

*Connick v. Myers*,
    461 U.S. 138 (1983)....................................................13, 26, 30

*Croft v. Westmoreland Cnty. Children and Youth Servs.*,
    103 F.3d 1123 (3d Cir. 1997)..................................................40

*Doe v. Heck,*
   327 F.3d 492 (7th Cir. 2003) ...............................................................40

*Doe 1 v. Madison Metro. Sch. Dist.,*
   2022 WI 65, 976 N.W.2d 584 (2022) .................................................41

*E. Tenn. Natural Gas Co. v. Sage,*
   361 F.3d 808 (4th Cir. 2004)) ...............................................................5

*Elrod v. Burns,*
   427 U.S. 347 (1976) ...............................................................................6

*Employment Div. v. Smith,*
   494 U.S. 872 (1990) ........................................................................... 7-13

*EEOC v. Abercrombie & Fitch Stores, Inc.,*
   575 U.S. 768 (2015) .............................................................................11

*Foote v. Ludlow Sch. Comm.,*
   2025 WL 520578 (1st Cir., Feb. 18, 2025) .........................................41

*Fulton v. Phila.,*
   593 U.S. 522 (2021) ......................................................................... 8-11

*Garcetti v. Ceballos,*
   547 U.S. 410 (2006) ....................................................................... 14-31

*Geraghty v. Jackson Local Sch. Dist.,*
   2024 WL 3758499 (N.D. Ohio, Aug. 12, 2024) ..........................20, 21

*Gillette* v. *United States,*
   401 U. S. 437 (1971) .............................................................................12

*Giovani Carandola, Ltd. v. Bason,*
   303 F.3d 507 (4th Cir. 2002) .................................................................6

*Givhan v. W. Line Consol. Sch. Dist.,*
   439 U.S. 410 (1979) .............................................................................13

*Gonzales v. O Centro Espirita*
    *Beneficente Uniao do Vegetal,*
    546 U.S. 418 (2006)) .......................................................33

*Greater Balto. Ctr. for Pregnancy Concerns,*
    *Inc. v. Mayor and City Council of Balto.,*
    879 F. 3d 101 (4th Cir. 2018)..........................................15

*Grimm v. Gloucester County School Board,*
    972 F.3d 586 (4th Cir. 2020) ..........................................34

*Groff v. DeJoy,*
    600 U.S. 447 (2023)..........................................................8

*Harris v. Quinn,*
    573 U.S. 616 (2014).........................................................29

*Hurley v. Irish Gay, Lesbian and Bisexual Grp. of Boston, Inc.,*
    515 U.S. 557 (1995).....................................................15, 38

*Janus v. Am. Fed. of State, County, and Mun. Employees,*
    585 U.S. 878 (2018)................... 15, 16, 18, 23, 27-30, 42

*Kennedy v. Bremerton Sch. Dist.,*
    597 U.S. 507 (2022)...........................7-9, 19, 22, 30, 34-35

*Keyishian v. Bd. of Regents,*
    385 U.S. 589 (1967).........................................................13

*Lane v. Franks,*
    573 U.S. 228 (2014).........................................................30

*Leaders of a Beautiful Struggle v.*
    *Baltimore Police Dep't,*
    2 F.4th 330 (4th Cir. 2021)...............................................6

*Lee v. Weisman,*
    505 U.S. 577 (1992).........................................................36

*Lemon v Kurtzman*,
　403 U.S. 602 (1971)......................................................8

*Lujan v. Defenders of Wildlife,*
　504 U.S. 555 (1992) ...................................................12

*Lujan v. Nat'l Wildlife Fed'n,*
　497 U.S. 871 (1990)....................................................12

*Mahmoud v. McKnight,*
　102 F.4th 191 (4th Cir. 2024),
　*cert. granted*, No. 24-297 (Sp. Ct., Dec. 3, 2024). ...............7

*Masterpiece Cakeshop Ltd. v. Colo. Civ. Rights Comm'n,*
　584 U.S. 617 (2018).............................................10, 35

*Matal v. Tam*,
　582 U.S. 218 (2017)...........................................35, 38

*Meriwether v. Hartop*,
　992 F.3d 492 (6th Cir. 2021)........................... 22-23, 31, 34

*Mirabelli v. Olson,*
　691 F. Supp. 3d 1197 (S.D. Cal. 2023).................... 23-24, 39

*Mirabelli v. Olson,*
　2025 WL 42507 (S.D. Cal., Jan. 7, 2025)..........................24

*Myers v. Centerville*,
　41 F.4th 746 (6th Cir. 2022)......................... 20-21

*Nat'l Institute of Family*
　*& Life Advocates v. Becerra*,
　585 U.S 755 (2018)....................................................15

*Nat'l Socialist Party of Am. v. Village of Skokie*,
　432 U.S. 43 (1977).....................................................35

*Parents 1 v. Montgomery Cnty. Bd. of Educ.*,
　78 F.4th 622 (4th Cir. 2023).................................21, 41

*Parham v. J. R.,* 442 U.S. 584 (197) ...................................................................25, 37

*Perry* v. *Sindermann,*
  408 U. S. 593 (1972)......................................................................................13

*Pickering v. Bd. of Educ.,*
  391 U.S. 563 (1968)..................................................................... 14, 27-31, 42

*Ramirez v. Collier,*
  595 U.S. 411 (2022) ........................................................................................5

*Reed v. Town of Gilbert,*
  576 U.S. 155 (2015)..................................................................................16, 32

*Ricard v. USD 475 Geary Cnty. KS Sch. Bd.,*
  2022 WL 1471372 (D. Kan., May 9, 2022).................................... 18, 36, 38-39

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.,*
  487 U.S. 781 (1988)......................................................................................14

*Roman Cath. Diocese of Brooklyn v. Cuomo,*
  592 U.S. 14 (2020)..........................................................................................6

*Rosenberger v. Rector and Visitors of Univ. of Va.,*
  515 U.S. 819 (1995)......................................................................................16

*Santosky v. Kramer,*
  455 U.S. 745 (1982)......................................................................................25

*Shelton* v. *Tucker,*
  364 U.S. 479 (1958)......................................................................................13

*Snyder v Phelps,*
  562 U.S. 443 (2011)) ...............................................................................30, 35

*State v. Loe,*
  692 S.W.3d 215 (Tex. 2024) ...........................................................................4

*Students for Fair Admissions, Inc. v.*
 *Pres. & Fellows of Harvard Coll.,*
 600 U.S. 181 (2023).................................................................33

*Tenn. v. Cardona,*
 2025 WL 63795 (E.D. Ky., Jan. 9, 2025) ....................................21, 34

*Tex. v. Johnson,* 491 U.S. 397 (1989) .....................................35

*Tinker v. Des Moines Ind. Cmty. Sch. Dist.,*
 393 U.S. 503 (1969)................................................... 13-14, 19

*Troxel v. Granville,*
 530 U.S. 57 (2002)................................................24, 37, 38

*Turner Broadcasting, Inc. v. FCC,*
 512 U.S. 622 (1994)..................................................15, 32

*United States v. Skrmetti,*
 No. 23-477 (Sp. Ct., argued Dec. 4, 2024) ....................................31, 34

*United States v. Treas. Employees,*
 513 U.S. 454 (1995)..................................................28

*Venkatraman v. REI Sys., Inc.,*
 417 F. 3d 418 (4th Cir. 2005)..........................................6

*Vlaming v. West Point Sch. Dist.,*
 895 S.E.2d 705 (Va. 2023)....................................20, 22, 23

*Walz* v. *Tax Comm'n of NY City,*
 397 U.S. 664 (1970)..................................................12

*Walker v. Sons of Confederate Vets.,*
 576 U.S. 200 (2015)..................................................20

*WV Ass'n of Club Owners & Fraternal Servs.,*
 *Inc. v. Musgrave,*
 553 F.3d 292 (4th Cir. 2009) ..........................................5

*W. Va. Bd. of Educ. v. Barnette*,
   319 U.S. 624 (1943)............................................................22

*Willey v. Sweetwater Cnty. Sch. Dist.*,
   680 F. Supp. 3d 1250 (D. Wyo. 2023) ............................39

*Winkelman v. Parma City Sch. Dist.*,
   550 U.S. 516 (2007)............................................................25

*Winter v. Nat'l Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)) ...............................................................5

*Wooley v. Maynard*,
   430 U.S. 705 (1977)..................................................... 14-16, 20

*Wyatt v. Fletcher*,
   718 F.3d 496 (5th Cir. 2013)....................................... 39-40

Statutes

20 U.S.C.
   §§ 1681-88 ..........................................................................33

28 U.S.C.
   § 1292(a)(1) ..........................................................................1

   §§ 1331 ..................................................................................1

   §§ 1343..................................................................................1

42 U.S.C.
   § 1983..............................................................................1, 43

   §§ 2000e et. seq...................................................................1

Other Authorities

EO 14168, "Defending Women from Gender
Ideology Extremism and Restoring Biological Truth
to the Federal Government" (Jan. 20, 2025),
https://www.whitehouse.gov/presidential-actions/2025/01/
defending-women-from-gender-ideology-extremism-and
-restoring-biological-truth-to-the-federal-government/.......................... 25, 34-35

EO 14190, "Ending Radical Indoctrination
in K-12 Schooling" (Jan. 29, 2025), https://www.whitehouse
.gov/presidential-actions/2025/01/ ending-radical-
indoctrination-in-k-12-schooling/.....................................................................25

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343, as Ms. Polk asserts claims under 42 U.S.C. §§ 1983 and 2000e *et seq.* for violations of the United States Constitution and Title VII of the Civil Rights Act of 1964. The district court denied her motion for preliminary injunction on January 17, 2025. (JA200-201.) She timely filed a notice of appeal on February 7, 2025 (JA202), and this Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1), which governs interlocutory appeals of denials of preliminary injunctions.

## Statement of the Issues

The district court denied Ms. Polk's request for a preliminary injunction based on its rulings that present the principal issues in this appeal:

1. Is Ms. Polk likely to succeed on her free exercise claim?

2. Is Ms. Polk likely to succeed on her free speech claim?

## Statement of Facts

The Montgomery County Board of Education and the Montgomery County Public Schools (collectively, "MCPS") approved Ms. Polk as a substitute teacher in 2021, and she taught preschool special education, kindergarten, and Grades 2 and 4 during the 2021-2022 school year. (JA23, 39-40.) She received positive reviews and qualified to continue substitute teaching during the 2022-2023 school year. (JA23, 39.)

However, MCPS required Ms. Polk in the summer of 2022 to do on-line training that included instruction on MCPS's gender identity policy. (JA23-24, 40-41.) That policy, which remains in effect and is contained in MCPS's "Gender Identity Guidelines" ("Guidelines") (attached in the Addendum to this brief and found at JA55-72), requires Ms. Polk to assist students who wish to transition genders at school by (1) using pronouns that do not match the student's biological sex[1] and (2) lying to parents about their children's transgender behaviors at school when the child or MCPS has decided that parents may not support their child's transition.[2] Ms. Polk objected to these policies on the basis of her religious faith. (JA24, 38, 41.) While she would use the preferred name of any student, she would not lie to students about their biological (and she believes God-given) sex or mislead parents about how their child was exhibiting treated while at school. (JA41, 171.) As a result, she could not in good conscience affirm that she would

---

[1] The MCPS guidelines state in part, "All students have the right to be referred to by their identified name and/or pronoun School staff members should address students by the name and pronoun corresponding to the gender identity that is consistently asserted at school . . . ." (JA67.)

[2] The MCPS guidelines state in part, "Transgender and gender nonconforming students have the right to discuss and demonstrate their gender identity and expression openly and decide when, with whom, and how much to share private information. The fact that students choose to disclose their status to staff members or other students does not authorize school staff members to disclose students' status to others, including parents/guardians and other school staff members, unless legally required to do so or unless students have authorized such disclosure." (JA67.)

abide by MCPS's gender identity policy in full.  Because she did not "check the box" that she would (something MCPS added in 2022), MCPS locked her out of the substitute teacher portal through which she had previously signed up for substitute positions.  Because she did not substitute for the required number of days the next school year, MCPS terminated her.  (JA25, 40, 152, 159.)

Ms. Polk in her prior substitute teaching never interacted with students exhibiting as other than their biological sex, and, in her experience, few such students exist in the lower grades.  (JA23, 40.)  Thus, she requested a religious accommodation from MCPS.  During her initial conversation with an MCPS official, she said she was willing to compromise by substituting only in elementary and lower classes and by calling on other MCPS personnel if she could not follow the MCPS gender policy without violating her religious beliefs.  The official indicated he thought an accommodation could be reached on this basis, but that the MCPS Central Office had to approve it.  A few days later, the official reported back to her that MCPS had categorically refused any religious accommodation.  (JA24-25, 42, 82-87.)

Ms. Polk filed an EEOC charge and, after more than six months, requested and received from EEOC a "right to sue" notice.  (JA27.)  She then filed a complaint in the district court in May 2024, alleging as-applied violations of Title VII and the Free Speech and Free Exercise Clauses of the United States

Constitution (JA15-33) and requesting a preliminary injunction contoured with the accommodations she had requested. (JA34-35.) MCPS countered with a motion to dismiss all the counts. The district court dismissed the Free Speech and Free Exercise claims. It denied MCPS's motion to dismiss the Title VII claim and Ms. Polk's motion for preliminary injunction. (JA200.)

## Summary of Argument

Justice Blacklock of the Texas Supreme Court has described the two sides in the great national debate over the wisdom and propriety of minors exhibiting as transgender as those holding to either the "Transgender Vision" or the "Traditional Vision." *State v. Loe*, 692 S.W.3d 215, 240 (Tex. 2024) (Blacklock, J., concurring). MCPS has landed with both feet on the side of the "Transgender Vision." MCPS not only believes it possible for someone to be "born in the wrong body," *id.*, but encourages minor students with any such inclination to exhibit as the other gender at school, while keeping this behavior secret from parents if the child desires to do so or if some school official assesses the parents as potentially "unsupportive." (JA65-68.) In addition, MCPS compels its teachers to call such children by their requested, "preferred" pronouns, rather than those conforming to their biological sex, even if this violates the teacher's religious beliefs. (JA67.)

MCPS refused to grant an accommodation to Ms. Polk and terminated her because she holds to the "Traditional Vision." *Id.* She could not affirm

4

compliance with MCPS's Guidelines due to her religious principles that (a) there are only two, God-given sexes, biologically determined, that are immutable, irrespective of the feelings or desires of the individual; (b) it is wrong and harmful to lie to children about their sex by using improper pronouns; and (c) it is wrong and harmful to hide from parents how the school is treating their children at school. (JA24, 38.)   In dismissing Ms. Polk's Free Speech and Free Exercise claims and, consequently, denying her preliminary injunction, the district court misapplied the law as to both claims and should be reversed as to both.

<u>Argument</u>

This Court reviews the denial of a preliminary injunction for abuse of discretion.  *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave,* 553 F.3d 292, 298 (4th Cir. 2009).  Factual findings are reviewed for clear error; legal conclusions, *de novo*.  *Id.* (citing *E. Tenn. Natural Gas Co. v. Sage,* 361 F.3d 808, 828 (4th Cir. 2004)).

To qualify for a preliminary injunction, the movant must "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Ramirez v. Collier,* 595 U.S. 411, 421 (2022) (quoting *Winter v. Nat'l Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008)).

5

While the district court recited the axiom that an injunction is an extraordinary remedy (JA197-198), it ignored other axioms that control here. It is, for instance, also axiomatic that the deprivation or infringement of a constitutional liberty is an irreparable harm that supports an injunction. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 18 (2020) (per curiam); *Elrod v. Burns,* 427 U.S. 347, 373 (1976); *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021). Concomitantly, "a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Giovani Carandola, Ltd. v. Bason,* 303 F.3d 507, 521 (4th Cir. 2002) (internal quotation marks omitted).

The issues here, then, turn on whether the district court properly dismissed Ms. Polk's constitutional claims. It did not. This Court reviews a grant of a motion to dismiss *de novo*, indulging all reasonable factual inferences in the non-movant's favor. *Venkatraman v. REI Sys., Inc.*, 417 F. 3d 418, 420 (4th Cir. 2005).

I.   MCPS Violated Ms. Polk's Free
     Exercise Rights, and Strict Scrutiny Applies

Ms. Polk's free exercise rights are obviously burdened by having to conform to MCPS's gender identity policy when it clashes with her religious beliefs. The district court properly found that MCPS's argument that she experienced no

burden, based on MCPS's concession that she did not have to "check the box" but would still have to abide the policy while on the job and would be subject to discipline if she did not, was "too clever by half." (JA169-170.) The specter of having to either be untrue to her religious principles or to suffer consequences on the job is a cognizable burden. *See Kennedy v. Bremerton School District*, 597 U.S. 507, 525 (2022); *Mahmoud v. McKnight*, 102 F.4th 191, 208 (4th Cir. 2024), *cert. granted*, No. 24-297 (Sp. Ct., Dec. 3, 2024).

Typically, a burden on religious exercise will require the government to justify it under strict scrutiny review. However, under *Employment Division v. Smith*, 494 U.S. 872 (1990), if the government infringement results from a neutral and generally applicable regulation, that regulation only need pass rational basis review.

*Smith* is a punch-drunk fighter, already counted out by a majority of the sitting Supreme Court justices. The district court, however, still thought *Smith* healthy enough to provide a haymaker to Ms. Polk's free exercise claim. *Smith* should not be applied because the Supreme Court has effectively abrogated it. Moreover, even if *Smith* were considered valid precedent, resort to it fails here because MCPS's application of its gender policy is neither generally applicable nor neutral: MCPS possesses discretion as to how to sanction violations of the guidelines against teachers, and the policy targets primarily religious parents. And,

as will be discussed in part III *infra*, whatever review standard is used—rational

basis, intermediate scrutiny, or strict scrutiny—MCPS cannot meet it to justify

infringement of Ms. Polk's constitutional rights.

A. The Supreme Court Has Effectively Abrogated *Smith*,
and It Should Not Be Applied to Lessen MCPS's Burden
to Justify Its Infringement of Ms. Polk's Free Exercise Rights

The last occasion on which the Court discussed *Smith* in detail was in

*Fulton v. Philadelphia*, 593 U.S. 522 (2021). Three justices wrote that *Smith*

should be overruled. *Id.* at 553 (Alito, Thomas, and Gorsuch, JJ., concurring).

Two others, while declining to join those three to create a majority to overrule

*Smith* at that juncture, observed that "the textual and structural arguments against

*Smith* are more compelling" than the countervailing historical arguments. *Id.* at

543 (Barrett and Kavanaugh, JJ., concurring).

In *Kennedy*, the Supreme Court upbraided the Ninth Circuit for relying on

the test of *Lemon v Kurtzman*, 403 U.S. 602 (1971), which the Court had not

expressly overruled but had not utilized in the recent past. 597 U.S. at 535-36; *see*

*Groff v. DeJoy*, 600 U.S. 447, 460 (2023) (describing *Lemon* as abrogated). With

respect to *Smith*, five active justices have declared it to be wrongly decided. Thus,

the Supreme Court has even more effectively abrogated *Smith* than it has *Lemon*.

As a result, the district court should not have applied *Smith*. *See Coalition Life v.*

*Carbondale*, No. 24-57 (Feb. 24, 2025) (Thomas, J., dissenting from denial of

cert.) (criticizing lower courts for continuing to follow another Supreme Court decision disapproved of by multiple justices in later decisions), *found at* https://www.supremecourt.gov/opinions/24pdf/24-57_21p3.pdf.  Rather, the district court should have applied strict scrutiny because of the burden MCPS put on Ms. Polk's religious exercise.[3]  *See Kennedy*, 597 U.S. at 525.

### B. *Smith* Does Not Apply Because MCPS Has Discretion in How to Handle Violations of the Guidelines by Teachers

The district court found that *Smith* applied because MCPS categorically refused to retain teachers unwilling to affirm full compliance with the Guidelines, and thus that it had no discretion to retain Ms. Polk because she had to "check the box" to affirm that she would follow the Guidelines *en toto*.  (JA177.)  This misreads the record.  As the district court itself noted, MCPS conceded at one point that it was willing to allow Ms. Polk to teach even if she did not "check the box" to affirm that she would follow the Guidelines.  (JA164.)  Indeed, sworn statements of both Ms. Polk and a MCPS representative establish that MCPS did not require Ms. Polk or other teachers to "check the box" in prior years when the Guidelines were in place.  (JA39, 104.)

---

[3] In *Fulton*, Justice Barrett, joined by Justice Kavanaugh, while stating that *Smith* was wrongly decided, stated that she had not yet determined what standard of review would apply if *Smith* were no longer applied.  593 U.S. at 543.  It is obvious from her opinion, though, that it should at least be a standard stricter than rational basis, if not strict scrutiny.

The issue properly framed, then, is whether MCPS has discretion as to whether and how to discipline Ms. Polk if she violated the Guidelines while teaching. MCPS Regulation GEF-RA, "Substitute Teachers" (JA46-53), answers that question in the affirmative. Regulation GEF-RA is replete with unbridled discretion for handling violations of school policies by teachers, using "may" throughout and reviewing cases on an individual basis. (JA48 (misconduct "may" result in "discipline or discharge"; discipline "may include reprimands and warning notices"; "a more serious infraction may warrant termination"), 50-51 (violations of standards "may warrant disciplinary action"), 51-52 (administrator "may determine" that the teacher's conduct warrants clarification rather than discipline).) *Fulton* teaches that such discretionary processes make the *Smith* safe harbor unavailable, whether or not the government exercises its discretion. A "law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" 593 U.S. at 533 (quoting *Smith*, 494 U.S. at 884).

C. *Smith* Does Not Apply Because the
   Guidelines Target Religious Exercise

The "government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 593 U.S. at 533 (*citing Masterpiece Cakeshop Ltd. v. Colo. Civ. Rights Comm'n*, 584 U.S. 617, 636-38 (2018); *Church of Lukumi Babalu Aye, Inc.*

10

*v. Hialeah*, 508 U.S. 520, 533 (1993). The Guidelines fail the neutrality test. It is obvious from the face of the Guidelines and their accompanying intake form (attached in the Addendum to this brief and found at JA73-74) that they target teachers and parents who disagree with the idea that students should be encouraged to exhibit as other than their God-given sex, and it is just as obvious that those teachers and parents holding traditional beliefs about sexuality of the major U.S. religions (Christianity, Judaism, and Islam) are in the forefront of those who disagree.

The Guidelines and its accompanying intake form label parents with contrary religious beliefs as "unsupportive," which results in MCPS and its teachers refusing to inform religious parents that their child is exhibiting as the other sex. (JA66-67, 73.) The Guidelines are no more religion-neutral than would be a facially neutral regulation that forbade meetings of more than 10 people on Sunday mornings or a facially neutral rule that women who wear head coverings will not be employed. *See EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 (2015) (finding religious discrimination despite employer's facially neutral dress code when it refused to hire a woman because she wore a hijab).

It is not sufficient that the purposes stated in the Guidelines themselves do not mention religion, as the district court recognized. (JA171.) The Supreme Court explained in *Lukumi*,

11

Facial neutrality is not determinative. The Free Exercise Clause, like the Establishment Clause, extends beyond facial discrimination. The Clause "forbids subtle departures from neutrality," *Gillette* v. *United States,* 401 U. S. 437, 452 (1971), and "covert suppression of particular religious beliefs," *Bowen* v. *Roy, supra,* [476 U.S. 693] at 703 [(1986)] (opinion of Burger, C. J.). Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality. The Free Exercise Clause protects against governmental hostility which is masked as well as overt. "The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders." *Walz* v. *Tax Comm'n of New York City,* 397 U. S. 664, 696 (1970) (Harlan, J., concurring).

508 U.S. at 534. The district court, however, turned a blind eye to the real focus of

the Guidelines, which is to counter traditional religious belief and punish its

practice by individuals such as Ms. Polk.

In ruling that Ms. Polk did not sufficiently plead lack of neutrality, the

district court erred. (JA173.) She pled that the Guidelines targeted inconsistent

religious beliefs (JA24-25, 40-41), and, on a motion to dismiss, the court must

assume that Ms. Polk could bring forward substantiating evidence. *See Lujan v.*

*Defenders of Wildlife,* 504 U.S. 555, 561 (1992) ("on a motion to dismiss we

'presum[e] that general allegations embrace those specific facts that are necessary

to support the claim.'" (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889

(1990))). Moreover, the *Smith* safe harbor to a state burdening religious exercise is

an affirmative defense that must be raised by the government, not rebutted by the

plaintiff in her opening complaint. *See, e.g.*, *Smith*, 494 U.S. at 875.

* * * * * * *

12

In summary, strict scrutiny is the proper standard of review for the burden MCPS has put on Ms. Polk's free exercise of religion. *Smith* does not require rational basis review in these circumstances. Not only has the Supreme Court effectively abrogated *Smith*, but the parts of the Guidelines that affect Ms. Polk are neither generally applicable nor neutral. In any event, as will be discussed in part III *infra*, MCPS cannot meet even rational basis review here, as its purported interests are not legitimate.

## II. MCPS Violated Ms. Polk's Free Speech Rights, and Strict Scrutiny Applies

The district court acknowledged that, under Supreme Court precedent, it is way too late in the day to claim that MCPS may put whatever conditions it wishes on Ms. Polk's speech when she works as a substitute teacher. (JA180.) *See Perry* v. *Sindermann,* 408 U. S. 593, 597-98 (1972) (holding that the government "may not deny a benefit to a person on the basis that infringes his constitutionally protected interests—especially his interest in freedom of speech") (citing *Shelton* v. *Tucker,* 364 U.S. 479 (1958); *Keyishian* v. *Bd. of Regents,* 385 U.S. 589 (1967)); *see also Connick v. Myers*, 461 U.S. 138, 144 (1983); *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 412-14 (1979). In the Supreme Court's well-known phraseology, teachers do not "shed their constitutional rights to freedom of speech

or expression at the schoolhouse gate." *Tinker v. Des Moines Ind. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969).

But after making that acknowledgement, the district court basically ruled that MCPS just has to put the condition it desires in a written policy and it is free to restrict its teachers' free speech rights. To reach that conclusion, the district court improperly expanded and applied the "government speech" exception of *Garcetti v. Ceballos*, 547 U.S. 410 (2006). The *Pickering* balancing test does not apply in this compelled speech situation, either, but, if it does, it requires exacting scrutiny in favor of Ms. Polk. *See Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).

A. MCPS Compels Speech, an
   Egregious Free Speech Violation

That compelled speech is at the heart of this case is obvious. MCPS, as a condition of employment, requires Ms. Polk to speak its preferred message on transgenderism, including by using pronouns that do not correspond with the child's biological sex and by misleading parents about how their children are being treated in school. The compelled speech doctrine applies to ideological speech such as is involved here. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 797-98 (1988); *Wooley v. Maynard*, 430 U.S. 705, 714 (1977).

In punishing Ms. Polk for refusing to articulate its message, MCPS runs directly counter to the Supreme Court's decisions recognizing that governments

violate the Free Speech Clause when they force someone to support a message with which she disagrees. *Janus v. American Federation of State, County, and Municipal Employees*, 585 U.S. 878, 892 (2018), teaches that doing so inflicts a "demeaning" injury that violates a "cardinal constitutional command"; *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.,* 515 U.S. 557, 573 (1995), that compelling speech runs roughshod over "the fundamental rule of protection under the First Amendment"; *Turner Broadcasting, Inc. v. FCC*, 512 U.S. 622, 641 (1994), that compelling speech undercuts the principle that lies "[a]t the heart of the First Amendment," one that grounds our very "political system and cultural life"; and *Wooley*, 430 U.S. at 715, that the "First Amendment protects the right of individuals to hold a point of view different from the majority and to refuse to foster . . . an idea they find morally objectionable." In *National Institute of Family & Life Advocates v. Becerra*, 585 U.S 755 (2018), the Court found intolerable under the Free Speech Clause a requirement that a pregnancy center post in its waiting room a pro-abortion message with which it disagreed. Justice Kennedy wrote, "Governments must not be allowed to force persons to express a message contrary to their deepest convictions." *Id.* at 780 (Kennedy, J., concurring); *see also Greater Balto. Ctr. for Pregnancy Concerns, Inc. v. Mayor and City Council of Balto.,* 879 F. 3d 101 (4th Cir. 2018). Here, Ms. Polk could

cave to MCPS's requirements "only at the price of evident hypocrisy." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 219 (2013).

To revisit *Janus*, there the objecting employee had to pay prorated dues to the union designated to negotiate exclusively with his employer even though he disagreed with many of the union's public policy positions. 585 U.S. at 887. The employee did not express any speech of his own, but, still, the Court held that forcing him to subsidize messages with which he disapproved violated his free speech rights. The Court warned, "Compelling individuals to mouth support for views they find objectionable" on "controversial public issues" should be "universally condemned." *Id.* at 892; *see also Wooley*, 430 U.S. at 714-15 (striking down a government attempt to make drivers "instrument[s] for fostering . . . an ideological point of view" they find "morally objectionable").

Of course, MCPS in its Guidelines compels its teachers to articulate a *particular* point of view. As such, it also runs afoul of the Free Speech Clause's prohibition of government regulation that is content-based or viewpoint discriminatory. Such regulation is accorded strict scrutiny review. *See 303 Creative, LLC v. Elenis*, 600 U.S. 570, 586 (2023) ("Generally, the government may not compel a person to speak its own preferred messages."); *see generally Reed v. Town of Gilbert,* 576 U. S. 155, 162-63 (2015); *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (ruling that the government may

not regulate speech "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction"). Here, MCPS has adopted a policy to implement "Transgender Vision" ideology by forcing its employees to use non-biological pronouns and to mislead or lie to parents about their children's behavior at school. Obviously, this can only be implemented by favoring the "Transgender Vision" viewpoint to the detriment of the "Traditional Vision" view.

### B. *Garcetti*'s "Government Speech" Exception Does Not Apply Here

The district court sidestepped this controlling law prohibiting compelled speech by holding that the speech MCPS requires is "government speech" and so not subject to the First Amendment under *Garcetti*. *Garcetti* ruled that a government employee—in that case a prosecutor—had no free speech rights when his communication is an exclusive function of his official responsibilities, making it basically governmental, rather than private, speech. 547 U.S. at 420-24. But *Garcetti* does not apply here for multiple reasons.

### 1. *Garcetti* Doesn't Apply Because the Speech MCPS Compels Is Not Its Own, But the Child's

The "official duties" exception of *Garcetti* recognizes that a government employer, like a private one, may express its own message and that it may evaluate the work product it requires of its employees; it "reflects the exercise of employer

control over *what the employer itself* has commissioned or created." *Garcetti*, 547 U.S. at 422 (emphasis added). That is not what MCPS is requiring of Ms. Polk via the Guidelines. MCPS is requiring that Ms. Polk accept and emulate not speech that *MCPS* has "commissioned or created," but the pronoun preferences of MCPS *students* and the *students'* desire to keep what is happening at school secret from their parents. It is not MCPS that is exhibiting as other than its actual sex—which, of course, is an impossibility—but it is some students who do so. And Ms. Polk is being forced to embrace and speak the transgender message of those students. Contrary to the district court's analysis, just because MCPS is requiring conformance to the student's desired speech does not make that speech MCPS's own. (JA189.)

*Garcetti* is "inapposite" unless "the employee's words are really the words of the employer." *Janus*, 585 U.S. at 910. A student's preferred pronouns are no more MCPS's speech than is a student's preferred or given name. *See Ricard v. USD 475 Geary Cnty. KS Sch. Bd.*, 2022 WL 1471372 at *8 (D. Kan., May 9, 2022) (holding that schools may not properly interfere with names and pronouns selected by parents for their minor children). It is the student who initiates and requests the use of a different name, not MCPS.

The district court repeatedly countered that, because MCPS has a written policy, any speech by a teacher on the subject at school is "official" speech, noting

that teachers are "paid to speak" and to interact with students and that she wouldn't be talking to students if she weren't a teacher. (JA183-190.) Of course, this is tautological and ignores the Supreme Court's frequent admonitions that a teacher does not shed her First Amendment rights at the schoolhouse gate. *See Kennedy*, 597 U.S. at 527; *Tinker*, 393 U.S. at 506. It also turns a blind eye to the Supreme Court's admonition in *Garcetti* that government employers not be allowed to "restrict employees' rights by creating excessively broad job descriptions." 547 U.S. at 424-25.

As to the speech taking place on school grounds, that is no more dispositive for Ms. Polk than it was for Coach Kennedy, who was a "role model" and "on duty" when he prayed on the school field after a game. That did not allow the school district to punish him for doing so. *Kennedy*, 597 U.S. at 530 (noting that it is not "dispositive" that speech "took place 'within the office' environment'"). The key in *Kennedy* was that he was not "seeking to convey a government-created message" and his prayers did not "ow[e their] existence" to his responsibilities as a public employee. *Id.* at 529-30 (quoting *Garcetti,* 547 U.S. at 421). The same is true for Ms. Polk. Using pronouns that accord with a student's actual sex is not seeking to convey an MCPS-created message (if anything, the opposite), and her position on these matters does not owe its existence to her serving as a teacher.

2. *Garcetti* Doesn't Apply Because Ms. Polk
Refuses to Recite the Speech Demanded of Her

The fact that Ms. Polk refuses to mouth the speech compelled of her by

MCPS similarly removes this case from the ambit of *Garcetti*. For example, in

*Wooley*, the driver taped over the government's message of "Live Free or Die" on

his state-issued license plate. The Supreme Court applied the Free Speech Clause

with strict scrutiny and held that the state improperly punished the driver for his

refusal to transmit a message that violated his moral and religious beliefs. 430

U.S. at 714-17; *see also Walker v. Sons of Confederate Vets*, 576 U.S. 200 (2015)

(holding that message on a state-issued license plate was government speech).

Other courts have applied this principle in the school teacher setting. The

Virginia Supreme Court, applying federal law in a case in which the school district

fired its teacher because he wouldn't use wrong-sex pronouns for his students, held

that "*Garcetti* applied the official-duties doctrine to 'expressions employees *make*

pursuant to their professional duties,' [547 U.S.] at 426 (emphasis added), not

expressions employees *refuse to make*." *Vlaming v. West Point Sch. Dist.*, 895

S.E.2d 705, 740 (Va. 2023) (emphasis in original). A district court in a similar

teacher case held the same: "by its plain language, *Garcetti* only applies to

situations where public employees '*make statements*.' *Garcetti*, 547 U.S. at 421

(emphasis added). That is, 'the employee must have *spoken*' for *Garcetti* to apply."

*Geraghty v. Jackson Local Sch. Dist.*, 2024 WL 3758499 at *11 (N.D. Ohio, Aug.

12, 2024) (quoting *Myers v. Centerville*, 41 F.4th 746, 760 (6th Cir. 2022) (emphasis added)).  And yet another district court has found that requiring teachers to use wrong-sex pronouns or suffer adverse consequences is unconstitutional: "Put simply, the First Amendment does not permit the government to chill speech or compel affirmance of a belief with which the speaker disagrees in this manner." *Tenn. v. Cardona*, 2025 WL 63795 at *4 (E.D. Ky., Jan. 9, 2025).  This Court should follow suit.

### 3. *Garcetti* Doesn't Apply Because the Speech It Compels Is <u>Not Part of a Teacher's Curricular or Administrative Duties</u>

The district court properly held, as have other courts, that this case does not involve curricular speech.  (JA183.)  A child's name and pronouns are not curricular matters, and forcing teachers to keep things secret from parents certainly is not.  *See Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th 622, 645 (4th Cir. 2023) (Niemeyer, J., dissenting).  Ms. Polk, by referring to the student only by name and declining to use any pronouns, would not impede her teaching of the curriculum assigned to her.  Nor would such a practice interfere with the regular operation of the school generally.  The *Geraghty* court applied this same rule in a middle school context.  It repelled the school district's justification that mirrors that of MCPS, i.e., that its pronoun rule was to "create a safe, secure, and welcoming learning environment," holding that preferred pronoun usage was not part of the teacher's official duties.  2024 WL 3758499 at *13.

Once again, the district court relies on the facts that Ms. Polk would be working as a teacher in school and MCPS put in a written policy that she must use nonbiological pronouns, allegedly making it part of her "official duties." (JA183.) As just recounted above, the Supreme Court has repeatedly rejected this precise argument. *See Kennedy*, 597 U.S. at 530; *Garcetti*, 547 U.S. at 424. And other courts have rejected the district court's reasoning in exactly this context:

> "[W]here the State's interest is to disseminate an ideology, no matter how acceptable to some, such interest cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message." *Wooley*, 430 U.S. at 717. The School Board cannot avoid this constitutional prohibition by simply declaring it Vlaming's "official duty" to courier the School Board's ideological view of gender identity.

*Vlaming,* 895 S.E.2d at 742. That's exactly what's happening here. MCPS is taking a position on a highly contentious matter that is roiling our country, to the extent of making sure its position on the issue gets enforced even when its teachers and parents think that doing so is against the children's best interests.

Of course, changing the descriptor from "curricular" to "administrative" does not change the result. That is clear from *West Virginia Board of Education v. Barnette*, 319 U.S. 624 (1943), in which state law required teachers to perform the administrative task of leading students in the pledge of allegiance but the Supreme Court struck it down as compelled speech. As the Sixth Circuit held in *Meriwether v. Hartop*, 992 F.3d 492, 507 (6th Cir. 2021), pronoun usage is "not a matter of

classroom management," but of "academic freedom." Again, as summarized in

*Vlaming*:

> Notions of "the need for orderly school administration," *Pickering*, 391 U.S. at 569, . . . play no role as a counterbalance to a teacher's right not to be compelled to give a verbal salute to an ideological view that violates his conscience and has nothing to do with the specific curricular topic being taught.

895 S.E.2d at 740.

#### 4. *Garcetti* Doesn't Apply Because the Speech It Compels Is for an Illegitimate Purpose

*Garcetti*'s government speech exception is inapplicable here for yet another

reason. The Supreme Court in *Janus* conditioned any right the government has to

compel employee speech on it being a "lawful message," 585 U.S. at 908, and the

Court in *Garcetti* also indicated that any compelled government message must not

be "unlawful or otherwise inappropriate." 547 U.S. at 426.

It is not lawful or appropriate for MCPS to require teachers to conspire to

hide information from parents, who have the constitutional right to such

information and the primary responsibility for the care, nurture, naming, and

education of their children. As another district court stated when considering this

issue in a preliminary injunction context, teachers have a "freedom of speech claim

if the policy compels them to violate the law or deliberately convey an illegal

message," and when a school policy demands that "teachers communicate

misrepresentations to parents about the names and pronouns adopted by their students . . ., that would likely be unlawful and in derogation of the constitutional rights of parents." *Mirabelli v. Olsen*, 691 F. Supp. 3d 1197, 1215 (S.D. Cal. 2023). The *Mirabelli* court held the same when denying the school's motion to dismiss:  "While the government may hire teachers to deliver prescribed curricular speech, it may not compel its employees to do so in a way that intentionally abridges parental constitutional rights or in a manner that is unlawful." *Id.*, 2025 WL 42507 at *9 (S.D. Cal., Jan. 7, 2025).

The district court cannot dodge this issue by claiming this is a "novel" argument (it is not; parental rights predate the Constitution) and that, "[i]f the Guidelines violate parents' substantive due process rights, the Board is responsible, not Polk" (but the Board is using Polk to accomplish its purpose).  (JA190-191.) Nor is Ms. Polk trying to "extend the reach of the First Amendment."  (JA191.) She is noting a limitation on the government speech exception to free speech doctrine.  And there is nothing "novel" about the constitutional right of parents to be principally responsible for their child's care and upbringing.  Indeed, "the interest of parents in the care, custody, and control of their children [ ] is perhaps the oldest of the fundamental liberty interests recognized" by the Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2002).

For a government to subvert parental rights and responsibilities is neither a lawful nor appropriate purpose. As will be discussed further in section III *infra*, what is novel is school districts like MCPS working actively to supplant parental rights. *See Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 529 (2007) ("it is not a novel proposition to say that parents have a recognized legal interest in the education and upbringing of their child"); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Parham v. J. R.,* 442 U.S. 584, 604 (1979). Moreover, two recent executive orders, referenced below, identify K-12 schools like MCPS that require teachers to use mismatched sexual pronouns and to hide matters occurring at school from parents to be acting in contravention of federal constitutional and statutory law.[4] *Garcetti* does not allow such action, either.

5. *Garcetti* Doesn't Apply Because the Speech It Compels Is in an Academic Setting

In *Garcetti*, the Supreme Court expressly refrained from considering the situation of teachers, which, as Justice Souter pointed out in his opinion, implicates

---

[4] *See* EO 14168, "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (Jan. 20, 2025), found at https://www.whitehouse.gov/presidential-actions/2025/01/defending-women-from-gender-ideology-extremism-and-restoring-biological-truth-to-the-federal-government/; EO 14190, "Ending Radical Indoctrination in K-12 Schooling" (Jan. 29, 2025), found at https://www.whitehouse.gov/presidential-actions/2025/01/ending-radical-indoctrination-in-k-12-schooling/.

broader constitutional concerns of academic freedom and a reality that teachers are often expected to voice their own views in class, even while serving as government employees. *Id.* at 425; *id.* at 438-39 (Souter, J., dissenting). This Court has held that *Garcetti*'s "official duties" rule does *not* apply to public school teachers at the university level, *see Adams v. Trustees of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 563 (4th Cir. 2011), but it has never ruled whether it does at the elementary school level.

Whatever may be the pros and cons of applying *Garcetti* in the normal elementary school situation—and the district court ruled in favor of application (JA181-184)—it pushes *Garcetti* yet another, improper step to apply it in a *compelled* speech setting, which the district court neglected to consider. Compelled speech of this type, when the teacher is not the initiator of the compelled speech but is being forced to mouth the message of another, does not involve any of the type of considerations found relevant in cases like *Garcetti* and *Connick,* in which the employees actively criticized their employers with speech they generated themselves. Thus, *Garcetti's* "official duties" exception does not apply here for this additional reason.

### C. *Pickering* Balancing Does Not Excuse the
### Violation of Ms. Polk's Free Speech Rights

In these circumstances, neither *Garcetti* nor *Pickering* apply, and so MCPS

must justify its regulation of Ms. Polk's free speech under strict scrutiny. But even

were *Pickering* balancing to be applied, it would have to be adjusted to weigh

much more heavily in Ms. Polk's favor than normal.

### 1. *Pickering* Doesn't Apply But, If It
### Does, It Demands Heightened Scrutiny

Many cases deciding whether a government employer may restrict or punish

an employee's speech are resolved by application of the balancing test the Supreme

Court set out in *Pickering*. The Court there held that a public employee's interest

in exercising her freedom of speech must be weighed against the government's

need to "promot[e] the efficiency of the public services it performs through its

employees." 391 U.S. at 568. The *Pickering* test is inapplicable here, however.

In *Janus*, the Supreme Court cast serious doubt on whether the *Pickering* test

applied in that case for two reasons, both of which are relevant here. First, the

Court noted that *Pickering* is designed to deal with a particular employee's speech;

it is ill suited to a "blanket requirement" that all employees support "speech with

which they may not agree":

> While we have sometimes looked to *Pickering* in considering general rules
> that affect broad categories of employees, we have acknowledged that the
> standard *Pickering* analysis requires modification in that situation. A
> speech-restrictive law with "widespread impact," we have said, "gives rise

to far more serious concerns than could any single supervisory decision." Therefore, when such a law is at issue, the government must shoulder a correspondingly "heav[ier]" burden and is entitled to considerably less deference in its assessment that a predicted harm justifies a particular impingement on First Amendment rights. The end product of those adjustments is a test that more closely resembles exacting scrutiny than the traditional *Pickering* analysis.

585 U.S. at 907 (citing and quoting *United States v. Treas. Employees,* 513 U.S. 454, 466-68 & n.11, 475-76 n.21, 482-83 (O'Connor, J., concurring) (1995)).

Those parts of the Guidelines to which Ms. Polk objects are general rules that apply to all teachers. Thus, the standard *Pickering* analysis does not apply for that reason. *Id.*

Second, the Supreme Court in *Janus* held that "the *Pickering* framework fits much less well" when the government compels speech:

When a public employer does not simply restrict potentially disruptive speech but commands that its employees mouth a message on its own behalf, the calculus is very different. . . . [I]t is not easy to imagine a situation in which a public employer has a legitimate need to demand that its employees recite words with which they disagree. And we have never applied *Pickering* in such a case.

. . . . If *Pickering* applies at all to compelled speech—a question that we do not decide—it would certainly require adjustment in that context.

*Id.* at 2473 (citing *Garcetti*, 547 U.S. at 421-22, 425-26).

Notably, Ms. Polk objects to deceiving parents about how their children are treated at school, which is not a "lawful," but an unlawful, purpose. MCPS enlists teachers to conspire with it via compelled speech to deprive parents of their

constitutional rights.  In these circumstances, *Pickering* balancing is inappropriate and, at a minimum, must be adjusted heavily in Ms. Polk's favor.

### 2.  This Case Involves More Than a "Private Concern"

The district court in a footnote contends that MCPS does not have to carry even the burden of *Pickering* balancing because Ms. Polk's speech is not on a matter of public interest, but only of private concern.  (JA192.)  It bases this argument on the fact that, to apply the policy, Ms. Polk would have to interface with specific students in the classroom and their parents.  In the first place, this argument fails because we are dealing here with compelled speech, not Ms. Polk's own speech.  But the argument would fail even if the speech were initiated by Ms. Polk.

The district court's reasoning tracks that of Justice Kagan in *Harris v. Quinn*, 573 U.S. 616 (2014), and in *Janus*, where she argued that the challenged policies were of no public concern because their application was in and about the workplace.  *Id.* at 675-76 (Kagan, J., dissenting); *Janus*, 585 U.S. at 945-47 (Kagan, J., dissenting).  The obvious problem for the district court is that Justice Kagan was writing in dissent, and the majority in both cases rejected her cramped view of what matters were of public concern for purposes of *Pickering*.  *Harris*, 573 U.S. at 652-55; *Janus*, 585 U.S. at 910-14.  Speech is "of public concern when it can be fairly considered as relating to any matter of political, social, or other

concern to the community, or when it is a subject of legitimate news interest." *Lane v. Franks,* 573 U.S. 228, 241 (2014) (internal quotation marks and citation omitted); *accord Connick*, 461 U.S. at 146. Thus, in *Janus* the Supreme Court considered an employee's objection to his having to pay for the speech of others. The Court did not treat this, as Justice Kagan urged, as something related solely to him and his workplace and, thus, on a topic of only private concern. Instead, the *Janus* majority viewed his objection in the context of the state's budget problems, in that the challenged policy involved many others and, thus, was of "substantial public concern." 585 U.S. at 911-14. Similarly, in *Kennedy* the parties conceded that the school district prohibiting the coach's private prayer at midfield while he was on duty at his workplace was a matter that not only concerned him individually, but also was a matter of public concern. 597 U.S. at 528.

Applied here, the genesis of Ms. Polk's objection is not a situation unique to her, but one that applies wholesale to MCPS teachers as a matter of policy. The topic involved is the advisability (or even possibility) of minors transitioning genders, and that topic is certainly one of broad public concern, as the Supreme Court noted in *Janus.* There, it described gender identity as a "controversial" and "sensitive" topic of "profound 'value and concern to the public.'" 585 U.S. at 913-14 (quoting *Snyder v Phelps*, 562 U.S. 443, 453 (2011)). Indeed, the Supreme Court has just heard a case involving Tennessee's statute that prohibits

pharmaceutical or surgical transitioning of minors—one of over 20 such state laws relying on recent studies that show the inadvisability of facilitating minors to transition genders. *See United States v. Skrmetti*, No. 23-477 (Sp. Ct., argued Dec. 4, 2024).

That MCPS's system-wide policy compels the speech partly in a classroom and, as applied, involves particular students and their parents does not somehow make the government regulation of that speech a strictly private concern. "Pronouns can and do convey a powerful message implicating a sensitive topic of public concern." *Meriwether*, 992 F.3d at 508. Ms. Polk's objection to using inaccurate pronouns and hiding information from parents "transcend[s] personal interest or opinion" and relates to "our social and/or political lives." *Id.* (describing that as the "linchpin" of the public concern issue). If Coach Kennedy's personal prayers at midfield after a game raised matters of public concern, Ms. Polk's compelled conformance with the Guidelines certainly does.

* * * * * * *

In summary, *Garcetti*'s "government speech" exception doesn't apply to excuse MCPS's compelling Ms. Polk to speak *its students'* desired messages over her objection, and *Pickering* balancing should not be applied, either. Ms. Polk's free speech rights may not be restricted unless strict scrutiny is satisfied. Government

regulations "that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny" as those "that suppress, disadvantage, or impose differential burdens upon speech because of its content" and are presumptively invalid. *Turner Broad.*, 512 U.S. at 642. Thus, MCPS has to justify its compelled speech requirement by showing a compelling governmental interest advanced in the least restrictive manner possible. *See Reed*, 576 U.S. at 163 (applying strict scrutiny to content restriction). Obviously, the very fact that religious accommodations are not only possible but mandated under Title VII shows that MCPS has not acted in a tailored or least restrictive manner here. At a minimum, MCPS must satisfy exacting scrutiny, as set out in *Janus* for situations such as this.

III. MCPS Has No Legitimate Interest in Violating Ms. Polk's Free
     Exercise and Free Speech Rights, Much Less a Compelling Interest

The district court improperly applied a rational basis test, but none of the interests it identified are sufficient to force teachers to use pronouns that do not correspond to a student's sex or to hide information from parents about how the school is treating their children. Moreover, even if those interests were legitimate, the preliminary injunction that Ms. Polk requested fully satisfies them.

The district court listed the three purposes of the Guidelines advanced by MCPS: (1) protecting students from their parents; (2) preventing discrimination

against students exhibiting as transgender at school, which allegedly is required by Title IX, 20 U.S.C. §§ 1681-88; and (3) hiring teachers who will "nurture" all students equally.  (JA178-179.)  None of these alleged purposes suffice in Ms. Polk's circumstances.

The asserted interests all fail at the outset because state interests must not be defined overly broadly, for fear that they will unduly sweep all before it with vague generalities about what are concededly important interests in the abstract.  The Supreme Court explained in *Burwell v. Hobby Lobby Stores, Inc.,* 573 U.S. 682 (2014), when applying RFRA's strict scrutiny requirement, that defining interests in "very broad terms, such as promoting 'public health' and 'gender equality'" is inadequate and that the focus must be how the interests would be affected by accommodating the particular persons involved.  *Id.* at 726 (citing and quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,* 546 U.S. 418, 430-31 (2006)).  More recently, the Supreme Court in *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 600 U.S. 181 (2023), rejected a university's proffered interests in "better educating its students through diversity" and "producing new knowledge stemming from diverse outlooks" as too amorphous to be afforded any weight.  *Id*. at 214.  The same holds true here for MCPS's resort to "safety" and "discrimination."  Ms. Polk brings an as-applied challenge, not a facial challenge to the Guidelines as a whole, and the interests

MCPS alleges to allow the burdening of her free exercise must match her situation.

They do not.

   A. MCPS Has No Legitimate Interest Here in Restricting
      Pronoun Usage, in Part Because Ms. Polk Will Not Use Them

The interest identified as sustaining the pronoun prong of the policy is to

prevent discrimination against transgender students outlawed by Title IX.  In the

first place, Ms. Polk has agreed *not* to use pronouns with students, but only names,

including preferred names.  (JA41.)  That satisfies any interest MCPS may have.

Indeed, the Sixth Circuit described such a solution as a "win-win," as the teacher

would not have to violate his principles and the policy would not be violated.

*Meriwether*, 992 F.3d at 510-11.  Such a solution cannot possibly be construed as

discriminatory, and it certainly does not violate Title IX.[5]  *Id.*

---

[5] The district court cited *Grimm v. Gloucester County School Board*, 972 F.3d 586,
619 (4th Cir. 2020), for the proposition that Title IX prohibits discrimination
against transgender students at school.  That case dealt only with use of bathroom
and locker room facilities, and the basic rationale of that decision, which equated
Title IX with the Equal Protection Clause and held that transgenderism is a quasi-
suspect class deserving of heightened scrutiny, is currently under consideration by
the Supreme Court in *United States v. Skrmetti*, No. 23-477 (Sp. Ct., argued Dec. 4,
2024).  The Biden Administration published regulations that interpreted "sex" in
Title IX to encompass "gender identity," but that attempt was enjoined by multiple
district courts, *e.g.*, *Carroll Ind. Sch. Dist. v. U.S. Dep't of Educ.*, No. 4:24-cv-461-
0, slip op. at 5 & n.14 (N.D. Tex., Feb. 19, 2025) (collecting cases); *Tenn. v.
Cardona*, 2025 WL 63795 (E.D. Ky., Jan. 9, 2025), *amended* (Jan. 10, 2025), and
the Trump Administration has announced its rejection of that interpretation.  *See*
EO 14168, "Defending Women from Gender Ideology Extremism and Restoring

To the extent that "nurturing" students equally and avoiding
"discrimination" are being used as code words for suggesting that students
exhibiting as transgender should not be exposed to what they regard as
objectionable speech, the Supreme Court has made clear repeatedly that the First
Amendment protects from exactly such regulation.  *See, e.g.*, *Masterpiece
Cakeshop, Ltd. v. Colo. Civ. Rights Comm'n*, 584 U.S. 617, 638 (2018) ("[I]t is not
. . . the role of the State or its officials to prescribe what shall be offensive.");
*Matal v. Tam*, 582 U.S. 218. 244 (2017) (citing cases);  *Snyder,* 562 U.S. at 448–49,
460-61; *Tex. v. Johnson*, 491 U.S. 397, 414 (1989); *Nat'l Socialist Party of Am. v.
Village of Skokie*, 432 U.S. 43 (1977).  MCPS's pronoun policy cannot be saved by
rephrasing the interest as an anodyne support for youth who have transgender
desires, as that is simply a repackaging of the desire to shield them from speech
they find offensive.  If they are old enough to make a decision in this regard, they
are old enough to hear, at least by implication, that not everyone agrees that a
person exhibiting as other than their actual sex is wise.  *See Kennedy*, 597 U.S. at
541 (referring to our "long constitutional tradition under which learning how to

---

Biological Truth to the Federal Government" (Jan. 20, 2025), found at
https://www.whitehouse.gov/presidential-actions/2025/01/defending
-women-from-gender-ideology-extremism-and-restoring-biological-truth-to-the-
federal-government/.

tolerate diverse expressive activities has always been 'part of learning how to live in a pluralistic society'" (quoting *Lee v. Weisman*, 505 U.S. 577, 590 (1992))).

Here, the interest involved is not a generalized nurturing of students who may wish to exhibit as transgender.  Instead, it is whether there is a state interest in forcing a teacher to use pronouns that mismatch the student's sex when the teacher, like Ms. Polk, is willing to use no pronouns at all, i.e., to be neutral on the topic. (JA152.)  Obviously, any such purported interest is nonexistent in Ms. Polk's circumstances.

### B. MCPS Has No Legitimate Interest in Having Ms. Polk Hide Information from Parents About Their Children

With respect to hiding information from parents, that policy runs headlong into the rights of parents to control their minor children's decisions about matters such as this.  A different district court expressed amazement over a similar policy: "It is difficult to envision why a school would even claim—much less how a school could establish—a generalized interest in withholding or concealing from the parents of minor children[] information fundamental to a child's identity, personhood, and mental and emotional well-being such as their preferred name and pronouns."  *See Ricard*, 2022 WL 1471372 at *8 (footnote omitted).

Whether a child should socially transition as transgender is a difficult and critically important decision that will have repercussions for the rest of the child's

life.  It is well established that *parents* get to make such decisions for their minor children.  As the Supreme Court explained in *Parham,* children lack the "maturity, experience, and capacity for judgment required for making life's difficult decisions."  442 U.S. at 602.  And in *Troxel,* the Court repeated that parents have a "fundamental right to make decisions concerning the care" of their minor children.  530 U.S. at 72.

It naturally follows from this principle that the perceived interest of child safety does not, as a matter of law, trump the parents' right to make decisions for the child.  The Supreme Court elucidated in *Parham* that  even if the decision of the parents "is not agreeable to a child or . . . involves risks . . . does not diminish the parents' authority to decide what is best for the child" or "automatically transfer the power to make that decision from the parents to some agency or officer of the state."  442 U.S. at 603-04.  MCPS's purported "interests" are illegitimate because they are simply attempted justifications for wanting to displace parents as the ones primarily responsible for the care and nurturing of the parents' children.  But it is parents, not schools, whom the law assumes act in their child's best interests.  *Id.* at 602; *see also Troxel*, 530 U.S. at 68-69.

At its base, the "interests" asserted by MCPS are nothing more than a statement that the school might not agree with what the parents decide for their children.  Thus, this situation is directly analogous to a governmental entity

restricting speech because it does not like the substance of what is being said. That, of course, is not a legitimate interest, but a repudiation of a fundamental right. *See Matal,* 582 U.S. at 244 (plurality op.). Similarly, a school may not subvert parental rights merely because the school prognosticates that it may disagree with how parents will exercise their fundamental rights with their minor children. Paraphrasing *Hurley*, a public school "is not free to interfere with [parental rights] for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government." 515 U.S. at 579. Indeed, Justice Thomas in his *Troxel* concurrence noted that second-guessing a fit parent's decision about socialization of her child is not a legitimate governmental interest. 530 U.S. at 80.

The district court in *Ricard* applied this teaching in the context of a school policy very similar to that here:

> Presumably, the [school] District may be concerned that some parents are unsupportive of their child's desire to be referred to by a name other than their legal name. Or the District may be concerned that some parents will be unsupportive, if not contest, the use of pronouns for their child that the parent views as discordant with a child's biological sex. But this merely proves the point that the District's claimed interest is an impermissible one because it is intended to interfere with the parents' exercise of a constitutional right to raise their children as they see fit. And whether the District likes it or not, that constitutional right includes the right of a parent to have an opinion and to have a say in what a minor child is called and by what pronouns they are referred.

2022 WL 1471372 at *8 (footnote omitted).  The district court in *Mirabelli* held the

same:

> The only meaningful justification the District offers for its insistence that the
> plaintiffs not reveal to parents gender information about their own children
> rests on a mistaken view that the District bears a duty to place a child's right
> to privacy above, and in derogation of, the rights of a child's parents.  The
> Constitution neither mandates nor tolerates that kind of discrimination.  The
> plaintiffs have demonstrated a strong likelihood of success on the merits for
> their free exercise claim against [the school district].

691 F. Supp. 3d at 1218.  The district court in *Willey v. Sweetwater County School*

*District*, 680 F. Supp. 3d 1250, 1279-80 (D. Wyo. 2023), also found no rational

basis for a school official to require a teacher to hide information about their

children from parents:

> Fundamentally, such an approach makes no sense. Simply by refusing or
> being unable to respond to the minor parent's inquiry, a school district
> employee effectively answers the parent's question, unless they blatantly lie
> to the parent. Where there is no reasonable concern for the minor child's
> safety there is no rational—let alone compelling reason—to prevent a school
> district employee from honestly responding to a parent's inquiry.
>
> Moreover, . . . by failing to provide complete and accurate information it
> would interfere with parent's liberty of directing the upbringing and
> education of minor children under their control . . . .

Circuit courts in related contexts have also applied the principle that the state

may not preempt parental rights due to perceived countervailing interests of the

child.  The Fifth Circuit noted that it "has never held that a person has a

constitutionally-protected privacy interest in her sexual orientation, and it certainly

has never suggested that such a privacy interest precludes school authorities from

discussing with parents matters that relate to the interests of their children." *Wyatt v. Fletcher*, 718 F.3d 496, 505 (5th Cir. 2013). The same applies to gender identity. Similarly, the Seventh Circuit found a violation of parents' rights when state actors "not only failed to presume that the plaintiff parents would act in the best interest of their children, they assumed the exact opposite." *Doe v. Heck,* 327 F.3d 492, 521 (7th Cir. 2003). And the Third Circuit underscored that "a state has no interest in protecting children from their parents unless it has some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Croft v. Westmoreland Cnty. Children and Youth Servs.*, 103 F.3d 1123, 1126 (3d Cir. 1997); *accord Brokaw v. Mercer Cnty.,* 235 F.3d 1000, 1019 (7th Cir. 2000). Simply put, absent "'some definite and articulable evidence'" of a child being abused, "neither the state nor its officials have any interest whatsoever 'in protecting children from their parents,' and no further inquiry (i.e., balancing of interests) is necessary." *Heck,* 327 F.3d at 521 (citing *Brokaw,* 235 F.3d at 1019; *Croft,* 103 F.3d at 1126).

The policy requiring teachers to deceive parents about their children is not based on "definite and articulable evidence" that the parents involved are unfit. It is based on a desire to override parental responsibilities. That does not state a

legitimate state interest, and papering over MCPS's true purpose with nice-sounding generalities does not suffice to make it legitimate.[6]

Finally, the district court once again erred by not taking into consideration that the specific preliminary injunction requested by Ms. Polk eliminates any potential conflict. She suggests an accommodation that would avoid any substantial interaction with transgender students and the need to apply the offending policies. MCPS per the Guidelines knows the identity of transitioning students, preparing a "gender support plan" with the intake form (JA66, 73-74, 150-151, 155), and there are multiple classrooms where Ms. Polk could substitute without them being in attendance. (JA150-151, 155, 157.)

All these considerations show that MCPS cannot meet even a rational basis test, much less the strict scrutiny that properly applies. The district court erred in

---

[6] The First Circuit in *Foote v. Ludlow School Committee*, 2025 WL 520578 (1st Cir., Feb. 18, 2025), is the first appellate court to rule that a policy similar to MCPS's gender policy does not violate parental rights. This ruling is not only contrary to the district court decisions cited above, but also to the opinion of Judge Niemeyer in *Parents 1*, 78 F.4th 622, 644-47 (4th Cir. 2024) (Niemeyer, J., dissenting), in which the majority dismissed the parental challenge on standing grounds, while labeling the parental preclusion provisions of MCPS's Guidelines "shocking," *id.* at 641, and the arguments parents made against it as "compelling." *Id.* at 636. Three justices of the Wisconsin Supreme Court in *Doe 1 v. Madison Metropolitan School District*, 2022 WI 65, 976 N.W.2d 584 (2022), also found a similar school policy violated parents' constitutional rights, *id.* at 599 (Roggensack, J., dissenting), while the majority avoided addressing the merits on procedural grounds.

denying a preliminary injunction when she showed a likelihood of success on her free exercise claim.

C. Any *Pickering* Balance Favors Ms. Polk

Finally, even if some form of the *Pickering* balancing test were applied to MCPS's violation of Ms. Polk's free speech rights, she would prevail. As discussed above, any such balancing test would have to be significantly adjusted in favor of the employee to require the equivalent of exacting scrutiny. *See Janus*, 585 U.S. at 907-08.

*Pickering* itself noted that a school will not likely carry its burden when the teacher's speech has not "in any way either impeded the teacher's proper performance of his daily duties in the classroom or . . . interfered with the regular operation of the schools generally." 391 U.S. at 572-73. Such is the case here. The balance tips even more in Ms. Polk's favor because this case involves a broad rule restricting speech and compels ideological speech. *See Janus*, 585 U.S. at 907-08. *Pickering* balancing, especially in this context, strongly favors Ms. Polk.

<u>Conclusion</u>

Ms. Polk is likely to prevail on the merits on her free exercise and free speech claims, and the injunctive relief she requests is not only in the public interest but tailored to avoid any harm to MCPS and students while preventing irreparable injury to her. This Court should grant the preliminary injunction.[7]

Respectfully submitted,
this 26th day of March, 2025

/s/ Frederick W. Claybrook, Jr.
Frederick W. Claybrook, Jr.
  (Counsel of Record)
Claybrook LLC
655 15th St., NW, Ste. 425
Washington, D.C. 20005
(301) 622-0360
Rick@claybrooklaw.com

---

[7] The district court dismissed all the individual parties after ruling in favor of MCPS in dismissing the constitutional counts brought under 42 U.S.C. § 1983 because Title VII claims are brought against the employer. (JA196-197) That ruling will automatically fall with the reversal of the district court with respect to those counts. The district court also dismissed Montgomery County Public Schools as a defendant because it is controlled by the defendant Montgomery County Board of Education, which may sue and be sued. (JA167.) However, under Title VII the proper defendant is the employer, and all available evidence provided to date specifies that MCPS, not MCBE, was Ms. Polk's employer. She preserves her right to raise this issue on appeal at a later date, as it is not related to the denial of her preliminary injunction that is the subject matter of this appeal.

Steven W. Fitschen
James A. Davids
National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 650-9210
sfitschen@nationallegalfoundation.org

Robert Flores*
Gammon & Grange, P.C.
1945 Old Gallows Rd., Ste. 650
Vienna, Va. 22181
jrf@gg-law.com

Attorneys for Appellant

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitations of F.R.A.P. 32(a)7(B)(i) and F.R.A.P. 29(a)(5). Exclusive of the exempted portions, this brief contains 10, 572 words, including footnotes, in 14-point Times New Roman font. This total was calculated with the Word Count function of Microsoft Office Word 365.

s/ Steven W. Fitschen
Steven W. Fitschen
The National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 650-9210
sfitschen@nationallegalfoundation.org

## CERTIFICATE OF SERVICE

I hereby certify that on March 26, 2025, I served the foregoing Brief

of the Appellant on all counsel through the CM/ECF system. I certify that all

participants in the case are registered CM/ECF users and that service on those

participants will be accomplished by the CM/ECF system.


s/ Steven W. Fitschen
Steven W. Fitschen
The National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 650-9210
sfitschen@nationallegalfoundation.org

# ADDENDUM

Montgomery County, Maryland, Public Schools'
Guidelines for Student Gender Identity
and
Intake Form

2023
**2024**

Student

# GENDER
# IDENTITY

in Montgomery County Public Schools
www.montgomeryschoolsmd.org

Maryland's Largest School District
**MONTGOMERY COUNTY PUBLIC SCHOOLS**
*Expanding Opportunity and Unleashing Potential*












## VISION

*We inspire learning by providing the greatest public education to each and every student.*

## MISSION

*Every student will have the academic, creative problem solving, and social emotional skills to be successful in college and career.*

## CORE PURPOSE

*Prepare all students to thrive in their future.*

## CORE VALUES

*Learning*
*Relationships*
*Respect*
*Excellence*
*Equity*

### Board of Education

Ms. Karla Silvestre
*President*

Mrs. Shebra L. Evans
*Vice President*

Ms. Lynne Harris

Ms. Grace Rivera-Oven

Mrs. Rebecca K. Smondrowski

Ms. Brenda Wolff

Ms. Julie Yang

Mr. Sami Saeed
*Student Member*

### Montgomery County Public Schools (MCPS) Administration

Monifa B. McKnight, Ed.D.
*Superintendent of Schools*

Mr. M. Brian Hull
*Chief Operating Officer*

Patrick K. Murphy, Ed.D.
*Deputy Superintendent*

Mr. Brian S. Stockton
*Chief of Staff*

Mrs. Stephanie P. Williams
*General Counsel*

Ms. Elba M. Garcia
*Senior Community Advisor*

Dr. Patricia E. Kapunan
*School System Medical Officer*

850 Hungerford Drive
Rockville, Maryland 20850
www.montgomeryschoolsmd.org

# 2023–2024

Student

# GENDER IDENTITY

in Montgomery County Public Schools
www.montgomeryschoolsmd.org

These *Guidelines for Student Gender Identity in Montgomery County Public Schools* are available in English, Spanish, French, Chinese, Korean, Vietnamese, Amharic, and Portuguese on the MCPS web at *www.montgomeryschoolsmd.org/students/rights/*

Guidelines for Student Gender Identity (English)
Normas sobre la Identidad de Género del Estudiante (Spanish)
學生性別認定指引 (Chinese)
Lignes directrices en matière d'identité de genre chez les élèves (French)
학생의 성 정체성에 관한 지침서 (Korean)
Hướng dẫn về Nhận dạng Giới tính của Học sinh (Vietnamese)
የተማሪ ጾታ ማንነት መመሪያዎች (Amharic)
Diretrizes sobre a Identidade de Gênero do Aluno (Portuguese)

Maryland's Largest School District

## MONTGOMERY COUNTY PUBLIC SCHOOLS

© September 2023
Montgomery County Public Schools
Rockville, Maryland

Maryland's Largest School District

# MONTGOMERY COUNTY PUBLIC SCHOOLS
*Expanding Opportunity and Unleashing Potential*

**OFFICE OF THE SUPERINTENDENT OF SCHOOLS**

September 2023

Dear Students, Parents/Guardians, and Colleagues,

At Montgomery County Public Schools (MCPS), our commitment to students is rooted in a culture of respect and equity. We celebrate the rich diversity of our community and ensure that every student has the opportunity to thrive and succeed. This commitment is firmly embedded in Montgomery County Board of Education Policy ACA, *Nondiscrimination, Equity, and Cultural Proficiency*, which reinforces our long-standing dedication to fostering an inclusive, accepting, and equitable environment for all. We recognize the importance of providing a safe and supportive space for our LGBTQ+ students, free from discrimination, bullying, and harassment. We believe that students should be able to express their gender identity authentically and without fear, and they should expect to learn in an environment that reflects and respects their unique identity and life experiences. As a school district, we are committed to recognizing and respecting matters of gender identity, making reasonable accommodations in response to student requests, and ensuring the privacy and confidentiality of every student.

To consolidate and clarify the various Board policies, MCPS regulations, and procedures that address this crucial topic, we have developed this comprehensive guide. We believe it is essential to have all this information readily available in one place, providing clarity and setting clear expectations for our staff, students, families, and community. Throughout the creation of this guide, we have actively collaborated with the MCCPTA-LGBTQ+ Subcommittee and other stakeholders, whose invaluable contributions have deepened our commitment to our core values of Learning, Relationships, Respect, Excellence, and Equity. We extend our heartfelt appreciation to them for their partnership and collaboration. It is through these meaningful partnerships that we continue to enhance our dedication to creating safe, positive, and respectful learning environments for all our students.

Respectfully,

*Monifa B. McKnight*

Monifa B. McKnight, Ed.D.
Superintendent of Schools

....................................

# C O N T E N T S

**Quick Reference Guide** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

**Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Definitions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Proactively Working with Transgender and Gender Nonconforming Students** . . . . . . . . . . . . 2

    Gender Support Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Communication With Families . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**Privacy and Disclosure of Information** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**Names/Pronouns** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Staff Communication . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**Permanent School Records** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**Dress Code** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**Gender-based Activities** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**Gender-separated Areas** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**New Construction/Renovation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**Physical Education Classes and Intramural Sports** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**Interscholastic Athletics** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**Clubs** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    Outdoor Education/Overnight Field Trips . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**Bullying, Harassment, or Intimidation and Threat Assessment** . . . . . . . . . . . . . . . . . . . . . 5

**Safe Spaces** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**Staff Support** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

# QUICK REFERENCE GUIDE
# RESOURCES FOR STUDENTS

## MONTGOMERY COUNTY CRISIS HOTLINES
### 24-hour information, Referrals, and Supportive Conversation

**Montgomery County Crisis Hotline/EveryMind/** . . . . . . . . . . . **301-738-2255**
**and https://www.every-mind.org/**
Provides a staffed hotline as well as a 24-hour chat box on their website.

**Montgomery County Crisis Center** . . . . **240-777-4000**
The Crisis Center provides free crisis support services 24/7 for individuals who are experiencing a mental health crisis.

**Youth Crisis Hotline of Montgomery County** . . . . . . . . . **301-738-9697**
Provides confidential and anonymous support by trained counselors through a 24-hour telephone active listening and referral service.

## TO REPORT SAFETY AND SECURITY CONCERNS

**MCPS Office of Systemwide Emergency Management.** . . . . . . . . . . . . . . . . . . . .**240-740-3066**
The MCPS office responsible for ensuring the safety of MCPS schools and offices.

**MCPS Student Welfare and Compliance: SWC@mcpsmd. org or TitleIX@mcpsmd.org.** . . . . . **240-740-3215**
The MCPS districtwide Title IX coordinator and districtwide child abuse and neglect contact. The Student Welfare and Compliance (SWC) web page is at https://www.montgomeryschoolsmd.org/compliance/. SWC works collaboratively with schools, the Office of the General Counsel and other MCPS offices, and community agencies to ensure consistency and coherence with implementation of policies, regulations, and guidelines, such as issues related to human relations; bullying, harassment (including Title IX sexual harassment), and intimidation; recognizing and reporting child abuse and neglect; incidents of hate-bias, hazing, and student gender identity.

**MCPS Cyber Safety dropbox:.  CyberSafety@mcpsmd.org**
Dropbox to report inappropriate online activity within MCPS.

**The Cyber Tipline** . . . . . . . . . . . **1-800-843-5678**
A 24/7 hotline to report suspected online enticement of children for sexual acts, extra-familial child sexual molestation, child pornography, child sex tourism, child sex trafficking, unsolicited obscene materials sent to a child, misleading domain names, and misleading words or digital images on the Internet.

**Safe Schools Maryland Hotline** . . . . . **833-MD-B-Safe (833-632-7233)**
A 24/7 anonymous and free reporting system available to students, teachers, school staff members, parents, and the general public to report any school or student safety concerns, including mental health concerns. Information about incidents is shared with the appropriate offices at Montgomery County Public Schools, respecting anonymity of the caller.

**Montgomery County Child Protective Services, Department of Health and Human Services (24 hours)** . . . .**240-777-4417 or 240-777-4815 TTY**
A 24/7 reporting hotline to report suspected child abuse or neglect to Montgomery County Child Protective Services.

**Montgomery County Adult Protective Services for Vulnerable Adults** .**240-777-3000, 240-777-4815 TTY**
A 24/7 hotline to report suspected adult abuse and neglect.

**Montgomery County Police Department, Special Victims Investigation Division (24 hours)** . . **240-773-5400**
A 24/7 hotline to report sex crimes against children and adults, physical child abuse, runaways, missing children, felony domestic violence, elder abuse/vulnerable adult abuse, and registration violations of sex offenders to Montgomery County Police Department.

**Montgomery County Police:**
**Drug and Gang Tip Hotline.** . . **240-773-GANG (4264) or 240-773-DRUG (3784)**
A 24/7 hotline to leave an anonymous tip with information relating to illegal drug/gang activities in Montgomery County.

## MCPS RESOURCES

**Countywide Student Government**
www.montgomeryschoolsmd.org/departments/student-leadership

**Director, Student Leadership and Extracurricular Activities** . . . . . . . **240-740-4692**

**Student Member of the Board**
www.montgomeryschoolsmd.org/boe/members/student.aspx

**Office of the Board of Education.** . . . . **240-740-3030**

**Chief of the Office of School Support and Well-being** . . . . **240-740-3100**

**Associate Superintendent, Well-being, Learning, and Achievement** . . . . . . **240-740-5630**

**Section 504 Resolution and Compliance** . **240-740-3230**

## MONTGOMERY NONEMERGENCY RESOURCES

**Montgomery County Police Nonemergency Line.** . . . . . . . . . **301-279-8000**

**Montgomery County Health and Human Services Information Line**
Contact the Department of Health and Human Services
General Information . . . . . . **311, 301-251-4850 TTY**
Outside Montgomery County Residents . .**240-777-0311**

## MCPS INFORMATION AND EMERGENCY ANNOUNCEMENTS

**Stay Connected to MCPS www.montgomeryschoolsmd.org**
For systemwide information and emergency announcements:

MCPS on Twitter . . . . . . . . . . www.twitter.com/mcps
MCPS en Español. . . . . . www.twitter.com/mcpsespanol

MCPS on Facebook . . . . . . www.facebook.com/mcpsmd
MCPS en Español. . . . www.facebook.com/mcpsespanol

Alert MCPS . www.montgomeryschoolsmd.org/alertMCPS




## MCPS INFORMATION AND EMERGENCY ANNOUNCEMENTS (CONTINUED)

*MCPS QuickNotes Email Messages
and Newsletter* . . . . . . . . www.mcpsQuickNotes.org

**Ask MCPS Information Service**
Telephone . . . . . . . . . . . . . . . 240-740-3000
Spanish Hotline . . . . . . . . . . . . 240-740-2845
Email . . . . . . . . . . . . . . AskMCPS@mcpsmd.org

**MCPS Public Information Office . . . . . . 240-740-2837**
MCPS Television . . . . . . . . . . . www.mcpsTV.org;
Comcast 34, 998; RCN 89, 1058; Verizon 36

*Recorded Emergency and
Weather Information* . . . . . . . . . . 301-279-3673

## MCPS RESOURCES ON THE WEB
### www.montgomeryschoolsmd.org

**Search:**

MCPS School Directory

MCPS Staff Directory

MCPS Strategic Plan

Athletics

Be Well 365

Board of Education

Bullying, Harassment, and Intimidation

Bus Routes

Child Abuse and Neglect

College and Career Center

Common Sense Education

Course Bulletin

Cybercivility and CyberSafety

Diploma Requirements

Gangs and Gang Activity

## MCPS RESOURCES ON THE WEB (CONTINUED)
### www.montgomeryschoolsmd.org

Grading and Reporting

Guidelines for Respecting Religious Diversity

Guidelines for Student Gender Identity

Lunch Menus

Maryland High School Assessments

Nondiscrimination

Online Pathway to Graduation

Physical Education

Policies and Regulations

Psychological Services

Pupil Personnel Services

Reporting Allegations of Child Abuse and Neglect

Restorative Justice

School Counseling Services

School Health Services

School Safety

Sexual Harassment

Social Media Digital Citizenship

Special Education

Special Programs

Strategic Planning

Student Code of Conduct

Student eLearning

Student Privacy

Student Service Learning

Suicide Prevention

Summer School

# INTRODUCTION

Montgomery County Support students so they may participate in school life consistent with their gender identity consistently asserted at school, including students who identify as transgender or gender nonconforming.

- Reduce stigmatization and marginalization of transgender and gender nonconforming students.
- Foster social integration and cultural inclusiveness of transgender and gender nonconforming students.
- Respect the right of students to keep their gender identity or transgender status private and confidential.
- Provide support for MCPS staff members to enable them to appropriately and consistently address matters of student gender identity and expression.

We hope you find these guidelines helpful. If you have questions about anything in this guide, please first talk with your school administrators. If you have further questions, contact the MCPS Office of District Operations, Student Welfare and Compliance, at 240-740-3215, SWC@mcpsmd.org or TitleIX@mcps.org. A *Student Gender Quick Guide* is available from Student Welfare and Compliance. If your questions cannot be answered by MCPS staff, you also may contact the Board of Education chief of staff or the Board ombudsman at 240-740-3030 or boe@mcpsmd.org.

## ■ Definitions

The definitions provided here are not intended to label students but rather to assist in understanding transgender and gender nonconforming students. Students might or might not use these terms to describe themselves.[3,4]

**AGENDER**   Without a gender (also "nongendered" or "genderless").

**CISGENDER**   A person whose gender identity and gender expression align with the person's sex assigned at birth; a person who is not transgender or gender nonconforming.

**GENDER EXPRESSION**   The manner in which a person represents or expresses gender to others, often through behavior, clothing, hairstyles, activities, voice, speech and word choices, or mannerisms.

**GENDER FLUID**   A person whose gender identity or gender expression is not fixed and shifts over time, depending on the situation.

**GENDER IDENTITY**   A person's deeply held internalized sense or psychological knowledge of the person's own gender. One's gender identity may be the same as or different from the sex assigned at birth. Most people have a gender identity that matches their sex assigned at birth. For some, however, their gender identity is different from their sex assigned at birth. All people have gender identity, not just persons who are transgender or gender nonconforming people. For the purposes of this guidance, a student's gender identity is that which is consistently asserted at school.

**GENDER NONCONFORMING**   A term for individuals whose gender expression differs from conventional or stereotypical expectations, such as "feminine" boys, "masculine" girls, and those whose gender expression may be androgynous. This includes people who identify outside traditional gender categories or identify as two or more genders. Other terms that can have similar meanings include "gender diverse" or "gender expansive."

**INTERSEX**   A range of conditions associated with the development of physical sex characteristics that do not fit the typical definition of male or female.

**LGBTQ**   An acronym for the Lesbian, Gay, Bisexual, Transgender, Queer, and Questioning community. This acronym often is written as LGBTQ+ in an effort to be more inclusive. It is also stated as LGBTA to include

people who are asexual, or LGBTI, with the I representing intersex, or LGBTQIA to represent all of the above.

**NON-BINARY**   A person who does not identify solely, or at all, as either male or female. Some non-binary people are also transgender.

**SEX ASSIGNED AT BIRTH**   The sex designation recorded on an infant's birth certificate, should such a record be provided at birth.

**SEXUAL ORIENTATION**   Describes a person's emotional, romantic, or sexual attraction to other people. Some examples of sexual orientation are heterosexual/straight, gay, lesbian, bisexual, asexual, or pansexual.

**TRANSGENDER**   An adjective describing a person whose gender identity or expression is different from that traditionally associated with the person's sex assigned at birth. Other terms that can have similar meanings are "transsexual" and "trans."

**TRANSITION**   The process by which a person decides to live as the gender with which the person identifies, rather than the gender assigned at birth. In order to openly express their gender identity to other people, transgender people may take a variety of steps (e.g., using a nickname or legally changing their names and/or their sex designation on legal documents; choosing clothes and hairstyles that reflect their gender identity; and generally living and presenting themselves to others consistently with their gender identity). Some, but not all, transgender people take hormones or undergo surgical procedures to change their bodies to align with their gender identity. Although transitioning includes the public representation of one's gender expression, transitioning is a personal process and individuals transitioning have the right to privacy.

**X MARKER**   Gender marker option for a person who does not identify with the binary categories of "M" for male or "F" for female.

## ■ Proactively Working with Transgender and Gender Nonconforming Students

### Gender Support Plan

The principal (or designee), in collaboration with the student and the student's family (if the family is supportive of the student), should develop a plan to ensure that the student has equal access and equal opportunity to participate in all programs and activities at school and is otherwise protected from gender-based discrimination at school. The principal, designee, or school-based mental health professional (e.g., school psychologist, school counselor, and/or school social worker) should use MCPS Form 560-80, *Intake Form: Supporting Students, Gender Identity,* to support this process and assist the student in participating in school. The completed form must be maintained in a secure location and may not be placed in the student's cumulative or confidential files. While the plan should be consistently implemented by all school staff, the form itself is not intended to be used or accessed by other school staff members.

- Each student's needs should be evaluated on a case-by-case basis, and all plans should be evaluated on an ongoing basis and revised as needed. As a part of the plan, schools should identify staff member(s) who will be the key contact(s) for the student. The plan should delineate how support will be provided and how and to whom information will be disseminated.

- In addition, each plan should address identified name; pronouns; athletics; extracurricular activities; locker rooms; bathrooms; safe spaces, safe zones, and other safety supports; and formal events such as graduation.

### Communication with Families

Prior to contacting a student's parent/guardian, the principal or identified staff member should speak with the student to ascertain the level of support the student either receives or anticipates receiving from home. In some cases, transgender and gender nonconforming students may not openly express their gender identity at home because of safety concerns or lack of acceptance. Matters of gender identity can be complex and may involve familial conflict. If this is the case, and support is required, Student Welfare and Compliance (SWC) should be contacted. In such cases, staff will support the development of a student-led plan that works toward inclusion of the family, if possible, taking safety concerns into consideration as well as student privacy, and recognizing that providing support for a student is critical, even when the family is nonsupportive.

## ■ Privacy and Disclosure of Information

- All students have a right to privacy. This includes the right to keep private one's transgender status or gender nonconforming presentation at school.

- Information about a student's transgender status, legal name, or sex assigned at birth may constitute

---

[1]For more information and lists of additional resources, see *Maryland State Department of Education, Providing Safe Spaces for Transgender and Gender Non-Conforming Youth: Guidelines for Gender Identity Non-Discrimination* (October 2015), available at
*marylandpublicschools.org/about/Documents/DSFSS/SSSP/ProvidingSafeSpacesTransgendergenderNonConformingYouth012016.pdf.*

[2]Related Montgomery County Board of Education policies and MCPS regulations: ACA, ACF, JHF, JHF-RA, ACA-RA, ACF-RA, COA, COA-RA

[3]Terminology used in these guidelines is intended to be as inclusive as possible; however, it is understood that terms and language are evolving and may become outdated quickly.

[4]Definitions were informed by the following sources: American Civil Liberties Union; American Psychological Association; Baltimore City Schools; California School Boards Association; Chicago Public Schools; District of Columbia Public Schools; Gay, Lesbian, and Straight Education Network; Howard County Public Schools; Human Rights Campaign; Lambda Legal; Maryland State Department of Education; Maryland Public Secondary Schools Athletic Association; Massachusetts Department of Elementary and Secondary Education; National Collegiate Athletic Association; National School Boards Association; New York City Department of Education; PFLAG; and Trevor Project.

**2** ■ 2023–2024 ■ GUIDELINES FOR STUDENT GENDER IDENTITY

confidential medical information. Disclosing this information to other students, their parents/guardians, or third parties may violate privacy laws, such as the federal *Family Educational Rights and Privacy Act* (FERPA).

■ Schools will ensure that all medical information, including that relating to transgender students, is kept confidential in accordance with applicable state, local, and federal privacy laws.

■ Please note that medical diagnosis, treatment, and/or other documentation are not required for a school to accommodate requests regarding gender presentation, identity, and diversity.

■ Transgender and gender nonconforming students have the right to discuss and demonstrate their gender identity and expression openly and decide when, with whom, and how much to share private information. The fact that students choose to disclose their status to staff members or other students does not authorize school staff members to disclose a student's status to others, including parents/guardians and other school staff members, unless legally required to do so or unless students have authorized such disclosure.

■ It is inappropriate to ask transgender or gender nonconforming students more questions than are necessary to support them at school.

## ■ Names/Pronouns

All students have the right to be referred to by their identified name and/or pronoun. School staff members should address students by the name and pronoun corresponding to the gender identity that is consistently asserted at school. Students are not required to change their permanent student records as described in the next section (e.g., obtain a court-ordered name and/or new birth certificate) as a prerequisite to being addressed by the name and pronoun that corresponds to their identified name. To the extent possible, and consistent with these guidelines, school personnel will make efforts to maintain the confidentiality of the student's transgender status.

### Staff Communication

Whenever schools are not legally required to use a student's legal name or sex assigned at birth on school records and other documents, the school should use the gender and name identified by the student on documents such as classroom rosters, identification badges, announcements, certificates, newspapers, newsletters, and yearbooks. To avoid harmful misgendering or misnaming, schools should be especially mindful that all information shared with substitute teachers should be in alignment with the student's identified gender and name.

■ Schools should seek to minimize the use of permission slips and other school-specific forms that require disclosure of a student's gender or use gendered terminology such as boys/girls (instead of students) or mother/father (instead of parent/guardian).

■ Unless the student or parent/guardian has specified otherwise, when contacting the parent/guardian of a transgender student, MCPS school staff members should use the student's legal name and pronoun that correspond to the student's sex assigned at birth.

■ Asking about a person's pronouns makes spaces more inclusive and welcoming of transgender, gender nonconforming, and non-binary people.

## ■ Permanent School Records

Schools are required to maintain a permanent student record for each student, which includes the gender and legal name of the student. Students or parents/guardians seeking to change the student's gender or legal name should consult with the school counselor, who will assist the family with completion of Form 560-80, *Intake Form: Supporting Student Gender Identity (SWC)*, and direct any questions to Student Welfare and Compliance. Changes to a student's gender and legal name are subject to different requirements by the Maryland State Department of Education (MSDE). For more information, see MCPS Regulation JOA-RA, *Student Records*.

**Change to Legal Name:** A student's permanent record will be changed to reflect a change in the student's legal name upon receipt of documentation that such legal name has been changed. Any of the following documents is evidence of a legal name change:

■ Birth Certificate
■ Passport/Visa
■ Physician's Certificate
■ Baptismal or Church Certificate
■ Hospital Certificate
■ Parent's/Guardian's Affidavit
■ Birth Registration
■ Other evidence of birth certificate

If a student and/or the student's parent/guardian requests a change to the student's permanent record, absent such documentation, the school should contact SWC.

**Change to Gender:** Self-identification of a student's gender is sufficient for the student's permanent record. In accordance with guidance from MSDE, a student's records may identify the student as male, female, or gender X. The *Maryland Student Records System Manual* allows for self-identification of a student's gender on student records as follows:

1-Male
2-Female
X-Non-binary, student identifies as neither male nor female or both

**Prevention of Disclosure:** The school must protect the student's previous identity once a change to a student's gender and/or legal name has occurred. Please refer to the Student Record Keeper Manual, Department of Shared Accountability, or SWC for additional information.

In situations where schools are required to use the gender and legal name from a student's permanent record, such

as for standardized tests or reports to MSDE, school staff members and administrators shall adopt practices to avoid the inadvertent disclosure of the student's gender and legal name when they differ from the student's identified name and gender.

When a gender and/or name change has been made to the permanent school record—

- the school must notify the Department of Shared Accountability so that appropriate notice to MSDE can be made, and
- school administrators should advise families that they must provide updated copies of any records provided to the school that were generated by external sources (e.g., immunization records, doctor's orders, or other records from medical providers).

**Former Students:** Similarly, a former student's permanent record should be changed to reflect a change in the former student's gender and/or legal name, on receipt of documentation that such gender and/or legal name have been changed. These changes are processed by Central Records.

## Dress Code

- Transgender and gender nonconforming students have the right to dress in a manner consistent with their gender identity or gender expression, so long as it complies with the MCPS dress code. School staff members shall not enforce a school's dress code more strictly for transgender or gender nonconforming students than for other students.
- Schools should consider gender-neutral dress codes for class or yearbook photos, honor society ceremonies, graduation ceremonies, and dances. In addition, in circumstances where gendered clothing is worn (e.g., in shows and performances), students should be allowed to wear the garments associated with their gender identity.

## Gender-based Activities

- Schools should evaluate all gender-based policies, rules, and practices, and maintain only those that have a clear and sound pedagogical purpose. For example, if music and performance groups arrange students into sections, they should seek to group them by voice type/qualities, rather than by gender.
- Whenever students are separated by gender in school activities or are subject to an otherwise lawful gender-specific rule, policy, or practice, students must be permitted to participate consistent with their gender identity.

## Gender-separated Areas

- Where facilities are designated by gender, students **must** be provided access to gender-specific facilities (e.g., bathrooms, locker rooms, and changing rooms) in alignment with their gender identity consistently asserted at school.

- Any student who is uncomfortable using a shared facility because of safety, privacy, or any other reason, should, upon request, be provided with a safe and nonstigmatizing alternative arrangement such as a single bathroom or, with respect to locker rooms, a privacy partition or curtain in changing areas, use of a nearby private restroom or office, or a separate changing schedule. The student should be provided access in a manner that safeguards confidentiality.
- Students who are entitled to use a facility consistent with their gender identity cannot be required to use an alternative arrangement. Alternative arrangements should be used only at the request of a student and in a manner that keeps the student's transgender status confidential.
- Some students may feel uncomfortable with a transgender student using the same sex-specific facility. This discomfort is not a reason to deny access to the transgender student. School administrators and counseling staff members should work with students to address their discomfort to foster understanding of gender identity and to create a school culture that respects and values all students.

## New Construction/Renovation

- If existing facilities do not meet the requirements of school administration to provide a gender-neutral facility for students, schools should work with the Department of Facilities Management to develop facility plans that could include renovation of existing facilities.
- Bearing in mind student safety considerations, the Department of Facilities Management should work to design gender-neutral bathroom facilities that are for student/public use.
- To the extent feasible, MCPS should build at least one gender-neutral restroom on each floor and in high-traffic areas.
- To the extent feasible, MCPS should incorporate at least one gender-neutral changing facility into the design of new schools and school renovations, allowing for safety and confidentiality considerations in the design and location of the gender-neutral facility.

## Physical Education Classes and Intramural Sports

- Whenever the school provides gender-segregated physical education classes and intermural sports, students must be allowed to participate in a manner consistent with their gender identity.

## Interscholastic Athletics

- Transgender and gender nonconforming student participation in interscholastic athletics is determined in accordance with Maryland Public Secondary Schools Athletic Association (MPSSAA) policies and guidelines (available online at *www.mpssaa.org/assets/1/6/ MPSSAA_Transgender_Guidance_revised_8.16.pdf*).

- Per MPSSAA guidance and to ensure competitive fairness, the integrity of women's sports, and equal opportunities to participate without discrimination, transgender and gender nonconforming students in MCPS shall be permitted to participate on the interscholastic athletics team of—

  - the student's sex assigned at birth, or

  - the gender to which the student has transitioned, or

  - the student's gender identity consistently asserted at school.

- Once MCPS has rendered a determination of eligibility to participate on an interscholastic athletics team that corresponds to the student's gender identity consistently asserted at school (as stated on MCPS Form 560-80), the eligibility is granted for the duration of the student's participation in interscholastic athletics.

- Schools should refer any appeals regarding eligibility to participate in interscholastic athletics to the MCPS Department of Athletics.

- Competition at other schools: Accommodations provided at the home school should be made available at other facilities with the consent of the student and as part of the student's plan. The coach or home school should notify the school to be visited about any necessary accommodations, keeping the identity of the student confidential.

## Clubs

- Many MCPS middle and high schools have student-led clubs that connect and support the interests of LGBTQ and gender nonconforming students, such as Gender and Sexuality Alliance (GSA) clubs. These clubs should run like any other club, with clearly defined purposes.

- Schools may not ban students from forming groups solely because they involve discussion of controversial and complex legal issues.

## Outdoor Education/Overnight Field Trips

- Students must be allowed to participate consistent with their gender identity consistently asserted at school.

- Sleeping arrangements should be discussed with the student and family (if the family is supportive of the student). Upon request, the student should be provided with a safe and non-stigmatizing alternative

arrangement, such as a private sleeping area, if practicable.

- Schools should try to accommodate any student who may desire greater privacy, if practicable, without isolating other students.

- A student's transgender status is confidential information and school staff members may not disclose or require disclosure of a student's transgender status to other students or their parents/guardians, as it relates to a field trip, without the consent of the student and/ or the student's parent/guardian.

## Bullying, Harassment, or Intimidation and Threat Assessment

- LGBTQ students have a higher incidence of being bullied, harassed, or intimidated as well as a higher rate of suicide contemplation, and are more than five times as likely as non-LGBTQ students to attempt suicide.

- Board Policy JHF, *Bullying, Harassment, or Intimidation*, sets forth the Board's commitment to an environment that is free of bullying, harassment, or intimidation so that schools are a safe place in which to learn; and MCPS Regulation JHF-RA, *Student Bullying, Harassment, or Intimidation*, provides procedures that address the prohibition of bullying in schools. These are available on the MCPS website at *https://www.montgomeryschoolsmd. org/departments/policy/pdf/jhf.pdf* and *https://www. montgomeryschoolsmd.org/departments/policy/pdf/jhfra. pdf*.

- Board Policy COA, *Student Well-being and School Safety*, establishes and maintains a behavior threat assessment process, based on an appraisal of behaviors, and provides appropriate preventive or corrective measures to maintain safe and secure school environments and workplaces. All children deserve a safe and nurturing school environment that supports their physical, social, and psychological well-being. In alignment with Board Policy ACA, *Nondiscrimination, Equity, and Cultural Proficiency*, school safety measures should not reinforce biases against, or rely on the profiling of, students based on their actual or perceived personal characteristics. MCPS Regulation COA-RA, *Behavior Threat Assessment*, requires that staff responsible for implementing behavior threat assessment procedures at the school level are trained to understand implicit bias, promote diversity awareness, and consider the risk of self-harm or the presence of suicidal ideation. Board of Education Policy COA, *Student Well-being and School Safety*, and MCPS Regulation COA-RA, *Behavior Threat Assessment*, are available on the MCPS web at *www.montgomeryschoolsmd.org/departments/policy/ pdf/coa.pdf* and *www.montgomeryschoolsmd.org/ departments/policy/pdf/coara.pdf*

- Bullying, harassment, and intimidation include conduct that is directed at a student based on a student's actual or perceived gender identity or expression, and includes conduct that targets a student because of a characteristic of a friend, family member, or other person or group with whom a student associates.

- The use of language and/or the display of images and symbols that promote hate may constitute bullying, harassment, or intimidation. The Board prohibits the use of language and/or the display of images and symbols that promote hate and can be reasonably expected to cause substantial disruption to school or district operations or activities.

- Complaints alleging discrimination, harassment, or intimidation directed at a student based on a student's actual or perceived gender identity or expression should be handled in the same manner as other discrimination or harassment complaints. Reporting structures are in place, as required in MCPS Regulation JHF-RA, *Student Bullying, Harassment, and Intimidation*, that include MCPS Form 230-35 as well as the *MCPS Stronger Student Mental Health and Wellness Application*. Schools should be vigilant about bullying, harassment, and intimidation and address it promptly.

- School staff members should take all reasonable steps to ensure safety and access for transgender and gender nonconforming students at their school and support students' rights to assert their gender identity and expression.

- Students shall not be disciplined based on their actual or perceived gender identity or expression.

- Schools are encouraged to have age-appropriate student organizations develop and lead programs to address issues of bullying prevention for all students, with emphasis on LGBTQ students.

## Safe Spaces

- **Hallway or "Flash" Pass:** If needed, schools will allow a transgender or gender nonconforming student to go to a safe space (e.g., main office, counselor's office) at any time the student encounters a situation that feels unsafe or uncomfortable.

- **Safe Zones:** Schools will designate certain teachers' classrooms, specific offices, or a location in a school that is deemed a safe zone where any student, for whatever reason, may go to be free from judgment and to feel comfortable and safe. Schools also should ensure that staff members who have safe zone stickers on their doors have received appropriate training regarding providing inclusive, affirming environments.

## Staff Support

- Board of Education Policy ACA, *Nondiscrimination, Equity, and Cultural Proficiency*, protects all MCPS employees from any form of discrimination, including actions that are motivated by an invidious intent to target individuals based on their actual or perceived personal characteristics as well as acts of hate, violence, insensitivity, disrespect, or retaliation— such as verbal abuse, harassment, bullying, slurs, threats, physical violence, vandalism, or destruction of property—that impede or affect the learning or work environment, and encompassing racism, sexism, issues of gender identity, and other forms of institutional prejudice in all their manifestations. Staff seeking guidance and supports involving issues of gender identity are encouraged to contact the coordinator in the Office of Human Resources and Development, Department of Compliance and Investigations, at 240-740-2888.

# MCPS NONDISCRIMINATION STATEMENT

Montgomery County Public Schools (MCPS) prohibits illegal discrimination based on race, ethnicity, color, ancestry, national origin, nationality, religion, immigration status, sex, gender, gender identity, gender expression, sexual orientation, family structure/parental status, marital status, age, ability (cognitive, social/emotional, and physical), poverty and socioeconomic status, language, or other legally or constitutionally protected attributes or affiliations. Discrimination undermines our community's long-standing efforts to create, foster, and promote equity, inclusion, and acceptance for all. The Board prohibits the use of language and/or the display of images and symbols that promote hate and can be reasonably expected to cause substantial disruption to school or district operations or activities. For more information, please review Montgomery County Board of Education Policy ACA, *Nondiscrimination, Equity, and Cultural Proficiency*. This Policy affirms the Board's belief that each and every student matters, and in particular, that educational outcomes should never be predictable by any individual's actual or perceived personal characteristics. The Policy also recognizes that equity requires proactive steps to identify and redress implicit biases, practices that have an unjustified disparate impact, and structural and institutional barriers that impede equality of educational or employment opportunities. MCPS also provides equal access to the Boy/Girl Scouts and other designated youth groups.**

| For inquiries or complaints about discrimination against MCPS students* | For inquiries or complaints about discrimination against MCPS staff* |
|---|---|
| Director of Student Welfare and Compliance<br>Office of District Operations<br>Student Welfare and Compliance<br>850 Hungerford Drive, Room 55, Rockville, MD 20850<br>240-740-3215<br>SWC@mcpsmd.org | Human Resource Compliance Officer<br>Office of Human Resources and Development<br>Department of Compliance and Investigations<br>45 West Gude Drive, Suite 2500, Rockville, MD 20850<br>240-740-2888<br>DCI@mcpsmd.org |
| **For student requests for accommodations under *Section 504 of the Rehabilitation Act of 1973*** | **For staff requests for accommodations under the *Americans with Disabilities Act*** |
| Section 504 Coordinator<br>Office of School Support and Well-being<br>Office of Well-being, Learning and Achievement<br>850 Hungerford Drive, Room 257, Rockville, MD 20850<br>240-740-5630<br>504@mcpsmd.org | ADA Compliance Coordinator<br>Office of Human Resources and Development<br>Department of Compliance and Investigations<br>45 West Gude Drive, Suite 2500, Rockville, MD 20850<br>240-740-2888<br>DCI@mcpsmd.org |
| **For inquiries or complaints about sex discrimination under Title IX, including sexual harassment, against students or staff*** | |
| Title IX Coordinator<br>Office of District Operations<br>Student Welfare and Compliance<br>850 Hungerford Drive, Room 55, Rockville, MD 20850<br>240-740-3215<br>TitleIX@mcpsmd.org | |

*Discrimination complaints may be filed with other agencies, such as the following: U.S. Equal Employment Opportunity Commission (EEOC), Baltimore Field Office, GH Fallon Federal Building, 31 Hopkins Plaza, Suite 1432, Baltimore, MD 21201, 1-800-669-4000, 1-800-669-6820 (TTY); Maryland Commission on Civil Rights (MCCR), William Donald Schaefer Tower, 6 Saint Paul Street, Suite 900, Baltimore, MD 21202, 410-767-8600, 1-800-637-6247, mccr@maryland.gov; or U.S. Department of Education, Office for Civil Rights (OCR), The Wanamaker Building, 100 Penn Square East, Suite 515, Philadelphia, PA 19107, 1-800-421-3481, 1-800-877-8339 (TDD), OCR@ed.gov, or www2.ed.gov/about/offices/list/ocr/complaintintro.html.*
**This notification complies with the federal Elementary and Secondary Education Act, as amended.*

This document is available, upon request, in languages other than English and in an alternate format under the *Americans with Disabilities Act*, by contacting the MCPS Office of Communications at 240-740-2837, 1-800-735-2258 (Maryland Relay), or PIO@mcpsmd.org. Individuals who need sign language interpretation or cued speech transliteration may contact the MCPS Office of Interpreting Services at 240-740-1800, 301-637-2958 (VP) mcpsinterpretingservices@mcpsmd.org, or MCPSInterpretingServices@mcpsmd.org.

Maryland's Largest School District

**MONTGOMERY COUNTY PUBLIC SCHOOLS**

Published by the Department of Materials Management for the
Office of Districtwide Services and Support

0840.23ct • Editorial, Graphics & Publishing Services • 9/23 • NP 

MCPS Form 560-80
October 2022
Page 1 of 2

Maryland's Largest School District

# MONTGOMERY COUNTY PUBLIC SCHOOLS

# Intake Form: Supporting Student Gender Identity

Student Welfare and Compliance Unit
MONTGOMERY COUNTY PUBLIC SCHOOLS
Rockville, Maryland 20850
See MCPS *Guidelines for Student Gender Identity*

**Instructions:** The school administrator, counselor, or psychologist should complete this form with the student. Parents/guardians may be involved if the student states that they are aware of and supportive of the student's gender identity. This form should be kept in a secure, confidential location. See distribution information on Page 2. **This form is not to be kept in the student's cumulative or confidential folders.** All plans should be evaluated on an ongoing basis and revised as needed.

## STUDENT INFORMATION

Student Name in MCPS Student Information System (Last, First, MI): _____

School_____ Grade _____

What is your identified name?* _____ MCPS ID # _____

What is your identified gender?**  ❏ Male   ❏ Female   ❏ X (unspecified/non-binary)  ❏ Other _____

What pronouns do you use to identify yourself in school? _____

## SUPPORT/SAFETY FOR STUDENT

Is parent/guardian aware of your gender identity? ❏ Yes   ❏ No
Support Level: (None) ❏ 1  ❏ 2  ❏ 3  ❏ 4  ❏ 5  ❏ 6  ❏ 7  ❏ 8  ❏ 9  ❏ 10 (High)
If support level is low, what considerations must be accounted for in implementing this plan?

**STUDENTS WORKING WITH THE SCHOOL COUNSELOR TO COMPLETE THIS FORM WILL BE INFORMED WHEN IDENTIFIED NAMES WILL BE USED AND WHEN LEGAL NAMES (LISTED IN ENROLLMENT AND RECORD KEEPING) WILL BE USED.**

| DOCUMENT/COMMUNICATION TYPE | LEGAL OR IDENTIFIED NAME | GENDER LISTED (YES OR NO) |
|---|---|---|
| 504 Plan | Legal Name | No |
| Attendance Calls | Identified Name | No |
| Class Rosters (Substitutes) | Identified Name | Yes (Identified) |
| High School Diploma | Legal Name | No |
| Individualized Education Plan (IEP) | Legal Name | Yes (Legal) |
| MAP Testing Reports | Identified Name | No |
| Maryland Comprehensive Assessment Program (MCAP) | Legal Name | No |
| Naviance (College Application Process) | Legal Name | No |
| Performance Matters | Identified Name | Yes (Identified) |
| Report Card | Identified Name | No |
| Student Record Cards | Legal Name | Yes (Legal) |
| Transcript (Official) | Legal Name | Yes (Legal) |

Former students who wish to update their student records with MCPS due to gender identity, and have had a legal name/gender change, should contact the Montgomery County Public Schools Central Records office at CentralRecords@mcpsmd.org to obtain the required documentation for initiating the change.

\* Consistent with *MCPS Guidelines for Student Gender Identity*, the school administrator/counselor/psychologist can request that the school record keeper add the identified name in the MCPS Student Information System.

\*\* Student's indication of identified gender on this form is for confidential notification to the school ONLY. If the student requests that their gender be changed on MCPS official records, the school must follow the procedures outlined in the *MCPS Student Record Keeper Manual*.

## PRIVACY, CONFIDENTIALITY, AND DISCLOSURE

Plan for bathroom/locker use:

Plan for sports/extracurricular activities:

Other issues to be considered/addressed:

Who will be the student's "go to adult" on campus?

## PRIVACY, CONFIDENTIALITY, AND DISCLOSURE (continued)

If this person is not available, what should student do?

What, if any, will be the process for periodically checking in with the student and/or family?

What are expectations in the event the student is feeling unsafe and how will the student signal their need for help?

## OTHER SCHOOL ACTIVITIES

Are there lessons, units, content or other school activities during the school year to consider (health curriculum, swim unit, social justice units, name projects, dance instruction, Pride events, school dances, promotion/graduation ceremonies, etc.)?

## COMMUNICATION PLAN

Identify staff to whom this information may be disclosed:

How public or private will information about this student's gender be?

## SUPPORT PLAN REVIEW AND REVISION

How will this plan be monitored over time?

Form completed by (print name) _____ Date _____/_____/_____