No. 25-1136

# In the United States Court of Appeals for the Fourth Circuit

KIMBERLY ANN POLK,

*Appellant,*

v.

MONTGOMERY COUNTY PUBLIC SCHOOLS, *et al.*,

*Appellees.*

Appeal from the United States District Court for the District of Maryland

## JOINT APPENDIX

**ATTORNEYS FOR APPELLANT**

Frederick W. Claybrook, Jr.
    Counsel of Record
Claybrook LLC
700 Sixth St., NW, Ste. 430
Washington, DC 20001
(202) 250-3833
rick@claybrooklaw.com

Steven W. Fitschen(
James A. Davids
The National Legal Foundation
524 Johnstown Rd.
Chesapeake, VA 23322
(757) 463-6133
sfitschen@nationallegalfoundation.org

Robert Flores
Gammon & Grange, P.C.
1945 Old Gallows Rd., Ste. 650
(703) 761-5000
Vienna, Va. 22182
jrg@gg-law.com

**ATTORNEYS FOR APPELLEES**

Alan E. Schoenfeld
    Counsel of Record
Cassanddra A. Mitchell
Wilmer Cutler Pickering Hale
    and Dorr LLP
World Trade Center
250 Greenwich Street
New York, NY 10007
212 937 7294
alan.schoenfeld@wilmerhale.com

Bruce M. Berman
Wilmer Cutler Pickering Hale
    and Dorr LLP
2100 Pennsylvania Ave., NW
Washington, DC 20037
(202) 663-6173
bruce.berman@wilmerhale.com

# TABLE OF CONTENTS

| Description | Docket No. | JA Page |
|---|---|---|
| District Court Docket Sheet | N/A | 1 |
| Verified Complaint | 1 | 15 |
| Motion for Preliminary Injunction | 4 | 34 |
| Declaration of Kimberly Ann Polk | 4-2 | 37 |
| Montgomery County Public Schools Regulation GEF-RA | 4-3 | 46 |
| List of Substitute Jobs Worked | 4-4 | 54 |
| Montgomery County Public Schools Gender Identity Guidelines | 4-5 | 55 |
| Montgomery County Public Schools Intake Form | 4-6 | 73 |
| Training Materials Screen Shots | 4-7 | 75 |
| Training Materials Check Boxes | 4-8 | 81 |
| Religious Accommodation Email | 4-9 | 82 |
| Email from Khalid Walker to Kimberly Polk | 4-10 | 87 |

Claude de Vastey Jones letter to Linda Lee          4-11          88
Re:  EEOC Complaint

J. Robert Flores letter to Linda Lee                4-12          94
Re:  EEOC Complaint

Declaration of Gregory S. Edmundson               28-2          101

Montgomery County Public Schools                  28-3          109
Policy ACA

Maryland State Department of Education            28-5          120
Guidelines for Gender Identity Non-
discrimination

Montgomery County Public Schools Substitute       28-6          131
Teacher Handbook

Second Declaration of Kimberly Ann Polk with       30-1          150
Attachments

Memorandum Opinion Below                          39            160

Order Below                                        40            200

Notice of Appeal                                   43            202

**U.S. District Court**
**District of Maryland (Greenbelt)**
**CIVIL DOCKET FOR CASE #: 8:24-cv-01487-DLB**

Polk v. Montgomery County Board of Education

Assigned to: Judge Deborah L. Boardman

Case in other court: USCA, 25-01136

Cause: 42:1983ed Civil Rights (Employment Discrimination)

Date Filed: 05/21/2024

Jury Demand: Plaintiff

Nature of Suit: 442 Civil Rights: Jobs

Jurisdiction: Federal Question

**Plaintiff**

| | |
|---|---|
| **Kimberly Ann Polk** | represented by |

**Kimberly Ann Polk**    represented by    **Frederick W. Claybrook , Jr.**
Claybrook LLC
655 15th Street, NW
Ste. 425
Washington, DC 20005
202-250-3833
Email: rick@claybrooklaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Alan Davids**
National Legal Foundation
524 Johnstown Rd.
Chesapeake, VA 23322
757-463-6133
Email: jimdavids@gmail.com
*ATTORNEY TO BE NOTICED*

**John Robert Flores , Sr.**
Gammon & Grange, PC
1945 Old Gallows Road
Suite 650
Vienna, VA 22182
703-761-5007

JA001

Fax: 703-761-5021
Email: JRF@GG-law.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Steven Werner Fitschen**
The National Legal Foundation
National Legal Foundation
524 Johnstown Rd.
Chesapeake, VA 23322
757-463-6133
Fax: 757-296-0010
Email:
sfitschen@nationallegalfoundation.org
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

| | | |
|---|---|---|
| **Montgomery County Public Schools**<br>*TERMINATED: 01/17/2025* | represented by | **Bruce M Berman**<br>Wilmer Cutler Pickering Hale and Dorr LLP<br>2100 Pennsylvania Avenue NW<br>Washington, DC 20037<br>202-663-6173<br>Email:<br>bruce.berman@wilmerhale.com<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Cassandra A. Mitchell**<br>7 World Trade Center<br>250 Greenwich Street<br>New York City, NY 10007<br>212-937-7273<br>Email: |

cassie.mitchell@wilmerhale.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Thomas Bredar**
Wilmer Cutler Pickering Hale and Dorr
LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
212-295-6343
Email:
thomas.bredar@wilmerhale.com
*ATTORNEY TO BE NOTICED*

**Defendant**

| **Montgomery County Board of Education** | represented by | **Bruce M Berman** |
|---|---|---|
| | | (See above for address) |
| | | *PRO HAC VICE* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Cassandra A. Mitchell** |
| | | (See above for address) |
| | | *PRO HAC VICE* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Thomas Bredar** |
| | | (See above for address) |
| | | *ATTORNEY TO BE NOTICED* |

**Defendant**

| **Shebra L. Evans** | represented by | **Bruce M Berman** |
|---|---|---|
| *in her individual and official capacities as board members* | | (See above for address) |
| *TERMINATED: 01/17/2025* | | *PRO HAC VICE* |
| | | *ATTORNEY TO BE NOTICED* |

**Cassandra A. Mitchell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Thomas Bredar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **Monique Felder**<br>*in her individual and official*<br>*capacities as board members*<br>*TERMINATED: 01/17/2025* | represented by | **Bruce M Berman**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |

**Cassandra A. Mitchell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Thomas Bredar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **Lynne Harris**<br>*in her individual and official*<br>*capacities as board members*<br>*TERMINATED: 01/17/2025* | represented by | **Bruce M Berman**<br>(See above for address)<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED* |

**Cassandra A. Mitchell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Thomas Bredar**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Grace Rivera-Oven**
*in her individual and official*
*capacities as board members*
*TERMINATED: 01/17/2025*

represented by **Bruce M Berman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cassandra A. Mitchell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Thomas Bredar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Karla Silvestre**
*in her individual and official*
*capacities as board members*
*TERMINATED: 01/17/2025*

represented by **Bruce M Berman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cassandra A. Mitchell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Thomas Bredar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Rebecca Smondrowski**
*in her individual and official capacities as board members*
*TERMINATED: 01/17/2025*

represented by

**Bruce M Berman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cassandra A. Mitchell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Thomas Bredar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Brenda Wolff**
*in her individual and official capacities as board members*
*TERMINATED: 01/17/2025*

represented by

**Bruce M Berman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cassandra A. Mitchell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Thomas Bredar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Julie Yang**
*in her individual and official capacities as board members*
*TERMINATED: 01/17/2025*

represented by

**Bruce M Berman**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Cassandra A. Mitchell**

JA006

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Thomas Bredar**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/21/2024 | 1 | COMPLAINT against All Defendants ( Filing fee $ 405 receipt number AMDDC-11275060.), filed by Kimberly Ann Polk. (Attachments: # 1 Civil Cover Sheet, # 2 Summons)(Claybrook, Frederick) (Entered: 05/21/2024) |
| 05/22/2024 | 2 | Summons Issued 21 days as to Shebra L. Evans, Monique Felder, Lynne Harris, Montgomery County Board of Education, Montgomery County Public Schools, Grace Rivera-Oven, Karla Silvestre, Rebecca Smondrowski, Brenda Wolff, Julie Yang.(heps, Deputy Clerk) (Entered: 05/22/2024) |
| 05/28/2024 | 3 | NOTICE of Appearance by Steven Werner Fitschen on behalf of Kimberly Ann Polk (Fitschen, Steven) (Entered: 05/28/2024) |
| 05/29/2024 | 4 | MOTION for Preliminary Injunction by Kimberly Ann Polk (Attachments: # 1 Memorandum in Support, # 2 Declaration, # 3 Attachment 1 to Declaration, # 4 Attachment 2 to Declaration, # 5 Attachment 3 to Declaration, # 6 Attachment 4 to Declaration, # 7 Attachment 5 to Declaration, # 8 Attachment 6 to Declaration, # 9 Attachment 7 to Declaration, # 10 Attachment 8 to Declaration, # 11 Attachment 9 to Declaration, # 12 Attachment 10 to Declaration, # 13 Text of Proposed Order)(Fitschen, Steven) (Entered: 05/29/2024) |
| 05/29/2024 | 5 | MOTION to Expedite *Discovery* by Kimberly Ann Polk (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Fitschen, Steven) (Entered: 05/29/2024) |

| 05/30/2024 | 6 | MOTION to Appear Pro Hac Vice for John Robert Flores, Sr. (Filing fee $100, receipt number AMDDC-11290612.) by Kimberly Ann Polk(Fitschen, Steven) (Entered: 05/30/2024) |
|---|---|---|
| 06/04/2024 | 7 | NOTICE of Appearance by James Alan Davids on behalf of Kimberly Ann Polk (Davids, James) (Entered: 06/04/2024) |
| 06/04/2024 | 8 | PAPERLESS ORDER granting 6 Motion to Appear Pro Hac Vice on behalf of John Robert Flores, Sr. Directing attorney John Robert Flores, Sr to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 6/4/2024. (mh4s, Deputy Clerk) (Entered: 06/04/2024) |
| 06/05/2024 | 9 | [FILED IN ERROR] AFFIDAVIT of Service for complaint and summonses served on Stephanie P. Williams, General Counsel on May 29, 2024, filed by Kimberly Ann Polk.(Claybrook, Frederick) Modified on 6/6/2024 (kk5s, Deputy Clerk). (Entered: 06/05/2024) |
| 06/06/2024 | 10 | NOTICE of Appearance by John Robert Flores, Sr on behalf of Kimberly Ann Polk (Flores, John) (Entered: 06/06/2024) |
| 06/06/2024 | 11 | QC NOTICE: 9 Affidavit of Service filed by Kimberly Ann Polk was filed incorrectly. *\*\*Incorrect event used. Refile using the event "Summons Returned Executed" and input the date of service for each party served." It has been noted as FILED IN ERROR, and the document link has been disabled.* (kk5s, Deputy Clerk) (Entered: 06/06/2024) |
| 06/07/2024 | 12 | SUMMONS Returned Executed by Kimberly Ann Polk. All Defendants.(Claybrook, Frederick) (Entered: 06/07/2024) |
| 06/21/2024 | 13 | NOTICE of Appearance by Thomas Bredar on behalf of Shebra L. Evans, Monique Felder, Lynne Harris, Montgomery County Board of Education, Montgomery County Public Schools, Grace Rivera-Oven, |

| | | |
|---|---|---|
| | | Karla Silvestre, Rebecca Smondrowski, Brenda Wolff, Julie Yang (Bredar, Thomas) (Entered: 06/21/2024) |
| 06/21/2024 | 14 | MOTION to Appear Pro Hac Vice for Bruce M. Berman (Filing fee $100, receipt number AMDDC-11330617.) by Shebra L. Evans, Monique Felder, Lynne Harris, Montgomery County Board of Education, Montgomery County Public Schools, Grace Rivera-Oven, Karla Silvestre, Rebecca Smondrowski, Brenda Wolff, Julie Yang(Bredar, Thomas) (Entered: 06/21/2024) |
| 06/21/2024 | 15 | MOTION to Appear Pro Hac Vice for Cassandra A. Mitchell (Filing fee $100, receipt number AMDDC-11330630.) by Shebra L. Evans, Monique Felder, Lynne Harris, Montgomery County Board of Education, Montgomery County Public Schools, Grace Rivera-Oven, Karla Silvestre, Rebecca Smondrowski, Brenda Wolff, Julie Yang(Bredar, Thomas) (Entered: 06/21/2024) |
| 06/21/2024 | 16 | Local Rule 103.3 Disclosure Statement by Shebra L. Evans, Monique Felder, Lynne Harris, Montgomery County Board of Education, Montgomery County Public Schools, Grace Rivera-Oven, Karla Silvestre, Rebecca Smondrowski, Brenda Wolff, Julie Yang (Bredar, Thomas) (Entered: 06/21/2024) |
| 06/21/2024 | 17 | PAPERLESS ORDER granting 14 Motion to Appear Pro Hac Vice on behalf of Bruce M Berman. Directing attorney Bruce M Berman to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 6/21/2024. (mh4s, Deputy Clerk) (Entered: 06/21/2024) |
| 06/21/2024 | 18 | PAPERLESS ORDER granting 15 Motion to Appear Pro Hac Vice on behalf of Cassandra A. Mitchell. Directing attorney Cassandra A. Mitchell to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when |

|  |  | registering. Signed by Clerk on 6/21/2024. (mh4s, Deputy Clerk) (Entered: 06/21/2024) |
|---|---|---|
| 06/21/2024 | 19 | Joint MOTION for Other Relief *(Set Briefing Schedule and Deadline to Respond)* by Kimberly Ann Polk (Attachments: # 1 Text of Proposed Order on Joint Motion to Set Briefing Schedule and Deadline to Respond)(Fitschen, Steven) (Entered: 06/21/2024) |
| 06/23/2024 | 20 | MOTION for Discovery *and Memorandum in Support* by Kimberly Ann Polk (Attachments: # 1 Text of Proposed Order)(Claybrook, Frederick) (Entered: 06/23/2024) |
| 06/25/2024 | 21 | RESPONSE in Opposition re 20 MOTION for Discovery *and Memorandum in Support* filed by Shebra L. Evans, Monique Felder, Lynne Harris, Montgomery County Board of Education, Montgomery County Public Schools, Grace Rivera-Oven, Karla Silvestre, Rebecca Smondrowski, Brenda Wolff, Julie Yang. (Attachments: # 1 Text of Proposed Order)(Bredar, Thomas) (Entered: 06/25/2024) |
| 06/26/2024 | 22 | ORDER granting 19 Joint MOTION for Other Relief (Set Briefing Schedule and Deadline to Respond). Signed by Judge Deborah L. Boardman on 6/26/2024. (kb3s, Deputy Clerk) (Entered: 06/26/2024) |
| 06/28/2024 | 23 | STATUS REPORT *on Plaintiff's Motion to Expedite Discovery (Joint)* by Shebra L. Evans, Monique Felder, Lynne Harris, Montgomery County Board of Education, Montgomery County Public Schools, Grace Rivera-Oven, Karla Silvestre, Rebecca Smondrowski, Brenda Wolff, Julie Yang(Bredar, Thomas) (Entered: 06/28/2024) |
| 07/01/2024 | 24 | PAPERLESS ORDER finding as moot 5 Motion to Expedite in light of the parties' agreement in ECF 23 . Signed by Judge Deborah L. Boardman on 7/1/2024. (lmys, Chambers) (Entered: 07/01/2024) |
| 07/01/2024 | 25 | PAPERLESS ORDER finding as moot 20 Motion for Discovery in light of the parties' agreement in ECF 23 . Signed by Judge Deborah L. Boardman on 7/1/2024. (lmys, Chambers) (Entered: 07/01/2024) |

| | | |
|---|---|---|
| 07/01/2024 | 26 | MOTION to Submit a Combined Motion to Dismiss and Opposition to Plaintiff's Motion for Preliminary Injunction and for Leave to Exceed Page Limit *(Unopposed)* by Shebra L. Evans, Monique Felder, Lynne Harris, Montgomery County Board of Education, Montgomery County Public Schools, Grace Rivera-Oven, Karla Silvestre, Rebecca Smondrowski, Brenda Wolff, Julie Yang (Attachments: # 1 Text of Proposed Order)(Bredar, Thomas) (Entered: 07/01/2024) |
| 07/02/2024 | 27 | PAPERLESS ORDER granting 26 Motion. The defendants shall submit a combinedmotion to dismiss and opposition to the plaintiff's motion for preliminary injunction not to exceed 45 pages. Signed by Judge Deborah L. Boardman on 7/2/2024. (lmys, Chambers) (Entered: 07/02/2024) |
| 07/03/2024 | 28 | MOTION to Dismiss *and Opposition to 4 MOTION for Preliminary Injunction* by Shebra L. Evans, Monique Felder, Lynne Harris, Montgomery County Board of Education, Montgomery County Public Schools, Grace Rivera-Oven, Karla Silvestre, Rebecca Smondrowski, Brenda Wolff, Julie Yang (Attachments: # 1 Opposition to Motion for Preliminary Injunction and Memorandum in Support of Motion to Dismiss, # 2 Declaration of Gregory S. Edmundson in Support of Opposition to Motion for Preliminary Injunction, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Text of Proposed Order)(Bredar, Thomas) (Entered: 07/03/2024) |
| 07/12/2024 | 29 | STATUS REPORT *on Plaintiff's Motion to Expedite Discovery (Joint)* by Shebra L. Evans, Monique Felder, Lynne Harris, Montgomery County Board of Education, Montgomery County Public Schools, Grace Rivera-Oven, Karla Silvestre, Rebecca Smondrowski, Brenda Wolff, Julie Yang(Bredar, Thomas) (Entered: 07/12/2024) |
| 07/17/2024 | 30 | RESPONSE in Opposition re 28 MOTION to Dismiss *and Opposition to 4 MOTION for Preliminary Injunction and Reply in Support of Motion for Preliminary Injunction* filed by Kimberly Ann Polk. (Attachments: # 1 Second Declaration of Kim Polk with Attachments)(Claybrook, Frederick) (Entered: 07/17/2024) |

| 07/31/2024 | 31 | REPLY to Response to Motion re 28 MOTION to Dismiss *and Opposition to 4 MOTION for Preliminary Injunction* filed by Shebra L. Evans, Monique Felder, Lynne Harris, Montgomery County Board of Education, Montgomery County Public Schools, Grace Rivera-Oven, Karla Silvestre, Rebecca Smondrowski, Brenda Wolff, Julie Yang.(Bredar, Thomas) (Entered: 07/31/2024) |
|---|---|---|
| 08/29/2024 | 32 | NOTICE by Kimberly Ann Polk *of Supplemental Authority* (Claybrook, Frederick) (Entered: 08/29/2024) |
| 09/06/2024 | 33 | PAPERLESS ORDER scheduling an in-court hearing on the motion for preliminary injunction 4 and the motion to dismiss 10 for October 4, 2024 at 10 a.m. Signed by Judge Deborah L. Boardman on 9/6/2024. (lmys, Chambers) (Entered: 09/06/2024) |
| 09/11/2024 | 34 | Correspondence re: Rescheduling Hearing (Mitchell, Cassandra) (Entered: 09/11/2024) |
| 09/12/2024 | 35 | PAPERLESS ORDER granting 34 request to reschedule hearing. The hearing is rescheduled for October 17, 2024 at 10:00 a.m.. Signed by Judge Deborah L. Boardman on 9/12/2024. (sb5s, Chambers) (Entered: 09/12/2024) |
| 10/17/2024 | 36 | Motions Hearing held on 10/17/2024 re 28 MOTION to Dismiss *and Opposition to 4 MOTION for Preliminary Injunction* filed by Karla Silvestre, Shebra L. Evans, Brenda Wolff, Grace Rivera-Oven, Monique Felder, Montgomery County Board of Education, Rebecca Smondrowski, Montgomery County Public Schools, Lynne Harris, Julie Yang and 4 MOTION for Preliminary Injunction filed by Kimberly Ann Polk before Judge Deborah L. Boardman. (Court Reporter: Patricia Klepp) (mtds, Deputy Clerk) (Entered: 10/17/2024) |
| 01/13/2025 | 37 | NOTICE by Kimberly Ann Polk *of Supplemental Authority* (Attachments: # 1 Attachment)(Flores, John) (Entered: 01/13/2025) |

| 01/16/2025 | 38 | NOTICE by Kimberly Ann Polk re 4 MOTION for Preliminary Injunction *Supplemental Authority* (Attachments: # 1 Attachment Supplemental Authority)(Flores, John) (Entered: 01/16/2025) |
| 01/17/2025 | 39 | MEMORANDUM OPINION. Signed by Judge Deborah L. Boardman on 1/17/2025. (kk5s, Deputy Clerk) (Entered: 01/17/2025) |
| 01/17/2025 | 40 | ORDER granting in part and denying in part 28 Defendants' Motion to Dismiss; dismissing without prejudice counts two and three of the complaint; dismissing with prejudice the claims against Montgomery County Public Schools; dismissing without prejudice the claims against the members of the Montgomery County Board of Education and the interim superintendent, in both their individual and official capacities; denying 4 Kimberly Polk's Motion for Preliminary Injunction. An answer is due by 1/31/2025. Signed by Judge Deborah L. Boardman on 1/17/2025. (kk5s, Deputy Clerk) (Entered: 01/17/2025) |
| 01/31/2025 | 41 | ANSWER to 1 Complaint by Montgomery County Board of Education.(Berman, Bruce) (Entered: 01/31/2025) |
| 01/31/2025 | 42 | Local Rule 103.3 Disclosure Statement by Montgomery County Board of Education (Berman, Bruce) (Entered: 01/31/2025) |
| 02/07/2025 | 43 | NOTICE OF APPEAL as to 40 Order on Motion to Dismiss, Order on Motion for Preliminary Injunction, 39 Memorandum Opinion by Kimberly Ann Polk. Filing fee $605, receipt number AMDDC-11771575.(Fitschen, Steven) Modified on 2/10/2025 (slss). (Entered: 02/07/2025) |
| 02/10/2025 | 44 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 43 Notice of Appeal. IMPORTANT NOTICE: To access forms which you are required to file with the United States Court of Appeals for the Fourth Circuit please go to http://www.ca4.uscourts.gov and click on Forms & Notices.(slss, Deputy Clerk) (Entered: 02/10/2025) |

| 02/11/2025 | 45 | USCA Case Number 25-1136 for 43 Notice of Appeal filed by Kimberly Ann Polk. Case Manager - Kirsten Hancock (av4s, Deputy Clerk) (Entered: 02/12/2025) |
| --- | --- | --- |
| 02/28/2025 | 46 | ORDER Re:Conference call. Signed by Judge Deborah L. Boardman on 2/28/2025. (Attachments: # 1 Proposed Scheduling Order)(kb3s, Deputy Clerk) (Entered: 02/28/2025) |
| 02/28/2025 | 47 | ORDER Re: Informal discovery dispute procedure. Signed by Judge Deborah L. Boardman on 2/28/2025. (kb3s, Deputy Clerk) (Entered: 02/28/2025) |
| 03/07/2025 | 48 | Joint MOTION to Stay *District Court Proceedings Pending Interlocutory Appeal* by Montgomery County Board of Education(Berman, Bruce) (Entered: 03/07/2025) |
| 03/07/2025 | 49 | PAPERLESS ORDER granting 48 Motion to Stay pending the Court of Appeals's resolution of the plaintiff's appeal. Signed by Judge Deborah L. Boardman on 3/7/2025. (lmys, Chambers) (Entered: 03/07/2025) |

IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

_____
                                                    )
KIMBERLY ANN POLK                                   )
21913 Foxlair Rd.                                   )
Gaithersburg                                        )
Montgomery County, Md. 20882                        )
                                                    )
        Plaintiff,                                  )
        v.                                          )
                                                    )
MONTGOMERY COUNTY PUBLIC SCHOOLS                     )
850 Hungerford Drive                                )
Rockville, Maryland 20850                           )
                                                    )
MONTGOMERY COUNTY BOARD OF EDUCATION                )    No. 8:24-cv-1487
850 Hungerford Drive                                )
Rockville, Maryland 20850                           )    Jury Trial Demanded
                                                    )
SHEBRA L. EVANS, MONIQUE FELDER,                    )
LYNNE HARRIS, GRACE RIVERA-OVEN,                    )
KARLA SILVESTRE, REBECCA SMONDROWSKI,               )
BRENDA WOLFF and JULIE YANG, in both their          )
  individual and official capacities as board members )
850 Hungerford Drive                                )
Rockville, Maryland 20850                           )
                                                    )
        Defendants.                                 )
_____             )

VERIFIED COMPLAINT FOR MONETARY,
DECLARATORY, AND INJUNCTIVE RELIEF

        The Plaintiff, Kimberly Ann Polk, being duly sworn, avers as follows for her verified

complaint:

JA015

<u>Nature of the Case</u>

1.  Ms. Polk brings this action because she was unlawfully denied a religious accommodation by the Montgomery County Public Schools ("MCPS") when she objected to certain parts of the MCPS *Guidelines for Student Gender Identity* ("Gender Identity Guidelines").  Those parts required her as an MCPS substitute teacher to assist children as young as three to transition genders at school and to hide this transitioning from the child's parents if MCPS officials believe the parents might not be "supportive" of the transition.

2.  In this instance, accommodation would have been simple.  Ms. Polk has previously substituted in preschool special education, kindergarten, and elementary classrooms, and there are many such classrooms in the MCPS system that do not include transitioning children.  Moreover, if a child expresses a newfound desire to transition, Ms. Polk is willing to obtain assistance for the child from other MCPS personnel.

3.  Ms. Polk has already lost two school years of substitute teaching due to MCPS's unlawful refusal to accommodate her religious beliefs.  Without injunctive relief, she will also lose the 2024-25 school year.

<u>Jurisdiction and Venue</u>

4.  This Court has jurisdiction of this action under 28 U.S.C. §§ 1331 and 1343, as Ms. Polk alleges a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. Ms. Polk exhausted her administrative remedy by filing a timely charge with the U.S. Equal Employment Opportunity Commission ("EEOC"), and she has filed this complaint within 90 days of receipt of her "right to sue" notice from the EEOC.  Ms. Polk also requests declaratory relief under 28 U.S.C. § 2201.

5.   This Court is an appropriate venue under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391. Both the Plaintiff and Defendants reside in this district and the events from which the causes of action arise occurred in this district.

<u>Parties</u>

6.   Ms. Polk is a university graduate and a resident of Montgomery County, Maryland. She is married and has raised five children, the youngest of which is currently in college.

7.   Defendant MCBE is a public entity that, pursuant to § 4-101 of the Education Article of the Code of Maryland, controls educational matters that affect Montgomery County.  Pursuant to § 4-108(3) of the Education Article, MCBE is authorized to adopt educational policies for MCPS, but not if those rules and regulations are inconsistent with State law.  Pursuant to § 4-108(4) of the Education Article, MCBE is authorized to adopt rules and regulations for the conduct and management of MCPS, but not if those rules and regulations are inconsistent with State law.  MCBE's principal place of business is located at 850 Hungersford Drive, Rockville, Maryland.

8.   MCPS is a "local school system" and "educational institution" as each is defined in Chapter 13a.08.02.03 of the Code of Maryland Regulations.  MCPS is the public school district for Montgomery County and is the largest in Maryland.  MCPS has an operating budget for FY2023-24 of over $3 billion, has over 25,000 full-time employees, and has 136 elementary schools, each of which has multiple kindergarten and graded classes, and typically more than one of each type.  Fourteen elementary schools provide preschool special education classes.  In 2023, MCPS was the seventh largest employer in the state.  MCPS's offices and principal place of business are located at 850 Hungerford Drive, Rockville, Maryland 20850.

- 4 -

9.   Defendants Shebra L. Evans, Jeanette E. Dixon, Lynne Harris, Karla Silvestre, Grace Rivera-Oven, Rebecca Smondrowski, Branda Wolff, Julie Yang, and Monique Felder (collectively, "MCBE Members") are elected members of the Montgomery County Board of Education.  They are all sued in both their official and individual capacities.

10. Defendant Monique Felder is the Interim Montgomery County Superintendent of Schools.  She is sued in both her official and individual capacities.  Pursuant to § 4-102 of the Education Article of the Code of Maryland, Defendant Felder is the executive officer, secretary, and treasurer of MCBE.  Defendant Felder is responsible for implementing and enforcing policies, rules, and regulations adopted by MCBE and MCPS.

Statement of the Case

<u>Gender Identity Guidelines</u>

11. Prior to the 2019-20 school year, MCPS adopted the 2019-20 Gender Identity Guidelines.  It has then published substantively the same Gender Identity Guidelines for each school year thereafter, including the current, 2023-24 school year.  (The Gender Identity Guidelines are found at https://www.montgomeryschoolsmd.org/siteassets/district/compliance /0840.23_genderidentityguidelinesforstudents_english.pdf.)

12. The Gender Identity Guidelines provide the following definitions:

> GENDER IDENTITY A person's deeply held internalized sense or psychological knowledge of the person's own gender. One's gender identity may be the same as or different from the sex assigned at birth. Most people have a gender identity that matches their sex assigned at birth. For some, however, their gender identity is different from their sex assigned at birth. All people have gender identity, not just persons who are transgender or gender nonconforming people. For the purposes of this guidance, a student's gender identity is that which is consistently asserted at school.
> . . . .

JA018

SEX ASSIGNED AT BIRTH The sex designation recorded on an infant's birth certificate, should such a record be provided at birth.

TRANSGENDER An adjective describing a person whose gender identity or expression is different from that traditionally associated with the person's sex assigned at birth. Other terms that can have similar meanings are "transsexual" and "trans."

13. With respect to "transgender and gender nonconforming students," the Gender Identity Guidelines provide in part as follows:

**Gender Support Plan**

The principal (or designee), in collaboration with the student and the student's family (if the family is supportive of the student), should develop a plan to ensure that the student has equal access and equal opportunity to participate in all programs and activities at school and is otherwise protected from gender-based discrimination at school. . . .

14. With respect to privacy, disclosure of information, the use of names/pronouns for transgender students, and use of gender-separated areas, the Gender Identity Guidelines provide in part as follows:

Privacy And Disclosure Of Information

All students have a right to privacy. This includes the right to keep private one's transgender status or gender nonconforming presentation at school.

Information about a student's transgender status, legal name, or sex assigned at birth may constitute confidential medical information. Disclosing this information to other students, their parents/guardians, or third parties may violate privacy laws, such as the federal Family Educational Rights and Privacy Act (FERPA).

Schools will ensure that all medical information, including that relating to transgender students, is kept confidential in accordance with applicable state, local, and federal privacy laws.

Please note that medical diagnosis, treatment, and/or other documentation are not required for a school to accommodate requests regarding gender presentation, identity, and diversity.

Transgender and gender nonconforming students have the right to discuss and demonstrate their gender identity and expression openly and decide

when, with whom, and how much to share private information. The fact that students choose to disclose their status to staff members or other students does not authorize school staff members to disclose students' status to others, including parents/guardians and other school staff members, unless legally required to do so or unless students have authorized such disclosure.

It is inappropriate to ask transgender or gender nonconforming students more questions than are necessary to support them at school.

Names/Pronouns

All students have the right to be referred to by their identified name and/or pronoun School staff members should address students by the name and pronoun corresponding to the gender identity that is consistently asserted at school. . . .

**Staff Communication**

. . . .

Unless the student or parent/guardian has specified otherwise, when contacting the parent/guardian of a transgender student, MCPS school staff members should use the student's legal name and pronoun that correspond to the student's sex assigned at birth.

. . . .

Gender-separated Areas

Where facilities are designated by gender, students must be provided access to gender-specific facilities (e g , bathrooms, locker rooms, and changing rooms) in alignment with their gender identity consistently asserted at school.

15. The Gender Identity Guidelines require MCPS personnel to prepare a "gender support plan" for each student who expresses the desire to transition genders at school: "The principal (or designee), in collaboration with the student and the student's family (if the family is supportive of the student), should develop a plan to ensure that the student has equal access and equal opportunity to participate in all programs and activities at school and is otherwise protected

from gender-based discrimination at school." It instructs MCPS personnel to use MCPS Form 560-80 "to support this process . . . ."

16. The Gender Identity Guidelines apply to all students of all ages in the MCPS system, including preschool, kindergarten, and elementary school students.

17. As quoted above, the Gender Identity Guidelines require teachers to use pronouns and to allow transgender students to use sex-segregated facilities consistent with a student's "consistently asserted [gender] at school."

18. As quoted above, the Gender Identity Guidelines contain specific provisions that interfere with the rights of parents to be fully informed and involved in addressing issues relating to gender transition with their minor children and that are designed to hinder parents from deciding what is in their minor children's best interests. The Gender Identity Guidelines contain provisions that require school officials to withhold information from parents about their minor child's professed transgender status if the child does not consent to disclosure.

19. The Gender Identity Guidelines state that providing information to parents "about a student's transgender status" to "their parents/guardians . . . may violate privacy laws, such as the federal Family Educational Rights and Privacy Act (FERPA)." This is incorrect. Withholding such information from parents violates both state law and FERPA.

20. MCPS has generated a MCPS Form 560-80, entitled "Intake Form: Supporting Student Gender Identity," to facilitate the Gender Identity Guidelines. Form 560-80 contains the following instructions:

> **Instructions:** The school administrator, counselor, or psychologist should complete this form with the student. Parents/guardians may be involved if the student states that they are aware of and supportive of the student's gender identity. This form should be kept in a secure, confidential location. See distribution information on Page 2. This form is not to be kept in the

- 8 -

> student's cumulative or confidential folders. All plans should be evaluated
> on an ongoing basis and revised as needed.

The distribution stated for the form is as follows:

> Copy 1/School Confidential folder (in principal's office)
>
> Copy 2/ Student Welfare and Compliance Unit, via scan to COS-
> StudentWelfare@mcpsmd.org, or via pony to CESC, Room 162, in a [sic]
> envelope marked confidential

(MCPS Form 560-80 is found at https://ww2.montgomeryschoolsmd.org/departments/forms

/detail.aspx?formNumber=560-80&catID=1&subCatId=44.)

21.  Form 560-80 requires an evaluation of minor students by MCPS personnel, and,

among other things requests a "yes" or "no" response by the minor students to, "Is

parent/guardian aware of your gender identity?"  Form 560-80 then requires minor students

exhibiting transgender inclinations or actions to identify a "Support Level" they believe would

be provided by their parents, to be ranked from "(None) 1" to "10 (High)."  It does not specify

the score needed for a parent to be considered "supportive" as stated in the

instructions.  However, it does continue, "If [parental] support level is low[,] what considerations

must be accounted for in implementing this plan?," leaving a space to be filled in.  Such

"considerations" would include withholding information from parents about their minor children

and using pronouns conforming to the children's birth gender when speaking to the parents about

their children, even though other pronouns are used at school.

22. The limited distribution of MCPS Form 560-80 as specified by the form (and in the

Gender Identity Guidelines) is designed, in part, to prevent review of the form by the parents of

the minor child.  Per the Gender Identity Guidelines, MCPS personnel are not to make completed

MCPS Forms 560-80 available to the parents of minor children unless the minor child consents

to its disclosure to the parents and MCPS personnel assess the parents to be sufficiently "supportive" of their child transitioning genders at school.

23. The evaluation by MCPS personnel of minor students as required by the Gender Identity Guidelines and Form 560-80 by design does not involve prior parental notice or consent.

Ms. Polk's Prior Experience at MCPS

24. During the 2021-22 school year, Ms. Polk worked part-time for MCPS as a substitute teacher on ten occasions at eight different elementary schools.  This amount of teaching qualified her to continue as a substitute teacher for MCPS for the next school year without reapplying.

25. During the 2021-22 school year, the majority of the classes in which she substituted were for preschool special education, but she also taught kindergarten, Grade 2, and Grade 4.

26. During the 2021-22 school year, Ms. Polk received uniformly positive reviews and responses concerning her teaching.  One teacher for whom she had previously substituted specifically asked for her.

27. During the 2021-22 school year, Ms. Polk did not encounter any student in her classes who presented as other than the child's biological gender.

Ms. Polk's Accommodation Request and MCPS's Refusal

28. Ms. Polk desired to continue to work for MCPS during the 2022-23 school year, while increasing the number of days that she would be available to substitute, due to her other part-time job ending.

29. As part of the retention process for the 2022-23 school year, MCPS instructed Ms. Polk to review several interactive, instructional videos, including those about MCPS policies and procedures.  Ms. Polk complied, and one of those instructional videos involved the Gender Identity Guidelines.

- 10 -

30. At the conclusion of the video on the Gender Identity Guidelines, the video instructed Ms. Polk to sign electronically (by clicking a box) an affirmation that she had watched and understood the video and that she would fully adhere to the guidelines.

31. Due to Ms. Polk's sincerely held religious beliefs, she was not able to affirm that she would adhere to the Gender Identity Guidelines.  In particular, Ms. Polk, based on her understanding of her Christian religion and the Holy Bible, sincerely believes that

    a.   God created individuals as either male or female and she would act unethically if she affirmatively assisted children to present as other than their God-given sex.  This would include lying to children by using pronouns for them that do not match their God-given, biological sex.

    b.   God gave parents the primary responsibility for the care and upbringing of their minor children and it would be unethical for her to hide from parents that their child is transitioning genders at school.

    c.   God requires modesty to be exercised between the sexes and it would be unethical for her to assist a child of one sex to use the restroom of the opposite sex while others of the opposite sex were present.

32.  On November 21, 2022, Ms. Polk submitted to Mr. Khalid Walker, Compliance Coordinator for MCPS, a request for an accommodation on this matter.  On that same date, she submitted a request via the MCPS web site.

33. During a conversation shortly after she submitted her accommodation request, Mr. Walker and Ms. Polk discussed parameters of a possible accommodation, subject to further MCPS approval.  Some of the particulars that they discussed were as follows:

    a.   Mr. Walker informed Ms. Polk that she would not have to use preferred pronouns.

JA024

- 11 -

b.  Mr. Walker informed Ms. Polk that she would not be required to sign the affirmation.

c.  Mr. Walker stated that Ms. Polk would be permitted to teach in the elementary schools and preschool special education program but not in the middle or high schools, to which she agreed as a compromise solution.

d.  Mr. Walker and Ms. Polk discussed in detail her expectations about how often gender or bathroom use issues would arise.  Ms. Polk expressed her belief that the issue was unlikely to arise and had not come up in her previous year of substitute teaching.  Mr. Walker informed Ms. Polk that he, too, believed that these issues would be unlikely to arise in the elementary or preschool special education environment.

e.  Mr. Walker informed Ms. Polk that, in the event a child presented gender identity issues such that she could not adhere to Gender Identity Guidelines, the school would provide her with someone else, like a school administrator, who would be able to provide her with support and to interact instead with the student.

34. On December 13, 2022, Mr. Walker informed Ms. Polk that MCPS had rejected any accommodation for her.

35. At no time has MCPS officially offered Ms. Polk a religious accommodation, and she has not been able to teach at MCPS during the 2022-2023 or 2023-2024 school years.

36. Being unable to continue and increase substitute teaching at MCPS has resulted in a negative financial impact to Ms. Polk and her family.

EEOC Proceeding

37. Ms. Polk timely filed a charge of employment discrimination with the EEOC on August 10, 2023, alleging that MCPS had wrongfully failed to provide her an accommodation of her sincerely held religious beliefs as required by Title VII.

- 12 -

38. On February 5, 2024, MCPS filed its statement of position ("SOP") with EEOC. MCPS stated that the Gender Identity Guidelines reflected policies of significant importance to MCPS. It further stated that the only accommodation MCPS would consider for Ms. Polk would be to allow her not to execute the affirmation in the training materials that she would abide by the policy in its entirety, but she would still be required to do so when working. This is not a true accommodation, but, instead, compels Ms. Polk to choose between losing her job and being untrue to her religious convictions.

39. MCPS failed to provide any data or information in its SOP identifying how Ms. Polk's involvement teaching in preschool and the elementary grades would pose an undue hardship to MCPS in the conduct of its business. For instance,

  a. MCPS failed to provide the number of students presenting as transgender or non-binary or gender fluid in the elementary or preschool student population, despite having such data per its Gender Identity Guidelines.

  b. MCPS failed to identify how many elementary or preschool classes have even one transgender student in them, which data should be readily available because all transitioning students are to have a written "gender support plan" on file pursuant to the Gender Identity Guidelines.

  c. MCPS failed to identify a population of transgendered or gender-confused students that Ms. Polk would invariably need to teach.

  d. MCPS failed to identify any administrative or other burden if Ms. Polk required assistance with handling a transgender student or situation.

40. On March 9, 2024, Ms. Polk filed a response to MCPS's SOP with EEOC.

41. On or about April 11, 2024, Ms. Polk requested EEOC to issue a "right to sue" notice, as it had been more than 180 days from the filing of her charge with EEOC.

42. On April 12, 2024, EEOC issued Ms. Polk a "right to sue" notice in this matter.

<u>Irreparable Harms Absent Injunctive Relief and the Public Interest</u>

43. Ms. Polk is suffering irreparable harm due to the violation of her constitutional rights.

44. Ms. Polk is suffering irreparable harm by not being able to substitute teach and by not being paid regularly for that work.

45. Without injunctive relief, it is likely that Ms. Polk will not be able to substitute teach for MCPS during the 2024-25 school year.

46. The public interest supports the prompt and strict enforcement of Title VII, which safeguards the religious freedom of employees.

47. The public interest supports an accommodation of an employee's religious beliefs if that accommodation will not cause undue hardship to the overall business of the employer.

48. The public interest supports the free exercise of religion when it can reasonably be accommodated in the public workplace.

49. The public interest supports the rights of parents to direct the care, health, and welfare of their minor children.

50. As demonstrated by federal law, including but not limited to FERPA, the public interest supports the parents' right to know how public schools are treating their minor children.

51. The public interest opposes government employers from requiring their employees to conspire with them to deprive parents of their constitutional rights by communicating misleading messages to them or by withholding information from them about how their children are treated at school.

- 14 -

52. MCPS will not be harmed by accommodating Ms. Polk's religious beliefs, much less will it suffer undue hardship to its overall business.

<u>Count I</u>

<u>Defendants' Violation of Title VII</u>

53. Ms. Polk incorporates by reference all other allegations of this complaint.

54. Title VII of the Civil Rights Act of 1964 declares it unlawful for covered employers "to fail or refuse to hire . . . any individual . . . because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1).

55. MCPS is a covered employer under Title VII.

56. When defining *religion* for purposes of unlawful discrimination, Congress in Title VII specifies as follows:

> The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

42 U.S.C. § 2000e(j).

57. The burden is on the employer to defend a denial of a religious accommodation by showing it would result in substantial increased costs in relation to the overall context of the conduct of its particular business. Showing a *de minimis* burden does not suffice. MCPS has not met, and cannot meet, its burden to deny Ms. Polk a religious accommodation by demonstrating an undue hardship.

58. Bias or hostility to a religious practice or a religious accommodation does not provide a valid defense to an employer or state any type of a hardship, much less an "undue" one.

MCPS's sole defense is that it does not agree with Ms. Polk's religious beliefs and practices; that defense is insufficient as a matter of law.

59. An employer must consider not only the particular accommodations requested by an employee, but must affirmatively consider all possible accommodations. MCPS unreasonably rejected the accommodations suggested by Ms. Polk and refused to consider any other possible accommodations.

60. MCPS's proffered "accommodation" of allowing Ms. Polk not to assent in writing to the policies that offend her religious beliefs but to violate them in practice is no accommodation at all, but a demonstration of MCPS's bias and hostility to Ms. Polk's religious beliefs and practices and compels her to choose between her job and being true to her religious beliefs.

WHEREFORE, Ms. Polk should be granted the relief she requests in the Requests for Relief.

<u>Count II</u>

<u>42 U.S.C. § 1983</u>

<u>Defendants' Violation of Free Speech</u>

61. Ms. Polk incorporates by reference all other allegations of this complaint.

62. The First Amendment, as incorporated to state actors through the Fourteenth Amendment, provides that public entities shall not infringe an individual's freedom of speech.

63. The Defendants are state actors to whom the First Amendment, as incorporated to state actors through the Fourteenth Amendment, applies.

64. 42 U.S.C. § 1983 states in relevant part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . ., subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the

- 16 -

party injured in an action at law, suit in equity, or other proper proceeding
for redress . , , ,

65. It is a violation of the Free Speech Clause of the First Amendment for a state actor to

compel an employee (a) to communicate a message that violates the law or (b) to act in concert

with the government to violate the constitutional rights of a third party.  These are

unconstitutional conditions.

66. The Defendants violate Ms. Polk's free speech rights by compelling her, on condition

of continued employment, to communicate misleading messages to parents and to deny them the

opportunity to exercise their constitutional rights to care for and make decisions for their minor

children regarding an important, non-curricular decision affecting the health and welfare of their

children.

67. The Defendants violate Ms. Polk's free speech rights by requiring adherence to a

content-based policy that discriminates by viewpoint.

WHEREFORE, Ms. Polk should be granted the relief she requests in the Requests for

Relief.

<u>Count III</u>

<u>42 U.S.C. § 1983</u>

<u>Defendants' Violation of Free Exercise Clause</u>

68. Ms. Polk incorporates by reference all other allegations of this complaint.

69. The Defendants violate Ms. Polk's free speech rights by engaging in content-based

regulation that is viewpoint discriminatory.

70. The First Amendment, as incorporated to state actors through the Fourteenth

Amendment, provides that public entities shall not infringe an individual's free exercise of

religion.

71. The Defendants violate Ms. Polk's free exercise rights by compelling her to communicate messages to students and parents and to take other actions with which she objects on the basis of sincerely held religious beliefs on penalty of refusing to employ her and/or continuing to employ her. These are unconstitutional conditions.

WHEREFORE, Ms. Polk should be granted the relief she requests in the Requests for Relief.

<u>Requests for Relief</u>

Ms. Polk requests that she be granted the following relief:

1. A declaration that MCPS violated Title VII;

2. A declaration that MCPS has violated 42 U.S.C. § 1983 by depriving her of her rights of free speech;

3. A declaration that MCPS has violated 42 U.S.C. § 1983 by depriving her of her rights of the free exercise of religion;

4. Make whole relief, including but not limited to monetary damages in an amount to be proven for her lost wages and compensatory damages;

5. A preliminary injunction allowing her to continue to substitute teach in classrooms in which students who are transitioning genders are not enrolled;

6. A permanent injunction consistent with the declaratory relief provided by the Court;

7. Attorneys' fees and expenses; and

8. Such other relief as is appropriate and permissible.

<u>Jury Demand</u>

Plaintiff demands a jury trial for all issues triable by a jury.

Respectfully submitted,

<u>/s/ Frederick W. Claybrook, Jr.</u>

Frederick W. Claybrook, Jr.
 (Counsel of Record)
Claybrook LLC
655 15th St., NW, Ste. 425
Washington, D.C. 20005
(202) 250-3833
rick@claybrooklaw.com
Bar No. 21604

Steven W. Fitschen*
James A. Davids*
National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 463-6133
sfitschen@nationallegalfoundation.org
jdavids@nationallegalfoundation.org

Attorneys for Plaintiff

*Application for admission pending

<u>Of Counsel</u>
Robert Flores
Gammon & Grange, P.C.
1945 Old Gallows Rd., Ste. 650
Vienna, Va. 22182
jrg@gg-law.com

May 15, 2024

- 19 -

## VERIFICATION

I, Kimberly Ann Polk, state as follows:

1.      I am the Plaintiff in the attached complaint.  I am over 18 and have firsthand knowledge of the facts stated in the complaint.

2.      I affirm that the facts stated in the attached complaint are true and accurate to the best of my knowledge and belief.

I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on this **15** day of May 2024.


Kimberly Ann Polk

IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

_____

KIMBERLY ANN POLK,                          )
                                            )
        Plaintiff,                          )        No. 8:24-cv-1487-DLB
                                            )
        v.                                  )        **Hearing Requested**
                                            )
MONTGOMERY COUNTY PUBLIC SCHOOLS, *et al.,* )
                                            )
        Defendants.                         )
_____    )

MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Rule 65, Ms. Polk moves for a preliminary injunction pending the resolution of this action by the Court.  As stated in the accompanying memorandum, she will likely succeed on the merits, she will be irreparably harmed without the injunction, the equities favor Ms. Polk, and the public interest supports its issuance.

The injunction requested is tailored  to avoid any harm to MCPS or students exhibiting as transgender.  As set out in the Verified Complaint and in the accompanying declaration of Ms. Polk and its attachments submitted in support of this motion, MCPS, due to its policies and practices, has a support plan for each of its students who are currently transitioning genders and knows what classes they attend.  Ms. Polk during the pendency of the injunction  will limit her substitute services to elementary school classrooms with no transitioning students attending them and will  obtain assistance from other MCPS personnel promptly if she must engage a transitioning student in a way that would violate her religious beliefs.  As she affirms in her declaration, she would always treat any transitioning student with respect and discretion should she interact with them.

1

JA034

WHEREFORE, for the reasons stated above and in her accompanying affidavit and supporting memorandum and the Verified Complaint, Ms. Polk requests that this Court grant her motion and issue a preliminary injunction in the form of the attached proposed order in time for the beginning of the upcoming, 2024-2025 MCPS school year.

Respectfully submitted,

/s/ Frederick W. Claybrook, Jr.
Frederick W. Claybrook, Jr., Bar No. 21604
  (Counsel of Record)
Claybrook LLC
655 15th St., NW, Ste. 425
Washington, D.C. 20005
(301) 622-0360
Rick@claybrooklaw.com

Of Counsel

Robert Flores
Gammon & Grange, P.C.
1945 Old Gallows Rd., Ste. 650
Vienna, Va. 22181
jrf@gg-law.com

Steven W. Fitschen, Bar No. 31117
James A. Davids, Bar No. 31107
National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 650-9210
sfitschen@nationallegalfoundation.org
jdavids@nationallegalfoundation.org

Attorneys for Plaintiff

May 29, 2024

2

CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2024, a copy of the Motion for Preliminary Injunction

and supporting Declaration and Memorandum and Draft Order, which were electronically file

this day, were served by email and first-class mail, postage pre-paid as follows:

Stephanie P. Williams,
        General Counsel
Montgomery County Public Schools
Room 156
850 Hungerford Dr.
Rockville, Md. 20850
Stephanie_Williams@mcpsmd.org

                                        /s/ Steven W. Fitschen
                                        Steven W. Fitschen, Bar No. 31117
                                        National Legal Foundation
                                        524 Johnstown Road
                                        Chesapeake, Va. 23322
                                        (757) 650-9210
                                        sfitschen@nationallegalfoundation.org

IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| KIMBERLY ANN POLK,  )  |  |
|  )  | |
| Plaintiff,  )  | |
|  )  | |
| v.  )  | |
|  )  | |
| MONTGOMERY COUNTY PUBLIC SCHOOLS, *et al.,*  )  | No. 8:24-cv-1487-DLB |
|  )  | |
| Defendants.  )  | |
|  )  | |

DECLARATION OF KIMBERLY ANN POLK

The declarant, Kimberly Ann Polk, under penalty of perjury declares as follows:

My Personal Information

1.      I am an adult and fully competent to give this declaration.  It is provided in support of the captioned action, in which I am the plaintiff, and in support of my motion for a preliminary injunction.

2.      The purpose of this declaration is to supplement the verified complaint, so I will not repeat all that is stated there in this declaration.  I am the same individual who verified the complaint, which verification I reaffirm here.

3.      I am currently 53 years old.  I am married and have five sons, all of whom are now 18 years or older.  My youngest is 19 and has just finished his first year at college.

4.      I have a B.S. in Graphic Arts Technology Management from Central Missouri State University (now the University of Central Missouri).

5.      My husband and I live at 21913 Foxlair Rd., Gaithersburg, MD 20882, which is in Montgomery County.  My husband is 58 years old; he is a retired police officer who has part-time security positions.

2

<u>My Religious Beliefs</u>

6.      I am an evangelical, Protestant Christian.  I was raised as a Southern Baptist, but I have attended other evangelical churches as well.  I believe that the Holy Bible is to be my guide for belief and practice.  I have been a regular church attender for my entire life.

7.      With regard to my Christian beliefs that are relevant to this case, in brief, I believe that the Bible teaches that God created each person and that he created them male or female. (Genesis 1:27, 5:2.)  God does not make mistakes when He creates us; He knows us from the womb.  (Jeremiah 1:5.)  When individuals reject their God-given sex, they are choosing a way of life that will be harmful to them, and I would sin if I knowingly assisted them in harming themselves, for instance, by using inaccurate pronouns when referring to them or by allowing them to use sex-segregated facilities that did not correspond to their God-given sex, which also implicates the modesty God desires between the sexes.  (Ephesians 5:1-17.)  I also believe that the Bible teaches that parents are primarily responsible for the health and welfare of their minor children (Ephesians 6:1-4) and that it is sinful to lie or mislead either children or parents about their children.  (Exodus 20:16.)  I believe that, because we were all created by God, we all have equal worth and dignity as persons and that we are to treat others respectfully.  (Gen. 1:26-27.) However, to assist others to do something wrong or harmful to themselves or others is itself a sin.  That includes children and governmental officials.  (Mathew 18:5-6; Acts 4:18-19.)  I believe it to be my responsibility as a Christian "not [to] be overcome by evil, but [to] overcome evil with good."  (Romans 12:21.)

<u>My Experience as a MCPS Substitute in the 2021-2022 School Year</u>

8.      I first applied to be a substitute teacher for MCPS by computer in early 2020, shortly before the COVID-19 shutdown.

3

9.      I was interviewed by MCPS in April 2021. I confirmed that I was (and still am) willing to substitute at any level where MCPS has a need.

10.     As part of the interview process, MCPS asked me to be fingerprinted, which I did.

11.     On May 3, 2021, MCPS sent me an e-mail with information on how to log into its portal to be able to access opportunities for being a substitute. At this point, I was eligible to serve as a substitute.

12.     My hiring process was conducted consistently with MCPS Regulation GEF-RA, which I attach as Attachment 1 and can be found on the MCPS website.

13.     I did not do any substitution before the 2020-2021 school year ended.

14.     After being accepted as a substitute, I reviewed some orientation materials provided by MCPS by its computer terminal. To the best of my recollection, those materials did not raise any of the concerns that the materials I had to review prior to the 2022-2023 school year did. If they did, then I simply failed to recognize them. (I no longer have access to those materials.)

15.     Due to the delay in my hiring due to COVID, I had obtained other part-time employment by 2021. However, that employment was scheduled to end during the summer of 2022, and I wanted to be able to make substituting for MCPS my principal part-time work. As a result, I took the required number of substitute jobs for MCPS during the 2021-2022 school year in order to retain my eligibility without having to reapply for the job.

16.     Attached to this declaration as Attachment 2 is a chart of my MCPS substitute days during the 2021-2022 school year from the MCPS web portal. In summary, I subbed 10 days. Most of those days were as an aide in special education classes. That was partly as a result of a special ed teacher appreciating the job I did for her and wanting me to sub for her whenever

she needed someone.  However, I also subbed in kindergarten, Grade 2, and Grade 4 and in a total of eight different schools.

17.     I always received very positive feedback for my substitution sessions.  I never received any negative feedback.

18.     I have extensive experience as a mother dealing with children, and especially boys.  I do my best to be positive in all my encounters with children, to build them up, to help them realize that each of them is valuable, and to teach them to treat others as they would like to be treated.

19.     During my substitution work in 2021-2022, I never encountered a child who was exhibiting as other than his or her biological gender.

My Training Before the 2022-2023 School Year

20.      As of the end of August 2022, my prior part-time job had ended, and I planned to expand my substitution work for MCPS significantly, averaging at least three full days per week for the entire school year.  Based on my experience during the 2021-2022 school year, I knew that there would be ample opportunities to do that amount of work, even in schools that were in close proximity to my home.

21.     MCPS informed me that I needed to do teacher training before the 2022-2023 school year began.  I logged onto the MCPS teacher portal in August 2022 to do so.

22.     Part of the teacher training in August 2022 was an explanation of the MCPS Guidelines for Student Gender Identity and how they operated.  The current version is attached as Attachment 3.  I've also attached the gender support intake form, MCPS Form 560-80, as Attachment 4.  MCPS uses this form with every student who is transitioning gender at school.

23.     I, of course, would never look down on students who were suffering with gender confusion, and I would always treat them with courtesy and respect and stop any bullying or harassment of them that I saw.  However, there were parts of the gender guidelines and teacher instruction that were inconsistent with my religious beliefs.  In particular, those parts were these:

- Using pronouns for a child that do not conform to his or her God-given sex, although I would use the name for the child that the child and his parents wished.

- Having children use restrooms and other sex-segregated facilities that do not correspond with their God-given sex.

- If on an overnight field trip, putting a child in a room with others not of his or her same, God-given sex.

- If the school decided that parents should not know that their child was exhibiting as other than his or her God-given sex at school, then teachers would have to hide that fact from the parents, even to the extent of lying to the parents and hiding school files from them.

24.     I took screenshots of the gender identity training materials.  I then typed up the dialogue in those materials.  I attach my transcription as Attachment 5 to this declaration.

25.     Part of the training told me to review the MCPS Guidelines for Gender Identity. At the end of the training, there was a statement that I was to confirm by checking the box that I had reviewed the Guidelines for Gender Identity and understood "my obligation to comply with it."  I was not able to check that box because of the parts of the gender policy that violate my religious beliefs, and so I did not.  I attached as Attachment 6 to this declaration the screenshots of that page as originally presented and as it appeared after I tried to continue without checking the box.

26.    Because I did not check the box, I was locked out of the MCPS system to sign up for substitute jobs.

<u>My Attempt to Get a Religious Accommodation from MCPS</u>

27.    I approached the substitute teacher department of MCPS to explain the situation, and they directed me to the compliance office.  That office told me that I would have to check the box, which I could not do in good conscience.  On November 21, 2002, I made a formal request for a religious accommodation so I could continue to work as a substitute.  I attach that request as Attachment 7.

28.    After submitting that request, as set out in more detail in the Verified Complaint, I had what I thought was a productive session with a compliance coordinator, Mr. Khalid Walker, in which we worked together toward reaching an accommodation.  He said the tentative agreement we had negotiated was subject to approval by the MCPS General Counsel.

29.    About two weeks later, on December 13, 2022, Mr. Walker wrote to inform me that MCPS would not entertain any religious accommodation and that I would have to both complete the training and adhere to the Gender Identify Guidelines.  I attach his email as Attachment 8.

30.    When trying to reach a negotiated accommodation with Mr. Walker, I was willing to compromise in ways that I thought still infringed my constitutional rights.  In particular, while I was willing to limit my substitute teaching to elementary schools, where the likelihood of having to deal with a student exhibiting as the other gender would be small, I do not think I should be excluded from substituting in middle school and high school.

31.    I am willing to forego my full legal rights in order to accommodate my request for a preliminary injunction in the same way as I was with MCPS, although by doing so I do not waive my right to obtain full relief to which I am entitled in a final judgment.

32.    It is very feasible for MCPS to inform me of classes which would be "off limits" to me because they have a student in the class exhibiting as transgender.  MCPS prepares a gender support plan for each such student, and they would not have to inform me of the student's identity, only the identity of the class.

33.    I also confirm that, in the event that a situation presented itself in which I was required to deal with a student transitioning gender in a way that violated my religious beliefs, then I would promptly request assistance from another MCPS employee to take over.

34.    MCPS has put me to the choice of losing my job or violating my religious beliefs, when my religious beliefs could easily be accommodated by MCPS.

35.    My continued inability to substitute for MCPS has caused me to seek other part-time work, including substituting at a private, Christian school.  However, the pay is not as good as at MCPS, and, due to the EEOC proceedings not progressing fast enough, I have had to commit recently to continue substituting at that school for two days a week this coming 2024-2025 school year.  That will limit my ability to substitute for MCPS, but this coming school year I would still intend to work as a substitute for an average of two additional days a week for MCPS.  That is important to my family's finances because we have the expense of a college tuition this coming year and do not have sufficient savings and income to handle that expense without my working the additional days.

8

The EEOC Proceedings

36.    In August 2023, I filed a charge with the EEOC due to MCPS refusing to give me a religious accommodation.

37.    In February 2024, MCPS filed its "Statement of Position" ("SOP") explaining why, in its opinion, it did not have to provide me a religious accommodation. I attach the SOP to this declaration as Attachment 9.

38.    In its SOP, MCPS says the only "accommodation" it would be willing to give me would be to allow me not to check the box saying I agreed to comply with the gender identity policies in all respects, but that I would still have to do so when I was substitute teaching. I do not consider this to be a real accommodation. It would not be consistent with my religious beliefs to comply with the policy, as I made clear to MCPS when I asked for an accommodation.

39.    I understood MCPS in its SOP basically to say that it simply refused to accommodate my religious beliefs because it disagrees with them and believes them to be discriminatory against students who are transitioning genders. If that is a sufficient reason not to give a religious accommodation, then I fail to see how anyone would ever get one. Indeed, MCPS says on page 6 of its SOP that allowing even "one single employee to claim a religious accommodation that would allow that employee to openly disregard the nondiscrimination policies of the employer would serve as an undue hardship to the operations."

40.    Through my counsel, in March 2024 I filed a responsive letter to MCPS's SOP. I attach the responsive letter to this declaration as Attachment 10.

9

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 15, 2024.

Kimberly Ann Polk

USCA4 Appeal: 25-1136     Doc: 34     Filed: 03/26/2025     Pg: 49 of 205

**GEF-RA**

# REGULATION   MONTGOMERY COUNTY PUBLIC SCHOOLS

**Related Entries:**          GEB-RA
**Responsible Office:**       Chief Operating Officer

## Substitute Teachers

**I.    PURPOSE**

To designate the responsibility and establish the procedures for the employment and assignment of substitute teacher personnel, who are also subject to the currently applicable Substitute Teacher's Contract Agreement between Montgomery County Education Association (MCEA) and the Board of Education of Montgomery County (Substitute Teacher's Contract)

**II.   DEFINITIONS**

A.   A *short-term substitute* is anyone who works fewer than eleven (11) consecutive workdays in the same assignment on a day-to-day basis.

B.   A *long-term substitute* is a substitute teacher who works a minimum of eleven (11) consecutive workdays in the same assignment for a regular classroom teacher who is on leave, or a substitute teacher who fills a vacancy for a minimum of eleven (11) consecutive workdays in the same assignment. Any break in service will end the long-term status except that a long-term substitute may be absent as specified in the Substitute Teachers' Contract.

**III.  PROCEDURES**

A.   Eligibility and Application Process

1.   Interested applicants apply through the Montgomery County Public Schools (MCPS) online Applicant Tracking System and submit all documentation required under Maryland law and Board policies, including, but not limited to, resume, references, and transcript.

2.   To be considered for substitute teaching, each applicant must present proof of the completion of the minimum of an associate's degree or 60 college credits from an accredited institution by submitting official transcript(s). A record of relevant paid experience and satisfactory performance working

**1 of 8**

USCA4 Appeal: 25-1136     Doc: 34     Filed: 03/26/2025     Pg: 50 of 205

**GEF-RA**

with children in the prekindergarten to high school age range may be accepted after review of the candidate's record, if a candidate has not completed all of the college credits specified above.

3.    The Office of Human Resources and Development (OHRD) will schedule individuals for interviews.  Applicants who successfully complete the interview process will be requested to obtain and submit a background check, including fingerprinting, and fulfill other requirements under Maryland law or Board policies, and they will be invited to participate in an orientation session.

   a)    The substitute orientation is mandatory and includes, but is not limited to, compliance training on recognizing and reporting child abuse and neglect, and completion of all required documentation.

   b)    Candidates must successfully complete the substitute orientation and all other applicable requirements before they can be added to the list of eligible substitute teachers.

B.    Assignment

1.    The Department of Certification and Staffing in OHRD is responsible for maintaining the list of eligible substitute teachers, and only individuals who are on this list may receive assignments to serve as substitutes in MCPS schools.

2.    Short-term substitutes may be assigned by the OHRD's Substitute Employee Management System (System) or be pre-arranged through the school/teacher and recorded in the System. Teachers/schools are required to register each absence requiring a substitute on the System.

3.    Substitute teachers are required to work a minimum of five days per semester in order to remain employed with MCPS.

4.    Requests for the approval of a substitute teacher selected for a long-term assignment must be filed with the Department of Certification and Staffing, on MCPS Form 445-17, *Long-term Teacher Substitute Assignment,* as soon as it is determined that the assignment will be more than ten consecutive duty days. Upon the completion of the long-term assignment, the principal must send a notification of termination to the Department of Certification and Staffing, on MCPS Form 445-17.

**2 of 8**

USCA4 Appeal: 25-1136    Doc: 34    Filed: 03/26/2025    Pg: 51 of 205

**GEF-RA**

C.    Substitute Teacher-s' Contract

The current Substitute Teachers' Contract covers matters regarding substitute teachers related to the following:

1.    Professional Development

2.    Schedules and Workload

3.    Salaries

4.    Insurance

5.    Authorized Absences

D.    Performance and Misconduct Issues

Substitute teachers are maintained on the MCPS roster of eligible substitutes, contingent upon their ability to comply with personal and professional standards of conduct.  Article 6 of the Substitute Teachers' Contract states: "No substitute teacher will be disciplined without proper cause."  This standard recognizes that employees should adhere to expected standards of behavior and failure to do so may constitute "proper cause" for discipline or discharge from employment.  Discipline of a substitute may include reprimands and warning notices, as well as removal from a substitute list at a school or districtwide.  Discipline is subject to review and appeal through grievance and appeal processes provided by law, Board policies, MCPS regulations, and negotiated agreements.  In general, if a substitute is removed from the list of those eligible to substitute at three different schools, the substitute also will be removed from the list of those eligible to substitute in any MCPS school.  Nevertheless, a more serious infraction may warrant termination of a substitute teacher, even for a first-time offense such as prohibited criminal conduct.

1.    Suspected Child Abuse and Other Allegations of Criminal Activity by a Substitute Teacher

a)    Grounds for Action

(1)    Cases involving suspected child abuse or neglect by an MCPS employee, whether or not on district property, require immediate reporting to Child Welfare Services in the Montgomery County Department of Health and Human Services, commonly known as CPS, and in cases of sexual abuse, to the Special Victims Investigations Division of the

**3 of 8**

**GEF-RA**

Montgomery County Police Department (MCPD) as well, as required by state law, Board Policy JHC, *Child Abuse and Neglect*, and MCPS Regulation JHC-RA, *Reporting and Investigating Child Abuse and Neglect*.

(2)     Other critical incidents involving suspected criminal activity, such as drug distribution or use of weapons on MCPS property, require reporting to the MCPD or another law enforcement agency, pursuant to Board policy and the Memorandum of Understanding among MCPS, MCPD, and other county agencies on the School Resource Officer Program and Other Law Enforcement Responses to School-Based Incidents, as well as all cases involving allegations of sexual misconduct or harassment and any other alleged misconduct referred to the Office of Employee Engagement and Labor Relations (OEELR) for investigation.

b)     Action Steps

(1)     After ensuring the required reporting to CPS, MCPD, or other law enforcement agency, the principal or designee will notify the Office of School Support and Improvement (OSSI). OSSI, in turn, will notify OEELR.

(2)     OEELR, in consultation with the principal or designee, the MCPS Systemwide Child Abuse Contact, CPS, and law enforcement agencies, as appropriate, will determine whether the substitute teacher will be "frozen" (i.e., temporarily denied the opportunity to substitute teach either in the school in question or the district as a whole), while any external or internal MCPS investigation is pending.

(a)     Cases are reviewed on an individual basis, and the key factor is whether the substitute teacher's continuation in their job poses a potential threat to students or staff, to the investigation of the allegedly inappropriate conduct, or to perpetuation of the allegedly inappropriate conduct. In accordance with MCPS Regulation JHC-RA, a substitute teacher who is the subject of allegations of child abuse or neglect will be restricted from substitute assignments, unless there is significant, credible information that another course of action is warranted.

**4 of 8**

USCA4 Appeal: 25-1136      Doc: 34        Filed: 03/26/2025      Pg: 53 of 205

GEF-RA

(b)    OEELR will notify the supervisor of substitute teachers in OHRD, the substitute teacher, and the school as appropriate, in consultation with CPS and/or the appropriate law enforcement agencies if the substitute teacher is "frozen."

c)    While any external investigation is ongoing, MCPS will cooperate fully with the external investigating agencies, and MCPS employees may not interview witnesses, alleged victims, or alleged perpetrators without prior agreement from and subject to any limitations recommended by the external investigating agencies.

d)    In all such cases, OEELR will conduct an MCPS investigation, consistent with all applicable Board policies and MCPS regulations, in a manner that does not interfere with or jeopardize the external investigation. OEELR will conduct an internal investigation even when CPS or MCPD screens out or closes the case without taking action and/or the Montgomery County State's Attorney's Office declines to bring criminal charges, because such cases may involve violations of Board policies, MCPS regulations, contracts, and/or other guidance.

e)    After conducting any additional investigation that may be required and considering all available information, OEELR will determine whether or not there is proper cause for disciplinary action and inform the substitute teacher, the school, and the substitute teacher office. A nonexhaustive list of possible actions includes the following:

(1)    Clearing the substitute teacher as eligible for substituting in schools

(2)    Other disciplinary action up to and including termination of the substitute teacher (i.e., removal of the substitute teacher from the list of those eligible to substitute teach in any MCPS school)

2.    Other Alleged Inappropriate Behavior or Performance Issues

a)    Grounds for Action

This category includes performance issues, as well as allegations of conduct that violates the standards in the MCPS *Employee Code of Conduct* but does not require reporting as suspected child abuse or

USCA4 Appeal: 25-1136    Doc: 34    Filed: 03/26/2025    Pg: 54 of 205

**GEF-RA**

other critical incidents involving suspected criminal activities. The examples below are illustrative and non-exhaustive. Conduct that is not expressly listed nonetheless may warrant disciplinary action.

(1)   Poor classroom management or poor performance of substitute duties

(2)   Arriving late, leaving early, or not reporting for the substitute job assignment

(3)   Improperly departing from (**i.e.,** not following) the MCPS curriculum

(4)   Theft or destruction of MCPS' or another's property

(5)   Inappropriate use of technology

b)   Action Steps

(1)   Unless other investigation steps are identified in consultation with OEELR, the principal or designee collects documentation and interviews or obtains statements from those who were involved in or observed the reported incident. All statements must be signed and dated.

(2)   The principal or designee should contact OEELR if the administrator is considering deletion or other disciplinary action. Guidance provided by OEELR should be followed when conferring with the substitute.

(3)   The principal or designee confers with the substitute teacher to discuss the issue including obtaining the substitute teacher's side of the story. The substitute may request the involvement of an MCEA representative. If the substitute teacher is no longer on assignment in the school, the school administrator will gather all available information and promptly send it to OEELR.

(4)   The principal or designee decides if the available information warrants further action, in consultation with OEELR and OSSI, as needed.

(a)   In some circumstances, the school administrator may determine that the substitute teacher's conduct

**6 of 8**

USCA4 Appeal: 25-1136    Doc: 34    Filed: 03/26/2025    Pg: 55 of 205

**GEF-RA**

warrants a clarification as to expectations regarding future conduct rather than formal disciplinary action. In such cases, the school administrator may provide written guidance as to expectations regarding future conduct. This document should be sent to OEELR to be maintained as a confidential record because it may provide context for future disciplinary action if the employee's conduct does not conform to the communicated expectations.

(b)     If no written guidance or discipline is contemplated, no further action is necessary.

(c)     If the school administrator decides to recommend deletion, the school administrator will promptly complete MCPS Form 445-18, *Substitute Teacher Removal Request,* and send it, along with any documents, statements, and a copy of or summary of any response provided by the substitute teacher, to OEELR.

3.     After conducting any additional investigation that may be required consistent with all applicable Board policies and MCPS regulations and considering all available information, OEELR will determine whether or not there is proper cause for disciplinary action and inform the substitute teacher, the school, and the substitute teacher's supervisor. The same list of possible actions applies here as in the preceding section. The specific facts of the situation inform which disciplinary actions are appropriate.  In general, if a substitute is removed from the list of those eligible to substitute at three different schools, he or she also will be removed from the list of those eligible to substitute in any MCPS school. Nevertheless, a more serious infraction may warrant termination, even for a first-time offense.

4.     Records of all written communication between a principal or designee and a substitute regarding the substitute's conduct, regardless of disciplinary action, shall be sent to OEELR to be maintained as a confidential record.

**Related Sources:**     Annotated Code of Maryland, Education Article, §6-113 and §6-113.2; Negotiated Agreement between Montgomery County Education Association and Board of Education of Montgomery County; *MCPS Substitute Teacher Handbook*; *MCPS Employee Code of Conduct*

**7 of 8**

**GEF-RA**

*Regulation History:* Formerly Regulation No. 435-1, August 29, 1980, revised February 1986, amended by the Agreement Between the Board of Education and Montgomery County Education Association (1984-87), Substitute Teachers, Article 4; amended by the Contract Agreement Between the Board of Education and Montgomery County Education Association (2002-2004); revised May 8, 2003; revised August 15, 2019.

USCA4 Appeal: 25-1136    Doc: 34    Filed: 03/26/2025    Pg: 56 of 205

List of Substitute Jobs worked

| Date | Time | Employee/Teach | Classification | Location/School | |
|------|------|----------------|----------------|-----------------|---|
| Friday 11/9/21 | 2 - 4pm | Charlene McNab | Special Ed- PEP Intensive Needs | Lois P. Rockwell ES | |
| Friday 12/17/21 | 12 - 4:15pm | Jennifer Kwon | Reading | Goshen ES | Put in Kindergarten instead |
| Thursday 1/06/22 | 12:15 - 3:45pm | Sondra Caplan | Grade 2 | Glenallan ES | |
| Friday 1/14/22 | 12:30 - 4:00pm | Elizabeth Johnston | Special Ed | William B Gibbs, Jr. ES | |
| Friday 1/21/22 | 2:45 - 4:15pm | Paola Castro | Grade 4 | Wheaton Woods ES | |
| Friday 1/28/22 | 12:00 - 4:00pm | Morgan Gunn | Special ED- Preschool Ed Program | Woodfield ES | |
| Friday 3/25/22 | 12:30 - 4:00pm | Morgan Gunn | Special ED- Preschool Ed Program | Woodfield ES | |
| Friday 4/22/22 | 12:30 - 4pm | Shante Flores | Special ED- Preschool Ed Program | Brookhaven ES | |
| Friday 5/27/22 | 12:30 - 4pm | Morgan Gunn | Special ED- Preschool Ed Program | Woodfield ES | |
| Friday 6/3/22 | 12:30-3:50 pm | Nancy Kachadorian | Special Education | Greenwood  ES | |

2023
# 2024

Student

# GENDER
# IDENTITY

in Montgomery County Public Schools

www.montgomeryschoolsmd.org

Maryland's Largest School District
**MONTGOMERY COUNTY PUBLIC SCHOOLS**
*Expanding Opportunity and Unleashing Potential*










## VISION

*We inspire learning by providing the greatest public education to each and every student.*

## MISSION

*Every student will have the academic, creative problem solving, and social emotional skills to be successful in college and career.*

## CORE PURPOSE

*Prepare all students to thrive in their future.*

## CORE VALUES

*Learning*
*Relationships*
*Respect*
*Excellence*
*Equity*

### Board of Education

Ms. Karla Silvestre
*President*

Mrs. Shebra L. Evans
*Vice President*

Ms. Lynne Harris

Ms. Grace Rivera-Oven

Mrs. Rebecca K. Smondrowski

Ms. Brenda Wolff

Ms. Julie Yang

Mr. Sami Saeed
*Student Member*

### Montgomery County Public Schools (MCPS) Administration

Monifa B. McKnight, Ed.D.
*Superintendent of Schools*

Mr. M. Brian Hull
*Chief Operating Officer*

Patrick K. Murphy, Ed.D.
*Deputy Superintendent*

Mr. Brian S. Stockton
*Chief of Staff*

Mrs. Stephanie P. Williams
*General Counsel*

Ms. Elba M. Garcia
*Senior Community Advisor*

Dr. Patricia E. Kapunan
*School System Medical Officer*

850 Hungerford Drive
Rockville, Maryland 20850
www.montgomeryschoolsmd.org

# 2023–2024

Student

# GENDER IDENTITY

in Montgomery County Public Schools
www.montgomeryschoolsmd.org

These *Guidelines for Student Gender Identity in Montgomery County Public Schools* are available in English, Spanish, French, Chinese, Korean, Vietnamese, Amharic, and Portuguese on the MCPS web at *www.montgomeryschoolsmd.org/students/rights/*

Guidelines for Student Gender Identity (English)
Normas sobre la Identidad de Género del Estudiante (Spanish)
學生性別認定指引 (Chinese)
Lignes directrices en matière d'identité de genre chez les élèves (French)
학생의 성 정체성에 관한 지침서 (Korean)
Hướng dẫn về Nhận dạng Giới tính của Học sinh (Vietnamese)
የተማሪ ጾታ ማንነት መመሪያዎች (Amharic)
Diretrizes sobre a Identidade de Gênero do Aluno (Portuguese)

Maryland's Largest School District

## MONTGOMERY COUNTY PUBLIC SCHOOLS

© September 2023
Montgomery County Public Schools
Rockville, Maryland

Maryland's Largest School District

# MONTGOMERY COUNTY PUBLIC SCHOOLS
*Expanding Opportunity and Unleashing Potential*

**OFFICE OF THE SUPERINTENDENT OF SCHOOLS**

September 2023

Dear Students, Parents/Guardians, and Colleagues,

At Montgomery County Public Schools (MCPS), our commitment to students is rooted in a culture of respect and equity. We celebrate the rich diversity of our community and ensure that every student has the opportunity to thrive and succeed. This commitment is firmly embedded in Montgomery County Board of Education Policy ACA, *Nondiscrimination, Equity, and Cultural Proficiency*, which reinforces our long-standing dedication to fostering an inclusive, accepting, and equitable environment for all. We recognize the importance of providing a safe and supportive space for our LGBTQ+ students, free from discrimination, bullying, and harassment. We believe that students should be able to express their gender identity authentically and without fear, and they should expect to learn in an environment that reflects and respects their unique identity and life experiences. As a school district, we are committed to recognizing and respecting matters of gender identity, making reasonable accommodations in response to student requests, and ensuring the privacy and confidentiality of every student.

To consolidate and clarify the various Board policies, MCPS regulations, and procedures that address this crucial topic, we have developed this comprehensive guide. We believe it is essential to have all this information readily available in one place, providing clarity and setting clear expectations for our staff, students, families, and community. Throughout the creation of this guide, we have actively collaborated with the MCCPTA-LGBTQ+ Subcommittee and other stakeholders, whose invaluable contributions have deepened our commitment to our core values of Learning, Relationships, Respect, Excellence, and Equity. We extend our heartfelt appreciation to them for their partnership and collaboration. It is through these meaningful partnerships that we continue to enhance our dedication to creating safe, positive, and respectful learning environments for all our students.

Respectfully,

Monifa B. McKnight, Ed.D.
Superintendent of Schools

..............................

# C O N T E N T S

**Quick Reference Guide** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

**Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Definitions.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Proactively Working with Transgender and Gender Nonconforming Students** . . . . . . . . . . . . 2

    Gender Support Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Communication With Families . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**Privacy and Disclosure of Information** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**Names/Pronouns** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    Staff Communication . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**Permanent School Records** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**Dress Code** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**Gender-based Activities** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**Gender-separated Areas** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**New Construction/Renovation** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**Physical Education Classes and Intramural Sports** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**Interscholastic Athletics** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**Clubs.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    Outdoor Education/Overnight Field Trips . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**Bullying, Harassment, or Intimidation and Threat Assessment** . . . . . . . . . . . . . . . . . . . . 5

**Safe Spaces** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**Staff Support** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

# QUICK REFERENCE GUIDE
## RESOURCES FOR STUDENTS

### MONTGOMERY COUNTY CRISIS HOTLINES
**24-hour information, Referrals, and Supportive Conversation**

**Montgomery County Crisis Hotline/EveryMind/** . . . . . . . . . . .301-738-2255
**and https://www.every-mind.org/**
Provides a staffed hotline as well as a 24-hour chat box on their website.

**Montgomery County Crisis Center** . . . . 240-777-4000
The Crisis Center provides free crisis support services 24/7 for individuals who are experiencing a mental health crisis.

**Youth Crisis Hotline of Montgomery County** . . . . . . . . 301-738-9697
Provides confidential and anonymous support by trained counselors through a 24-hour telephone active listening and referral service.

### TO REPORT SAFETY AND SECURITY CONCERNS

**MCPS Office of Systemwide Emergency Management.** . . . . . . . . . . . . . . . . . . . .240-740-3066
The MCPS office responsible for ensuring the safety of MCPS schools and offices.

**MCPS Student Welfare and Compliance: SWC@mcpsmd.org or TitleIX@mcpsmd.org.** . . . . . 240-740-3215
The MCPS districtwide Title IX coordinator and districtwide child abuse and neglect contact. The Student Welfare and Compliance (SWC) web page is at https://www.montgomeryschoolsmd.org/compliance/. SWC works collaboratively with schools, the Office of the General Counsel and other MCPS offices, and community agencies to ensure consistency and coherence with implementation of policies, regulations, and guidelines, such as issues related to human relations; bullying, harassment (including Title IX sexual harassment), and intimidation; recognizing and reporting child abuse and neglect; incidents of hate-bias, hazing, and student gender identity.

**MCPS Cyber Safety dropbox:** . **CyberSafety@mcpsmd.org**
Dropbox to report inappropriate online activity within MCPS.

**The Cyber Tipline** . . . . . . . . . . . **1-800-843-5678**
A 24/7 hotline to report suspected online enticement of children for sexual acts, extra-familial child sexual molestation, child pornography, child sex tourism, child sex trafficking, unsolicited obscene materials sent to a child, misleading domain names, and misleading words or digital images on the Internet.

**Safe Schools Maryland Hotline** . . . . . **833-MD-B-Safe (833-632-7233)**
A 24/7 anonymous and free reporting system available to students, teachers, school staff members, parents, and the general public to report any school or student safety concerns, including mental health concerns. Information about incidents is shared with the appropriate offices at Montgomery County Public Schools, respecting anonymity of the caller.

**Montgomery County Child Protective Services, Department of Health and Human Services (24 hours)** . . . .240-777-4417 or 240-777-4815 TTY
A 24/7 reporting hotline to report suspected child abuse or neglect to Montgomery County Child Protective Services.

**Montgomery County Adult Protective Services for Vulnerable Adults** .240-777-3000, 240-777-4815 TTY
A 24/7 hotline to report suspected adult abuse and neglect.

**Montgomery County Police Department, Special Victims Investigation Division (24 hours)** . . 240-773-5400
A 24/7 hotline to report sex crimes against children and adults, physical child abuse, runaways, missing children, felony domestic violence, elder abuse/vulnerable adult abuse, and registration violations of sex offenders to Montgomery County Police Department.

**Montgomery County Police: Drug and Gang Tip Hotline.** . . 240-773-GANG (4264) or 240-773-DRUG (3784)
A 24/7 hotline to leave an anonymous tip with information relating to illegal drug/gang activities in Montgomery County.

### MCPS RESOURCES

**Countywide Student Government**
www.montgomeryschoolsmd.org/departments/student-leadership

**Director, Student Leadership and Extracurricular Activities** . . . . . . . 240-740-4692

**Student Member of the Board**
www.montgomeryschoolsmd.org/boe/members/student.aspx

**Office of the Board of Education.** . . . . 240-740-3030

**Chief of the Office of School Support and Well-being** . . . . 240-740-3100

**Associate Superintendent, Well-being, Learning, and Achievement** . . . . . . 240-740-5630

**Section 504 Resolution and Compliance** . 240-740-3230

### MONTGOMERY NONEMERGENCY RESOURCES

**Montgomery County Police Nonemergency Line.** . . . . . . . . . 301-279-8000

**Montgomery County Health and Human Services Information Line**
Contact the Department of Health and Human Services
General Information . . . . . . . 311, 301-251-4850 TTY
Outside Montgomery County Residents . .240-777-0311

### MCPS INFORMATION AND EMERGENCY ANNOUNCEMENTS

**Stay Connected to MCPS www.montgomeryschoolsmd.org**
For systemwide information and emergency announcements:

MCPS on Twitter . . . . . . . . .www.twitter.com/mcps
MCPS en Español. . . . . .www.twitter.com/mcpsespanol

MCPS on Facebook . . . . .www.facebook.com/mcpsmd
MCPS en Español. . . .www.facebook.com/mcpsespanol

Alert MCPS . www.montgomeryschoolsmd.org/alertMCPS




## MCPS INFORMATION AND EMERGENCY ANNOUNCEMENTS (CONTINUED)

*MCPS QuickNotes Email Messages and Newsletter* . . . . . . . . www.mcpsQuickNotes.org

**Ask MCPS Information Service**
Telephone . . . . . . . . . . . . . . . 240-740-3000
Spanish Hotline . . . . . . . . . . . . 240-740-2845
Email . . . . . . . . . . . . . AskMCPS@mcpsmd.org

**MCPS Public Information Office . . . . . . 240-740-2837**
MCPS Television . . . . . . . . . . . www.mcpsTV.org;
Comcast 34, 998; RCN 89, 1058; Verizon 36

*Recorded Emergency and Weather Information* . . . . . . . . . . 301-279-3673

## MCPS RESOURCES ON THE WEB
www.montgomeryschoolsmd.org

**Search:**

MCPS School Directory

MCPS Staff Directory

MCPS Strategic Plan

Athletics

Be Well 365

Board of Education

Bullying, Harassment, and Intimidation

Bus Routes

Child Abuse and Neglect

College and Career Center

Common Sense Education

Course Bulletin

Cybercivility and CyberSafety

Diploma Requirements

Gangs and Gang Activity

## MCPS RESOURCES ON THE WEB (CONTINUED)
www.montgomeryschoolsmd.org

Grading and Reporting

Guidelines for Respecting Religious Diversity

Guidelines for Student Gender Identity

Lunch Menus

Maryland High School Assessments

Nondiscrimination

Online Pathway to Graduation

Physical Education

Policies and Regulations

Psychological Services

Pupil Personnel Services

Reporting Allegations of Child Abuse and Neglect

Restorative Justice

School Counseling Services

School Health Services

School Safety

Sexual Harassment

Social Media Digital Citizenship

Special Education

Special Programs

Strategic Planning

Student Code of Conduct

Student eLearning

Student Privacy

Student Service Learning

Suicide Prevention

Summer School

# INTRODUCTION

Montgomery County Support students so they may participate in school life consistent with their gender identity consistently asserted at school, including students who identify as transgender or gender nonconforming.

- Reduce stigmatization and marginalization of transgender and gender nonconforming students.
- Foster social integration and cultural inclusiveness of transgender and gender nonconforming students.
- Respect the right of students to keep their gender identity or transgender status private and confidential.
- Provide support for MCPS staff members to enable them to appropriately and consistently address matters of student gender identity and expression.

We hope you find these guidelines helpful. If you have questions about anything in this guide, please first talk with your school administrators. If you have further questions, contact the MCPS Office of District Operations, Student Welfare and Compliance, at 240-740-3215, SWC@mcpsmd.org or TitleIX@mcps.org. A *Student Gender Quick Guide* is available from Student Welfare and Compliance. If your questions cannot be answered by MCPS staff, you also may contact the Board of Education chief of staff or the Board ombudsman at 240-740-3030 or boe@mcpsmd.org.

## ■ Definitions

The definitions provided here are not intended to label students but rather to assist in understanding transgender and gender nonconforming students. Students might or might not use these terms to describe themselves.[3,4]

**AGENDER**   Without a gender (also "nongendered" or "genderless").

**CISGENDER**   A person whose gender identity and gender expression align with the person's sex assigned at birth; a person who is not transgender or gender nonconforming.

**GENDER EXPRESSION**   The manner in which a person represents or expresses gender to others, often through behavior, clothing, hairstyles, activities, voice, speech and word choices, or mannerisms.

**GENDER FLUID**   A person whose gender identity or gender expression is not fixed and shifts over time, depending on the situation.

**GENDER IDENTITY**   A person's deeply held internalized sense or psychological knowledge of the person's own gender. One's gender identity may be the same as or different from the sex assigned at birth. Most people have a gender identity that matches their sex assigned at birth. For some, however, their gender identity is different from their sex assigned at birth. All people have gender identity, not just persons who are transgender or gender nonconforming people. For the purposes of this guidance, a student's gender identity is that which is consistently asserted at school.

**GENDER NONCONFORMING**   A term for individuals whose gender expression differs from conventional or stereotypical expectations, such as "feminine" boys, "masculine" girls, and those whose gender expression may be androgynous. This includes people who identify outside traditional gender categories or identify as two or more genders. Other terms that can have similar meanings include "gender diverse" or "gender expansive."

**INTERSEX**   A range of conditions associated with the development of physical sex characteristics that do not fit the typical definition of male or female.

**LGBTQ**   An acronym for the Lesbian, Gay, Bisexual, Transgender, Queer, and Questioning community. This acronym often is written as LGBTQ+ in an effort to be more inclusive. It is also stated as LGBTA to include

people who are asexual, or LGBTI, with the I representing intersex, or LGBTQIA to represent all of the above.

**NON-BINARY**   A person who does not identify solely, or at all, as either male or female. Some non-binary people are also transgender.

**SEX ASSIGNED AT BIRTH**   The sex designation recorded on an infant's birth certificate, should such a record be provided at birth.

**SEXUAL ORIENTATION**   Describes a person's emotional, romantic, or sexual attraction to other people. Some examples of sexual orientation are heterosexual/straight, gay, lesbian, bisexual, asexual, or pansexual.

**TRANSGENDER**   An adjective describing a person whose gender identity or expression is different from that traditionally associated with the person's sex assigned at birth. Other terms that can have similar meanings are "transsexual" and "trans."

**TRANSITION**   The process by which a person decides to live as the gender with which the person identifies, rather than the gender assigned at birth. In order to openly express their gender identity to other people, transgender people may take a variety of steps (e.g., using a nickname or legally changing their names and/or their sex designation on legal documents; choosing clothes and hairstyles that reflect their gender identity; and generally living and presenting themselves to others consistently with their gender identity). Some, but not all, transgender people take hormones or undergo surgical procedures to change their bodies to align with their gender identity. Although transitioning includes the public representation of one's gender expression, transitioning is a personal process and individuals transitioning have the right to privacy.

**X MARKER**   Gender marker option for a person who does not identify with the binary categories of "M" for male or "F" for female.

## ■ Proactively Working with Transgender and Gender Nonconforming Students

### Gender Support Plan

The principal (or designee), in collaboration with the student and the student's family (if the family is supportive of the student), should develop a plan to ensure that the student has equal access and equal opportunity to participate in all programs and activities at school and is otherwise protected from gender-based discrimination at school. The principal, designee, or school-based mental health professional (e.g., school psychologist, school counselor, and/or school social worker) should use MCPS Form 560-80, *Intake Form: Supporting Students, Gender Identity,* to support this process and assist the student in participating in school. The completed form must be maintained in a secure location and may not be placed in the student's cumulative or confidential files. While the plan should be consistently implemented by all school staff, the form itself is not intended to be used or accessed by other school staff members.

■ Each student's needs should be evaluated on a case-by-case basis, and all plans should be evaluated on an ongoing basis and revised as needed. As a part of the plan, schools should identify staff member(s) who will be the key contact(s) for the student. The plan should delineate how support will be provided and how and to whom information will be disseminated.

■ In addition, each plan should address identified name; pronouns; athletics; extracurricular activities; locker rooms; bathrooms; safe spaces, safe zones, and other safety supports; and formal events such as graduation.

### Communication with Families

Prior to contacting a student's parent/guardian, the principal or identified staff member should speak with the student to ascertain the level of support the student either receives or anticipates receiving from home. In some cases, transgender and gender nonconforming students may not openly express their gender identity at home because of safety concerns or lack of acceptance. Matters of gender identity can be complex and may involve familial conflict. If this is the case, and support is required, Student Welfare and Compliance (SWC) should be contacted. In such cases, staff will support the development of a student-led plan that works toward inclusion of the family, if possible, taking safety concerns into consideration as well as student privacy, and recognizing that providing support for a student is critical, even when the family is nonsupportive.

### ■ Privacy and Disclosure of Information

■ All students have a right to privacy. This includes the right to keep private one's transgender status or gender nonconforming presentation at school.

■ Information about a student's transgender status, legal name, or sex assigned at birth may constitute

---

[1] For more information and lists of additional resources, see *Maryland State Department of Education, Providing Safe Spaces for Transgender and Gender Non-Conforming Youth: Guidelines for Gender Identity Non-Discrimination* (October 2015), available at
*marylandpublicschools.org/about/Documents/DSFSS/SSSP/ProvidingSafeSpacesTransgendergenderNonConformingYouth012016.pdf.*

[2] Related Montgomery County Board of Education policies and MCPS regulations: ACA, ACF, JHF, JHF-RA, ACA-RA, ACF-RA, COA, COA-RA

[3] Terminology used in these guidelines is intended to be as inclusive as possible; however, it is understood that terms and language are evolving and may become outdated quickly.

[4] Definitions were informed by the following sources: American Civil Liberties Union; American Psychological Association; Baltimore City Schools; California School Boards Association; Chicago Public Schools; District of Columbia Public Schools; Gay, Lesbian, and Straight Education Network; Howard County Public Schools; Human Rights Campaign; Lambda Legal; Maryland State Department of Education; Maryland Public Secondary Schools Athletic Association; Massachusetts Department of Elementary and Secondary Education; National Collegiate Athletic Association; National School Boards Association; New York City Department of Education; PFLAG; and Trevor Project.

JA066

confidential medical information. Disclosing this information to other students, their parents/guardians, or third parties may violate privacy laws, such as the federal *Family Educational Rights and Privacy Act* (FERPA).

■ Schools will ensure that all medical information, including that relating to transgender students, is kept confidential in accordance with applicable state, local, and federal privacy laws.

■ Please note that medical diagnosis, treatment, and/or other documentation are not required for a school to accommodate requests regarding gender presentation, identity, and diversity.

■ Transgender and gender nonconforming students have the right to discuss and demonstrate their gender identity and expression openly and decide when, with whom, and how much to share private information. The fact that students choose to disclose their status to staff members or other students does not authorize school staff members to disclose a student's status to others, including parents/guardians and other school staff members, unless legally required to do so or unless students have authorized such disclosure.

■ It is inappropriate to ask transgender or gender nonconforming students more questions than are necessary to support them at school.

## ■ Names/Pronouns

All students have the right to be referred to by their identified name and/or pronoun. School staff members should address students by the name and pronoun corresponding to the gender identity that is consistently asserted at school. Students are not required to change their permanent student records as described in the next section (e.g., obtain a court-ordered name and/or new birth certificate) as a prerequisite to being addressed by the name and pronoun that corresponds to their identified name. To the extent possible, and consistent with these guidelines, school personnel will make efforts to maintain the confidentiality of the student's transgender status.

### Staff Communication

Whenever schools are not legally required to use a student's legal name or sex assigned at birth on school records and other documents, the school should use the gender and name identified by the student on documents such as classroom rosters, identification badges, announcements, certificates, newspapers, newsletters, and yearbooks. To avoid harmful misgendering or misnaming, schools should be especially mindful that all information shared with substitute teachers should be in alignment with the student's identified gender and name.

■ Schools should seek to minimize the use of permission slips and other school-specific forms that require disclosure of a student's gender or use gendered terminology such as boys/girls (instead of students) or mother/father (instead of parent/guardian).

■ Unless the student or parent/guardian has specified otherwise, when contacting the parent/guardian of a transgender student, MCPS school staff members should use the student's legal name and pronoun that correspond to the student's sex assigned at birth.

■ Asking about a person's pronouns makes spaces more inclusive and welcoming of transgender, gender nonconforming, and non-binary people.

## ■ Permanent School Records

Schools are required to maintain a permanent student record for each student, which includes the gender and legal name of the student. Students or parents/guardians seeking to change the student's gender or legal name should consult with the school counselor, who will assist the family with completion of Form 560-80, *Intake Form: Supporting Student Gender Identity (SWC)*, and direct any questions to Student Welfare and Compliance. Changes to a student's gender and legal name are subject to different requirements by the Maryland State Department of Education (MSDE). For more information, see MCPS Regulation JOA-RA, *Student Records*.

**Change to Legal Name:** A student's permanent record will be changed to reflect a change in the student's legal name upon receipt of documentation that such legal name has been changed. Any of the following documents is evidence of a legal name change:

■ Birth Certificate
■ Passport/Visa
■ Physician's Certificate
■ Baptismal or Church Certificate
■ Hospital Certificate
■ Parent's/Guardian's Affidavit
■ Birth Registration
■ Other evidence of birth certificate

If a student and/or the student's parent/guardian requests a change to the student's permanent record, absent such documentation, the school should contact SWC.

**Change to Gender:** Self-identification of a student's gender is sufficient for the student's permanent record. In accordance with guidance from MSDE, a student's records may identify the student as male, female, or gender X. The *Maryland Student Records System Manual* allows for self-identification of a student's gender on student records as follows:

1-Male
2-Female
X-Non-binary, student identifies as neither male nor female or both

**Prevention of Disclosure:** The school must protect the student's previous identity once a change to a student's gender and/or legal name has occurred. Please refer to the Student Record Keeper Manual, Department of Shared Accountability, or SWC for additional information.

In situations where schools are required to use the gender and legal name from a student's permanent record, such

as for standardized tests or reports to MSDE, school staff members and administrators shall adopt practices to avoid the inadvertent disclosure of the student's gender and legal name when they differ from the student's identified name and gender.

When a gender and/or name change has been made to the permanent school record—

- the school must notify the Department of Shared Accountability so that appropriate notice to MSDE can be made, and
- school administrators should advise families that they must provide updated copies of any records provided to the school that were generated by external sources (e.g., immunization records, doctor's orders, or other records from medical providers).

**Former Students:** Similarly, a former student's permanent record should be changed to reflect a change in the former student's gender and/or legal name, on receipt of documentation that such gender and/or legal name have been changed. These changes are processed by Central Records.

## Dress Code

- Transgender and gender nonconforming students have the right to dress in a manner consistent with their gender identity or gender expression, so long as it complies with the MCPS dress code. School staff members shall not enforce a school's dress code more strictly for transgender or gender nonconforming students than for other students.
- Schools should consider gender-neutral dress codes for class or yearbook photos, honor society ceremonies, graduation ceremonies, and dances. In addition, in circumstances where gendered clothing is worn (e.g., in shows and performances), students should be allowed to wear the garments associated with their gender identity.

## Gender-based Activities

- Schools should evaluate all gender-based policies, rules, and practices, and maintain only those that have a clear and sound pedagogical purpose. For example, if music and performance groups arrange students into sections, they should seek to group them by voice type/qualities, rather than by gender.
- Whenever students are separated by gender in school activities or are subject to an otherwise lawful gender-specific rule, policy, or practice, students must be permitted to participate consistent with their gender identity.

## Gender-separated Areas

- Where facilities are designated by gender, students **must** be provided access to gender-specific facilities (e.g., bathrooms, locker rooms, and changing rooms) in alignment with their gender identity consistently asserted at school.

- Any student who is uncomfortable using a shared facility because of safety, privacy, or any other reason, should, upon request, be provided with a safe and nonstigmatizing alternative arrangement such as a single bathroom or, with respect to locker rooms, a privacy partition or curtain in changing areas, use of a nearby private restroom or office, or a separate changing schedule. The student should be provided access in a manner that safeguards confidentiality.
- Students who are entitled to use a facility consistent with their gender identity cannot be required to use an alternative arrangement. Alternative arrangements should be used only at the request of a student and in a manner that keeps the student's transgender status confidential.
- Some students may feel uncomfortable with a transgender student using the same sex-specific facility. This discomfort is not a reason to deny access to the transgender student. School administrators and counseling staff members should work with students to address their discomfort to foster understanding of gender identity and to create a school culture that respects and values all students.

## New Construction/Renovation

- If existing facilities do not meet the requirements of school administration to provide a gender-neutral facility for students, schools should work with the Department of Facilities Management to develop facility plans that could include renovation of existing facilities.
- Bearing in mind student safety considerations, the Department of Facilities Management should work to design gender-neutral bathroom facilities that are for student/public use.
- To the extent feasible, MCPS should build at least one gender-neutral restroom on each floor and in high-traffic areas.
- To the extent feasible, MCPS should incorporate at least one gender-neutral changing facility into the design of new schools and school renovations, allowing for safety and confidentiality considerations in the design and location of the gender-neutral facility.

## Physical Education Classes and Intramural Sports

- Whenever the school provides gender-segregated physical education classes and intermural sports, students must be allowed to participate in a manner consistent with their gender identity.

## Interscholastic Athletics

- Transgender and gender nonconforming student participation in interscholastic athletics is determined in accordance with Maryland Public Secondary Schools Athletic Association (MPSSAA) policies and guidelines (available online at *www.mpssaa.org/assets/1/6/ MPSSAA_Transgender_Guidance_revised_8.16.pdf*).

- Per MPSSAA guidance and to ensure competitive fairness, the integrity of women's sports, and equal opportunities to participate without discrimination, transgender and gender nonconforming students in MCPS shall be permitted to participate on the interscholastic athletics team of—

  - the student's sex assigned at birth, or
  - the gender to which the student has transitioned, or
  - the student's gender identity consistently asserted at school.

- Once MCPS has rendered a determination of eligibility to participate on an interscholastic athletics team that corresponds to the student's gender identity consistently asserted at school (as stated on MCPS Form 560-80), the eligibility is granted for the duration of the student's participation in interscholastic athletics.

- Schools should refer any appeals regarding eligibility to participate in interscholastic athletics to the MCPS Department of Athletics.

- Competition at other schools: Accommodations provided at the home school should be made available at other facilities with the consent of the student and as part of the student's plan. The coach or home school should notify the school to be visited about any necessary accommodations, keeping the identity of the student confidential.

## Clubs

- Many MCPS middle and high schools have student-led clubs that connect and support the interests of LGBTQ and gender nonconforming students, such as Gender and Sexuality Alliance (GSA) clubs. These clubs should run like any other club, with clearly defined purposes.

- Schools may not ban students from forming groups solely because they involve discussion of controversial and complex legal issues.

## Outdoor Education/Overnight Field Trips

- Students must be allowed to participate consistent with their gender identity consistently asserted at school.

- Sleeping arrangements should be discussed with the student and family (if the family is supportive of the student). Upon request, the student should be provided with a safe and non-stigmatizing alternative arrangement, such as a private sleeping area, if practicable.

- Schools should try to accommodate any student who may desire greater privacy, if practicable, without isolating other students.

- A student's transgender status is confidential information and school staff members may not disclose or require disclosure of a student's transgender status to other students or their parents/guardians, as it relates to a field trip, without the consent of the student and/ or the student's parent/guardian.

## Bullying, Harassment, or Intimidation and Threat Assessment

- LGBTQ students have a higher incidence of being bullied, harassed, or intimidated as well as a higher rate of suicide contemplation, and are more than five times as likely as non-LGBTQ students to attempt suicide.

- Board Policy JHF, *Bullying, Harassment, or Intimidation*, sets forth the Board's commitment to an environment that is free of bullying, harassment, or intimidation so that schools are a safe place in which to learn; and MCPS Regulation JHF-RA, *Student Bullying, Harassment, or Intimidation*, provides procedures that address the prohibition of bullying in schools. These are available on the MCPS website at *https://www.montgomeryschoolsmd. org/departments/policy/pdf/jhf.pdf* and *https://www. montgomeryschoolsmd.org/departments/policy/pdf/jhfra. pdf*.

- Board Policy COA, *Student Well-being and School Safety*, establishes and maintains a behavior threat assessment process, based on an appraisal of behaviors, and provides appropriate preventive or corrective measures to maintain safe and secure school environments and workplaces. All children deserve a safe and nurturing school environment that supports their physical, social, and psychological well-being. In alignment with Board Policy ACA, *Nondiscrimination, Equity, and Cultural Proficiency*, school safety measures should not reinforce biases against, or rely on the profiling of, students based on their actual or perceived personal characteristics. MCPS Regulation COA-RA, *Behavior Threat Assessment*, requires that staff responsible for implementing behavior threat assessment procedures at the school level are trained to understand implicit bias, promote diversity awareness, and consider the risk of self-harm or the presence of suicidal ideation. Board of Education Policy COA, *Student Well-being and School Safety*, and MCPS Regulation COA-RA, *Behavior Threat Assessment*, are available on the MCPS web at *www.montgomeryschoolsmd.org/departments/policy/ pdf/coa.pdf* and *www.montgomeryschoolsmd.org/ departments/policy/pdf/coara.pdf*

JA069

- Bullying, harassment, and intimidation include conduct that is directed at a student based on a student's actual or perceived gender identity or expression, and includes conduct that targets a student because of a characteristic of a friend, family member, or other person or group with whom a student associates.

- The use of language and/or the display of images and symbols that promote hate may constitute bullying, harassment, or intimidation. The Board prohibits the use of language and/or the display of images and symbols that promote hate and can be reasonably expected to cause substantial disruption to school or district operations or activities.

- Complaints alleging discrimination, harassment, or intimidation directed at a student based on a student's actual or perceived gender identity or expression should be handled in the same manner as other discrimination or harassment complaints. Reporting structures are in place, as required in MCPS Regulation JHF-RA, *Student Bullying, Harassment, and Intimidation*, that include MCPS Form 230-35 as well as the *MCPS Stronger Student Mental Health and Wellness Application*. Schools should be vigilant about bullying, harassment, and intimidation and address it promptly.

- School staff members should take all reasonable steps to ensure safety and access for transgender and gender nonconforming students at their school and support students' rights to assert their gender identity and expression.

- Students shall not be disciplined based on their actual or perceived gender identity or expression.

- Schools are encouraged to have age-appropriate student organizations develop and lead programs to address issues of bullying prevention for all students, with emphasis on LGBTQ students.

## Safe Spaces

- **Hallway or "Flash" Pass:** If needed, schools will allow a transgender or gender nonconforming student to go to a safe space (e.g., main office, counselor's office) at any time the student encounters a situation that feels unsafe or uncomfortable.

- **Safe Zones:** Schools will designate certain teachers' classrooms, specific offices, or a location in a school that is deemed a safe zone where any student, for whatever reason, may go to be free from judgment and to feel comfortable and safe. Schools also should ensure that staff members who have safe zone stickers on their doors have received appropriate training regarding providing inclusive, affirming environments.

## Staff Support

- Board of Education Policy ACA, *Nondiscrimination, Equity, and Cultural Proficiency*, protects all MCPS employees from any form of discrimination, including actions that are motivated by an invidious intent to target individuals based on their actual or perceived personal characteristics as well as acts of hate, violence, insensitivity, disrespect, or retaliation— such as verbal abuse, harassment, bullying, slurs, threats, physical violence, vandalism, or destruction of property—that impede or affect the learning or work environment, and encompassing racism, sexism, issues of gender identity, and other forms of institutional prejudice in all their manifestations. Staff seeking guidance and supports involving issues of gender identity are encouraged to contact the coordinator in the Office of Human Resources and Development, Department of Compliance and Investigations, at 240-740-2888.

JA070

# MCPS NONDISCRIMINATION STATEMENT

Montgomery County Public Schools (MCPS) prohibits illegal discrimination based on race, ethnicity, color, ancestry, national origin, nationality, religion, immigration status, sex, gender, gender identity, gender expression, sexual orientation, family structure/ parental status, marital status, age, ability (cognitive, social/emotional, and physical), poverty and socioeconomic status, language, or other legally or constitutionally protected attributes or affiliations. Discrimination undermines our community's long-standing efforts to create, foster, and promote equity, inclusion, and acceptance for all. The Board prohibits the use of language and/or the display of images and symbols that promote hate and can be reasonably expected to cause substantial disruption to school or district operations or activities. For more information, please review Montgomery County Board of Education Policy ACA, *Nondiscrimination, Equity, and Cultural Proficiency*. This Policy affirms the Board's belief that each and every student matters, and in particular, that educational outcomes should never be predictable by any individual's actual or perceived personal characteristics. The Policy also recognizes that equity requires proactive steps to identify and redress implicit biases, practices that have an unjustified disparate impact, and structural and institutional barriers that impede equality of educational or employment opportunities. MCPS also provides equal access to the Boy/Girl Scouts and other designated youth groups.**

| For inquiries or complaints about discrimination against MCPS students* | For inquiries or complaints about discrimination against MCPS staff* |
|---|---|
| Director of Student Welfare and Compliance<br>Office of District Operations<br>Student Welfare and Compliance<br>850 Hungerford Drive, Room 55, Rockville, MD 20850<br>240-740-3215<br>SWC@mcpsmd.org | Human Resource Compliance Officer<br>Office of Human Resources and Development<br>Department of Compliance and Investigations<br>45 West Gude Drive, Suite 2500, Rockville, MD 20850<br>240-740-2888<br>DCI@mcpsmd.org |
| **For student requests for accommodations under *Section 504 of the Rehabilitation Act of 1973*** | **For staff requests for accommodations under the *Americans with Disabilities Act*** |
| Section 504 Coordinator<br>Office of School Support and Well-being<br>Office of Well-being, Learning and Achievement<br>850 Hungerford Drive, Room 257, Rockville, MD 20850<br>240-740-5630<br>504@mcpsmd.org | ADA Compliance Coordinator<br>Office of Human Resources and Development<br>Department of Compliance and Investigations<br>45 West Gude Drive, Suite 2500, Rockville, MD 20850<br>240-740-2888<br>DCI@mcpsmd.org |
| **For inquiries or complaints about sex discrimination under Title IX, including sexual harassment, against students or staff*** ||
| Title IX Coordinator<br>Office of District Operations<br>Student Welfare and Compliance<br>850 Hungerford Drive, Room 55, Rockville, MD 20850<br>240-740-3215<br>TitleIX@mcpsmd.org ||

*Discrimination complaints may be filed with other agencies, such as the following: U.S. Equal Employment Opportunity Commission (EEOC), Baltimore Field Office, GH Fallon Federal Building, 31 Hopkins Plaza, Suite 1432, Baltimore, MD 21201, 1-800-669-4000, 1-800-669-6820 (TTY); Maryland Commission on Civil Rights (MCCR), William Donald Schaefer Tower, 6 Saint Paul Street, Suite 900, Baltimore, MD 21202, 410-767-8600, 1-800-637-6247, mccr@maryland.gov; or U.S. Department of Education, Office for Civil Rights (OCR), The Wanamaker Building, 100 Penn Square East, Suite 515, Philadelphia, PA 19107, 1-800-421-3481, 1-800-877-8339 (TDD), OCR@ed.gov, or www2.ed.gov/about/offices/list/ocr/complaintintro.html.*
**This notification complies with the federal Elementary and Secondary Education Act, as amended.*

This document is available, upon request, in languages other than English and in an alternate format under the *Americans with Disabilities Act*, by contacting the MCPS Office of Communications at 240-740-2837, 1-800-735-2258 (Maryland Relay), or PIO@mcpsmd.org. Individuals who need sign language interpretation or cued speech transliteration may contact the MCPS Office of Interpreting Services at 240-740-1800, 301-637-2958 (VP) mcpsinterpretingservices@mcpsmd.org, or MCPSInterpretingServices@mcpsmd.org.

Maryland's Largest School District

**MONTGOMERY COUNTY PUBLIC SCHOOLS**
Published by the Department of Materials Management for the
Office of Districtwide Services and Support

0840.23ct • Editorial, Graphics & Publishing Services • 9/23 • NP 

Maryland's Largest School District

MCPS Form 560-80
October 2022
Page 1 of 2

## MONTGOMERY COUNTY PUBLIC SCHOOLS

# Intake Form: Supporting Student Gender Identity

Student Welfare and Compliance Unit
MONTGOMERY COUNTY PUBLIC SCHOOLS
Rockville, Maryland 20850
See MCPS *Guidelines for Student Gender Identity*

**Instructions:** The school administrator, counselor, or psychologist should complete this form with the student. Parents/guardians may be involved if the student states that they are aware of and supportive of the student's gender identity. This form should be kept in a secure, confidential location. See distribution information on Page 2. **This form is not to be kept in the student's cumulative or confidential folders.** All plans should be evaluated on an ongoing basis and revised as needed.

### STUDENT INFORMATION

Student Name in MCPS Student Information System (Last, First, MI): _____

School_____ Grade _____

What is your identified name?* _____ MCPS ID # _____

What is your identified gender?** ❑ Male ❑ Female ❑ X (unspecified/non-binary) ❑ Other _____

What pronouns do you use to identify yourself in school? _____

### SUPPORT/SAFETY FOR STUDENT

Is parent/guardian aware of your gender identity? ❑ Yes ❑ No

Support Level: (None) ❑ 1 ❑ 2 ❑ 3 ❑ 4 ❑ 5 ❑ 6 ❑ 7 ❑ 8 ❑ 9 ❑ 10 (High)

If support level is low, what considerations must be accounted for in implementing this plan?

**STUDENTS WORKING WITH THE SCHOOL COUNSELOR TO COMPLETE THIS FORM WILL BE INFORMED WHEN IDENTIFIED NAMES WILL BE USED AND WHEN LEGAL NAMES (LISTED IN ENROLLMENT AND RECORD KEEPING) WILL BE USED.**

| DOCUMENT/COMMUNICATION TYPE | LEGAL OR IDENTIFIED NAME | GENDER LISTED (YES OR NO) |
|---|---|---|
| 504 Plan | Legal Name | No |
| Attendance Calls | Identified Name | No |
| Class Rosters (Substitutes) | Identified Name | Yes (Identified) |
| High School Diploma | Legal Name | No |
| Individualized Education Plan (IEP) | Legal Name | Yes (Legal) |
| MAP Testing Reports | Identified Name | No |
| Maryland Comprehensive Assessment Program (MCAP) | Legal Name | No |
| Naviance (College Application Process) | Legal Name | No |
| Performance Matters | Identified Name | Yes (Identified) |
| Report Card | Identified Name | No |
| Student Record Cards | Legal Name | Yes (Legal) |
| Transcript (Official) | Legal Name | Yes (Legal) |

Former students who wish to update their student records with MCPS due to gender identity, and have had a legal name/gender change, should contact the Montgomery County Public Schools Central Records office at CentralRecords@mcpsmd.org to obtain the required documentation for initiating the change.

\* Consistent with MCPS *Guidelines for Student Gender Identity*, the school administrator/counselor/psychologist can request that the school record keeper add the identified name in the MCPS Student Information System.

\*\* Student's indication of identified gender on this form is for confidential notification to the school ONLY. If the student requests that their gender be changed on MCPS official records, the school must follow the procedures outlined in the MCPS *Student Record Keeper Manual*.

JA073

**MCPS Form 560-80**
**Page 2 of 2**

## PRIVACY, CONFIDENTIALITY, AND DISCLOSURE

Plan for bathroom/locker use:

Plan for sports/extracurricular activities:

Other issues to be considered/addressed:

Who will be the student's "go to adult" on campus?

## PRIVACY, CONFIDENTIALITY, AND DISCLOSURE (continued)

If this person is not available, what should student do?

What, if any, will be the process for periodically checking in with the student and/or family?

What are expectations in the event the student is feeling unsafe and how will the student signal their need for help?

## OTHER SCHOOL ACTIVITIES

Are there lessons, units, content or other school activities during the school year to consider (health curriculum, swim unit, social justice units, name projects, dance instruction, Pride events, school dances, promotion/graduation ceremonies, etc.)?

## COMMUNICATION PLAN

Identify staff to whom this information may be disclosed:

How public or private will information about this student's gender be?

## SUPPORT PLAN REVIEW AND REVISION

How will this plan be monitored over time?

Form completed by (print name) _____ Date _____/_____/_____

Distribution: Copy 1/School Confidential folder (in principal's office)
         Copy 2/Student Welfare and Compliance Unit, via scan to SWC@mcpsmd.org, or via pony to CESC, Room 55, in an envelope marked confidential

**WELCOME**

 There are 4 sections in this compliance module. To move through this module you need to press next or swipe to the right. On some slides, more information will be available by clicking the blue and white "i"

**PROVIDING A SAFE AND WELCOMING ENVIRONMENT**

Transgender and other gender-nonconfoming students are among our most emotionally and psychologically vulnerable students. Research conducted by the CDC and Prevention and the NIH indicates that our transgender and gnc students are more frequently at risk of violence and bullying as well as the mental health issues tha accompany these stressors than are students who identify with the gender that was assigned by them at birth.

A national survey found that 75% of transgender youth feel unsafe at school. Another study found that almost 50% of transgender youth had seriously considered  suicide with 25% reporting they had made a previous suicide attempt.

Our charge as educators is to provide a safe and welcoming learning environment  where all our students feel valued regardless of race, ethnicity, sexual orientation, gender identity  or any other personal characteristics.

As part of our longstanding effort to fulfill this commitment, MCPS developed guidelines for student gender identity. While federal law on the topic of gender  identity continues to evolve, MCPS Board of Ed has reaffirmed that the Guidelines will remain in place.

The Guidleines are fully aligned with the Maryland State Department of Education's Providing Safe Spaces for Transgender and Gender Nonconforming Youth: Guidelines for Gender Identity Non-Descrimination, and our own MCPS Board policies and regulations, as well as the policies in many other school districts across the Nation.

https://marylandpublicschools.org/about/Documents/DSFSS/SSSP/ProvidingSafeSpacesTransg endergenderNonConformingYouth012016.pdf

**DEFINING KEY TERMS**

This module provides an overview of the principles set forth in these Guidelines as we seek to enable staff members to address matters of student gender identity appropriately and consistently. Gender identity is a new issue for many. Let's start with some definitions to help us all set a common language around this topic.

Gender Expression- The manner in which a student expresses gender to others often through behavior, clothing, hairstyles, activities, voice speech and word choices or mannerisms.

Gender nonconforming- a term for people whose gender expression differs from conventional or stereotypical expectations. This may include "feminine" boys, "mascuine" girls or those whose

gender is androgynous. This term also includes individuals who identify outside traditional gender categories.or identify as two or more genders. Other terms that have similar meanings include "gender diverse" or "gender expansive"

Transgender- an adjective describing a person whose gender identity or gender expression is differnet from that traditionally associated with the persons sex assigned at birth

Gender identity - a person's deeply held internalized sense or psychological knowledge of the person's own gender. All individuals have a gender identity. Many people have a gender identity thatt matches their sex assigned at birth.Gender identity does not necessarily define a person's sexual orientation. Sexual orientation is who someone is emotionally or physically attracted to.

Nonbinary- A person who does not identify solely or at all, as either male or female. some nonbinary people are also transgender

Cisgender - A person whose gender identity and gender expression align with the persons sex assigned at birth; a person who is not transgender or gender nonconforming.

MCPS developed these definitions based on reliable resources.published by organizations and agencies such as the American Psychological Assoc.; the Maryland state dept of ed; the national school board association, as well as other school districts.

**STUDENTS RIGHTS**
These definitions are not intended to label students. But rather to assist in understanding transgender and gender- nonconforming students.Students might or might not use these terms to describe themselves. In addition MCPS understands that these terms are evolving and may become outdated quickly.

In accordance with state Law, MCPS permits students to enroll and be identified as either male, female or gender X. Schools are required to use the legal name from a student's permanent record for standardized tests or reports to the MD Dept of ED. For more specifics please refer to the Guidelines for student gender identity.

In the following scenarios we explore the steps that schools should take to ensure that every student has equal access and equal opportunity to participate in all programs and activities at school and is otherwise protected from gender based discrimination at school.

**QUIZ**
A family with a transgender student is new to MCPS. While enrolling their child, they request that their students trangender status remain confidential. Does MCPS have an obligation to reasonably accommodate their request?

YES NO MAYBE

The answer is yes. The school must honor the family's request for confidentiality. All students have a right to Privacy. This includes the right to keep private one's transgender status at school. Information about a students transgender status, legal name or sex assigned at birth may constitute confidential medical information. Transgender students have the right to discuss and demonstrate their gender identity and expression openly. And they also have the right to decide when, with whom, and how much and how much to share private information.

This can be a challenging time and issue for the student and his or her family, and they need and deserve your respect. In addition disclosing this information to other students, their parents or guardians or third parties could violate laws such as the federal family educational rights and privacy act (FERPA)

#2 Donna first enrolled in MCPS as a kindergarten student. Now in grade 8 Donna has requested that the teachers use the name Don.
 Should teachers use the student's identified name?

YES NO MAYBE

The answer is YES. Teachers should use the students identified name. It is our job to make  all students feel safe and accepted.  Please note that medical diagnosis, treatment or other documentation are not required in order for a school to accommodate requests regarding gender identity. Equally important students are not required to obtain a court ordered name and/or sex designation change in order to be addressed by the name that corresponds to their gender identity.

#3 A bus driver repeatedly refers to Don as "she". The students on the bus continue to remind the bus driver of his identified (preferred)  name and pronoun, but the driver refuses to use the correct pronoun. Do MCPS rules permit the bus driver to refuse?

The answer is No.

Students should be addressed by all staff members by the name and pronoun corresponding to the gender identity that is consistently asserted at school.  **As an employee of MCPS, the bus driver is expected to model MCPS values and respect the rights of the student, regardless of any conflicting personal views.**

#4 Don has also requested to use the boys' restroom.  Should the student be allowed to use the boys' restroom?

YES NO MAYBE

The answer is yes. All students must be permitted to use the restroom of their consistently asserted gender identity. Any student who is uncomfortable using a shared facility because of safety, privacy or any other reason, should upon request be provided with a safe and non-stigmatizing alternative arrangement. Such as a use of a nearby private restroom. But students who are entitled to use a facility consistent with their gender identity cannot be required to use an alternative arrangement. Alternative arrangements should be used only at the request of a student.and in a matter thatt keeps the students transgender status confidential.

**Some students may feel uncomfortable with a transgender student using the same restroom. This discomfort is not a reason to deny access to the transgender student. School administrators and counseling staff should work with the students to address the discomfort and to foster understanding of gender identity and to create a school culture that respects and values all students.** For additional information on gender identity, please refer to the MCPS Guidelines for Gender Identity.

## GUIDELINES, POLICIES AND REGULATIONS

MCPS has developed an intake form to assist school administrators in this planning process. Should you need to develop a plan for a student, your administrator or supervisor will take the lead. The principal or other appropriate administrator should develop a plan, in collaboration with the student and the students family ( if the family is supportive of the student) The plan should seek to provide the supports and accommodations needed to facilitate the students ability to participate in the school community in accordance with their gender identity. Each student's needs should be assessed on a case by case basis. The best interest of the child is paramount.

Intake form

https://ww2.montgomeryschoolsmd.org/departments/forms/pdf/560-80.pdf

Remember to be supportive of the student and their family and let them know you are on their side. Plan for the students' success and always make every attempt to honor the students wishes.

Because students' needs change over time all plans should be evaluated on an ongoing basis and revised as needed.

Consider this scenario. You witness several students routinely using the phrase "Thats so gay" as an insult, epithet, or dislike of something. What should you do? Staff should intervene and follow processes developed through the school disciplinary guidelines and the MCPS Code of Conduct.

No one should use a person's identity in a negative way that is rude or hurtful. Bullying based on sexual oriention or gender identity is inconsistent with MCPS core values and expectations and will not be tolerated. Complaints alleging discrimination or harrassment directed at a student based on a students actual or perceived sexual orientation or gender identity or expression should be handled in the same manner as other discrimination or harrasment complaints as discussed in more depth in the online compliance training modules on student bullying and sexual harrasment. Bullying and harassment also includes targeting a student  because of the sexual oritentation or gender identity  of a friend, family member or other person or group with whom a student associates.

School staff members should take all reasonable steps to ensure safety and access for LGBTQ+ students at their school and support students' rights to assert their gender identity and expression.

LGBTQ+- An acronym for the Lesbian, Gay Bisexual, Transgender, Queer, and Questioning community, This acronym often is written asLGBTQ+ in an effort to be more inclusive. It is also stated as LGBTA to include people who are asexual, or LGBTI, with the I representing intersex or LGBTQIA to representall of the above.

For more information on Gender Identity, please review the information found in this key resource. When you finish, you should check-off that you have reviewed the guideline and understand your obligation to comply with it. In addition, you can download or print this resource for future reference and you can always find the most updated version on the MCPS website.

https://www.montgomeryschoolsmd.org/uploadedFiles/students/rights/0848.22_2022-23_StudentRightsAndResponsibilities_WEB.pdf





**Employee Request for Religious Accommodation**

---

| | |
|---|---|
| From | Google Forms <forms-receipts-noreply@google.com> |
| To | kwpolk@protonmail.com |
| Date | Monday, November 21st, 2022 at 11:22 AM |

---

Thanks for filling out Employee Request for Religious Accommodation

Here's what was received.

# Employee Request for Religious Accommodation

INSTRUCTIONS:

MCPS employees must use the electronic or PDF versions of this form when requesting a religious accommodation or exemption. If you have already filled out this form, as a PDF or on paper, you do not need to submit it electronically.

Questions about religious accommodations can be directed to khalid_d_walker@mcpsmd.org.

Email *

kwpolk@protonmail.com

MCPS ID Number *

112316

JA082

Employee Name *

Kimberly A. Polk

Position *

e.g. bus operator, paraeducator, secretary, teacher, etc.

Substitute Teacher

Work Location *

e.g. School Name, such as Argyle Middle School, or Building, such as CESC or 45 W Gude.

Various MCPS Elementary Schools

Preferred Phone Number

301.219.5042

Describe requested accommodation *

I am requesting to work as a substitute teacher without committing to adhere to the full gender identity guidelines and training provided by the Montgomery County School Board (MCSB). I request that I be permitted engage with students, teachers, and parents without: needing to agree with or express the belief that gender can be different than biological sex; engaging in or supporting deceptive practices that may result in keeping information from a parent that their child is or has a desire to transition—whether medically or behaviorally—because they might disagree or not support their child's desire; being required to use pronouns that differ from a child's sex; and allowing a child to use a restroom while there is another child of the opposite sex using the facilities as it would violate my understanding of the Bible's teaching on modesty. Doing any of those things would be a sin for me.

Indicate duration of requested accommodation (temporary, permanent; amount of time)

During my employment by MCSB.

Describe the religious belief or practice that necessities this request for accommodation *

Because teaching is so important to me financially, I am hopeful that obtaining work as a substitute teacher will not require that I surrender my Constitutional rights to practice my sincerely held religious beliefs. It is my deep belief in God who sacrificed his son, Jesus, because he loved me that compels me to love and care for the children in the classes I have taught and to offer my best work to the school, teachers, and students.

I grew up in a Christian home and have gone to church throughout my life. I don't remember a time when I did not believe that Jesus was God's son, that he was born to a woman, lived, and was crucified, so that he could bear my sins and obtain the forgiveness that I believe only he can purchase for me. The Bible makes clear that I am a sinner and that without the sacrifice of Jesus on the cross, I cannot have eternal life with him. For as long as I can remember I have always believed the Gospel of Jesus Christ. I have always had this innate sense that there is a higher power who is controlling the universe and he is just and that no matter what happens he sets everything right.

I was baptized when I was 11 around the 5th or 6th grade. I did understand that I wanted to live for Jesus. Even then I knew that being a Christian didn't just mean a free ticket to heaven, but that he changed your life and you lived for Him now. As a result, I was no longer free to do what I wanted if it was contrary to what I understood the Bible to say. As a young person, while I didn't fully understand what it meant to have Jesus live inside of me or be filled with the spirit, I knew that God was always with me and would never leave me or forsake me and that I wanted to serve him in everything I did.

Although I was raised Baptist, I come from a long line of Quakers. My mother and grandmother were both strong believers and they valued education. My Grandmother was an elementary school teacher and taught Sunday School forever (70 years). She was always helping people, caring for the poor, and was involved in missions work. My mother was the same. She was always looking out for the underdog and had me read books about people like George Washington Carver. My mom taught Sunday School my whole life and she was a teacher in our church's preschool.

My religious beliefs are not merely intellectual or philosophical pursuits, but they have a direct impact on what I do and how I do it. I am not wealthy. Yet, because of how I saw my mother and grandmother live for Christ, I practice what I and others in my life have preached. For example, I have sponsored a World Vision child for many years because I saw my

JA084

grandmother sponsor a child from the Philippines writing letters to her and becoming friends. My Grandmother changed her life. Through her, I saw what it meant to love others as you do yourself, a Biblical command that is sometimes difficult, but which I know God can help me do because I saw how my mother and Grandmother lived their lives. So even how my husband and I spend our money, we believe that we must find ways to help others. I grew up going to church every Sunday and Wednesday. My mother also made me go to choir which I hated, but in obedience to her, I went. I was active in our church youth group, went on several mission trips, helped with Vacation Bible School, and volunteered in the church nursery.

In college I was active in the Baptist Student Union. I went on a mission trip to Mexico and also helped lead a local kids club (Big A) sharing the gospel. I did summer missions for 2 summers in college where I met my husband who had also volunteered. After graduation from Central Missouri State University (now University of Central Missouri). I took a job with the Government Printing Office in Washington DC. I got married in 1991 and had my first son in 1995. Having a child was among the most wonderful blessings I have experienced. I love being a mom to our five children. All my life I wanted to be a mom and parenting has taught me a lot about God, especially his unconditional love.

I have to say that my Christian life has definitely been a journey; slowly but steadily becoming closer to God and learning that I must follow what I believe is God's leading even when I didn't want to. I made a lot of adjustments to my life including leaving the corporate world and quitting my full-time job, so I have time to pour my life into people because I believe God made all of us in his image and we all have a dignity that comes from that, not what we do or how much money we have. I love working with and teaching kids. This is why as a mom with kids who are now adults, I took a part time job babysitting and also became a substitute teacher. I'm also taking care of an elderly friend who has no living family members nearby.

As I hope you can see from the information above, my faith is a part of me that I cannot cut out or ignore. And my understanding of the Bible and what it teaches and requires of me on the gender issue is simple and straight-forward. I believe that God has created all human beings and that in his wisdom, he created them as either male or female. And while I am aware of babies born who have some traits of both men and women, that is not the situation the MCSB policy on transgender students addresses.

As a Christian I believe that it would be against God's law to lie to a child and pretend that I agree with the idea that gender can be different than biological sex, or that I have the right to hide from a parent their child's desire to transition—whether medically or behaviorally— because they might disagree or not support their child's desire. Doing any of those things would be a sin for me. The Bible clearly teaches that the education of a child is a parent's responsibility though they may choose to be aided by others, such as Montgomery County Public Schools in doing so. I don't have a right to hide or lie to a parent. I cannot engage in conduct or speech that supports the idea that God erred when he made a child a boy or a girl and that a person has the right to change that. The Bible is also clear on what is required in terms of modesty, and I could not allow a child to use a restroom while there is another child of the opposite sex using the facilities.

JA085

Finally, with respect to names, if there were a child who wanted me to use a name other than the one, he or she was assigned by their parent(s) at birth and the parent(s) agreed to the use of another name, I would have no problem calling that child by his or her chosen name, rather than the name assigned at birth. I would, of course, continue to use the pronouns that accurately reflect his or her sex.

As an elementary school substitute teacher, I don't anticipate any of these issues coming up on a regular basis. Accordingly, there should be minimal impact on my ability to substitute teach the grades I have previously taught. To be clear, I understand that some students are dealing with and considering issues pertaining to gender. I do not see it as my responsibility to play a role promoting or denigrating student decisions on this or related issues. I must, however, draw a clear line that I cannot cross because it would result in my violating deeply held religious beliefs. Ensuring that all children in my classes are included in class activities and are safe and not bullied by anyone for any reason is what I have done in the past and will continue to do.

As provided for in the instructions to this form, I have emailed a more complete version of my request and justification for a religious accommodation directly to Mr. Khalid D. Walker, at khalid_d_walker@mcpsmd.org which should be considered part of this submission.

Certification of Religious Beliefs *

[✓] I certify my religious beliefs and practices, which result in this request for a religious accommodation, are sincerely held. I understand that my request for an accommodation may not be granted if it is unreasonable and/or if it creates an undue hardship on my employer. I understand I may be asked to provide supporting documentation regarding my religious practice and beliefs to further evaluate my request for a religious accommodation.

Optional: Upload documentation related to request

Submitted files

[PDF] Request for Religious Accommodation - Kimberly Polk.pdf

Create your own Google Form
Report Abuse

JA086

From: Walker, Khalid D <Khalid_D_Walker@mcpsmd.org>
Date: On Tuesday, December 13th, 2022 at 3:31 PM
Subject: Religious Accommodation Request
To: kwpolk@protonmail.com <kwpolk@protonmail.com>
CC: Simmons, Michaele O <Michaele_O_Simmons@mcpsmd.org>

Hi Mrs. Polk,

I am writing to follow up on your request for a religious accommodation. On November 21, 2022, you submitted a request for a religious accommodation. On December 2, 2022, you and I met to discuss your request.  You requested to be permitted to refrain from completing the Gender Identity training by refraining from acknowledging that you would adhere to MCPS' *Guidelines for Student Gender Identity*.  You also requested to be permitted to refrain from adhering to the *Guidelines for Student Gender Identity*.

Unfortunately, I am writing today to inform you that MCPS is unable to accommodate your request. You are required to complete the training and adhere to the *Guidelines for Student Gender Identity.* Completing the training and adhering to the guidelines are a condition of employment and the training provides information on how to perform the job, how to comply with equal employment opportunity obligations, and information on workplace policies, procedures, or applicable legal requirements.

You may appeal this determination by contacting Mrs. Michaele Simmons, supervisor, Department of Compliance and Investigations, copied on this email.

Please let me know if you have any questions.

Khalid Walker

Compliance Coordinator

# Carney, Kelehan Bresler, Bennett & Scherr LLP

### ATTORNEYS AT LAW

Kevin J. Kelehan
Earl E. Wise III
B. Darren Burns
Peter D. Fastow
Evan J. Feldman
Manisha S. Kavadi
Craig S. Meuser
Claude de Vastey Jones
Kathy L. Stump
Austin C. Klinger

OF COUNSEL:
Judith S. Bresler

IN MEMORIAM:
Thomas M. Meachum
David A. Carney

www.CarneyKelehan.com

February 5, 2024

Linda Lee
Via email and EEOC PORTAL (LINDA.LEE@EEOC.GOV )
Equal Employment Opportunity Commission
G.H. Fallon Federal Building
31 Hopkins Plaza, Suite 1432
Baltimore, MD 21201

Re:    *Kimberly Polk v. Montgomery County Public Schools*
       EEOC No. 531-2023-02520

Dear Ms. Lee:

This firm has been asked to respond to the charge of employment discrimination filed by Kimberly Polk ("the Complainant") against the Montgomery County Public Schools ("MCPS").  The charge states as follows:

I.     I have been employed by the above-named Respondent since April 2021, as a Substitute Teacher.  On November 21, 2022, I requested a religious accommodation.  Shortly thereafter, I had a phone conversation with Khalid Walker/Compliance Coordinator, and he stated that my request should be granted.  On December 13, 2022, my religious accommodation was denied and was locked out of the system for work assignments.

II.    Respondent stated my request was denied due to not adhering to the guidelines.

III.   I believe I was discriminated against with respect to my religion (Christian) and denial of religious accommodation and work assignments for engaging in a protected activity in violation of Title VII of the Civil Rights Act of 1964, as amended.

**Response**

The Complainant's allegations of discrimination are without merit.   The Complainant filed a request for religious accommodation via the MCPS Google form platform and by electronic mail to the Department of Compliance and Investigations on November 21, 2022. See *Exhibits 1* and *2*, attached hereto. Following the interactive process and consultation with the Office of General Counsel and Student Welfare and Compliance Unit, Complainant was notified that

10715 Charter Drive, Suite 200
Columbia, Maryland 21044
410-740-4600  * Fax: 410-730-7729

1997 Annapolis Exchange Parkway, Suite 300
Annapolis, Maryland 21401
410-972-4685  * Fax: 410-730-7729

106 Circle Avenue, Suite 116
Salisbury, Maryland 21801
410-740-4600  * Fax: 410-730-7729

JA088

Ms. Linda Lee
February 5, 2024
Page 2

her accommodation request was denied on December 13, 2022. See *Exhibit 3*, attached hereto. The denial was based on the Complainants refusal to accept to abide by the MCPS policies, regulations, guidelines, expectations, and standards of conduct to not discriminate against students based on personal characteristics, which include sex, gender, gender identity, gender expression and sexual orientation. As the facts will demonstrate, Complainant was not subjected to discrimination based on her religious beliefs. These matters are discussed further below.

**Background**

The Complainant was hired by MCPS on May 3, 2021, as a short-term substitute teacher. She worked as a substitute teacher on two occasions during the 2021-2022 school year.[1] In order to be eligible to work with students, MCPS requires that all employees, to include Complainant, to complete annual compliance training.[2] *Exhibit 7*, MCPS *Employee Code of Conduct,* attached hereto. Compliance training is made available to all MCPS employees and staff online via the MCPS website at Student Welfare and Compliance. See *Exhibit 4*, attached hereto. Complainant, like all other MCPS employees and staff, as a condition of employment was required to complete all training modules. Complainant refused to complete the *Respecting Student Differences* module. *Exhibit 8*, attached hereto. Complainant explained in her November 21, 2022, Employee Request for Religious Accommodation, that she would not be able to adhere to the MCPS policies and regulations regarding the gender identity and expressions guidelines. *Exhibit 5*, attached hereto. Complainant specifically provided that she would be unable to engage with student and parents without agreeing that gender can be different than biological sex; that she would not keep confidential information from parents regarding a student's desires to transition; that she would not use a pronoun different than the child's biological sex; and that she would not allow a student to use the bathroom of the opposite sex. See, *Exhibit 1 and 2*.

As part of the Department of Compliance and Investigations procedure to evaluate a request for accommodation, Khalid Walker, Compliance Coordinator, engaged Complainant in the interactive process to seek information necessary to assess the feasibility and practicality of the request.[3] During the process, Complainant

---

[1] November 19, 2021, and June 3, 2022.
[2] "MCPS is committed to providing a safe and welcoming learning and working environment for students and staff across our district. To fulfill this commitment, all staff are required to complete the annual Districtwide Compliance Training every school year." *Exhibit 7*, MCPS *Employee Code of Conduct*, MCPS 7-12.
[3] MCPS would note, contrary to Complainant's allegation, at no time during the interactive process did Mr. Walker state that Complainant should be provided a religious accommodation.

Ms. Linda Lee
February 5, 2024
Page 3

requested that she not be required to abide by the gender identity guidelines. MCPS explored with Complainant options that would include completing the module and verbally assenting to adhere to the expectations within the module without signing the acknowledgment.

Following this process, the Department of Compliance and Investigations, the Office of General Counsel, in consultation with the Compliance Unit, decided to deny the request. Further conversations by MCPS staff to create an accommodation in which the Complainant would complete the training and adhere to the policies, regulations, and guidelines on gender identity, were refused by Complainant.

MCPS's mission includes a commitment to diversity, equity, and inclusion.

> To fulfill this commitment, all staff are required to complete the annual Districtwide Compliance Training. This training is designed to ensure that every employee has the necessary information to establish and maintain a positive, safe, healthy, and lawful climate and culture in which all adults and students are able to thrive and do their best work.
>
> ***
>
> Due to the importance of this training, school-based staff will not be permitted to work with students until training is completed. *Exhibit 4*, MCPS 4-5 and 4-6, attached hereto.

This pledge to engage all students in a safe learning environment is rooted in MCPS's policies and regulations in prohibiting discrimination "directed at persons because of their actual or perceived personal characteristics[4]" and the promotion of "understanding, respect, civility, acceptance, and positive interaction among all individuals and groups." *Exhibit 9*, Policy ACA, *Nondiscrimination, Equity and Cultural Proficiency*, MCPS 9-3 and 9-6, attached hereto.

**Discussion**
*The Appellant's Requested Accommodation*

Complainant asserts that she was discriminated based on her religious beliefs when MCPS failed to provide her an accommodation which would allow her to ignore

---

[4] Personal Characteristics is defined within the policy to include race, ethnicity, color, ancestry, national origin, nationality, religion, immigration status, sex, gender, gender identity, gender expression, sexual orientation, family structure/parental status, marital status, age, ability (cognitive, social/emotional, and physical), poverty and socioeconomic status, language, or other legally or constitutionally protected attributes or affiliations. *Exhibit 9*, Policy ACA, *Nondiscrimination, Equity, and Cultural Proficiency*. MCPS 9-3.

Ms. Linda Lee
February 5, 2024
Page 4

MCPS policies, regulations, guidelines, and procedures regarding student personal characteristics, specifically dealing with gender. When Complainant met with the Department of Compliance and Investigations, she advised that she would not be able to comply with the requirements found in the *Student Gender Identity Guidelines*. See also*, Exhibit 6,* attached hereto.  The Complainant contends that MCPS discriminated against her when they denied her request for a religious accommodation to not adhere to the compliance module regarding *Respecting Student Differences*, which included the *Student Gender Identity Guidelines*. See, *Exhibit 8 and Exhibit* 5, attached hereto.

In accordance with  Title VII of the Civil Rights Act of 1964[5] ("Title VII") and 24 C.F.R §1605.2, employers have a duty to accommodate an employee's religious accommodation unless the employer "demonstrates [it] is unable to reasonably accommodate an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." *See* 42 U.S.C. §§ 2000e(j), 2000e-2(a).  The burden is on the employer to show that the accommodation was an undue hardship. *Groff v. DeJoy*, 600 U.S. 447, 453 (2023).

The Supreme Court in *Groff* found that "undue hardship" is "when a burden is substantial in the overall context of an employer's business." *Id.* at  447. Thus, the Court held that Title VII requires an employer that denies an accommodation to demonstrate that the accommodation would substantially increase costs to its business. ("What is most important is that "undue hardship" in Title VII means what it says, and courts should resolve whether a hardship would be substantial in the context of an employer's business in the common-sense manner that it would use in applying any such test.") *Id.* at 471.

MCPS' nondiscrimination statement provides:

> Montgomery County Public Schools (MCPS) **prohibits illegal discrimination based on** race, ethnicity, color, ancestry, national origin, nationality, religion, immigration status, **sex, gender, gender identity, gender expression, sexual orientation**, family structure/parental status, marital status, age, ability (cognitive, social/emotional, and physical), poverty and socioeconomic status, language, or other legally or constitutionally protected attributes or affiliations. **Discrimination undermines our community's long-standing efforts to create, foster, and promote equity, inclusion, and acceptance for all.** The Board prohibits the use of language

---

[5] 42 U.S.C. §2000, et. seq., prohibits employers from discriminating against employees and applicants on the basis of religion.

Ms. Linda Lee
February 5, 2024
Page 5

and/or the display of images and symbols that promote hate and can be reasonably expected to cause substantial disruption to school or district operations or activities. For more information, please review Montgomery County Board of Education Policy ACA, *Nondiscrimination, Equity, and Cultural Proficiency*. **This Policy affirms the Board's belief that each and every student matters, and in particular, that educational outcomes should never be predictable by any individual's actual or perceived personal characteristics.** The Policy also recognizes that equity requires proactive steps to identify and redress implicit biases, practices that have an unjustified disparate impact, and structural and institutional barriers that impede equality of educational or employment opportunities. MCPS also provides equal access to the Boy/Girl Scouts and other designated youth groups.

This statement is at the heart of MCPS' commitment to fulfil the mission that every student matters and "to create an educational community guided by its five core values-Learning, Relationships, Respect, Excellence, and Equity." *Exhibit 9*, MCPS 9-1, attached hereto.

Complainant's request to not abide by core policies and regulations is an undue burden to the District. Taking a practical and common sense approach to the Complainants request, MCPS offered Complainant alternatives to ensure compliance with the crux of the policies, specifically to address discrimination based on personal characteristics. The adherence to these policies, regulations and guidelines are to protect and ensure that students are able to learn in a safe environment. Complainant, as a substitute teacher, would need to adhere to this premise based on the potential interactions with students. MCPS' efforts to work with Complainant, to include reviewing the compliance module and agreeing to abide by the principles while not providing a written affirmation at the end of the module, was rejected.

The practical impact of allowing Complainant to openly oppose this core policy, regulation, and principle in which MCPS has provided that students shall not be discriminated against based on their personal characteristics, is clearly an undue burden. "It impedes MCPS's ability to discharge its responsibilities to students, staff, and families and achieve the community's long-standing efforts to create, foster, and promote equity, inclusion, and acceptance for all." *Exhibit 10*, MCPS Regulation ACA-RA, *Nondiscrimination, Equity, and Cultural Proficiency,* MCPS 10-2, attached hereto.

The undue burden to allow Complainant to flatly disregard these tenets would factor into the actual operation of MCPS. *Groff v. Dejoy*, 600 U.S. at 470-471. In evaluating a religious accommodation, an employer may consider the burdens an

Ms. Linda Lee
February 5, 2024
Page 6

accommodation imposes on other employees as part of its assessment to the extent
the accommodation affects the conduct of the employer's business and operations.
*Id.* at 475 ("Title VII requires "undue hardship on the *conduct* of the employer's
business." 42 U.S.C. § 2000e(j) (emphasis added). Because the "conduct of [a]
business" plainly includes the management and performance of the business's
employees, undue hardship on the conduct of a business may include undue
hardship on the business's employees.) (Sotomayor, J., concurring).  Allowing one
single employee to claim a  religious accommodation that would allow that
employee to openly disregard the nondiscrimination policies of the employer would
serve as an undue hardship to the operations.

As stated earlier, following the interactive process and conversations with the
Compliance Unit, the accommodation that was provided to Complainant, was
declined. While the Complainant may have a different view of how MCPS could
accommodate her religious belief, she fails to appreciate the over 160,000 students
MCPS services and the need to provide equitable access to educational
opportunities regardless of a student's individual characteristics. There simply was
no alternative that she would accept absent complete non-compliance regarding the
*Respecting Student Differences* module, Policy ACA, Regulation ACA-RA, and the
*Student Gender Equity Guidelines*. Complainant's insistence that she will not abide
or follow policies, regulations and guidelines that are designed to prevent
discrimination, harassment and provide a nurturing environment to vulnerable
students factors into her fitness to perform the job. Thus, there is insufficient
evidence to demonstrate that MCPS discriminated against Complainant by failing
to provide a religious accommodation.

If you have any questions, please do not hesitate to contact me.


Sincerely,

/s/Claude de Vastey Jones
Claude de Vastey Jones
Carney, Kelehan, Bressler,
 Bennett & Scherr, LLP


CC: Jody Malmstrom, *MCPS Legal Director* via email Jody_L_Malmstrom@mcpsmd.org



ATTORNEYS AND COUNSELORS AT LAW
McLean • Richmond • Leesburg

1945 Old Gallows Road
Suite 650
Tysons, VA 22182

703-761-5000
www.GG-Law.com

Robert B. Adams
A. Wray Fitch III
Robert Flores
James A. Gammon*
Derek L. Gaubatz
George R. Grange II
Stephen H. King

Nancy Oliver LeSourd
Kenneth E. Liu
W. Franklin Pugh, P.L.C. ‡
J. Matthew Szymanski
Bonnie L. Van Der Weide
Scott J. Ward

* Co-Founder, 1934-2011
‡ Of Counsel—Leesburg

March 9, 2024

Ms. Linda Lee
Equal Employment Opportunity Commission          VIA EMAIL and EEOC Portal
G.H. Fallon Federal Building                                     [Linda.Lee@EEOC.Gov]
31 Hopkins Plaza, Suite 14332
Baltimore, Maryland 21201.

> Re:     Rebuttal to Position Statement
>            Kimbery Polk v. Montgomery County
>            Public Schools, No. 531-2023-02520

Dear Ms. Lee:

MCPS refused to hire Ms. Polk for the 2022-23 school year as a substitute teacher because she has a religious objection to parts of MCPS's gender identity guidelines. This refusal follows Ms. Polk's successful work for MCPS as a substitute teacher during the prior year. Indeed, MCPS in its Statement of Position ("SOP") admits that no individuals like Ms. Polk holding traditional religious beliefs may teach in the MCPS system if they do not agree to violate their sincerely held religious beliefs regarding transgenderism and gender identity, subscribe to beliefs with which they disagree, and commit to speak messages they find unethical, including lying to parents.

It is hard to imagine a stronger case of religious discrimination.  Title VII of the Civil Rights Act of 1964 has made it unlawful for covered employers "to fail or refuse to hire . . . any individual . . . because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1).  MCPS, therefore, must show that its business would suffer "undue hardship" if it were required to accommodate Ms. Polk's religious beliefs and practices.

At bottom, MCPS's proffered reason why it cannot grant her an accommodation is that it feels strongly about its preferred gender messaging and disagrees with Ms. Polk's religious views.  This, of course, provides no defense at all, as it would make Title VII's accommodation requirement self-defeating.  Beyond that, MCPS has completely failed to carry its burden to prove that an accommodation of Ms. Polk by assigning her to classes that do not have any transgender students or provide assistance should she have transgender students or gender issues arise in her classroom is any burden at all, much less one that meets Title VII's undue hardship standard as recently clarified by the Supreme Court.

### Key Facts

1. MCPS is a large, government-run operation. MCPS lists on its public website that it operates 136 elementary schools. https://www.montgomeryschoolsmd.org/ about (last visited (Feb. 21, 2024).

2. The school system, the largest in Maryland, boasts over 160,000 students and a workforce of almost 25,000 employees. The FY 2024 budget is $3,165,007,511 dollars. In 2023, MCPS was the seventh largest employer in the state. https://www.heraldmailmedia.com/story/news/state/2023/01/04/the-10-biggest-employers-in-maryland-for-2022/69741502007 (last visited Feb. 21, 2024).

3. Ms. Polk has a proven track record as a substitute teacher for MCPS at eight different elementary schools in the 2021-2022 school year. Indeed, no teachers expressed or reported any problems with her performance and one even planned her absence to ensure that Ms. Polk would be available to cover their class as a substitute teacher.[1] She never encountered a student transitioning genders in her classroom assignments throughout the entire school year.

4. Ms. Polk's family needed this job and for financial reasons in 2022, she anticipated increasing the number of days she worked. As a result of her desire to continue doing work she enjoyed Ms. Polk undertook to satisfy the MCPS requirements to continue working as a substitute teacher for the 2022-2023 school year by taking teacher training during the summer of 2022. While she particularly enjoyed her substitute placements in pre-K, K, and Grade 1, she was willing to substitute in any class, including one where a student was transitioning or claimed no specific gender.

5. Ms. Polk viewed all of the instructional videos that MCPS required, including the one on Gender Identity Guidelines and procedures. Upon doing so, she realized that she was unable to sign the affirmation because her sincerely held religious beliefs would not allow her to lie to students about their gender by using pronouns that differed from birth sex, keep secret from a student's parent that the student was transitioning or expressing gender confusion, or allow boys and girls to use the same bathroom simultaneously because one or more children believed themselves to be of the opposite sex. She was honest, demonstrated commitment to her sincerely held religious beliefs, and asked for an accommodation, not a license to harm students.

6. Ms. Polk's requested accommodation pertains to pronoun use and allowing male and female children to simultaneously use the same bathroom. She was and continues to be willing, if there were a child who wanted her to use a name other than the one he or she was assigned at birth and the parent(s) agreed to the use of another name, to the use of the other name; however, she would continue to use the pronouns that accurately reflect the student's birth sex.

7. Such an approach recognizes that first and middle names, while often associated with a particular sex, are not exclusively so. Pronouns, however, are sex-specific. In the same way, Ms. Polk would not use singular-gender, neutral pronouns when doing so would constitute an effort to misidentify or confuse a child's biological sex. To do so would be to reject her sincerely held religious beliefs that God makes men and women in his image,

---

[1] Ms. Polk would be able to provide the names of these teachers if requested by the EEOC investigator.

including their sex. In sum, Ms. Polk believes that the MCPS policy requires her to lie to a child, deny a basic Biblical truth that has been consistent for thousands of years, violate Biblical standards of morality and modesty, and engage in compelled speech with which she does not agree.

8. Ms. Polk requested a reasonable and limited accommodation so that she could resume teaching in the MCPS system.

9. During a telephone call on December 2, 2022, at 1:00PM, Khalid Walker, Compliance Coordinator for MCPS, and Ms. Polk discussed her requested accommodations in detail. Mr. Walker expressed his belief that issues pertaining to transgenderism or bathroom use could be addressed per their discussion, subject to further MCPS approval.

   a. Mr. Walker informed Ms. Polk that she would not have to use preferred pronouns.

   b. Mr. Walker informed Ms. Polk that she would not be required to sign the affirmation.

   c. Mr. Walker stated that Ms. Polk would be permitted to teach in the elementary schools and PEP program but not in the middle or high school, a condition she agreed to.

   d. Mr. Walker and Ms. Polk discussed in detail her expectations about how often gender or bathroom use issues would arise. Ms. Polk expressed her belief that the issue was unlikely to arise and had not come up in the previous year during which she was employed by MCPS as a substitute teacher. Mr. Khalid informed Ms. Polk that he, too, believed that these issues would be unlikely to arise in the elementary or preschool environment.

   e. Mr. Walker informed Ms. Polk that, in the event that there was a child with gender identity issues that where she couldn't adhere to MCPS policy, the school would provide her with someone else to assist, like a school administrator, who would be able to provide her with support and interact with the students.

   f. When the phone call ended, Ms. Polk understood that MCPS was capable of providing the accommodations and that Mr. Walker needed to put the request through the process to make sure the MCPS administration or general counsel did not have a policy problem with granting the accommodation.

10. On December 14, 2022, Mr. Walker informed Ms. Polk that the requested accommodations were rejected by MCPS.

11. At no time has MCPS offered Ms. Polk a reasonable accommodation, and she has not been able to teach during the 2022-2023 or 2023-2024 school years, which has resulted in a negative impact to her family's financial position.

12. Nothing in the MCPS's SOP indicates that the school system considered any other accommodations than allowing her to avoid signing the affirmation that she would abide by all the procedures of the Gender Identity Guidelines even though she would continue to be required to follow them.

13. MCPS has failed to provide any data or information, in its SOP or otherwise, identifying how Ms. Polk's involvement teaching in preschool and the elementary grades would pose an undue hardship to MCPS in the conduct of its business. For instance,

     a.  MCPS has failed to provide the EEOC with the number of students presenting as transgender or non-binary or gender fluid in the elementary or pre-school student population, despite having such data per its Gender Identity Guidelines.[2]

     b.  MCPS has failed to identify how many elementary or pre-school classes have even one transgender student in them, which data should be readily available because transitioning students are to have a written plan pursuant to the Gender Identity Guidelines.

     c.  MCPS has failed to identify a population of transgendered or gender confused students that she would invariably need to teach.

     d.  MCPS has failed to identify any administrative or other burden if Ms. Polk required assistance with handling a transgender student or situation.

14.  MCPS has no published process by which it explains how it treats requests for religious accommodations.

<u>Discussion</u>

When defining *religion* for purposes of unlawful discrimination, Congress in Title VII explains as follows:

> The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

42 U.S.C. § 2000e(j).  While EEOC and the courts have reached somewhat conflicting opinions on what constitutes an "undue hardship" in the past, we have the luxury of a recent Supreme Court decision, *Groff v. DeJoy*, 600 U.S. 447, (2023), clarifying the undue hardship standard. While MCPS does not satisfy even those EEOC regulations and guidance issued prior to *Groff* regarding "undue hardship," they have not yet been modified in light of *Groff*, and so we will focus on that decision's lessons.[3]

*Groff*'s lessons are simple enough for present purposes, and they dispose of MCPS's purported defense in its SOP:

- Showing a *de minimis* burden does not suffice. *Id.* at 468.

- Consistent with the plain language of Title VII and common sense, the burden is on the employer to defend a denial of a religious accommodation by showing it would result in

---

[2] *See* 2023-2024 Student Gender Identity in the Montgomery County Public Schools (Sept. 2023) at 5-12, 13.

[3] We note, however, that the Supreme Court in *Groff* remarked that "today's clarification may prompt little, if any, change in the agency's guidance explaining why no undue hardship is imposed by temporary costs, voluntary shift swapping, occasional shift swapping, or administrative costs. See 29 C.F.R. § 1605.2(d)." 143 S. Ct. at 471.

substantial increased costs in relation to the overall context of the conduct of its particular business. *Id.* at 468-69, (holding that employer "must show" sufficient burden).

- Bias or hostility to a religious practice or a religious accommodation does not provide a valid defense to an employer. *Id.* at 468.

- An employer may not only consider particular accommodations requested by an employee, but must affirmatively consider all possible accommodations. *Id.* at 473.

<u>MCPS's Proffered Justifications Are Insufficient as a Matter of Law</u>

MCPS seeks to avoid its Title VII responsibilities by a two-pronged approach: (a) repeating at length how important it believes it to be to hold affirming view of homosexuality and transgenderism (see, e.g., SOP at 4-5), and (b) claiming that it provided Ms. Polk an acceptable accommodation by saying she would have to fully comply with the gender identity policies in practice but would just not have to affirm in writing (or by "checking the box" electronically) that she agreed with them (see SOP at 2-3). This approach fails as a matter of law.

What MCPS is basically saying is that it disagrees---even strongly disagrees---with Ms. Polk's religiously informed views (views, we would add, consistently held by Christians for millennia). As a result, MCPS will require her to dishonor her beliefs in practice, even if it does not make her expressly affirm MCPS's contrary vision of reality and morality. All MCPS does by putting this forward as a purported defense of not hiring Ms. Polk is show its anti-religion bias. It does no more good for MCPS to say it disagrees with Ms. Polk's religious beliefs than it would have for USPS to defend its firing of Mr. Groff by saying that USPS felt strongly that his beliefs about the Sunday being a Sabbath day of rest were mistaken. Title VII requires *accommodation* of an employee's religious view, if reasonably possible, even when they might come into conflict in some ways the employer's beliefs and business practices.

The Supreme Court emphasized in *Groff* that an anti-religious bias, i.e., a disagreement with the complaining employee's religious beliefs and practices, was simply irrelevant in the Title VII accommodation enquiry. Putting it in the context of other employees disagreeing with the religious employee and perhaps suffering some inconvenience because of it, the Court explained as follows:

> [A] coworker's dislike of religious practice and expression in the workplace or the mere fact [of] an accommodation is not cognizable to factor into the undue hardship inquiry. . . . An employer who fails to provide an accommodation has a defense only if the hardship is "undue," and a hardship that is attributable to employee animosity to a particular religion, to religion in general, or to the very notion of accommodating religious practice cannot be considered "undue." If bias or hostility to a religious practice or a religious accommodation provided a defense to a reasonable accommodation claim, Title VII would be at war with itself.

143 S. Ct. at 472 (quotation marks and cites removed). These words of the Court applied to *coworker* animosity to the complaining employee's religious beliefs and practices obviously apply in spades to *employer* animosity like that illustrated so well by MCPS in its SOP. To say, as MCPS

does, that it does not have to accommodate Ms. Polk because it does not agree with her religious views puts Title VII "at war with itself." *Id.*

Of course, MCPS's claimed "accommodation" that Ms. Polk act inconsistently with her religious beliefs is also "at war with itself." It is no accommodation at all, but a required capitulation. Viewed more cynically, MCPS was trying to create the type of Catch-22 trap that Title VII prohibits: Had Ms. Polk taken MCPS up on its disingenuous offer and altered her behavior, it would have undermined her credibility of sincerely holding orthodox Christian beliefs about gender; if she acted consistently with her beliefs after taking the "accommodation," she would be guilty of violating MCPS's rules and subject to dismissal.

<u>Ms. Polk's Suggested Accommodation Is Feasible</u>

We could end this discussion here. Both Title VII and the Supreme Court in *Groff* make clear that it is the *employer's* burden to prove that no accommodation is feasible without involving an undue hardship to the overall business. *Id.* at 468-70. MCPS has done nothing except posit excuses that are unavailing as a matter of law.

But Ms. Polk and MCPS's Mr. Walker did broker an accommodation, and it shows that one is available here.  Their accommodation, in fine, was that Ms. Polk would (1) agree to use a student's chosen name as long as their parent agreed, but continue to use the correct pronouns, and (2) that should an issue arise in the context of a biologically male or female child demanding to use the bathroom of the opposite sex, another teacher or staff member would assist and she would remove herself from the situation. Obviously, Ms. Polk is not asking for an accommodation to ridicule, discriminate, or even draw unnecessary attention to her sincerely held religious beliefs, and her suggested accommodation would not undercut the school's professed mission to support its transitioning students. The only accommodation that Ms. Polk and Mr. Walker agreed to was that Ms. Polk would not seek to teach in the middle or high school.

This suggested accommodation is obviously one that is reasonable, practical, and eminently feasible. MCPS has hundreds of preschool and elementary school classrooms, it has thousands of employees, it knows which classes have transitioning students, and providing assistance to Ms. Polk in those cases where a transitioning students is present does not present an undue hardship. Despite being aware of this suggested accommodation, MCPS in its SOP fails to explain how such an approach would involve an undue hardship.

Of course, it does not because it cannot. The Supreme Court in *Groff* also spoke to this point. It held that just pointing to some potential inconvenience or expense due to accommodating a religious employee is insufficient: "Faced with an accommodation request like Groff's, it would not be enough for an employer to conclude that forcing other employees to work overtime would constitute an undue hardship. Consideration of other options, such as voluntary shift swapping, would also be necessary." *Id.* at 473. The obvious analogue to shift swapping in the context of MCPS's business is placing Ms. Polk in a classroom environment in which the problem that MCPS sees as a potential one will simply not occur, or addressing it quickly by other employees if it does. After all, Ms. Polk worked the full 2021-2022 school year without any such problem arising.

<u>MCPS Has Not Carried Its Burden to Show Other Accommodations Are Infeasible</u>

The Supreme Court in *Groff* also stressed that the employer's burden to canvass for accommodations that do not involve an undue hardship is not satisfied simply by considering what the religious employee might suggest. Instead, "Title VII requires that an employer reasonably accommodate an employee's practice of religion, not merely that it assess the reasonableness of a particular possible accommodation or accommodations. This distinction matters." *Id.* at 473.

As its SOP discloses, MCPS has made no effort whatsoever to search for accommodations for Ms. Polk. SOP at 2-3. The Supreme Court further instructs that it is required to do so "in a manner that takes into account all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, size and operating cost of [an] employer." *Id.* at 470 (citation and internal quotation marks omitted). In this case, that means, among other things, recognizing that MCPS has over 130 elementary schools, each with multiple classrooms where Ms. Polk could teach, and that it has almost 25,000 employees and an over-three-billion-dollar annual budget. Moreover, certified substitute teachers utilize a web-based portal to find classes in need of a substitute. This portal, maintained by MCPS, could be used to ensure that Ms. Polk was not assigned to a classroom with a child presenting with gender issues, as the school system identifies children with gender issues and tracks them.

MCPS's failure to look for any accommodation---indeed, its demonstrated antipathy to doing so---violates Title VII. For this additional reason, Ms. Polk should prevail in her complaint.

Conclusion

In closing, we return to the fact that MCPS cannot defeat Title VII's demand that it not discriminate against employees or prospective employees on account of their religion by resort to its own "core beliefs" that may be in conflict with those of the employee. Of course, MCPS seems blind to its own hypocrisy, as it discriminates against, and is intolerant toward, those with traditional religious beliefs about homosexual and transgender practices. If MCPS has its way, it will never hire those who hold such views and, if some are among its current workforce, it will drive them into hiding or, worse, into taking actions inconsistent with their beliefs in order to sustain their livelihood. Not only does it not have to be that way, but Title VII *demands* that it not be that way. We request that your office promptly investigate and remedy this situation for Ms. Polk, prosecuting if necessary. We note that continued delay will jeopardize her employment for the 2024-2025 school year. She should be allowed to begin substitute teaching immediately.

Respectfully submitted,

/s/ J. Robert Flores
J. Robert Flores, Esq.
Attorney for Ms. Kim Polk

cc:    Steven W. Fitschen, Esq.
       Frederick W. Claybrook, Jr., Esq.

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

| | | |
|---|---|---|
| KIMBERLY ANN POLK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 8:24-cv-01487-DLB |
| | ) | |
| MONTGOMERY COUNTY PUBLIC | ) | |
| SCHOOLS, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## DECLARATION OF GREGORY S. EDMUNDSON IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

I, Gregory S. Edmundson, declare as follows:

1.    I am the Director of Student Welfare and Compliance and the Districtwide Title IX Coordinator at Montgomery County Public Schools (MCPS), where I have been employed for 32 years.  In my current role, I oversee the implementation of policies and procedures reflecting the district's commitment to support student and staff success, regardless of actual or perceived personal characteristics.  The mission of my department is to create and maintain a lawful, positive, safe, and healthy climate and culture within MCPS.  This includes administration of MCPS policies relating to gender identity.  I make this declaration based on my personal knowledge and upon review of MCPS's records maintained in the ordinary course of business, to which I have access based on my job responsibilities.

**A.    Montgomery County Public Schools And The Montgomery County Board of Education Serve A Diverse Community**

2.    MCPS is Maryland's largest school district and the 14th largest school system in the United States.  It enrolled over 160,000 students for the 2023-2024 school year across 212 schools, including 137 elementary schools.

1

3.      MCPS has approximately 25,000 employees, including more than 13,000 teachers.  On any given day, MCPS schools are also served by hundreds of substitute teachers across its 212 schools.

4.      The Montgomery County Board of Education (the "Board") is the official educational policy-making body in the county.  It sets goals, establishes policies, and commits resources to benefit MCPS's diverse student population.

5.      The Board consists of seven county residents elected by voters for a four-year term and a student elected by secondary school students for a one-year term.

6.      The Board values learning, respect, relationships, excellence, and equity.  The Board believes that building relationships with its diverse community requires it to understand the perspectives and experiences of others.  It also believes that the diversity of culture, interests, skills, and backgrounds in its community is an asset that makes it stronger.  These principles are announced in Montgomery County Board of Education Policy ACA, Nondiscrimination, Equity, and Cultural Proficiency.  Policy ACA is attached as **Exhibit 1**.

**B.      The Guidelines for Student Gender Identity**

7.      MCPS has memorialized its policies relating to transgender and gender non-conforming students in the "Guidelines for Student Gender Identity in Montgomery County Public Schools" (the "Guidelines").  The 2023-2024 version of the Guidelines is attached as **Exhibit 2**.

8.      The Guidelines were adopted in accordance with the Maryland State Department of Education's 2015 guidance document, "Providing Safe Spaces for Transgender And Gender Non-Conforming Youth: Guidelines for Gender Identity Non-Discrimination."  This document is attached as **Exhibit 3.**

2

9.      MCPS student, parent, and staff groups, including the Montgomery County Council of Parent-Teacher Associations (MCCPTA) LGBTQ+ Subcommittee, worked closely in drafting the Guidelines.

10.     When requested by a student or family member, or discussed in connection with a teacher, principal or other staff member, MCPS will assist in drafting a Gender Support Plan, as contemplated by the Guidelines.

11.     MCPS retains Gender Support Plans confidentially.  They are not included in students' files, nor are they are accessible to any staff who do not have reason to know about them.

12.     The identities of students with Gender Support Plans is kept at the school, not district level.  No single data source is available that would allow an MCPS employee to review which classrooms, district-wide, contain students with Gender Support Plans.

13.     MCPS does not require that every student who could be viewed as transgender or gender nonconforming has a formal Gender Support Plan.

14.     In fact, it is my understanding that some students who could be viewed as transgender or gender nonconforming do not have formal Gender Support Plans.  Students would need to proactively make known their gender identity if they decided to develop an identity plan in collaboration with their school counselor.

**C.      MCPS Substitute Teachers**

15.     MCPS hires substitute teachers to fill coverage gaps throughout the school system.  A full-time teacher's absence may be long-planned or last-minute.

16.     There are currently approximately 3,000 active substitute teachers qualified to teach in MCPS schools.  On an average day, approximately 800 substitute teachers are assigned to classrooms.

3

17.     The MCPS Department of Human Capital Management is responsible for maintaining the list of eligible substitute teachers, and only individuals who are on this list may receive assignments to serve as substitutes in MCPS schools.

18.     To be added to the substitute teaching list, an applicant must show that they meet the minimum educational requirements, provide references, complete an interview, and undergo a background check.

19.     Once everything in the candidate's application is complete, they are then required to complete the same district-wide compliance training that is required of all MCPS staff. Substitute teachers are required to review the district-wide compliance training materials each year before they are allowed to receive assignments.

20.     Material on the Student Gender Identity Guidelines (the "Guidelines") was added to the district-wide compliance training for the first time during approximately the 2017-2018 school year.

21.     Starting with the 2022-2023 school year, as part of the compliance training, staff members were also required to affirm that they understood the contents of the Guidelines and their obligation to comply with them.

22.     Substitute teachers are also required to adhere to the Substitute Teacher Handbook.  Substitute teachers are provided with the Handbook as part of their yearly training. The 2023-2024 version of the Handbook is attached as **Exhibit 4**.

23.     Once a substitute teacher has completed their compliance training, they can complete a preference form listing the subject areas or grade levels they are interested in teaching, and the schools in which they are interested in being placed.  Substitute teachers are allowed to list up to 30 potential schools on their teaching list.

24.     Teachers and principals register requests for substitutes within the Substitute Employee Management System (SEMS).  Substitute teachers may also log into SEMS to see and select open jobs.

25.     Once a job has been created in SEMS, the system begins automatically making phone calls to substitute teachers whose preferences match the job.  For example, if a substitute teaching job opens for an art teacher at Thurgood Marshall Elementary School, the system will begin making calls to substitute teachers who'd listed that they were willing to both teach art class and to teach at Thurgood Marshall Elementary School.  Once a teacher receives a call with a particular job offer, they can choose to accept or decline that job.

26.     Substitute teachers can also log on to a web portal to see available jobs in the schools and subject areas or grade levels that they have preferenced.

27.     I understand that Ms. Polk has suggested that MCPS assign her to substitute teach in classrooms without students on Gender Support Plans.  SEMS does not have a mechanism to prevent jobs in particular classrooms from being sent out to be matched with particular substitute teachers.

28.     The only way a substitute teacher can be blocked from being assigned a classroom is if they are blocked from an assignment to an entire school.  MCPS uses this process—the substitute removal process—if a school has concerns with a substitute, or feels that they are not a good fit.  If a substitute removal process is initiated, an MCPS staff member manually removes the school in question from the substitute's preference list, and that substitute is no longer able to be matched at that school.

29.     In addition, while substitute teachers may be covering for one particular teacher, they are often required to teach many different groups of children.  For example, a substitute

filling in for an elementary school art or music teacher may be tasked with teaching art or music to any number of different elementary school classrooms depending on the day. And a middle school or high school teacher typically also covers five different classes each day. If an administrator were tasked with ensuring that those substitute teachers were not assigned to classrooms with students on Gender Support Plans, the administrator would potentially have to review many different rosters that could change depending on the day. In addition, rosters are not static throughout the year and would likely have to be rechecked before every assignment to ensure that students had not moved into or out of classrooms.

**D.    Ms. Polk's Guidelines Training**

30.    As part of her onboarding process for the 2021-2022 school year, Ms. Polk was required to view training materials on the Guidelines.

31.    In order to continue serving as a substitute teacher for the 2022-2023 school year, Ms. Polk was required to view training materials on the Guidelines, and to affirm that she would comply with them.

**E.    MCPS's Administration of the Gender Guidelines**

32.    Since 2022, MCPS has not permitted any of its staff to work without agreeing to comply with the Guidelines.

33.    MCPS has not approved any religious accommodations allowing a staff member not to comply with the Guidelines.

34.    I believe that an accommodation like the one Ms. Polk is requesting would be an undue burden for the following reasons:

   a.    *First*, the Substitute Employee Management System does not contain any data as to which elementary classrooms contain students with gender support plans. As stated in the Guidelines, gender support plans are strictly confidential. Staff

6

JA106

involved with substitute teacher scheduling will generally not have access to students' gender support plan forms.

b.  *Second*, some students may identify as transgender or gender nonconforming without having a formal gender support plan on file.  MCPS school administrators have no way of tracking which classrooms those students are enrolled in. Requiring MCPS to obtain this information before approving any given substitute teaching assignment would drastically undermine the efficiency of school operations.

c.  *Third*, Ms. Polk has stated that if she must interact with transgender students, she will seek assistance from other MCPS personnel to handle the interaction.  This proposal is unworkable.  Substitute teachers are specifically called in because a school is short staffed.  Calling in another staff member on an ad hoc basis throughout the day would be highly disruptive to the students in Ms. Polk's class and those in the other classroom.

35.    Further, MCPS determined that permitting this type of accommodation would undermine its efforts to ensure its classrooms are safe and conducive to learning for all students. MCPS was concerned that permitting some teaching staff to refuse to instruct transgender or gender nonconforming students would expose those students to social stigma and isolation.  This result risks putting MCPS out of compliance with its obligations under state and federal nondiscrimination laws.  MCPS's interest in compliance with these nondiscrimination laws is reflected in Policy ACA, as well as MCPS's Guidelines for Student Gender Identity.  Finally, MCPS is committed to hiring teachers who will treat transgender and non-transgender

students with equal care and respect, in recognition that the youngest people in our community are those most susceptible to the influence of their teachers.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 2nd day of July, 2024.

Gregory S. Edmundson

8

# EXHIBIT 1

ACA

# POLICY     BOARD OF EDUCATION OF MONTGOMERY COUNTY

**Related Entries:**   ACD, ACF, ACH, ACH-RA, ACG, BMA, GAA, GBA-RA, GBH, GEG-RA, JHF, JHF-RA, JHG-RA

**Responsible Offices:**   Chief of Staff Montgomery County Public School; Teaching, Learning, and Schools; Strategic Initiatives; Districtwide Services and Supports; Human Resources and Development; General Counsel

## Nondiscrimination, Equity, and Cultural Proficiency

**A.   PURPOSE**

To affirm the Montgomery County Board of Education's desire to create an educational community guided by its five core values—Learning, Relationships, Respect, Excellence, and Equity.

To affirm the Board's deep commitment to providing every student equitable access to the educational opportunities, rigor, resources, and supports that are designed to maximize the student's academic success and physical, psychological, and social/emotional well-being, and ensuring all staff are empowered to do their best work.

To assert the Board's belief that each and every student matters, each student's individual characteristics are valuable, and in particular, that educational outcomes should never be predictable by any individual's actual or perceived personal characteristics, and that equity demands intensive focus and attention to eliminate all gaps in student achievement.

To establish and promote a framework that prepares all students to live and work in a globally-minded society; fosters a positive learning environment that embraces all unique and individual differences; and, uses an equity lens to consider the impact of any program, practice, decision, or action on all student groups with a strategic focus on marginalized student groups.

To affirm the Board's unwavering commitment that all staff will be culturally proficient, and demonstrate mutual respect without regard to any individual's actual or perceived personal characteristics.

**1 of 10**

**ACA**

To uphold the Board's core values, and ensure compliance with all federal, state, and local nondiscrimination laws.

**B.    ISSUE**

Discrimination in any form will not be tolerated.  It impedes Montgomery County Public Schools' (MCPS) ability to discharge its responsibilities to all students and staff, and achieve our community's long-standing efforts to create, foster, and promote equity, inclusion, and acceptance for all.

The Board recognizes that equity goes beyond meeting the letter of the law.  Equity also requires proactive steps to identify and redress implicit biases and structural and institutional barriers that too often have resulted in identifiable groups of students and staff being unjustifiably or disproportionately excluded from or underrepresented in key educational program areas and sectors of the workforce, as well as over-identified in student discipline actions.  Continued vigilance is necessary to end identified inequities that students and staff experience because of their actual or perceived personal characteristics.

For the purposes of this policy, the following definitions are used:

1.    *Cultural proficiency* is the ongoing process of becoming knowledgeable of one's own culture, as well as the cultures of others in order to foster an appreciation, understanding, and respect for varying cultural expressions that exist in the actions and interactions of an organization; and, to strengthen and enrich the organization and the community at large with the presence and contributions of many cultures.

2.    *Discrimination* includes actions that are motivated by an invidious intent to target individuals based on their actual or perceived personal characteristics, as well as acts of hate, violence, insensitivity, disrespect, or retaliation—such as verbal abuse, harassment, bullying, slurs, threats, physical violence, vandalism, or destruction of property—that impede or affect the learning or work environment. Discrimination also includes conduct or practices that may be facially neutral but that have an unjustified impact based on individuals' actual or perceived personal characteristics.  Discrimination encompasses racism, sexism, and other forms of institutional prejudice in all their manifestations.

3.    *Equity* is the commitment to ensure that every student and staff member, without regard to their actual or perceived personal characteristics, is given the individual challenges, support, and opportunities to exceed a rigorous common standard in order to be prepared for academic and career success.

4.    *Equity lens* means that for any program, practice, decision, or action, the impact on all students is addressed, with a strategic focus on marginalized student groups.

5.    *Implicit bias* refers to the attitudes or stereotypes that affect our understanding, actions, and decisions.  These biases, which encompass both favorable and

**ACA**

unfavorable assessments, may be activated involuntarily and without an individual's awareness or intentional control.

6. *Personal Characteristics* include race, ethnicity, color, ancestry, national origin, nationality, religion, immigration status, sex, gender, gender identity, gender expression, sexual orientation, family structure/parental status, marital status, age, ability (cognitive, social/emotional, and physical), poverty and socioeconomic status, language, or other legally or constitutionally protected attributes or affiliations.

**C.    POSITION**

1. The Board expects the district to develop and promote a culture of high expectations for all students and staff performance and maintain environments that will be equitable, fair, safe, diverse, and inclusive; and eliminate inequities of opportunities, raise the level of achievement for all students, and significantly address achievement gaps.

2. The Board prohibits the use of language and/or the display of images and symbols that promote hate and can be reasonably expected to cause substantial disruption to school or district operations or activities. This prohibition will not be used, however, to prevent responsible discussion of such language, images or symbols for educational purposes.

3. The Board expects all students and staff to conduct themselves in a manner that demonstrates mutual respect without regard to an individual's actual or perceived personal characteristics.

4. The Board prohibits discrimination, by students and staff, of any kind, directed at persons because of their actual or perceived personal characteristics.

5. The Board commits to modelling the expectations in this policy, and expects all Board and MCPS reports, presentations, and decision making to take into account the equity implications of this policy.

6. The Board also expects and promotes the following:

    a) Collaboration among staff, students, parents/guardians, and the community

        (1) Staff are expected to work together and with students, parents/guardians, and community members to ensure that each school and work site is free from discrimination.

        (2) Parents/guardians are encouraged to establish expectations for their children that are consistent with the beliefs, intentions, and obligations set forth in law and as reflected in this policy, and to collaborate with MCPS staff to meet these expectations.

**3 of 10**

ACA

    (3)    Staff are expected to promote engagement of all parents/guardians in their children's education and work to remove barriers that impede their active participation without regard to actual or perceived personal characteristics.

    (4)    MCPS shall seek broad participation on task forces, committees, commissions, and other advisory bodies which represent diverse communities, cultures, languages, and perspectives.

b)    Equality of educational opportunities

    (1)    The Board is committed to addressing disparities in levels of access to factors critical to the success of all students, including the following:

        (a)    Resources, including challenging and creative courses, programs, and extracurricular activities;

        (b)    Effective and qualified teachers, leaders, and support staff;

        (c)    Adequate facilities and equipment;

        (d)    Updated technology;

        (e)    Quality education materials;

        (f)    Practices and procedures that provide for educational equity and ensure that there are not obstacles to accessing educational opportunities for any student; and

        (g)    Sufficient funding.

    This commitment is, and must continue to be, evident in how resources are allocated, including an intentional strategy of providing additional funding to students in greater need, as well as to schools that serve larger numbers of students in need.

    (2)    MCPS will work to identify and address structural and institutional barriers that could prevent students from equitably accessing educational opportunities in all schools.

    (3)    MCPS will expect the equitable administration of disciplinary consequences as one of the essential components to equitable access to educational opportunities in schools.

**ACA**

(4) MCPS will work toward empowering emergent multilinguals/English Learners to master social and academic English, using their first language(s) and culture(s) as assets, to thrive in school, college, careers, and as global citizens. MCPS will provide access to rigorous coursework and equal access to comparable academic programs both among schools and among students within the same school without regard to actual or perceived personal characteristics.

(5) MCPS will encourage all students to pursue their goals and interests, without regard to historical barriers or stereotypes. Students will be provided wide access to various and multiple opportunities to enroll in challenging programs and participate in a wide variety of school activities, including athletics, extracurricular and non-academic programs, to enrich their perspectives and to prepare for meaningful and fulfilling work in their chosen careers.

(6) MCPS will promote and encourage schools, classrooms, work sites, and school-sponsored representations (including mascots, logos, team names, chants, or musical accompaniments) to be inclusive, nondiscriminatory, and bias-free, and to provide a welcoming climate for all.

(7) MCPS will provide a culturally responsive Prekindergarten to Grade 12 curriculum that promotes equity, respect, and civility among our diverse community, accurately depicts and represents the distinctive contributions of our global community, and provides opportunities for staff and students to model cultural proficiency in every school and program. The curriculum shall enable staff to model, and students to develop, the following attitudes, skills, and behaviors:

    (a) Value one's heritage and the heritage of others;

    (b) Respect, value, and celebrate diversity as an essential component of a healthy and thriving community;

    (c) Value the richness of cultural pluralism and commonality;

    (d) Develop and promote inclusive relationships and work effectively in cross-cultural environments; and

    (e) Confront and eliminate stereotypes related to individuals' actual or perceived personal characteristics.

(8) Instructional materials used in MCPS schools will reflect the diversity of the global community, the aspirations, issues, and

**ACA**

    achievements of women, persons with disabilities, persons from diverse racial, ethnic, and cultural backgrounds, as well as persons of diverse gender identity, gender expression, or sexual orientation.

c)    Professional learning and education to achieve districtwide cultural proficiency

    MCPS will encourage effective collaboration among staff, parents/guardians, and community members by offering opportunities to enhance cultural proficiency, creating districtwide engagement, and promoting understanding and resolution of differences and disagreements.

d)    Equality of employment opportunities

    (1)    MCPS shall continue to monitor and promote a diverse workforce and take appropriate action to create a district free of implicit bias and discrimination in all aspects of employment.

    (2)    MCPS will take positive steps to eliminate structural and institutional barriers to recruiting, hiring, retaining, and promoting a diverse workforce.

    (3)    MCPS will identify staff positions in which individuals from diverse backgrounds are underrepresented, and promote a diverse workforce by actively recruiting and/or promoting qualified candidates, consistent with negotiated agreements. For example, MCPS will continue to recruit staff to positions that are nontraditional for their gender.

    (4)    MCPS will empower staff to promote the Board's core values and beliefs expressed in this policy in daily interactions with peers, students, parents/guardians, and members of the community.

**D.    DESIRED OUTCOMES**

1.    Every school and work site will embody a culture of respect, grounded in the Board's core values, that promotes understanding, respect, civility, acceptance, and positive interaction among all individuals and groups.

2.    Structural and institutional barriers to educational and employment opportunities will be eliminated.

3.    MCPS schools and work sites will be equitable, safe, diverse, inclusive, and free of discriminatory acts of hate, violence, insensitivity, and disrespect.

4.    Educational outcomes shall not be predictable by actual or perceived personal characteristics, and gaps in student achievement will be significantly reduced.

**6 of 10**

ACA

5.    MCPS students and staff will become models in the community of civility, acceptance, respect, and positive interactions.

6.    The educational experiences of all students will be enriched by providing exposure to staff from many backgrounds reflecting the pluralistic nature of the community, thereby providing settings for education that promote understanding of diversity and contribute to the quality of the exchange of ideas inherent in the educational setting.

**E.    IMPLEMENTATION STRATEGIES**

1.    The Board will address disparities in levels of access to resources critical to the success of students by implementing an intentional strategy of providing additional funding to students in greater need, as well as to schools that serve larger numbers of students in need; and ensuring equitable access to effective leaders and teachers for all students.

2.    MCPS will engage with staff, students, parents/guardians, and the entire community to build and sustain a culture emblematic of the ideals of this policy.

3.    MCPS will identify a process for analyzing data to develop goals, objectives, strategies, and timelines for the implementation of equitable and culturally competent practices in each school. Multiple indicators are necessary to monitor student outcomes, engagement, and school climate, and specific data will be used to ensure accountability for student, school, and districtwide performance; to reduce variability in outcomes; and to ensure that academic outcomes will not be predictable by actual or perceived personal characteristics and can be assessed and reported transparently to the public.

4.    Programs, curricula, instructional materials, and activities, including athletics, extracurricular and non-academic programs and activities, will provide all students with the knowledge, skills, attitudes, and behaviors that promote cultural proficiency and behaviors that enable students to live and work together in our increasingly diverse county, state, nation, and world.

5.    MCPS will provide tailored and differentiated professional learning to –

a)    build capacity for cultural proficiency and cultural responsiveness,

b)    gain the skills and knowledge to create a learning environment that is student-centered and meets the individual and diverse needs of all students, and

c)    address areas of inequity in the system and the barriers that may impede students success, social-emotional learning, and physical and psychological health of students.

**7 of 10**

6.    At all times, staff will foster –

   a)    physically and psychologically safe and welcoming environments for learning and working;

   b)    model and encourage respectful, and civil discourse and interactions among all staff, students, parents/guardians, and community members; and

   c)    strive to remove cultural, linguistic, technological, or transportation-related barriers that may prevent families from engaging with their children's education, through the use of culturally responsive resources, such as –

      1.    interpreters,

      2.    translated documents, and

      3.    collaboration with organizations that may facilitate communication between MCPS and families.

7.    Specific strategies will be identified, communicated and used to prevent discrimination, and procedures will be followed to resolve, monitor, and analyze such incidents of discrimination if they occur.

8.    MCPS will identify partnerships and work cooperatively with the Montgomery County Executive, the Montgomery County Council, local law enforcement agencies, other county agencies, community groups, business organizations, and other stakeholders to increase equity and reduce discrimination for students and staff.

9.    A statement summarizing this Board policy of nondiscrimination, will be prominently included in MCPS publications and on the MCPS website. Any publication that states the Board policy of nondiscrimination in English will also be translated into those languages for which translation and interpretation services are most frequently requested by parents/guardians of MCPS students.

10.    The superintendent of schools will designate an appropriate lead office to implement this policy, with support from other offices as appropriate, and  assume responsibility for the following:

   a)    Monitoring and ensuring MCPS compliance with all federal, state, and local nondiscrimination laws and MSDE reporting requirements;

      b)    Identifying the method of evaluation to measure the effect of equitable practices districtwide and in schools;

      c)    Promptly investigating, and resolving complaints of discrimination;

      d)    Designating an individual responsible for the facilitation, monitoring, and implementation of system equity initiatives;

      e)    Increasing awareness of the Board's values and expectations under this policy;

      f)    Requiring that an equity lens be used in reviews of –

            1) staff, curriculum, pedagogy, professional learning, instructional materials, and assessment designs; and

            2) all staff recruiting, hiring, retention, and promotion processes;

      g)    Providing professional learning regarding nondiscrimination, equity and cultural proficiency; and conducting outreach to support the application of these concepts in professional conduct and practice; and

      h)    Maintaining appropriate records.

11.    The superintendent of schools may direct an employee who exhibits insensitive behavior, as evidenced by violating the values and expectation expressed in this policy, to participate in additional training regarding cultural proficiency. Continued insensitivity will not be tolerated by the Board and may result in further disciplinary action, including dismissal, consistent with the *MCPS Employee Code of Conduct*.

**F.    REVIEW AND REPORTING**

1.    The superintendent of schools will –

      a)    ensure that equity be addressed in the Local Every Student Succeeds Act (ESSA) Consolidated Strategic Plan;

      b)    disaggregate student data to analyze trends and identify gaps, and use such data to support the creation of equitable solutions; and

      c)    provide the public and the Board with regular updates on the implementation of this policy and efforts undertaken by the district to create an equitable school system that fulfills the Board's core values.

2.    This policy will be reviewed every three years in accordance with the Board of Education's policy review process.

**9 of 10**

**ACA**

| | |
|---|---|
| **Related Sources:** | MCPS Culture of Respect Compact[1]; Student Code of Conduct in MCPS; MCPS Employee Code of Conduct; MCPS Guidelines for Respecting Religious Diversity; MCPS Guidelines for Student Gender Identity; U.S. Constitution U.S.C.), Amendment 14; Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.; Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.; Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq.; 34 Code of Federal Regulations (CFR), Part 106, 34 CFR Part 100; Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § § 1400-1487; Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794; Americans with Disabilities Act (ADA), 42 U.S.C. § 12131 et seq.; Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981; Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634; Equal Pay Act of 1963, 29 U.S.C. § 206(d); Equal Rights Amendment to the Maryland Constitution's Patient Protection Affordable Care Act, 42 U.S.C. § 18001 et seq.; Maryland Constitution Declaration of Rights (Article 46); Annotated Code of Maryland, State Government Article, Title 20, Human Relations; Annotated Code of Maryland, Education Article 6-104, 7-424.1; Code of Maryland Regulations (COMAR) 13A.05.01; Montgomery County Racial Equity and Social Justice Act Amendments to Montgomery County Code §1A-201, §2-64A, §2-81C, §27-83, §33A-14. |

*Policy History:*   Adopted by Resolution No. 595-69, November 11, 1969; amended by Resolution No. 16-72, January 11, 1972; amended by Resolution No. 536-77, August 2, 1977; amended by Resolution No. 240-96, March 25, 1996; amended by Resolution No. 323-96, May 14, 1996; amended by Resolution No. 249-03, May 13, 2003; amended by Resolution No. 318-17, June 26, 2017; copy edits December 11, 2019; amended by Resolution No. 321-21, June 29, 2021.

*Note:*  Tenets of Board policies ACB, *Nondiscrimination*, ACE, *Gender Equity*, GBA, *Workforce Diversity*, and GMA, *Human Relations Training of MCPS Staff*, were incorporated into Resolution No. 318-17 amendments to this policy, and were rescinded upon adoption of amended Board Policy ACA on June 26, 2017.

---

[1] *Culture of Respect Compact among Montgomery County Public Schools, Montgomery County Education Association, Service Employees International Union Local 500, and the Montgomery County Association of Administrators and Principals*

**10 of 10**

# EXHIBIT 3

Case 8:24-cv-01487-DLP    Document 28-5    Filed 07/03/24    Page 2 of 11



# Providing Safe Spaces for Transgender and Gender Non-Conforming Youth: Guidelines for Gender Identity Non-Discrimination

Maryland schools have a history of commitment to educating all students to reach their highest potential. School safety is a vital component of that commitment. Safety and prevention efforts, long the hallmark of Maryland's success, have provided students with safe, respectful, engaging, and welcoming environments in which to grow and learn. In growing numbers transgender and gender non-conforming students are becoming more comfortable with who they are and are more visible in schools. Providing schools with information, support, and best practices is an important step in assuring welcoming, caring, respectful, and affirming environments for all students.

It is the hope of the Maryland State Department of Education (MSDE) that this document may provide technical guidance and assistance as each Maryland school system works to support the rights of all students, including those who are transgender and gender non-conforming.

These guidelines are designed to serve as suggestions for consideration for school systems and administrators who may want to develop their own transgender policy, procedures, and/or guidelines.

## The Need

In "Growing Up LGBT (Lesbian, Gay, Bisexual, Transgender) in America," the Human Rights Campaign Foundation's groundbreaking survey of more than 10,000 LGBT youth, 42 percent of gender non-conforming youth report "frequently" or "often" being called names and 40 percent report being excluded by peers "frequently" or "often". More than half of gender non-conforming youth reported "never participating" in the majority of activities listed in the survey (e.g., sports, church/religious youth groups and service organizations) out of fear of discrimination.

Additional research indicates that 80 percent of transgender students feel unsafe at school because of who they are. According to data from Center for Disease Control's Youth Risk Behavior Survey (2011), the percentage of gay, lesbian, and bisexual students (across sites) who did not go to school at least one day during the 30 days before the survey because of safety concerns ranged from 11 percent to 30 percent of gay and lesbian students and 12 percent to 25 percent of bisexual students.

1

Case 8:24-cv-01487-DLP     Document 28-5     Filed 07/03/24     Page 3 of 11



# Providing Safe Spaces for Transgender and Gender Non-Conforming Youth: Guidelines for Gender Identity Non-Discrimination

The Journal of Adolescent Health (2015) reported that compared with non-transgender youth, transgender youth had an elevated probability of being diagnosed with depression (50.6 percent vs. 20.6 percent); suffering from anxiety (26.7 percent vs. 10 percent); attempting suicide (17.2 percent vs. 6.1 percent); and engaging in self-harming activities without lethal intent (16.7 percent vs. 4.4 percent).

The need for protections for transgender and gender non-conforming students is clear. According to a 2011 report from the National Center for Transgender Equality and the National Gay and Lesbian Task Force, 132 Maryland respondents who expressed transgender identity or gender nonconformity while in grades K-12 reported alarming rates of harassment (81percent), physical assault (38 percent) and sexual violence (16 percent). A staggering 43 percent reported that they had attempted suicide at some point in their life, 27 times the rate of the general population of 1.6 percent. Harassment was so severe that it led 6 percent to leave a school in K-12 settings or leave higher education. In addition, the Gay, Lesbian, and Straight Education Network (OLSEN, 2014) reports that students who experienced high levels of victimization based on gender expression were twice as likely as students who did not experience high levels of victimization to report that they did not plan to pursue post-secondary education.

Rather than focusing on their education, many transgendered and gender non-conforming students struggle for the ability to come to school and be themselves. The National Center for Transgender Equality reports that 59 percent of transgender students have been denied access to restrooms consistent with their gender identity. Some are denied opportunities to go on field trips or participate in sports. Together with bullying and victim-blaming, these conflicts can lead to disproportionate discipline and involvement in the juvenile justice system.

## Vocabulary

Discussion regarding the needs of transgender and gender non-conforming students is best held when there is mutual understanding of key concepts and a shared vocabulary. The key concepts and vocabulary used in this document include:

- Sex – the genetic and anatomical characteristics with which people are born, typically labeled "male" or "female".
- Gender – the attitudes, feelings, and behaviors that a given culture associates with a person's biological sex.

2



# Providing Safe Spaces for Transgender and Gender Non-Conforming Youth: Guidelines for Gender Identity Non-Discrimination

- Gender Identity – A person's deeply held internalized sense or psychological knowledge of their gender regardless of the biological sex they were assigned at birth.
- Cisgender – Students whose sex assigned at birth correspond to their gender identity.
- Transgender – Students whose internalized knowledge and sense of who they are as either male or female does not match their sex assigned at birth.
- Gender Expression – The manner in which a student represents or expresses gender to others, often through manner of speech and word choices, manner of dress and hairstyle, the wearing (or not wearing) of cosmetics, and other distinctive cultural markers of gender.
- Gender Non-Conforming – An umbrella term for students whose gender expression differs from stereotypical expectations of the sex they were assigned at birth. Students who do not identify with either traditional gender categories or identify as both genders are often called gender non-conforming, gender diverse, or gender expansive.
- Transition – The process through which transgender people begin to live as the gender with which they identify, rather than the one typically associated with their sex assigned at birth. Transitions may include any combination of physical, social, and medical processes.
    - Social transition may include changing names, pronouns, hairstyle, and clothing.
    - Medical transition may include medical components like hormone therapy and gender affirming surgeries. Not all transgender individuals seek medical care as part of their transition, especially minors.

## Non-Discrimination Guidelines for All

A safe and supportive school environment minimizes stigmatization, protects all students from harassment and bullying, and does not single out students by gender. It may help to create a gender-neutral environment. These non-discrimination guidelines are not intended to address every situation that might occur with respect to transgender or gender non-conforming students. In all cases, the goal is to provide equal educational opportunity

3



# Providing Safe Spaces for Transgender and Gender Non-Conforming Youth: Guidelines for Gender Identity Non-Discrimination

and healthy development of students. When developing transgender policy or procedure, school systems and administrators may want to consider the following:

- Review dress codes to describe what the school considers appropriate clothing without referencing gender.
- Consider gender neutral dress codes for class or yearbook photos, honor society ceremonies, graduation ceremonies, or dances.
- Review dress codes to describe what the school considers appropriate clothing:
  - Permit all students to wear any clothing that is appropriate for students under the school dress code, regardless of the student's gender or gender identity. This includes school extracurricular activities, as well as events, such as school dances, choral concerts, the wearing of uniforms, or graduation.
  - If a school has two separate gender-specific dress codes, any student should be permitted to dress consistently with the dress code for either gender. So long as the student is compliant with one of the dress codes, the student should not be subject to discipline or a requirement to change clothing on the grounds that the student is wearing the "wrong" dress code for the student's gender or gender identity.
- Eliminate gender-based sorting of students.
- Include the categories of sexual orientation, gender identity, and gender expression in all non-discrimination materials.
- Provide staff training that addresses student diversity and builds the capacity of all staff to understand and appreciate student sexual orientation, gender identity, and gender non-conforming as part of regular training and/or continuing education.
- Modify forms that allow families and students the ability to self-identify their gender and preferred names and pronouns. Multiple federal and state agencies have adopted a two- part question that asks separately about current gender identity and sex assigned at birth.
- Design classroom lessons that expand understandings of gender diversity and look for entry points in the curriculum to address gender diversity.
- Include questions specific to LGBT students in school climate surveys.

4



# Providing Safe Spaces for Transgender and Gender Non-Conforming Youth: Guidelines for Gender Identity Non-Discrimination

- Post anti-bullying and anti-discrimination policies around the school and share them with the school community.
- Select a restroom in your school that is designated for only one user at a time as a gender neutral/unisex restroom.
- Provide access to a single use/gender neutral restroom for any student who has a need or desire for increased privacy, regardless of the underlying reason.

### Non-Discrimination Guidelines for Name and Gender

Equal education in a non-discriminatory environment may be supported by the following guidelines:

- Address every student by a name and pronoun that corresponds to the student's gender identity.
- Privately ask students how they want to be addressed in class and whether this will be different when in correspondence to the home or at conferences with the student's parents or guardians.
- Train all teachers, staff, and school administrators to use the student's preferred name, pronouns and gender.
- Use the student's preferred name for classroom rosters, identification badges, announcements, certificates, newspapers, newsletters, yearbooks, and any other record where the use of the legal name is not specifically required by law.
- Create a process so a student or parent/legal guardian may request a change of name and/or gender so that a student may be registered in school under a name and gender that corresponds with the student's gender identity.
  - Provide a means to protect the student's previous identity once a legal name change has occurred and current records are amended to show the change.
  - Store historical records where they are safe from inadvertent disclosure.
  - Implement practices that safeguard confidential information from inadvertent disclosure when school staff or administrators are required by law to use or to report a student's legal name or gender as it appears in the official record.
- Upon request, amend and re-issue a diploma in a former student's name once

5

Case 8:24-cv-01487-DLB     Document 28-5     Filed 07/03/24     Page 7 of 11



# Providing Safe Spaces for Transgender and Gender Non-Conforming Youth: Guidelines for Gender Identity Non-Discrimination

the former student secures a legal name change, being sure that the fact that the student's name was changed is not indicated in any way on the diploma.

## Non-Discrimination Guidelines for Disclosing Information

All persons, including students, have a right to privacy. This includes the right to keep private one's transgender status or gender non-conforming presentation at school. In considering the creation or development of a local transgender policy, school system administrators may want to review and consider these guidelines:

- Note that while a balance between students' rights to privacy and parents' rights to information in the educational environment is vital, no provision of state or federal law requires schools to affirmatively disclose this sensitive information to parents. Courts have recognized a constitutional right to medical confidentiality concerning one's status as a transsexual person, (See Powell v. Schriver, 175 F.3d 107, 111 (2nd Cir. 1999). Federal courts have concluded that schools should not disclose sensitive student information such as sexual orientation to parents without a legitimate stated interest to do so.
- Treat all student information, medical, or other sensitive personal information, including information relating to transgender students, as confidential in accordance with applicable state, local and federal privacy laws.
- Permit transgender and gender non-conforming students to discuss and express their gender identity openly and to decide when, with whom, and how much private information may be shared.
- Implement training and practices that assist school staff and prevent accidental disclosure of information that may reveal a student's transgender status to others, including parents and other school staff unless the student and/or the student's parent has authorized school staff to make such disclosure or staff is legally required to do so.
    - Consider that while information in official student records must be disclosed upon the request of parents, sensitive information related to gender identity generally need not be disclosed without the student's consent.

6

Case 8:24-cv-01487-DLB     Document 28-5     Filed 07/03/24     Page 9 of 11



# Providing Safe Spaces for Transgender and Gender Non-Conforming Youth: Guidelines for Gender Identity Non-Discrimination

### Non-Discrimination Guidelines for Access

Perhaps the most difficult and sensitive issue school administrations will face is the use of bathrooms and locker rooms. Respect for the privacy and comfort-level of each student can guide the decision-making process. For example, a transgender student may not feel comfortable in a sex-specific bathroom or locker room. Likewise, a cisgender student may not feel comfortable using a bathroom or locker room with a transgender student. Having a gender neutral, single stall bathroom available to those students respects the privacy and comfort-level of each of them. Not every school building has such a bathroom generally available, but it may be that the nurse's office can be open for this purpose.

There are several cases that have found it discriminatory to mandate that a transgender student use a particular bathroom or locker room. See, e.g., Doe v. Clenchy, No. 09-201 (Me. Super. Ct. April 11, 2011; Mathis v. Fountail-Fort Carson School District #8, No. P20130034X (Colorado Division of Civil Rights. June 17, 2013). But, there are cases that find to the contrary. Johnston v. University of Pittsburgh, 2015 WL 1497753 (W.D.Pa., March 31, 2015); GG v. Glouscester County School Board, Civil No. 4:15cv54L (E.D.Va., Sept. 17, 2015). The law has not yet settled on this issue.

### Non-Discrimination  Guidelines  for  Restrooms

The following suggestions may assist school systems in creating a non-discriminatory and equitable school environment.

- Provide access to the restroom that corresponds to the student's gender identity.
- Designate any available single stall restroom with a locking door as a unisex/gender neutral restroom and as available to all students. If a single stall student restroom is not generally available, designate a private restroom such as one in the health suites for any student who requests increased privacy and safety, for any reason. This accommodation  may be offered to all students.
- Permit transgender and gender non-conforming students whose gender identity is not exclusively male or female to use facilities they believe are the most consistent with their safety and gender identity.

7



**Providing Safe Spaces for Transgender and Gender Non-Conforming Youth: Guidelines for Gender Identity Non-Discrimination**

### Discrimination Guidelines for Locker Rooms

Respectful and careful review of all relevant factors and concerns is essential when considering the locker room issue.

- Designate any available single stall restroom with a locking door as a unisex/gender neutral restroom and as available to all students. If a single stall student restroom is not generally available, designate a private restroom such as one in the health suites for any student who requests increased privacy and safety, for any reason. This accommodation  may be offered to all students.
- Provide access to the locker room that corresponds to the student's gender identity.
- Provide the option to use a safe and non-stigmatizing private alternative space for any student who is uncomfortable using shared facilities.
- Provide reasonable alternative arrangements for any student who expresses a need or desire for increased privacy. Alternative arrangements should be provided in a way that protects the transgender student's ability to keep his or her transgender status confidential.
- Based on availability and appropriateness to address privacy concerns, such arrangements could include, but are not limited to:
    - Assignment of a student locker in near proximity to the coaches' office or a supportive peer group.
    - Use of a private area within the public area of the locker room facility (e.g. nearby restroom stall with a door or an area separated by a curtain).
    - Use of a nearby private area (e.g. nearby restroom or a health office restroom).
    - A separate changing schedule (either utilizing the locker room before or after the other students).

### Non-Discrimination Guidelines for Physical Education and Athletics

Suggested guidelines for consideration are:
- Include transgender students in sex-segregated athletic activities based on their gender identity.
- Allow athletic participation without medical or legal documentation regarding

8

JA128



# Providing Safe Spaces for Transgender and Gender Non-Conforming Youth: Guidelines for Gender Identity Non-Discrimination

gender.

- Protect the student athlete's privacy rights. Personal information regarding transgender status, medical history, or sex assigned at birth should not be disclosed to teammates, or to staff or students of other schools without the student's consent.
- Follow Maryland Public Secondary Schools Athletic Association Guidelines/COMAR for participation in Interscholastic Athletics. Regulations:
  - Each school system should develop and apply criteria for students to participate on interscholastic athletic teams consistent with their bona fide gender identity. All students who participate in interscholastic athletics must meet eligibility standards in COMAR 13A.06.03.

### Non-Discrimination Guidelines for Single-Sex Classes and Extracurricular Activities

Non-discrimination and equity consideration in this area may address the following issues:

- Any single-sex classes or extracurricular activities must be consistent with Title IX and applicable regulations, including that the decision to offer a single-sex class or activity generally must be substantially related to an important educational objective.
- The USDE interprets Title IX to mean that schools generally must treat students consistent with their gender identity in all aspects of the single-sex classes and extracurricular activities.

### Non-Discrimination Guidelines for Overnight Field Trips

Student comfort is paramount in the decisions around overnight field trips. Maximizing the student's social integration may be achieved by the integration of these guidelines:

- Make arrangements in consultation with the student. If the transgender student's parents or guardians are involved and supportive, they may also be consulted.
- Be sensitive to the need to maintain the student's privacy and not disclose or require disclosure of the student's transgender status to the other students or their parents without the consent of the transgender student and/or the student's parent.

9



**Providing Safe Spaces for Transgender and Gender Non-Conforming Youth: Guidelines for Gender Identity Non-Discrimination**

- Allow students the opportunity to room with others according to their gender identity.
- Make efforts to accommodate any student who desires greater privacy; however, transgender or gender non-conforming students should not be isolated.

10

JA130

# EXHIBIT 4

Office of Human Resources and Development

# Substitute Teacher

Montgomery County Public Schools, Rockville, Maryland

## 2023–2024 HANDBOOK





**VISION**

*We inspire learning by providing the greatest public education to each and every student.*

**MISSION**

*Every student will have the academic, creative problem solving, and social emotional skills to be successful in college and career.*

**CORE PURPOSE**

*Prepare all students to thrive in their future.*

**CORE VALUES**

*Learning*
*Relationships*
*Respect*
*Excellence*
*Equity*

**Board of Education**

Ms. Karla Silvestre
*President*

Mrs. Shebra L. Evans
*Vice President*

Ms. Lynne Harris

Ms. Grace Rivera-Oven

Mrs. Rebecca K. Smondrowski

Ms. Brenda Wolff

Ms. Julie Yang

Mr. Sami Saeed
*Student Member*

**Montgomery County Public Schools (MCPS) Administration**

Monifa B. McKnight, Ed.D.
*Superintendent of Schools*

Mr. M. Brian Hull
*Chief Operating Officer*

Patrick K. Murphy, Ed.D.
*Deputy Superintendent*

Mr. Brian S. Stockton
*Chief of Staff*

Mrs. Stephanie P. Williams
*General Counsel*

Ms. Elba M. Garcia
*Senior Community Advisor*

Dr. Patricia E. Kapunan
*School System Medical Officer*

850 Hungerford Drive
Rockville, Maryland 20850
www.montgomeryschoolsmd.org

# Substitute Teaching in Montgomery County Public Schools

CONGRATULATIONS on your selection as a Montgomery County Public Schools (MCPS) substitute teacher. Substitute teachers are vital to the continuity of the instructional program and are essential to a high-quality education for each student.

The material in this booklet was developed by MCPS Human Resources and Development staff, teachers, and experienced substitute teachers. It contains guidelines and practical suggestions to help you work effectively as a substitute teacher.

## Contents

Montgomery County Public Schools at a Glance .................................................. ii

Professional Expectations ........................................................................... 1
    School Information Packet ...................................................................... 1
    Work Schedule ................................................................................... 1
    Required Days ................................................................................... 1
    Employee Code of Conduct ..................................................................... 1
    *Student Guide to Rights and Responsibilities* .............................................. 1
        Patriotic Exercises ......................................................................... 1
    Nondiscrimination .............................................................................. 1
    *Guidelines for Respecting Religious Diversity in MCPS* .................................. 2
    *Guidelines for Student Gender Identity* .................................................... 2
    Classroom Control and Discipline ............................................................. 2
    Corporal Punishment ........................................................................... 2
    Alcohol-Free and Drug-Free Workplace ...................................................... 2
    Confidentiality .................................................................................. 2
    Inclement Weather .............................................................................. 2
    Emergency Preparedness ....................................................................... 2
    Board Policies and MCPS Regulations ........................................................ 3
    Child Abuse and Neglect ....................................................................... 3
    Districtwide Compliance Training ............................................................. 3

Advice for Substitute Teachers ..................................................................... 3

Important Telephone Numbers ...................................................................... 4

Using the Substitute Employee Management System ............................................ 4
    How Substitutes Receive Assignments ....................................................... 4
    Calling Times .................................................................................... 4
    Tips on Using the System ...................................................................... 4
    Prearranged Assignments. ..................................................................... 4
    Substitute Misconduct and Performance Issues ............................................. 4

Marketing Yourself ................................................................................... 5

Substitute Quick Reference Card ................................................................... 6
    New Employee Registration Instructions ..................................................... 6
    Telephone System Information ................................................................. 6
    Telephone Access Instructions ................................................................ 7
    Web Access Instructions ....................................................................... 8

Emergency Preparedness Procedures ............................................................ 10

MCPS Nondiscrimination Statement ................................................... Back Cover

# Montgomery County Public Schools at a Glance

## Our School System*
- 160,564 students
- Largest school system in Maryland
- 14th largest school system in the United States
- 2010 Malcolm Baldrige National Quality Award recipient
- Students from 157 countries speaking 150 languages
- 16 million meals served during the 2018–2019 school year
- 1,307 buses transport more than 103,000 students
- 209 schools
  - 135 elementary schools
  - 40 middle schools
  - 25 high schools
  - 1 career and technology center
  - 5 special schools
  - 1 alternative education program
- 42 National Blue Ribbon Schools

## Our Students
- Demographics
  - 32.4 percent Hispanic/Latino
  - 26.9 percent White
  - 21.4 percent Black or African American
  - 14.1 percent Asian
  - ≤ 5.3 percent Two or more races
  - ≤ 5.0 percent American Indian or Alaskan Native
  - ≤ 5.0 percent Native Hawaiian or other Pacific Islander
- 33.3 percent participate in Free and Reduced-price Meals System (FARMS)
- 11.7 percent receive special education services
- 18.2 percent participate in English for Speakers of Other Languages (ESOL)
- 1098 average combined SAT score for class of 2020

## System Resources
- $2.76 billion FY 2021 Operating Budget
- $1.728 billion six-year Capital Improvements Program (FY 2021-2026)
- 22,589 employees
- 13,646 teachers
- 86.8 percent of teachers have a master's degree or equivalent

For the most up to date MCPS At a Glance Information, go to the "About MCPS" page at *www.montgomeryschoolsmd.org/about/*

# Professional Expectations

## School Information Packet
Each school retains an information packet relevant to the operation of the school. It is beneficial to arrive early enough to familiarize yourself with the information contained in this packet.

## Work Schedule
In accordance with the agreement between the Montgomery County Education Association (MCEA) and the Montgomery County Board of Education (Board), "Each substitute unit member will work the same number of normal hours worked by the unit member who is on leave or the scheduled number of hours for the vacant position. Starting and dismissal times shall be assigned by the principal."

## Required Days
A substitute teacher must work five days during each semester as a substitute teacher (half or full days) to remain employed with MCPS. If you have no reported earnings as a substitute teacher during the semester, substitute employment will be terminated at the end of that semester.

## Employee Code of Conduct
Each substitute should review the *MCPS Employee Code of Conduct*, available on the MCPS website at **www.montgomeryschoolsmd.org/staff**. This document provides a general overview of the legitimate expectations and standards of conduct that MCPS and the broader community expect employees to follow in carrying out their important part of the district's mission. In addition, this *MCPS Employee Code of Conduct* summarizes the disciplinary procedures that MCPS uses to address situations where employees fall short of our expectations and standards of conduct.

The *MCPS Employee Code of Conduct* applies to all MCPS employees, both certificated and noncertificated, full- and part-time, as well as substitutes and others employed in a temporary or seasonal capacity. Many aspects of this *MCPS Employee Code of Conduct* are based on applicable Board policies and MCPS regulations and other guidelines (referred to hereafter as MCPS rules), as well as negotiated agreements and state and federal laws. This *MCPS Employee Code of Conduct* is not intended to replace these resources, but rather to provide a one-document summary and reference point of appropriate items that would be useful to all employees. Please note that this *MCPS Employee Code of Conduct* is not a contract, and the policy and legal requirements that it references are subject to change and supersede the statements contained in this publication.

Each substitute should review the *MCPS Employee Code of Conduct* because it provides expectations for the following:
- Ethical Conduct in the Work Environment
- Ethical Conduct with Students
- Ethical Conduct with Colleagues, Parents/Guardians, and the Community.

Further information about performance and misconduct issues and discipline procedures can be found in MCPS Regulation GEF-RA, *Substitute Teachers*.

## Student Rights and Responsibilities
*Student Rights and Responsibilities* is available on the MCPS website at **www.montgomeryschoolsmd.org/students/rights**.

This booklet is a guide to the rights and responsibilities that students enjoy in MCPS, and is only a summary of state and federal laws, Board policies, MCPS regulations, and MCPS rules that affect students. It is not a definitive statement of student rights in any particular situation. Board policies and MCPS regulations are available at **www.montgomeryschoolsmd.org/departments/policy**. MCPS rules also are subject to change and shall supersede the statements and references contained in this publication. Substitutes are to review *Students Rights and Responsibilities* to learn more about student's rights and responsibilities in MCPS.

One area in which students are protected is participation in patriotic exercises.

### Patriotic Exercises
Students will have the opportunity to participate in and/or watch patriotic exercises in school. Students have a right to not be compelled to participate in patriotic exercises, or be penalized or embarrassed for failure to participate. A student may not interrupt others who are participating in patriotic exercises.

## Nondiscrimination
Montgomery County Public Schools (MCPS) prohibits illegal discrimination based on race, ethnicity, color, ancestry, national origin, nationality, religion, immigration status, sex, gender, gender identity, gender expression, sexual orientation, family structure/parental status, marital status, age, ability (cognitive, social/emotional, and physical), poverty and socioeconomic status, language, or other legally or constitutionally protected attributes or affiliations. Discrimination undermines our community's long-standing efforts to create, foster, and promote equity, inclusion, and acceptance for all. Some examples of discrimination include acts of hate, violence, insensitivity, harassment, bullying, disrespect, or retaliation. The Board prohibits the use of language and/or the display of images and symbols that promote hate and can be reasonably expected to cause substantial disruption to school or district operations or activities. This prohibition will not be used, however, to prevent responsible discussion of such language, images, or symbols for educational purposes. For more information, please review Board Policy ACA, *Nondiscrimination, Equity, and Cultural Proficiency*. The MCPS Nondiscrimination Statement can be found on the MCPS website at www.montgomeryschoolsmd.org/info/nondiscrimination/ and on the back cover of this handbook.

## Guidelines for Respecting Religious Diversity in MCPS

MCPS is committed to promoting respect and appreciation for the religions, beliefs, and customs of our diverse student population. MCPS believes that multiculturalism is one of our greatest strengths and should enrich our community as we learn together in our schools. Respect is a core value of MCPS and, therefore, fostering a culture where all families feel respected is of utmost importance. MCPS *Guidelines for Religious Diversity* is available on the MCPS website at **www2. montgomeryschoolsmd.org/students/rights/**.

## Guidelines for Student Gender Identity

MCPS is committed to a safe, welcoming school environment where students are engaged in learning and are active participants in the school community because they feel accepted and valued. To this end, all students should feel comfortable expressing their gender identity, including students who identify as transgender or gender nonconforming. *(Related Board Policies and MCPS Regulations: ACA, ACF, JHF, JHF-RA, ACA-RA, ACF-RA)*. It is critical that all MCPS staff members recognize and respect matters of gender identity; make all reasonable accommodations in response to student requests regarding gender identity; and protect student privacy and confidentiality. To assist in these efforts, MCPS has developed guidelines for student gender identity that are aligned with the Board's core values, guidance from the Maryland State Department of Education (MSDE), and the Board Policy ACA, *Nondiscrimination, Equity, and Cultural Proficiency*, which prohibits discrimination, stigmatization, and bullying based on gender identity, as well as sex, gender, gender identity, gender expression, and sexual orientation, among other personal characteristics. These guidelines cannot anticipate every situation which might occur. Consequently, the needs of each student must be assessed on a case-by-case basis.

All students have the right to be referred to by their identified name and/or pronoun. Students should be addressed by school staff members by the name and pronoun corresponding to the gender identity that is consistently asserted at school. The student's identified name should be used for classroom rosters (especially those provided to substitute teachers), identification badges, announcements, certificates, newspapers, newsletters, and yearbooks.

The *2023-2024 Guidelines for Student Gender Identity* can be found at **www2.montgomeryschoolsmd.org/ students/rights/** along with the *Student Rights and Responsibilities,* the *Student Code of Conduct,* and the *Guidelines for Respecting Religious Diversity in MCPS*.

## Classroom Control and Discipline

Each substitute should review the *Student Code of Conduct,* which is available on the MCPS website at **www2.montgomeryschoolsmd.org/students/rights/**. The purpose of this document is to promote fairness and equity through clear, appropriate, and consistent expectations and consequences in addressing student misbehavior and to ensure that students learn from their mistakes and make appropriate amends when their behavior affects others. MCPS strives to create positive school climates where students, parents/guardians, and all staff work together respectfully to maintain an orderly and safe learning environment focused on teaching and learning.

The use of physical restraint or seclusion is prohibited in MCPS, except under very limited circumstances specified in MCPS Regulation JGA-RA, *Classroom Management and Student Behavior Interventions.* Care should be taken during the resolution of disciplinary matters to avoid physical contact, unless absolutely necessary.

Inappropriate language, threatening statements, or profanity used by substitutes will not be tolerated.

If you feel immediate follow-up is needed regarding any student's behavior, contact a school administrator or counselor immediately. Do not attempt to contact a parent or guardian directly in a short-term substitute assignment.

## Corporal Punishment

MCPS Regulation JGA-RA states that the use of corporal punishment is prohibited in MCPS under any circumstances, and that administering of such punishment is grounds for disciplinary action.

## Alcohol-free and Drug-free Workplace

MCPS Regulation COF-RA, *Alcohol, Tobacco, and Other Drugs on MCPS Property*, states:
- No person may possess, use, or sell alcohol on MCPS property, except for very limited circumstances when it may be approved by the Board.
- No person may sell or use tobacco on MCPS property at any time.
- No person may manufacture, distribute, dispense, or possess with intent to distribute, a controlled dangerous substance in, on, or within 1,000 feet of an MCPS property or in an MCPS vehicle.

## Confidentiality

All substitutes are expected to maintain the confidentiality of information that they obtain through their work, including employee and student records.

## Inclement Weather

Long-term substitute teachers working more than 6 consecutive days in the same assignment do not report to work on snow days. These substitutes will be granted emergency leave and paid for any snow day occurring during their long-term substitute tenure. Short-term substitutes are paid for a full day for delayed openings and early closings. They are not reimbursed for snow days.

## Emergency Preparedness

You are a very valuable member of the MCPS family. Our students are entrusted into your care, and it is imperative that you know what to do and where to go if an emergency arises. Remember to be prepared, because the students will look to you for direction. Please also see "Emergency Preparedness Procedures: Guidelines for Lockdown-Evacuation-Shelter" on page 10.

## Board Policies and MCPS Regulations

Board policies and MCPS regulations are available on the MCPS website, **www.montgomeryschoolsmd.org/departments/policy/**.

## Child Abuse and Neglect

All MCPS employees are personally and directly required to report any suspected instances of abuse and/or neglect of a child/student to Child Protective Services (CPS), pursuant to Maryland Law and MCPS Regulation JHC-RA, *Reporting and Investigating Child Abuse and Neglect*. The Annual Districtwide Compliance Training, Recognizing and Reporting Child Abuse and Neglect Module, outlines the mandated procedures for reporting suspected child abuse and/or neglect.

**IF THERE IS DOUBT ABOUT WHETHER TO REPORT ABUSE OR NEGLECT, ALWAYS ERR IN FAVOR OF MAKING THE REPORT.**

## Mandatory Districtwide Compliance Training

**All staff are required to complete an Annual Districtwide Compliance Training every school year.** This training is designed to ensure that every employee has the necessary information to establish and maintain a positive, safe, healthy, and lawful climate and culture in which all adults and students are able to thrive and do their best work.

The training is available in English and Spanish, and covers three important areas of focus; *a) Student Safety, b) Respecting Student Differences, and c) Workplace Expectations*. Topics from these modules include preventing, recognizing, and reporting child abuse and neglect, employee code of conduct, bullying, harassment (including sexual harassment) and intimidation prevention, recognizing and reporting incidents of hate-bias, religious diversity, and many other important issues.

Based on your MCPS position you may be required to complete job-specific trainings that are separate and in addition to the districtwide compliance modules. Your principal or supervisor will notify you of these requirements.

# Advice for Substitute Teachers

We value the cultural backgound and experiences of all MCPS employees. Each substitute should review the *MCPS Employee Code of Conduct*. The following suggestions come from successful substitutes and apply across grade levels and subjects.

- Arrive at school with sufficient time to organize materials and familiarize yourself with local school rules, bell times, and procedures.
- Take advantage of available school resources, starting with the office. Check with administrators, counselors, and secretaries to get any general information you will need to know that day.

- Greet students warmly at the beginning of class.
- Make sure to locate class seating chart(s) as soon as possible. Take attendance. If you are unsure how to pronounce a student's name, spell the student's name and ask him or her to pronounce it. Use the seating chart to call on students.
- While you should typically find a well-planned lesson available for use, it is always a good idea to have supplemental plans handy in case the teacher's plans do not cover the time allotted for class. Your plans should be generic and deal with appropriate subject material. The following are some suggestions:

  » Ask the students to write down 5–10 questions pertaining to the subject matter they are reviewing, and then use the questions to have a class discussion.

  » Write vocabulary words (10 to 20) on the board, and ask students to use them in sentences. Have the sentences read, and/or use the words to build a crossword puzzle.

  » Keep exercises, brain teasers, mathematic detective puzzles, and mysteries to fill in a mathematic lesson. Check the media center for materials. Let students work individually or in teams, based on your comfort with classroom control.

- Expect the unexpected. Be ready for contingent action. Stay in control.
- Those teaching in the same grade can review leave plans, make suggestions, and give you ideas. Resource teachers and interdisciplinary resource teachers are excellent resources to consult in secondary schools. Please ask for their support if needed.
- The media specialist can answer questions about the relevance of materials or share resources that are related to the lesson plan. The media specialist's help can be critical if a lesson is too short or to check the appropriateness of personal materials.
- Building positive relationships with students will increase your ability to manage the classroom.
- Show an interest in each student you encounter.
- Never leave students unattended. Adherence to school rules (e.g., regarding food, drinks, hats) is expected at all times in a fair, firm, and consistent manner. Refer students to the school nurse, health room technician, or other appropriate staff member in the case of cuts, injuries, or use of medication. Other circumstances also may warrant referral to the same individuals.
- Refrain from any action or conduct that endangers or potentially threatens the health and/or safety of self or others.
- Always address students in a friendly, nonconfrontational, nonthreatening tone of voice.
- Dress for work in a professionally appropriate manner to encourage student cooperation and respect.
- Follow lesson plans, in accordance with the teacher's directions. Ask questions of appropriate staff regarding meaning, intent, availability,

location of resources, or any obstacles to strict adherence to the teacher's lesson plans.
- Leave written feedback for the teacher regarding the day's activities (positive as well as negative student behavior, notification of any unusual events).
- Leave the classroom and instructional materials in an orderly manner.

# Important Telephone Numbers

| | |
|---|---|
| Automated Calling System | 301-298-2861 |
| Central Substitute Calling Office | 240-740-8060 |
| Payroll | 301-517-8100 |
| Technical Help Desk | 301-517-5800 |

# Using the Substitute Employee Management System

## How Substitutes Receive Assignment

Teachers and principals register requests for substitutes with an automated Substitute Employee Management System. Substitute coverage is arranged by referring to the school's lists of preferred substitutes or by requesting one specific substitute. Also, teachers can register prearranged assignments directly with a substitute so that the substitute does not get calls for other jobs that day. If a preferred substitute is not assigned, the system calls other substitutes, based on subject and location preferences submitted during new-substitute orientation.

## Calling Times

During the school year, the substitute system calls substitutes from 5:45 a.m. to noon and from 4:30 p.m. to 9:30 p.m. Calls also will occur afternoons and evenings, weekends, and some holidays. Morning calls are limited to jobs for that day, but the computer arranges coverage as far into the future as it can each evening and on weekends. Schools maintain separate lists of preferred substitutes for each subject area. These substitutes are always called first, unless a teacher specifies that a particular substitute is to get the first call. The computer then calls other substitutes whose location and subject preferences match the assignment.

## Tips on Using the System

*Hit the phone keys squarely and briefly.* When entering data, **do not hold a key down for very long.** The system allows 30 seconds between entries so that you do not have to rush, but a long tone may be improperly interpreted.

- If you make a mistake or the computer does not respond, hitting the star (*) key repeatedly will bring you to a point where you can start over.
- If you make a mistake while trying to accept a job, call the Central Substitute Office immediately.

**Remember, until you hear the job number, you have not accepted an assignment offered by the computer.**
- If you have call-waiting, complete your interaction with the Substitute Management System before transferring to the other line. If you do transfer, the computer will disconnect within 30 seconds.
- If the system disconnects after you have entered your PIN, the system registers the call as a decline and will not offer you that job again.
- As you become familiar with the system, bypass the instructions. As soon as the system answers you may enter your PIN before the system requests the PIN.
- If you know the option you want, you do not have to listen to the other options before entering your choice.
- If you press a key while the system is talking, it will normally execute the option you have selected as soon as the message is complete.

## Prearranged Assignments

Teachers should register jobs on the computer even when they contact you directly to arrange an assignment. Teachers are required to register prearranged substitute jobs for three important reasons:

1. *If you have to cancel a job, the computer immediately seeks a replacement.* If the job is not registered, the teacher and the school must be contacted so that alternative coverage can be arranged.
2. *Principals and coordinators call to review absences.* If problems arise and your job is registered, the system provides the information schools need to contact you.
3. *The system will avoid calling you to offer other jobs on a day when you already have an assignment.* Most substitutes appreciate this, and it allows the system to concentrate on other assignments.

If you accept an assignment directly from a teacher, you do not have to confirm acceptance with the computer. Teachers will confirm your acceptance when registering the absences. Please confirm with the teacher that he or she will register the assignment so that you will not be contacted for other assignments that day. You may call and obtain the job number using the review process, but this is not required.

## Substitute Misconduct and Performance Issues

Substitute teachers are maintained on the MCPS roster of eligible substitutes, contingent upon their ability to comply with personal and professional standards of conduct. Article 6 of the Substitute's Contract, which appears on page 91 of the collective bargaining agreement between the Montgomery County Education Association and the Montgomery County Board of Education, states: "No substitute teacher will be disciplined without proper cause." This standard recognizes that employees should adhere to expected standards of behavior and failure to do so may constitute "proper cause" for discipline or

discharge from employment. Discipline of a substitute may include reprimands and warning notices, as well as removal from a substitute list at a school or systemwide. Discipline is subject to review and appeal through grievance and appeal processes provided by law, Board policies, MCPS regulations, and negotiated agreements. In general, if a substitute is deleted from the list of those eligible to substitute at three different schools, the substitute also will be removed from the list of those eligible to substitute in any MCPS school. Nevertheless, a more serious infraction may warrant termination of a substitute teacher, even for a first-time offense such as prohibited criminal conduct.

Below are examples of inappropriate behavior or performance issues that violate the standards in the *MCPS Employee Code of Conduct*. The examples are illustrative and nonexhaustive. Nonetheless, conduct that is not expressly listed may warrant disciplinary action:

- Poor classroom management or poor performance of substitute duties
- Arriving late, leaving early, or not reporting for the substitute job assignment
- Improperly departing from (not following) the MCPS curriculum
- Theft or destruction of MCPS's or another's property
- Inappropriate use of technology

Guidelines on these issues are set forth in more detail in the *MCPS Employee Code of Conduct*, as well as applicable laws, Board policies, MCPS regulations, MCPS rules, and negotiated agreements.

# Marketing Yourself

You may wish to search for jobs or wait for the central substitute calling system to offer you a substitute position. If you wish to search for open substitute jobs, do the following:

- Choose the schools where you would like to work. Telephone those schools and leave your name, telephone number, email address, and qualifications. Express your interest in desired grade levels. Also, you may notify the schools by leaving a business card or handwritten note with the same information. Leave enough business cards and/or notes for distribution.
- After substituting in a particular school several times, ask the principal to include your name on the priority substitute list. If the principal does this, your chance of getting calls from the central substitute calling system for that school increases dramatically.
- Do your best at each substitute assignment you receive. Satisfied teachers will recommend you to their teammates and friends.
- If you still do not have a position at 7 a.m. on a day you want to work, call the Central Substitute Office at 301-279-3280. A staff member will place you for that day if there are appropriate jobs available.
- Teach each class as if it were your own.

**MONTGOMERY COUNTY PUBLIC SCHOOLS**
*Expanding Opportunity and Unleashing Potential*

eSchool SOLUTIONS  **Substitute Employee Management System**

### MONTGOMERY COUNTY PUBLIC SCHOOLS
### Substitute Quick Reference Card

| | |
|---|---|
| **Substitute System Telephone** | **301-298-2864** |
| **Technical Help Desk Telephone** | **301-517-5800** |
| **Employee ID Number** | _____ |
| **Phone PIN Number** | _____ |
| **Web Browser URL** | **https://montgomerycountymd.eschoolsolutions.com** |
| | *Web access is available 24 hours a day, 7 days a week.* |

#### NEW EMPLOYEE REGISTRATION INSTRUCTIONS

> **Before any features are available, you must register with the system and create a PIN. The Employee ID Number and PIN are used for all interactions with the phone**

1. Enter your **Employee ID Number** as your **Access ID** followed by the star (*) key.
2. When asked for your PIN, enter your **Employee ID Number** again followed by the star (*) key.
3. Record your name followed by the star (*) key.
4. Hear your callback number. Correct if necessary.
5. You will be asked to select a new **PIN**. Enter a **PIN** that is at least six (6) digits in length but no more than nine (9) digits followed by the star (*) key.

#### TELEPHONE SYSTEM INFORMATION

**THE SYSTEM CALLS SUBSTITUTES DURING THESE TIMES*:**

**Today's Jobs:** 5:45 am – 12:00 pm

| Day | Future Jobs |
|---|---|
| Monday-Wednesday Evenings | 4:30 pm – 9:30 pm |
| Thursday Evenings | 4:00 pm – 9:30 pm |
| Friday Evenings | 4:00 pm – 9:30 pm |
| Saturday/Sunday | 3:00 pm – 9:30 pm |
| Holidays | 3:00 pm – 9:30 pm |

*\*Web access is available 24 hours a day, 7 days a week.  See page 3 for Web access instructions.*

**JOB CANCELLATION REASONS:**
1. Personal Illness
2. Family Illness
3. Other Emergency

**TELEPHONE ACCESS INSTRUCTIONS** *(See page 3 for web access instructions.)*

# THE SYSTEM CALLS

1. Enter your **Employee ID Number** as your **Access ID** followed by the star (*) key.
2. Enter your **PIN** followed by the star (*) key.

**HEAR THE JOB OFFER**

- **PRESS 1** to hear the job offer.
  **PRESS 2** to set temporary do not call.
- If you **pressed 1** to hear the job offer:
  **PRESS 1** to hear the job description.
  **PRESS 2** to decline the job (without hearing the description).
- If you **pressed 1** to hear the job
  description:
  **PRESS 1** to accept this job**.**
  ***Record the job number. You are successfully assigned to the job.***
**PRESS 2** to repeat the job description.
**PRESS 3** to decline the job.
  **PRESS 1** to confirm.
- If you **pressed 2** to set temporary do not call, hear a time
  offered: **PRESS 1** to accept the time offered**.**
**PRESS 2** to enter an earlier time in HH:MM format.

**HEAR THE CANCELLATION**

1. Hear ***"This assignment has been cancelled"*** and the job information.
2. **PRESS 1** to repeat the job information.

## CALLING THE SYSTEM

**MENU OPTIONS**
**1 - Review or Cancel Assignments**
**2 - Hear Available Jobs**
**3 - Change your Callback Number- Review or Modify Temporary Do Not Call Time**
**4 - Review or Modify Unavailability Dates**
**5 - Review or Modify Daily Availability**
**7 - Change PIN or Re-record Name**
**9 - Exit and Hang-up**

**REVIEW OR CANCEL ASSIGNMENTS**

1. Hear assignments in chronological order:
   **PRESS 1** to hear assigned job information again.
   **PRESS 2** to cancel this assigned job.
2. If you **pressed 2** to cancel assignment:
   **PRESS 1** to confirm cancellation. (Enter the cancellation reason followed by the * key.)

**HEAR AVAILABLE JOBS**

1. Hear assignment information:
   **PRESS 1** to repeat assignment.
   **PRESS 2** to accept assignment.
   **PRESS 3** to decline assignment.

**CHANGE YOUR CALLBACK NUMBER**

1. Hear the callback telephone number:
   **PRESS 1** to modify callback telephone number.
2. Enter new telephone number followed by the star (*) key.

---

**TO CHANGE PIN or RE-RECORD NAME**
1. **PRESS 1** to change your PIN.
   **PRESS 2** to change the recording of your name.

---

## WEB ACCESS INSTRUCTIONS

**SIGN IN**

Open your browser and access the Substitute Employee Management System sign-in page (https://montgomerycountymd.eschoolsolutions.com). Enter your **Outlook Login Name** as your **user ID** and your **Outlook Password** as your **password**.

---

**PASSWORD REMINDER**

If you have forgotten your **Outlook Password,** please go to the myID (**www.montgomeryschoolsmd.org/ departments/myid/**) website and follow the directions on the webpage to retrieve or reset your password.

---

**WEB BROWSER INFORMATION**

You can click the *help* link to access user guides and how-to-videos.
**Important Note**: *Do NOT use the browser's BACK button to navigate to screens. Navigation buttons are at the bottom of SmartFindExpress screens, such as the **return to list** and **continue** buttons.*

---

**PROFILE**

**Select Profile Icon (Initials) >Settings>Personal**
   **Update Email**— View your MCPS Outlook email address.  You cannot update the system email address.
   **Change Password (PIN)**—Enter your current **PIN** followed by a new **PIN** twice and click *save*. You can access your profile by clicking on your **initials** (on the right**)** click on **Settings**, and then click on the **Personal Tab Callback Number**—Update the phone number (on your profile) you want the system to use to call to offer you jobs.

---

**MANAGE SCHEDULE**
- **Manage availability**
  ° Select *Profile Icon > Settings*
  ° Click *Schedule*
  ° For each day of the week, click *Edit (pencil)* to define *Available Times* and *Do Not Call Times*
  ° Click *All Day, Unavailable,* or *Custom*
  ° If custom, enter *Start Time* and *End Time*. Use HH:MM AM or PM format.
  ° Click *Save*

**Classifications and Locations**
- Review classifications and locations that you have chosen for assignments.

**Unavailable Dates Tab**
- **Create Unavailability Schedule**
  ° From *Job Search (Date).* Select *Unavailable*
  ° Click *Add Unavailability*
  ° Enter the unavailability details.
  ° Click *Save*.

---

JA143

**AVAILABLE JOBS - Job search is your start page in both the web and mobile apps.**
**To view available jobs**:
- You must be available to work all days and times of the job.
- You must have specified that you will work at the location.

**To accept or decline jobs**:
- From the ***Available*** list, view a summary of all jobs matching your qualifications and preferences.
- To view the job schedule and details, expand the row
- To take the job assignment, click ***Accept*** OR to hide a job from the list, click ***Decline.*** Select a ***Reason for Declining,*** and then click ***Confirm***.

   **CAUTION:**

   If the system determines that a substitute is in the process of accepting a job via telephone, the job will not be assigned. If the job assignment is successful, a job number is provided.

   **TIP:**

   Occasionally refresh your search results. The list of available jobs can change as other substitutes accept assignments and jobs are added.


**MANAGE ACTIVE JOBS –**
**Review and manage jobs that you have accepted or that have been assigned to you**:
- From ***Job Search*** select ***Active***
- To view the job schedule, details and instructions, expand the row by clicking on the down arrow.

**If you have been canceled from an assignment by someone else, you should acknowledge the cancellation**.

- From ***Job Search*** select ***Canceled.***
- Click a *job flagged* as ***Action Required***
- Click ***Acknowledge Cancellation***

**CALENDAR VIEW**

- View jobs available to you and your active jobs in one place. In the web app, click ***My Calendar.*** Click any job to view its details

**SIGN OUT**
At any time during the session, the **sign out** link can be selected by clicking on your initials to end the session and disconnect from *SmartFindExpress*. Selecting the browser's back button or going to another site on the Internet does **NOT** disconnect the session from *SmartFindExpress*.

To ensure security and privacy of information, use the **sign out** link to disconnect from *SmartFindExpress,* and close the web browser when you finish your session.

# Emergency Preparedness Procedures

## Guidelines for Lockdown–Evaculate–Shelter

### Lockdown
When there is a threat on school property, but the severity and location is unknown, principals/administrators may elect to activate a schoolwide Lockdown for the safety of all, which will override implementation of Lockdown with Options procedures.

### Persons Authorized to Call a Lockdown
School administrators or their designee will notify students, staff, and visitors via public address (PA) system and two-way portable radios when a Lockdown is in effect. Directions should be given to immediately move to Lockdown mode. Staff should make an announcement and notify 911 and Office of Teaching, Learning, and Schools, School Support and Improvement. (OTLS-SSI).

### Lockdown Alert
- When the administrator/designee announces a Lockdown, scan the immediate area outside the classroom or office for any students and staff. Allow them in the classroom/office, and immediately lock or secure the door if possible.
- Make the room look unoccupied by turning off the lights, closing and/or covering the windows and blinds, and moving away from the line of sight from the doors and windows. Remain silent.
- If staff and students are inside the building but outside a classroom or office when a Lockdown is called, move students to the nearest securable location.
- Staff supervising students outside when a Lockdown alert occurs inside the building should be notified of the Lockdown activation by PA or two-way radio. Staff and students should move to a predetermined safe location identified on the school's emergency plan, away from the building, and maintain communication with the command post.
- Ignore the fire alarm system and class change bells.
- Wait for further instructions.

### Lockdown with Options…
When a school is faced with an active assailant intending to do harm against a school, staff, or students, a *Lockdown with Options* will be initiated.

When a *Lockdown with Options* is announced or initiated based on situational awareness, everyone in the school must decide whether to **AVOID, DENY**, or **DEFEND**:

**AVOID**—If safe and practicable to do so, **AVOID** the area by quickly moving/fleeing as far away from the threat as possible.

**DENY**—When you cannot safely **AVOID**, or it is impossible to do so, lock and barricade your room to **DENY** access to an assailant, following Lockdown procedures.

**DEFEND**—as a last resort, act by yourself or with age-appropriate students, to **DEFEND** yourself from the assailant.

### Important Terminology
Situational Awareness – taking in the details of your surroundings, so you can adapt and respond to challenging situations in a safe manner, if and when they arise.

**Safe Corner**—areas in classrooms where students and teachers would not be visible from hallways, windows, or door openings.

**High-risk Zone**—refers to areas such as stairwells, hallways, and doorways that are generally narrow, confined areas that offer little or no cover or concealment.

**Protective Assets**—available furniture, such as desks, chairs, file cabinets, and tables, can be placed against a door to block or DENY entry to an office or classroom.

## Evacuate
There are two types of evacuations: *fire* and *directed*.

### Fire Evacuation
- Activate fire evacuation alarm.
- Students/staff/visitors leave the building by the nearest exit.
- Proceed to a point at least 50 feet from the building.
- Perform an accountability of the students/staff/visitors.

### Directed Evacuation
- Will be used during possible high-level bomb threats, an identified suspicious package, or an inside hazardous material release.
- Notify 911 and OTLS-SSI.
- Determine a plan to direct everyone away from the known danger area.
- Announce via PA and two-way portable radio.
- Students/staff/visitors must evacuate to a point at least 300 feet from the building.

## Shelter
This term is used to alert staff that an emergency exists at or near an MCPS facility. It requires all students to be accounted for and under supervision. Administrators may activate OSET and set up a command post when appropriate. There are three types of shelters: *Public Safety, Severe Weather,* and *Outside Hazardous Materials Release.*

### Persons authorized to call a Shelter alert
Administrators or their designee will notify students/staff/visitors via the PA system and two-way portable radios when a Shelter alert is activated. It is recommended that an age-appropriate announcement of a Shelter alert include a brief description of the nature and location of the incident.

## Public Safety Shelter Alert
- When the administrator announces a Public Safety Shelter alert, bring outside students/staff/visitors into the main building; relocatable classrooms are secured but not evacuated.
- Outside doors are locked and kept secured.
- Students should be accounted for in an instructional area.
- Classroom instruction should continue.
- Staff must document attendance and report any discrepancies to an administrator/designee.
- During a Public Safety Shelter alert, classroom lockdown is not required.
- OSET may be activated by an administrator during a Public Safety Shelter alert via a PA announcement and two-way portable radios.
- Depending on the nature of the emergency or potential threat, it may not be appropriate to change classes. In these situations, class bells should be turned off and students and staff should remain in their classrooms until directed otherwise by the administrator/designee.
- Do not ignore the fire alarm system.

## Severe Weather Shelter
A severe thunderstorm or tornado warning is activated for the area near the school.
- Students/staff/visitors must report to the identified weather-safe areas inside the building.
- Relocatable classrooms are to be evacuated to the main building.
- Bring the emergency kit, emergency kit cell phone, and Nextel phone to the identified weather-safe area.
- Ensure that the NOAA weather radio is monitored continually.

## Outside Hazardous Material Release Shelter Alert
This term is used to describe a specific shelter alert due to an outside air contamination emergency at or near the building. This could be the result of a suspected chemical, biological, or radiological incident or a nearby hazardous material spill.

## Outside Hazardous Material Release Alert
When activating an Outside Hazardous Material Release Shelter alert, take the following steps immediately:
- Announce an Outside Hazardous Material Release Shelter alert.
- Bring students/staff/visitors into the main building from outdoor activities.
- Evacuate relocatable classrooms if safe to do so.
- Secure/lock exterior doors and windows.
- Hold students in their current locations inside the building until the best course of action can be determined.
- Turn off electrical power to ensure immediate shutdown of HVAC.
- Ignore fire alarm system only during this Outside Hazardous Material Release Shelter alert.

## Parent/Child Reunification
All schools have plans in place to reunite students with their parents/guardians in the event of an emergency at a school. This process will ensure the safe and orderly reuniting of students and parents/guardians. Schools will ensure that a three-step approach is used:
- Verify the authorization to release the student.
- Locate the student.
- Sign out student and unite student and parent/guardian.

## Firearms
- Avoid attempts to disarm/subdue an armed subject.
- Notify administrator/designee and school-based security of any firearm incidents immediately, and call 911 with details.
- Determine the need to implement either a Lockdown or a Public Safety Shelter alert.
- Abandoned/discarded firearms should be covered by appropriate means and never left unattended.

## Bomb Threat Assessment
- Factors to consider:
  - » Specific details provided by the threat.
  - » Number of prior threats to the school.
  - » Current events surrounding the school.
  - » Demeanor of the threat.
- The administrator will make a decision on evacuation based on an assessment of the situation and input from other school administrators, the Department of Systemwide Safety and Emergency Management, and the police. Any disagreement will be resolved in favor of evacuation. Refer to MCPS Regulation EKC-RA, Bomb Threats/Explosive Devices. Use a Directed Evacuation to evacuate the school.
- Evacuation **is warranted only** if the threat level is high.
- Evacuation **is not warranted** if the threat level is low.
- A Public Safety Shelter alert is recommended and sweep/scan teams should be used during a low-level threat when the building is not evacuated.
- Notify school administration immediately. Report the bomb threat to OTLS- OSSI and contact 911.

## Bomb Threat Sweep/Scan
- In certain circumstances, staff volunteers may be asked to sweep/scan the facility or grounds for suspicious items.
- A sweep/scan should be conducted in teams and only by visual means (eyes and ears only).
- If a suspicious item is discovered during a sweep/scan, evacuate to a 300-foot safe zone and immediately notify administrator.
- If a suspicious item is located, do not use a radio or cell phone in the immediate area; i.e., within 25 feet in all directions.
- No suspicious item should be handled in any manner by school staff. Do not touch it!

**What to do During an Earthquake**

Stay as safe as possible during an earthquake. Be aware that some earthquakes are actually foreshocks, and a larger earthquake might occur. Minimize your movements to a few steps to a nearby safe place and, if you are indoors, stay there until the shaking has stopped and you are sure exiting is safe.

**If Indoors**
- **Drop** to the ground; take **Cover** by getting under a sturdy table or other piece of furniture; **Hold On** until the shaking stops. If there isn't a table or desk near you, cover your face and head with your arms and crouch in an inside corner of the building.
- Stay away from glass, windows, outside doors and walls, and anything that could fall such as light fixtures or furniture. Use a doorway for shelter only if it is in close proximity to you and you know it is a strongly supported, loadbearing doorway.
- Stay inside until the shaking stops and it is safe to go outside. Most injuries occur when people move to a different location or exit the building.
- Do not use the elevators

**If Outdoors**
- Stay there. Move away from building, streetlights, and utility wires.

You can review additional information at the Safety and Security homepage at **www.montgomeryschoolsmd. org/departments/security/.**

# MCPS NONDISCRIMINATION STATEMENT

Montgomery County Public Schools (MCPS) prohibits illegal discrimination based on race, ethnicity, color, ancestry, national origin, nationality, religion, immigration status, sex, gender, gender identity, gender expression, sexual orientation, family structure/parental status, marital status, age, ability (cognitive, social/emotional, and physical), poverty and socioeconomic status, language, or other legally or constitutionally protected attributes or affiliations. Discrimination undermines our community's long-standing efforts to create, foster, and promote equity, inclusion, and acceptance for all. The Board prohibits the use of language and/or the display of images and symbols that promote hate and can be reasonably expected to cause substantial disruption to school or district operations or activities. For more information, please review Montgomery County Board of Education Policy ACA, *Nondiscrimination, Equity, and Cultural Proficiency*. This Policy affirms the Board's belief that each and every student matters, and in particular, that educational outcomes should never be predictable by any individual's actual or perceived personal characteristics. The Policy also recognizes that equity requires proactive steps to identify and redress implicit biases, practices that have an unjustified disparate impact, and structural and institutional barriers that impede equality of educational or employment opportunities. MCPS also provides equal access to the Boy/Girl Scouts and other designated youth groups.**

| For inquiries or complaints about discrimination against MCPS students* | For inquiries or complaints about discrimination against MCPS staff* |
|---|---|
| Director of Student Welfare and Compliance<br>Office of District Operations<br>Student Welfare and Compliance<br>850 Hungerford Drive, Room 55, Rockville, MD 20850<br>240-740-3215<br>SWC@mcpsmd.org | Human Resource Compliance Officer<br>Office of Human Resources and Development<br>Department of Compliance and Investigations<br>45 West Gude Drive, Suite 2500, Rockville, MD 20850<br>240-740-2888<br>DCI@mcpsmd.org |
| **For student requests for accommodations under *Section 504 of the Rehabilitation Act of 1973*** | **For staff requests for accommodations under the *Americans with Disabilities Act*** |
| Section 504 Coordinator<br>Office of School Support and Well-being<br>Office of Well-being, Learning and Achievement<br>850 Hungerford Drive, Room 257, Rockville, MD 20850<br>240-740-5630<br>504@mcpsmd.org | ADA Compliance Coordinator<br>Office of Human Resources and Development<br>Department of Compliance and Investigations<br>45 West Gude Drive, Suite 2500, Rockville, MD 20850<br>240-740-2888<br>DCI@mcpsmd.org |
| **For inquiries or complaints about sex discrimination under Title IX, including sexual harassment, against students or staff*** | |
| Title IX Coordinator<br>Office of District Operations<br>Student Welfare and Compliance<br>850 Hungerford Drive, Room 55, Rockville, MD 20850<br>240-740-3215<br>TitleIX@mcpsmd.org | |

*Discrimination complaints may be filed with other agencies, such as the following: U.S. Equal Employment Opportunity Commission (EEOC), Baltimore Field Office, GH Fallon Federal Building, 31 Hopkins Plaza, Suite 1432, Baltimore, MD 21201, 1-800-669-4000, 1-800-669-6820 (TTY);  Maryland Commission on Civil Rights (MCCR), William Donald Schaefer Tower, 6 Saint Paul Street, Suite 900, Baltimore, MD 21202, 410-767-8600, 1-800-637-6247, mccr@maryland.gov; or U.S. Department of Education, Office for Civil Rights (OCR), The Wanamaker Building, 100 Penn Square East, Suite 515, Philadelphia, PA 19107, 1-800-421-3481, 1-800-877-8339 (TDD), OCR@ed.gov, or www2.ed.gov/about/offices/list/ocr/complaintintro.html.*
**This notification complies with the federal Elementary and Secondary Education Act, as amended.*

This document is available, upon request, in languages other than English and in an alternate format under the *Americans with Disabilities Act*, by contacting the MCPS Office of Communications at 240-740-2837, 1-800-735-2258 (Maryland Relay), or PIO@mcpsmd.org. Individuals who need sign language interpretation or cued speech transliteration may contact the MCPS Office of Interpreting Services at 240-740-1800, 301-637-2958 (VP) mcpsinterpretingservices@mcpsmd.org, or MCPSInterpretingServices@mcpsmd.org.

Maryland's Largest School District

## MONTGOMERY COUNTY PUBLIC SCHOOLS

Published by the Department of Materials Management for
the Office of Human Resources and Development
0223.24ct • Editorial, Graphics & Publishing Services • 9/23 • NP

IN THE
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| KIMBERLY ANN POLK, | ) | |
| | ) | |
| Plaintiff, | ) | No. 8:24-cv-1487-DLB |
| | ) | |
| v. | ) | |
| | ) | |
| MONTGOMERY COUNTY PUBLIC SCHOOLS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

<u>SECOND DECLARATION OF KIMBERLY ANN POLK</u>

The declarant, Kimberly Ann Polk, under penalty of perjury declares as follows:

1. I am the same Kimberly Ann Polk who provided a declaration in support of my motion for a preliminary injunction pursuant to which I would not take substitution opportunities in elementary, kindergarten, and preschool education classrooms with students exhibiting as transgender.

2. I have been provided with a copy of the Declaration of Gregory S. Edmundson in support of MCPS's opposition to my request for a preliminary injunction. I provide this declaration in part to respond to his contentions that the accommodation I request is impractical in various respects.

3. Mr. Edmundson states that the computerized substitution system is not set up to identify classrooms in which there are students with gender support plans (GSPs). I never meant to suggest that it was. However, once I identify the 30 or less elementary schools for which I would like to have the system identify possibilities for me, I could check any opportunities of interest to me against a list of classrooms with GSP students and make sure not to select opportunities in any such classes, whether I saw the opportunity on the

web site or was phoned about it.  I could do the same for any other classrooms a school puts on my "do not take" or "off limits" list because there are students exhibiting as transgender who do not have a GSP.  In my experience, it would be easy for the principal or another administrator at a school to question the teachers at the school as to whether their class had students exhibiting as transgender.  Again in my experience, there would be very few classrooms on my "off limits" list, and it would take very little trouble to canvass teachers about this matter.

4.  In confirmation that it would be very easy for MCPS to provide me with such a "do not take" or "off limits" list, I attach two documents.  The first is a chart generated by MCPS entitled "MCPS Form 560-80 Data Breakdown," that accumulates information about students who had GSPs, by grade, as June 2024.  I attach it as Attachment 11.  It shows only 81 K-5 students in all MCPS elementary schools with GSPs.  The second document is a page from interrogatory responses by MCPS to information about the total number of elementary school classrooms MCPS has, in which responds it has over 3,000.  I attach it as Attachment 12.

5.  Mr. Edmundson refers to substitution jobs for art and music teachers who go class to class.  While I qualify for substituting for them, solely for purposes of the preliminary injunction request, I will agree not to do so.

6.  Mr. Edmundson makes some reference to long-term substitution jobs, such as filling in for a teacher on pregnancy leave.  Currently, my schedule will not accommodate any such long-term jobs, and I will not be soliciting or accepting them.  Instead, I agree that, for purposes of the preliminary injunction request, I will limit myself to short-duration opportunities, as I did previously.  (See my Attachment 2.)

7. I wish to repeat that I am not refusing to teach students exhibiting as transgender. I would give them the same courtesy and respect that I would give every student, including protecting them from bullying and harassment. I would also refer to them by their preferred name. Based on my substantial experience with children, referring to a transgender student only by preferred name while referring to other students by both their name and by pronouns would neither be noticed by the children nor cause them to feel any "stigma."

8. Mr. Edmundson also greatly overstates the "disruption" that might occur if I ever felt compelled to ask for assistance from other personnel so as not to violate my conscience by conforming to the Gender Identity Guidelines. My main concern in this area is being required to accompany children in a mixed-sex bathroom situation. I am told that MCPS has stated in its opposition that the Guidelines do not require me to be proactive in that respect, and so that eliminates my concern. However, I also want to point out that, in most of the preschool classes in which classes I have substituted, the classrooms have one-toilet bathrooms attached for use solely by the students in that class, as do some kindergarten classrooms. Moreover, the preschool classes in my experience have a primary teacher and an aide, such that assistance is immediately available.

9. I have also been asked to address what entity I dealt with as an employer. I always dealt with MCPS in the dealings that I recall and in the information I received. For example, the training materials identified MCPS as the employer (Attach. 6), and the religious accommodation form (Attach. 7) refers to "MCPS employees." MCPS has also just provided in response to discovery the "Personnel Action Notice" issued to me by MCPS,

not MCBE, stating that I had been "terminated for no earnings" as of November 2023,

which I attach as Attachment 13.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on July 16 2024.

Kimberly Ann Polk

Polk Second Declaration

Attachment 11

| MCPS Form 560-80 Data Breakdown | | |
|---|---|---|
| School Year | Total | Breakdown by School Level |
| FY19 | 27 | |
| | | 7- Elementary School |
| | | 20- Middle School |
| | | 0 - High School |
| FY20 | 17 | |
| | | 0 - Elementary School |
| | | 5 - Middle School |
| | | 12 - High School |
| FY21 | 99 | |
| | | 12 - Elementary School |
| | | 35- Middle School |
| | | 52 - High School |
| FY22 | 239 | |
| | | 17 - Elementary School |
| | | 130 - Middle School |
| | | 92-High School |
| FY23 | 223 | |
| | | 26 - Elementary School |
| | | 110 - Middle School |
| | | 87 - High School |
| FY24 | 136 | |
| | | 19 - Elementary School |
| | | 54 - Middle School |
| | | 63 - High School |
| | 741 | |
| Breakdown by Grade Level | | |
| K - 5 G | 81 | |
| 6 - 8 G | 354 | |
| 9 - 12 G | 306 | |
| Parent Support Level % | | |
| 0 - 3 | 17% | |
| 4  7 | 25% | |
| 8  10 | 56% | |
| X [Non-Binary] = 47% / 741Forms Received | | |
| 69 Secondary Schools    32 Elementary Schools | | |
| DATA as of June 26, 2024 | | |

Polk Second Declaration

Attachment 12

MCPS objects to this Interrogatory as overly broad, unduly burdensome, not proportional to the needs of the case, and not relevant to any party's claim or defense, including to the extent it purports to require MCPS to obtain classroom rosters from each of the district's 212 schools and determine whether each roster includes a student with a Gender Support Plan. MCPS also objects to this Interrogatory as not relevant to any party's claim or defense to the extent it seeks information about the number of students with Gender Support Plans that have not been communicated to the student's parents. Plaintiff seeks to be excused from teaching in any classroom with a transgender student, not just classrooms with students who have Gender Support Plans that have not been communicated to their parents. MCPS further objects to this request to the extent it calls for the provision of information subject to an attorney-client, work product, or other privilege.

Subject to and without waiving the foregoing objections, MCPS provides the following information:

|  | 2022-2023 | 2023-2024 | 2024-2025 |
|---|---|---|---|
| Number of elementary schools | 136 | 137 | 137 |
| Number of elementary school classrooms | 3250 | 3246 | 3143 |

**INTERROGATORY NO. 4:**

Identify the following:
a. **All persons who worked within an MCPS facility without adhering to one or more policies or procedures pertaining to the MCPS policy on gender identity.**
b. **Whether MCPS disciplined in any way these persons identified in subparagraph (a) and, if so, in what way.**
c. **Whether MCPS granted a religious accommodation to any person identified in response to subparagraph (a).**

**RESPONSE TO INTERROGATORY NO. 4:**

6

Polk Second Declaration

Attachment 13



## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **KIMBERLY ANN POLK,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Civ. No. DLB-24-1487** |
| **MONTGOMERY COUNTY PUBLIC SCHOOLS, *et al*.,** | * | |
| | * | |
| **Defendants.** | | |

### MEMORANDUM OPINION

Kimberly Ann Polk worked as a substitute teacher for Montgomery County Public Schools ("MCPS") during the 2021–2022 school year. In the summer of 2022, all MCPS teachers, including Polk, were required to review an online instructional video on MCPS's gender identity guidelines ("the Guidelines"). The Guidelines set forth MCPS policies on transgender and gender nonconforming students and provide for the creation of gender support plans for students. Under the Guidelines, teachers must refer to students by their preferred pronouns and may not discuss a student's gender identity with the student's parents without the student's consent. At the end of the video, teachers were required to affirm they understood the Guidelines and their obligation to follow them. Polk refused to affirm because, in her view, the Guidelines require her to act and speak in a manner that conflicts with her Christian beliefs. Because Polk refuses to abide by the Guidelines, she may not be a substitute teacher in MCPS.

Polk sued MCPS, the Montgomery County Board of Education ("the Board of Education" or "the Board"), the elected members of the Board of Education, and the interim Superintendent of the Board of Education. Polk claims that the defendants violated her First Amendment rights to free exercise of religion and free speech when MCPS ended their employment relationship because

Polk would not comply with the Guidelines. Polk also claims the defendants violated her rights under Title VII of the Civil Rights Act because her employer refused to accommodate her religious beliefs.

Polk moves for a preliminary injunction that requires MCPS to place her in a classroom that has "no transitioning students." ECF 4, at 1. The defendants oppose the preliminary injunction motion and move to dismiss Polk's complaint for failure to state a claim. Both motions are fully briefed. For the following reasons, the Court grants the motion to dismiss the free exercise and free speech claims, denies the motion to dismiss the Title VII claim, and denies the motion for a preliminary injunction.

## I.    Background[1]

### A.  MCPS and the Guidelines

MCPS is the public school district for Montgomery County, Maryland. ECF 1, ¶ 8. It is the largest school district in Maryland. *Id.* In 2023, it was the seventh largest employer in the state. *Id.*

Maryland law authorizes the Montgomery County Board of Education to adopt rules, regulations, and educational policies for MCPS, so long as those rules, regulations, and policies are consistent with state law. *Id.* ¶ 7; *see also* Md. Code Ann., Educ. § 4-108(3)–(4). Pursuant to that grant of authority, the Board of Education adopted gender identity guidelines for the 2019–2020 school year. ECF 1, ¶ 11. The Board has published substantively the same Guidelines for

---

[1] These facts, accepted as true, are from Polk's complaint, ECF 1, and the Guidelines, ECF 28-4, which are attached to the motion to dismiss, integral to the complaint, and authentic. *See Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 164 (4th Cir. 2016) ("[I]t is well established that a document attached to a motion to dismiss may be considered when evaluating a motion to dismiss if the document was 'integral to the complaint and authentic.'" (quoting *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007))).

each school year thereafter. *Id.* The Guidelines apply to every student in the MCPS system. *Id.* ¶ 16.

The Guidelines permit schools to create "Gender Support Plans" for transgender and gender nonconforming students. *Id.* ¶ 13. The Guidelines provide that the principal or their designee, "in collaboration with the student and the student's family (if the family is supportive of the student), should develop a plan to ensure that the student has equal access and equal opportunity to participate in all programs and activities at school and is otherwise protected from gender-based discrimination at school." *Id.*

The Guidelines instruct school staff members, including substitute teachers, to "address students by the name and pronoun corresponding to the gender identity that is consistently asserted at school." *Id.* ¶ 14. The Guidelines also address a student's right to keep their gender identity private, even from their parents. *Id.* The Guidelines provide:

> Privacy And Disclosure Of Information
>
> All students have a right to privacy. This includes the right to keep private one's transgender status or gender nonconforming presentation at school.
>
> Information about a student's transgender status, legal name, or sex assigned at birth may constitute confidential medical information. Disclosing this information to other students, their parents/guardians, or third parties may violate privacy laws, such as the federal Family Educational Rights and Privacy Act (FERPA).
>
> Schools will ensure that all medical information, including that relating to transgender students, is kept confidential in accordance with applicable state, local, and federal privacy laws. . . .
>
> Transgender and gender nonconforming students have the right to discuss and demonstrate their gender identity and expression openly and decide when, with whom, and how much to share private information. The fact that students choose to disclose their status to staff members or other students does not authorize school staff members to disclose students' status to others, including parents/guardians and other school staff members, unless legally required to do so or unless students have authorized such disclosure.

*Id.* When a staff member speaks to a parent of a transgender student, the Guidelines instruct staff members to "use the student's legal name and pronoun that correspond to the student's sex assigned at birth," "[u]nless the student or parent/guardian has specified otherwise." *Id.* The Guidelines do not tell staff members what they must say to parents if they inquire about their child's gender identity. *Id.* Rather, the Guidelines encourage staff members to keep such information confidential and authorize disclosure only if it is legally required or if the student consents to disclosure. *Id.*

### B. Kimberly Polk and Her Reaction to the Guidelines

Kimberly Polk worked as a substitute teacher for MCPS during the 2021–2022 school year. *Id.* ¶ 24. The Guidelines were in effect that year. *Id.* ¶ 11. Polk taught ten times at eight different MCPS elementary schools. *Id.* ¶ 24. She primarily taught in preschool special education classes, but she also taught kindergarten and second and fourth grade. *Id.* ¶ 25. She "received uniformly positive reviews and responses concerning her teaching." *Id.* ¶ 26. Polk was qualified to return to MCPS as a substitute teacher for the 2022–2023 school year without reapplying. *Id.* ¶ 24. She planned to substitute teach more frequently during the 2022–2023 school year. *Id.* ¶ 28.

"As part of the retention process for the 2022-23 school year," Polk was required to review online instructional videos about MCPS policies and procedures. *Id.* ¶ 29. One of those videos was about the Guidelines. *Id.*

Polk watched the Guidelines video. *Id.* At the end of the video, the screen instructed Polk to electronically sign an affirmation, by clicking a box, that she had watched and understood the instructional video and would "fully adhere to" the Guidelines. *Id.* ¶ 30.

Because of her "sincerely held religious beliefs," Polk "was not able to affirm that she would adhere to [the Guidelines]." *Id.* ¶ 31. Polk believes that "God created individuals as either

male or female and she would act unethically if she assisted children to present as other than their God-given sex." *Id.* This would "include lying to children by using pronouns for them that do not match their God-given, biological sex." *Id.* Polk also believes that "God gave parents the primary responsibility for the care and upbringing of their minor children and it would be unethical for her to hide from parents that their child is transitioning genders at school." *Id.* Polk's beliefs are "based on her understanding of her Christian religion and the Holy Bible."[2] *Id.*

In November 2022, Polk submitted a request for a religious accommodation to Khalid Walker, the MCPS compliance coordinator. *Id.* ¶ 32. Polk also submitted a request for an accommodation on the MCPS website. *Id.* Afterward, Polk and Walker spoke on the phone about a possible accommodation. *Id.* ¶ 33. Walker told Polk that any accommodation they discussed would be "subject to further MCPS approval." *Id.* Walker "informed [Polk] that she would not have to use preferred pronouns," "would not be required to sign the affirmation," and "would be permitted to teach in the elementary schools and preschool special education program but not in the middle or high schools." *Id.* Walker also "informed [Polk] that, in the event a child presented gender identity issues such that she could not adhere to [the Guidelines], the school would provide her with someone else, like a school administrator, who would be able to provide her with support and to interact instead with the student." *Id.*

In December 2022, Walker informed Polk that MCPS had rejected "any accommodation for her." *Id.* ¶ 34. Because she did not receive an accommodation, Polk did not teach in MCPS schools during the 2022–2023 or 2023–2024 school years. *Id.* ¶ 35. Her inability to substitute teach for MCPS has negatively impacted her family's finances. *Id.* ¶ 36.

---

[2] Polk also claims that the Guidelines violate her religious beliefs by requiring her "to assist a child of one sex to use the restroom of the opposite sex while others of the opposite sex were present." ECF 1, ¶ 31.

### C.  Procedural History

Polk timely filed a charge of employment discrimination with the Equal Employment Opportunity Commission ("EEOC") in August 2023. *Id.* ¶ 37. She alleged that MCPS violated her rights under Title VII by denying her a religious accommodation. *Id.* In February 2024, MCPS filed a statement of position with the EEOC. *Id.* ¶ 38. MCPS said it was amenable to one accommodation: Polk would not have "to execute the affirmation in the training materials that she would abide by the policy in its entirety, but she would still be required to do so when working." *Id.* Polk does not believe this was a "true accommodation," because it "compels" her "to choose between losing her job and being untrue to her religious convictions." *Id.* In April 2024, Polk requested and received from the EEOC a right to sue notice. *Id.* ¶¶ 41–42.

In May 2024, Polk filed her complaint in this Court against MCPS, the Board of Education, and the elected Board members and the interim MCPS Superintendent in their individual and official capacities. *Id.* ¶¶ 7–10. Polk asserts three claims against all defendants: (1) a violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e *et seq.*, for failing to provide her with a religious accommodation; (2) a violation of 42 U.S.C. § 1983 for violating her First Amendment right to free speech; and (3) a violation of 42 U.S.C. § 1983 for violating her First Amendment right to free exercise of religion. *Id.* ¶¶ 53–71. Polk seeks monetary damages and a declaration that the Guidelines violate her constitutional rights and her rights under Title VII. *Id.* at 17. She also seeks "[a] preliminary injunction allowing her to continue to substitute teach in classrooms in which students who are transitioning genders are not enrolled" and "[a] permanent injunction consistent with the declaratory relief." *Id.*

Polk moves for a preliminary injunction. ECF 4. Though Polk eventually wants a permanent injunction that would allow her not to comply with the Guidelines at all, she pledges,

for the duration of the preliminary injunction, to "limit her substitute services to elementary school classrooms with no transitioning students attending them" and to "obtain assistance from other MCPS personnel promptly if she must engage a transitioning student in a way that would violate her religious beliefs." *Id.* at 1. The defendants oppose the preliminary injunction and move to dismiss Polk's complaint. ECF 28. Both motions are fully briefed. ECF 4, 4-1, 28, 28-1, 30, 31. After briefing was complete, Polk filed three notices of supplemental authority. ECF 32, 37, 38. The Court held a motions hearing on October 17, 2024. ECF 36.

## II.    Motion to Dismiss

The defendants move to dismiss Polk's free exercise and free speech claims because she has not stated a cognizable constitutional claim. The defendants also move to dismiss Polk's Title VII failure-to-accommodate claim because accommodating her would pose an undue hardship on her employer. Polk's First Amendment claims are dismissed. Polk's Title VII claim survives.

### A.  Standard of Review

Rule 8 of the Federal Rules of Civil Procedure requires a party to state "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under Rule 12(b)(6), a party may seek dismissal of a claim because the pleader does not "state a claim upon which relief can be granted." *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021) (quoting Fed. R. Civ. P. 12(b)(6)). "To survive a motion to dismiss, the complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Merely "reciting" a claim's elements and "supporting them by conclusory statements does not meet the required standard." *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 212 (4th Cir. 2019).

When considering a Rule 12(b)(6) motion to dismiss, the Court must "accept all well-pleaded allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Langford v. Joyner*, 62 F.4th 122, 124 (4th Cir. 2023). The Court "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)). Still, the court must "draw on its judicial experience and common sense" to determine whether the plaintiff has stated a claim that is plausible, not merely possible. *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

### B. Proper Employer Defendant

Before resolving the motion to dismiss, the Court first addresses the defendants' argument that MCPS is not Polk's employer and thus is not a proper a defendant. They argue that the proper employer defendant is the Board of Education. They are correct. MCPS is the name of a local school district. Under Maryland law, a "school district . . . does not exist as a separate entity for purposes of suit." *Adams v. Calvert Cnty. Pub. Schs.*, 201 F. Supp. 2d 516, 520 n.3 (D. Md. 2002). Instead, state law establishes "a county board of education for each county school system," Educ. § 3-103, which "[m]ay sue and be sued," *id.* § 3-104(b). The county board of education is the proper defendant in a civil lawsuit brought by an employee of a public school system in Maryland. *See Eller v. Prince George's Cnty. Pub. Schs.*, 580 F. Supp. 3d 154, 167 (D. Md. 2022) (noting the proper defendant in Maryland public school teacher's anti-discrimination lawsuit was county board of education); *Adams*, 201 F. Supp. 2d at 520 n.3 (treating janitor's anti-discrimination lawsuit as suit against county board of education); *cf. James v. Frederick Cnty. Pub. Schs.*, 441 F. Supp. 2d 755, 758 (D. Md. 2006) (holding county board of education was proper defendant in

excessive force suit brought by parent against school system). Thus, the Board of Education, not MCPS, is the proper employer defendant in this action. The claims against MCPS are dismissed.[3]

### C. Free Exercise

The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise" of religion. U.S. Const. amend. I. "Many matters fall under the ambit of the Free Exercise Clause, encompassing both direct and indirect coercion of religion." *Mahmoud v. McKnight*, 102 F.4th 191, 204 (4th Cir. 2024). To state a violation of the Free Exercise Clause, the plaintiff must allege facts showing that a government action has burdened her religious exercise. *Id.* at 205. The plaintiff need not show that the action imposes a "substantial burden" on her religious exercise—just that the law imposes "*a* burden." *Id.* at 207 & n.12; *see also Firewalker-Fields v. Lee*, 58 F.4th 104, 114 n.2 (4th Cir. 2023) (recognizing that the Supreme Court overruled prior cases requiring a "substantial burden" on religious practice). "[A] burden exists whenever government conduct either 'compel[s] a violation of conscience' or 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Mahmoud*, 102 F.4th at 208 (second and third alterations in original) (quoting *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 717–18 (1981)). If the plaintiff plausibly alleges that government action burdens her religious exercise, "then the analysis shifts to whether the government can justify the limitation or intrusion under the applicable level of scrutiny." *Id.* at 205 (emphasis omitted). If the government action is subject to rational basis review, "[t]he party challenging the law bears the burden of negating 'any reasonably conceivable state of facts that could provide a rational basis' for the law." *Kim v. Bd. of Educ.*, 93 F.4th 733, 749 (4th Cir. 2024) (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)).

---

[3] Throughout this opinion, the Court refers to MCPS and its policies and decisions. These references do not imply that MCPS is the proper defendant. The only legal entity that Polk may sue is the Board of Education.

### 1. Burden

Polk alleges the Guidelines burden her religious exercise by forcing her to act in violation of her Christian beliefs. Polk objects to the requirements that she address students by pronouns that do not correspond to the sex assigned to them at birth and that she "hide from parents that their child is transitioning genders at school." ECF 1, ¶ 31. Polk insists that if she agrees to these requirements, she would be forced to act contrary to her Christian beliefs that "God created individuals as either male or female" and that "God gave parents the primary responsibility for the care and upbringing of their minor children." *Id.* Polk says MCPS forced her to choose between violating her religious beliefs and losing her job. Indeed, because Polk refuses to abide by the Guidelines, she is not allowed to substitute teach. That suffices to allege a burden on her religious practice. *See Mahmoud*, 102 F.4th at 208.

The Board argues Polk has not alleged a religious burden because "the only thing required . . . to date has been to review the training materials" and attest that she has reviewed them and understands her obligation to comply with them. ECF 28-1, at 36. According to the Board, the "attestation does not require her to shed her religious beliefs or endorse the policy; it only requires her to attest that she is aware of the expectation that she comply with the policy." *Id.*

The Board's argument is too clever by half. There is no meaningful difference between Polk affirming that she will comply with the Guidelines and Polk actually complying with them. Polk has refused to do either. When Polk requested accommodations that would alleviate the burden on her religious exercise, MCPS rejected them. When MCPS suggested it could accommodate Polk by eliminating the affirmation requirement, it insisted that Polk "would still be required to [comply with the Guidelines] when working." ECF 1, ¶ 38. Polk has refused this "accommodation" because she believes it compels her "to choose between losing her job and being

untrue to her religious convictions." *Id.* Because Polk will not comply with the Guidelines, MCPS will not employ her as a substitute teacher. Their employment relationship remains severed. Polk has alleged a religious burden.

### 2. Neutrality and General Applicability

"The Court's free exercise analysis does not end with proving the existence of a burden on religious exercise . . . because '[n]ot all burdens on religion are unconstitutional.'" *Mahmoud*, 102 F.4th at 206 (alteration in original) (quoting *United States v. Lee*, 455 U.S. 252, 257 (1982)). For example, "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Emp. Div., Dep't of Human Res. v. Smith*, 494 U.S. 872, 879 (1990) (quoting *Lee*, 455 U.S. at 263 n.3 (Stevens, J., concurring)). Under *Smith*, "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021) (citing *Smith*, 494 U.S. at 878–82).[4] If the law is neutral and generally applicable, the government need show only that it survives rational basis review, which "requires merely that the law at issue be rationally related to a legitimate governmental interest." *Canaan Christian Church v. Montgomery County*, 29 F.4th 182, 199 (4th Cir. 2022) (internal quotation marks omitted) (quoting *Bethel World Outreach Ministries v. Montgomery Cnty. Council*, 706 F.3d 548, 561 (4th Cir. 2013)). If the law is not neutral or generally applicable, strict scrutiny applies. *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022). The plaintiff bears the burden of showing that the government action is not neutral or generally applicable. *Id.*

---

[4] Polk argues that *Smith* rests on "shaky ground" and "should be overruled." ECF 4-1, at 29 & n.5 (observing that in *Fulton*, five justices agreed that *Smith* "should be reconsidered and likely overruled"). As of today, *Smith* is the law of the land, and this Court must and will apply it.

### i. Neutrality

The "[g]overnment fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 593 U.S. at 533; *see also Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 584 U.S. 617, 640 (2018). "Conversely, government action is neutral if it 'has no object that infringes upon or restricts practices *because* of their religious motivation.'" *Kim*, 93 F.4th at 748 (quoting *Alive Church of the Nazarene, Inc. v. Prince William County*, 59 F.4th 92, 108 (4th Cir. 2023)) (cleaned up in original).

To determine whether a law targets religion, a court "must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993). The text of the Guidelines is facially neutral. It does not mention religion at all. The Guidelines do not discriminate on their face.

Polk disagrees. She proclaims that it is "obvious from the face of" the Guidelines that they target people like her who "hold to traditional religious teachings on transgenderism" and "disagree with the idea that students should be free to transition from their God-given sex." ECF 4-1, at 30. Yet Polk points to nothing in the text of the Guidelines that supports this sweeping proclamation. It is not, as Polk insists, "obvious from the face of" the Guidelines that they discriminate against people with her religious beliefs. The Guidelines are facially neutral.

Even so, "[f]acial neutrality is not determinative." *Lukumi*, 508 U.S. at 534. The Free Exercise Clause "'forbids subtle departures from neutrality' and 'covert suppression of particular religious beliefs.'" *Id.* (first quoting *Gillette v. United States*, 401 U.S. 437, 452 (1971); and then quoting *Bowen v. Roy*, 476 U.S. 693, 703 (1986) (plurality opinion)). So, "[w]hen presented with a law that affects religious practice, even if indirectly, a court must look behind the law's text to determine if it was enacted 'because of' and not 'in spite of' its effect on religion." *Alive Church*

*of the Nazarene*, 59 F.4th at 108 (quoting *Lukumi*, 508 U.S. at 540). "Such an inquiry compels the court to look at contemporaneous statements made by decisionmakers or community members surrounding the law's passage, and any deviations from standard decisionmaking procedures." *Id.*

In her complaint, Polk does not allege that the Board made any religiously hostile statements contemporaneous with the enactment of the Guidelines. Polk also does not allege that the Board deviated from standard procedures when it implemented the Guidelines. Indeed, the Guidelines largely follow the Maryland State Department of Education's gender identity guidelines. The state guidelines are not binding on local school systems, but they are "designed to serve as suggestions for consideration for school systems and administrators who may want to develop their own transgender policy, procedures, and/or guidelines." ECF 28-5, at 1.[5] Those guidelines indicate that staff should refer to students by their preferred pronouns and suggest that parents should not be told about their child's gender identity unless the child consents. *See id.* at 6, 7. The state guidelines explain that "no provision of state or federal law requires schools to affirmatively disclose this sensitive [gender identity] information to parents." *Id.* at 7. Instead, "while information in official student records must be disclosed upon the request of parents, sensitive information related to gender identity generally need not be disclosed without the student's consent." *Id.* The state policy encourages local school systems to create training and practices that "prevent accidental disclosure of information that may reveal a student's transgender status to others, *including parents* and other school staff unless the student and/or the student's

_____

[5] The Court may take judicial notice of the state's gender identity guidelines, which are a matter of public record, without converting the motion to dismiss into a summary judgment motion. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); *Hall v. Virginia*, 385 F.3d 421, 424 n.3 (4th Cir. 2004) (approving the consideration of "publicly available [statistics] on the official redistricting website of the Virginia Division of Legislative Services" at the motion to dismiss stage); *see also Corbitt v. Balt. City Police Dep't*, 675 F. Supp. 3d 578, 583 n.5 (D. Md. 2023) (taking judicial notice of a police department policy on a motion to dismiss).

13

parent has authorized school staff to make such disclosure or staff is legally required to do so." *Id.*
(emphasis added). Following this guidance, the Board implemented its own policy on transgender
and gender nonconforming students that largely mirrors the state's policy.

In her briefing, Polk points to statements that MCPS made in response to her employment
discrimination charge with the EEOC. Polk maintains that, in its EEOC position statement, "MCPS
claimed that it could not tolerate even a single person in its teaching ranks who holds a traditional
religious view of transgenderism and parental authority over minor children." ECF 4-1, at 30. Polk
asks the Court to infer from this position statement that the Board had covert religious hostility
when it enacted the Guidelines. No such inference can be drawn.

Polk does not allege in her complaint that the position statement is evidence of
discriminatory intent, and she cannot amend her complaint through her preliminary injunction
briefing. *See Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (explaining that a
plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of
motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998).

Even if Polk had alleged that the position statement was evidence of discriminatory intent,
it would not change the outcome. MCPS, through counsel, submitted its position to the EEOC in
February 2024. Counsel's statements, written years after the Guidelines were enacted, were made
in connection with an adversarial proceeding. They are not "contemporaneous statements made by
decisionmakers or community members" that are relevant to whether the Board enacted the
Guidelines "'because of' . . . [their] effect on religion." *See Alive Church of the Nazarene*, 59 F.4th
at 108 (quoting *Lukumi*, 508 U.S. at 540).

Even so, Polk insists her case is like *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*.
It is not. In *Lukumi*, the Supreme Court found that a city violated the free exercise rights of people

14

JA173

who practiced Santeria. 508 U.S. at 547. Members of the religion engaged in animal sacrifice as "one of the principal forms of devotion" of their faith. *Id.* at 524. In response, city lawmakers enacted three ordinances banning animal sacrifice. *Id.* at 527–28. The Supreme Court held that the ban violated the First Amendment because it was not religiously neutral. *Id.* at 545–46. Indeed, there was overwhelming evidence that the city enacted the ordinances with the intent of preventing the church members from engaging in the religious ritual. The ordinances prohibited only animal sacrifice (not other animal killings), legislators and community members made hostile comments about the church on the public record, and the city passed a resolution noting the concern of city residents about the practices of "certain religions." *Id.* at 535–42. No such allegations are found here. Polk makes only conclusory allegations about intent. She offers no facts from which the Court could plausibly infer that the Board created the Guidelines to target teachers who adhere to traditional religious teachings on gender identity or that the Board was hostile towards any religion when it enacted the Guidelines. The Guidelines apply to everyone. Anyone who disagrees with them—for religious, secular, or other reasons—must nevertheless abide by them.

Polk's attempt to analogize this case to *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission* fails for the same reasons. In *Masterpiece Cakeshop*, the Supreme Court found that the Colorado Civil Rights Commission's treatment of a cakeshop owner's religious discrimination claim reflected hostility towards his religious beliefs and violated his free exercise rights. 584 U.S. at 640. During the Commission's meetings, several of the Commission members made inappropriate and dismissive comments about the shop owner's faith. *Id.* at 634–35. One member even described his faith as "one of the most despicable pieces of rhetoric that people can use" and said his faith was used to justify slavery and the Holocaust. *Id.* at 635. The Court found that those "statements cast doubt on the fairness and impartiality of the Commission's adjudication

of [his] case." *Id.* at 636. The Commission violated the cake shop owner's free exercise rights by not adjudicating his civil rights complaint in a manner "neutral toward religion." *Id.* at 640. The factual allegations here could not be more different. There are no contemporaneous statements by members of the Board of Education that suggest religious animus motivated the Guidelines.

Polk does not plausibly allege that the Board enacted the Guidelines because of religious animus. Still, Polk argues that she is "[a]t a minimum . . . entitled to discovery on [neutrality]." ECF 30, at 26. Nothing entitles Polk to discovery on neutrality. She alleges no facts from which the Court could infer religious animus. Polk may not try to find those missing facts in discovery. *See Iqbal*, 556 U.S. at 678–79 (stating that Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions").

The Guidelines are neutral.

### ii.  General Applicability

The Court next considers whether the Guidelines are generally applicable. A policy is not generally applicable "if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions'" or "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 533–34 (alteration in original) (quoting *Smith*, 494 U.S. at 884).

Polk argues that the Guidelines are not generally applicable for three reasons. None persuades. First, Polk argues that she was not required to affirm the Guidelines when she was hired as a substitute teacher in 2021 but she is required to affirm them now. MCPS's decision to require affirmation of the Guidelines does not make them generally inapplicable. All teachers have been treated the same. Before 2022, no one, including Polk, was required to affirm the Guidelines. Since

2022, everyone, including Polk, must affirm them. There are no allegations that MCPS has ever allowed, on an individual basis, teachers to be exempt from complying with the Guidelines. MCPS's decision to impose an affirmation requirement for the 2022–2023 school year and beyond does not render the Guidelines generally inapplicable.

Second, Polk claims that "MCPS has unbridled discretion with respect to how to apply the policy to parents" and how to discipline teachers who violate the Guidelines. ECF 4-1, at 31. That is beside the point. Even if MCPS has discretion over how to apply the policy to parents on a case-by-case basis and how to discipline teachers who violate the policy, MCPS does not have any discretion to exempt teachers from their obligation to comply with the Guidelines. Contrast these facts with those in *Fulton*. There, the city of Philadelphia refused to make referrals to a Catholic foster care agency because the agency refused to certify same-sex couples as foster parents. 593 U.S. at 531. The foster care agency sued the city, alleging that the referral freeze violated its First Amendment free exercise rights. *Id.* The city argued that the agency's practice violated the nondiscrimination provision in the city's standard foster care contract. *Id.* at 534. The Supreme Court held that the contract's nondiscrimination provision was not generally applicable because it "incorporate[d] a system of individual exemptions" from the provision that could be invoked in the contract administrator's "sole discretion." *Id.* at 535. The city would not exempt the Catholic foster care agency from the nondiscrimination provision. *Id.* That was a *Smith* problem. Under *Smith*, the city could not "refuse to extend [the exemption] system to cases of religious hardship without compelling reason." *Id.* (internal quotation marks omitted) (quoting *Smith*, 494 U.S. at 884). And even though the city had never granted an exemption, "[t]he creation of a formal mechanism for granting exceptions renders a policy not generally applicable . . . because it 'invite[s]' the government to decide which reasons for not complying with the policy are worthy

of solicitude, here, at the Commissioner's 'sole discretion.'" *Id.* at 537 (alteration in original) (internal citation omitted). Because the policy was not generally applicable, it triggered strict scrutiny. *Id.* at 541. The Court found that the policy did not survive strict scrutiny and violated the First Amendment. *Id.* at 542.

Here, no system of individual exemptions exists. The Board's requirement that teachers comply with the Guidelines applies to every teacher; there is no mechanism for granting exemptions to it. That the Board may exercise discretion in how it implements the Guidelines with parents and how it disciplines teachers who violate the Guidelines does not alter the fact that all teachers must abide by them. *See Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs.*, 680 F. Supp. 3d 1250, 1284 (D. Wyo. 2023) (finding similar policy generally applicable when the complaint contained no allegation that the school ever granted an exception to a policy requiring teachers to use students' preferred names and pronouns).

Finally, Polk argues that exemptions from the Guidelines are available under Title VII. On Polk's account, because someone *could* get a religious accommodation under Title VII, compliance with the Guidelines is not uniformly required and thus not generally applicable. Assuming the premise of Polk's argument is true—that a religious accommodation is available under Title VII—Polk offers no authority to support the proposition that the possibility of an accommodation under a federal anti-discrimination employment statute turns an otherwise generally applicable policy into one that allows exemptions. Under *Fulton*, a court must determine whether the policy itself creates a mechanism for individual exemptions, not whether a federal anti-discrimination law may require individual accommodations.

The Guidelines are neutral and generally applicable.

### 3. Rational Basis

The neutral and generally applicable Guidelines are subject to rational basis review. *See Jesus Christ Is the Answer Ministries, Inc. v. Baltimore City*, 915 F.3d 256, 265 (4th Cir. 2019), *as amended* (Feb. 25, 2019). "Under rational basis review, a classification enjoys a strong presumption of validity and is constitutional as long as 'there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'" *United States v. Timms*, 664 F.3d 436, 447 (4th Cir. 2012) (quoting *Heller*, 509 U.S. at 320). The government's "policy decisions are 'not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.'" *Van Der Linde Hous., Inc. v. Rivanna Solid Waste Auth.*, 507 F.3d 290, 293 (4th Cir. 2007) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993)). A court may not judge a policy's rationality "on the basis of its wisdom, fairness, or logic (or lack thereof)." *Id.* at 293–94.

On a motion to dismiss, the court considers the allegations in the complaint to determine whether the plaintiff has sufficiently negated a rational basis for the challenged policy. *See Kim*, 93 F.4th at 749 (affirming dismissal of free exercise claim when plaintiff made no effort in the complaint to show policy lacked a rational basis); *Alive Church of the Nazarene*, 59 F.4th at 110 (affirming dismissal of free exercise claim because plaintiff did not allege facts that would negate a rational basis).

Polk has not alleged any facts that would negate a rational basis for the Guidelines.

For its part, the Board identifies three purposes of the Guidelines: "(1) protecting student safety and preventing discrimination against students; (2) complying with its obligations under federal law, including Title IX [of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688.], which prohibits discrimination based on gender identity; and (3) hiring staff who will nurture

transgender and non-transgender students in equal measure." ECF 28-1, at 30. These are legitimate government purposes.

The Board's requirement that teachers address students by their preferred pronouns is rationally related to its obligations under Title IX, which prohibits discrimination against transgender students at school. *See Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 619 (4th Cir. 2020) (finding school board's refusal to let transgender student use bathroom corresponding to his gender identity and update school records to reflect his gender identity violated Title IX). Likewise, the Board's requirement that teachers keep students' gender identities confidential, even from their parents, is rationally related to the Board's goal of supporting and protecting the safety of the students whose parents may object to their decision to transition. *See* ECF 28-4, at 13 (the Guidelines) ("In some cases, transgender and gender nonconforming students may not openly express their gender identity at home because of safety concerns or lack of acceptance. Matters of gender identity can be complex and may involve familial conflict."); *cf. Coal. for TJ v. Fairfax Cnty. Sch. Bd.*, 68 F.4th 864, 887 (4th Cir. 2023) (finding school admissions policy supported by rational basis and explaining that "'federal courts should not lightly interfere with the day-to-day operation of schools,' given that 'school officials are far more intimately involved with running schools' than are judges" (quoting *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 440 (4th Cir. 2013))). Finally, the requirement that all teachers must abide by the Guidelines is rationally related to the Board's goal of hiring staff who will treat and nurture every student equally. The Guidelines are rationally related to legitimate government purposes. Polk's allegations do not defeat the Guidelines' "strong presumption of validity." *Timms*, 664 F.3d at 447.

Polk has alleged the Guidelines burden her religious exercise. Under *Smith*, the Guidelines are subject to rational basis review because they are neutral and generally applicable to all staff.

The Guidelines easily pass that level of review. They are rationally related to legitimate government purposes, and Polk has not alleged facts that would defeat the presumption of their validity. In consequence, Polk has not alleged that the Board violated her free exercise rights when it terminated their employment relationship after Polk refused to abide by the Guidelines. Polk has failed to state a free exercise claim. The Board's motion to dismiss this claim is granted.

### D. Free Speech

Polk also claims that the Board violated her First Amendment right to freedom of speech. Polk argues that the Board compelled her—as a condition of employment—to speak in a manner that conflicts with her religious beliefs in two respects. First, the Board compelled her to use children's preferred pronouns even if the pronouns do not correspond to the children's assigned sex at birth. Second, the Board compelled her not to discuss with parents their child's desire to transition genders. Because Polk refused to engage in this speech, the Board refused to allow her to substitute teach.

It has long been settled that "a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers,* 461 U.S. 138, 142 (1983). That bedrock principle applies to public school teachers. Teachers do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Kennedy*, 597 U.S. at 527 (quoting *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969)). However, "certain limitations are placed on the[ir] free speech rights . . . due to the nature of their employment by government-operated schools." *Lee v. York Cnty. Sch. Div.*, 484 F.3d 687, 693 (4th Cir. 2007).

When public school teachers and other government employees assert free speech claims, courts "use a three-prong test to determine if the employee's rights under the First Amendment

21

were violated." *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 583 (4th Cir. 2017). First, the court asks "whether the speech at issue was that of a private citizen speaking on a matter of public concern." *Lee*, 484 F.3d at 694 (quoting *Urofsky v. Gilmore*, 216 F.3d 401, 406 (4th Cir. 2000) (en banc)); *see Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006). "This prong can in turn be divided into two inquiries: whether the speech was made as a citizen or pursuant to the employee's duties, and whether the content of the speech addressed 'a matter of interest to the community' rather than 'complaints over internal office affairs.'" *Crouse*, 848 F.3d at 583 (internal citation omitted) (quoting *Connick*, 461 U.S. at 149). Second, if—and only if—the speech was made as a private citizen and addressed a matter of public concern, then the court must balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); *see also City of San Diego v. Roe*, 543 U.S. 77, 82 (2004) (per curiam) ("*Pickering* did not hold that any and all statements by a public employee are entitled to balancing. To require *Pickering* balancing in every case where speech by a public employee is at issue, no matter the content of the speech, could compromise the proper functioning of government offices."). Finally, the court must determine whether the employee's speech caused the disciplinary action. *See Crouse*, 848 F.3d at 583.

Polk's free speech claim fails at the first prong. Polk does not make the speech as a private citizen. She makes the speech pursuant to her official duties as a public school teacher.

The Supreme Court's decision in *Garcetti v. Ceballos* forecloses Polk's free speech claim. In *Garcetti*, a state prosecutor, Richard Ceballos, wrote a memorandum to his supervisors in which he identified misrepresentations in an affidavit in support of a search warrant and recommended dismissal of a pending criminal case. 547 U.S. at 414. His supervisors disagreed with the

recommendation and refused to dismiss the charges. *Id.* Later, Ceballos was called as a defense witness to testify at a motions hearing on the validity of the search warrant. *Id.* at 415. In the aftermath of these events, Ceballos's supervisors reassigned him, transferred him to another courthouse, and denied him a promotion. *Id.* Ceballos argued that his memorandum was protected speech and that his supervisors retaliated against him in violation of his First Amendment rights when they punished him because he wrote the memorandum. *Id.*

The Supreme Court disagreed. It held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. Ceballos, a public employee, did not dispute that he wrote the internal memorandum pursuant to his official duties as a prosecutor. *Id.* Still, the Court explained the reasons why it agreed the memo was written "pursuant to [his] official duties." *See id.* at 421–22. The "controlling factor" was that "Ceballos spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case." *Id.* at 421. He wrote the memo "because that is part of what he, as a calendar deputy, was employed to do." *Id.* The Court elaborated: When Ceballos "went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings," he "did not act as a citizen," and he did "not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case." *Id.* at 422. Because Ceballos was "simply performing [his] job duties" when he wrote the memorandum, it was not protected speech, and his supervisors did not violate his First Amendment rights when they disciplined him because of the memorandum. *Id.* at 423. The Court declined to apply the *Pickering* balancing test to Ceballos's speech because to do so "would be to demand

permanent judicial intervention in the conduct of governmental operations to a degree inconsistent with sound principles of federalism and the separation of powers." *Id.*

Applying *Garcetti* to these facts, the Court finds that the speech Polk challenges is made pursuant to her official duties as a substitute teacher. Using pronouns when interacting with and communicating about students is intrinsic to teaching. *Wozniak v. Adesida*, 932 F.3d 1008, 1010 (7th Cir. 2019) ("[H]ow faculty members relate to students *is* part of their jobs."). And communicating with parents about their children's conduct in school is "part and parcel" of a teacher's responsibilities. *See Coomes v. Edmonds Sch. Dist. No. 15.*, 816 F.3d 1255, 1264 (9th Cir. 2016). The Guidelines enhance these traditional responsibilities of a teacher. These responsibilities now include referring to students by their preferred pronouns and not communicating with parents about their child's gender identity without the student's consent. Both categories of speech would occur only to fulfill Polk's responsibilities as a teacher. *See Garcetti*, 547 U.S. at 421. In the words of *Garcetti*, the speech "is part of what [Polk], as a [substitute teacher], was employed to do." *See id.*[6]

The speech required by the Guidelines is part of Polk's official duties as a teacher. When Polk uses pronouns to refer to students in the classroom setting, she is acting as a teacher, not as a citizen. When Polk speaks to parents about their child's behavior in school, she is acting as a teacher, not as a citizen. Such speech is not protected by the First Amendment. Under *Garcetti*, the Board may require Polk to use student-preferred pronouns and may restrict what Polk says to parents about their child's gender identity. Polk may object to the employer-mandated speech on

---

[6] Polk argues that referring to children by pronouns and keeping their confidences about the gender identity they express in school are "not curricular matters." ECF 30, at 14. True, the challenged speech does not concern a subject taught in school. Even so, the speech is part of Polk's job responsibilities as a substitute teacher.

religious grounds, but if she chooses to teach in public schools, she is a government employee and must perform "the tasks [she] was paid to perform." *See id.* at 422. Conditioning Polk's employment as a substitute teacher on her agreement to abide by the Guidelines does not violate her right to free speech.

Determined to avoid the outcome that *Garcetti* requires, Polk insists that *Garcetti* does not apply here for two reasons.

First, Polk argues *Garcetti* does not apply because this case involves speech related to teaching, which Polk claims is afforded more constitutional protection than *Garcetti* provides. Polk grounds her argument in the following dicta in *Garcetti*: "There is some argument that expression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by this Court's customary employee-speech jurisprudence." *See id.* at 425. The *Garcetti* Court did not resolve that argument. It declined to decide "whether the analysis we conduct today would apply in the same manner to a case involving speech related to scholarship or teaching." *Id.* The Supreme Court still has not decided the issue.

The Fourth Circuit has—in the context of speech of public university faculty members. In this circuit, "the *Garcetti* rule does not extend to speech by public university faculty members, acting in their official capacity, that is 'related to scholarship or teaching.'" *Porter v. Bd. of Trs. of N.C. State Univ.*, 72 F.4th 573, 582 (4th Cir. 2023) (quoting *Garcetti*, 547 U.S. at 425); *see Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 564 (4th Cir. 2011) (finding *Garcetti* did not apply "to the academic work of a public university faculty member" whose "speech . . . was intended for and directed at a national or international audience on issues of public importance unrelated to any of [the professor's] assigned teaching duties . . . or any other terms of his employment"). Other circuits have held similarly. *See Meriwether v. Hartop*, 992 F.3d 492, 507

25

(6th Cir. 2021) (holding *Garcetti* did not apply to university professor's refusal to use preferred

pronouns because of the importance of "the free exchange of ideas in the college classroom");

*Heim v. Daniel*, 81 F.4th 212, 227 (2d Cir. 2023) (highlighting the Supreme Court's "deep[]

commit[ment] to safeguarding academic freedom' as 'a special concern of the First Amendment"

and holding *Garcetti* does not apply to a public university professor's academic writing and

teaching (alteration in original) (quoting *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385

U.S. 589, 603 (1967))); *Demers v. Austin*, 746 F.3d 402, 411–12 (9th Cir. 2014) (holding that

*Garcetti* did not apply to a public university's teaching and academic writing because "the Court .

. . 'ha[s] long recognized that, given the important purpose of public education and the expansive

freedoms of speech and thought associated with the university environment, universities occupy a

special niche in our constitutional tradition'" (quoting *Grutter v. Bollinger*, 539 U.S. 306, 329

(2003))).

When it comes to the classroom speech of public elementary and secondary school

teachers, the Fourth Circuit has not decided whether *Garcetti* applies. The court had the

opportunity to answer that question in *Lee v. York County School Division*, but it declined to do

so. *See Lee*, 484 F.3d at 694 n.11 (opting not to decide whether *Garcetti* applied to the posting of

religious materials on a middle school Spanish teacher's blackboard and instead deciding the

speech was not a matter of public concern under *Pickering*).

Several other circuits have found that *Garcetti* does apply to the in-class speech of public

elementary and secondary school teachers. *See Brown v. Chi. Bd. of Educ.*, 824 F.3d 713, 715 (7th

Cir. 2016) (noting *Garcetti* applies to school teachers because the "core of the teacher's job is to

speak in the classroom on the subjects she is expected to teach" and finding teacher's "impromptu

lesson on racial epithets" not protected because it was given "in the course of his regular grammar

lesson to a sixth grade class"); *Johnson v. Poway Unified Sch. Dist.*, 658 F.3d 954, 966 & n.12 (9th Cir. 2011) (holding *Garcetti's* carve-out for "academic freedom" does not apply to "primary and secondary school teachers" and finding high school teacher spoke as a government employee when he displayed religious banners in his classroom because his speech "'owe[d] its existence' to his position as a teacher" (quoting *Garcetti*, 547 U.S. at 421–22)); *Evans-Marshall v. Bd. of Educ.*, 624 F.3d 332, 340 (6th Cir. 2010) (finding *Garcetti* applied to high school English teacher who was fired because she taught books and topics not in line with the approved curriculum); *Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 480 (7th Cir. 2007) (holding *Garcetti* applied to speech of probationary elementary school teacher who was fired because she expressed her personal views on the Iraq War in a lesson that "was part of her assigned tasks in the classroom" despite the principal's order that teachers not take sides in political controversies).

These cases suggest two reasons why courts have found *Garcetti* applies to the classroom speech of elementary and secondary school teachers. First, public school teachers are paid to speak. "Expression is a teacher's stock in trade, the commodity she sells to her employer in exchange for a salary." *Mayer*, 474 F.3d at 479. When "teachers hire out their own speech," they "must provide the service for which employers are willing to pay." *Id.* When a "school board . . . hires [a teacher's] speech, it can surely 'regulate the content of what is or is not expressed.'" *Evans-Marshall*, 624 F.3d at 340 (quoting *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 833 (1995)).

Second, public education is compulsory, and elected school board officials, not teachers, decide the curriculum and how teachers present it in the classroom. *See Mayer*, 474 F.3d at 479. "This is an accountability measure, pure and simple, one that ensures the citizens of a community have a say over a matter of considerable importance to many of them—their children's education—

by giving them control over membership on the board." *Evans-Marshall*, 624 F.3d at 341. "The

First Amendment does not ban this policy choice or this accountability measure." *Id.* As the

Seventh Circuit has explained:

> Children who attend school because they must ought not be subject to teachers'
> idiosyncratic perspectives. Majority rule about what subjects and viewpoints will
> be expressed in the classroom has the potential to turn into indoctrination; elected
> school boards are tempted to support majority positions about religious or patriotic
> subjects especially. But if indoctrination is likely, the power should be reposed in
> someone the people can vote out of office, rather than tenured teachers. At least the
> board's views can be debated openly, and the people may choose to elect persons
> committed to neutrality on contentious issues.

*Mayer*, 474 F.3d at 479–80. The Constitution does not "entitle teachers to present personal views

to captive audiences against the instructions of elected officials." *Id.* at 480.

The Court finds the reasoning of these cases persuasive. When the Board hires Polk to be

a substitute teacher, it is paying her to speak on its behalf. She must provide the service for which

she is being paid. The Board has the responsibility and authority to determine the educational

policies for MCPS. *See* Educ. § 4-108(3). Pursuant to that authority, the Board implemented the

Guidelines. When Polk works for the Board, Polk must follow her employer's directives, including

the Guidelines. If the residents of Montgomery County disagree with the Guidelines, they have the

power to vote the members of the Board of Education out of office and make changes. But Polk,

in her capacity as a substitute teacher, cannot deviate from the Board's policies. She must provide

the service that the Board is paying her to provide, and that includes complying with the

Guidelines. The speech at issue here does not "implicate[] additional constitutional interests" that

are "not fully accounted for by . . . customary employee-speech jurisprudence." *See Garcetti*, 547

U.S. at 425. *Garcetti* applies to the speech Polk makes pursuant to her official duties as a public

school teacher.

Next, Polk argues that *Garcetti* does not apply to government-compelled speech. Unlike the government employee in *Garcetti*, Polk was not punished because of what she said; Polk was punished because of what she refused to say. On Polk's account, hers is a challenge to government-compelled speech. For that reason, Polk argues that compelled speech cases, such as *Riley v. National Federation of the Blind of North Carolina*, 487 U.S. 781 (1988); *Wooley v. Maynard*, 430 U.S. 705 (1977); and *National Institute of Family & Life Advocates v. Becerra*, 585 U.S. 755 (2018), apply to her case, and *Garcetti* does not.[7] The Court is unconvinced.

Polk is correct that *Garcetti* did not involve compelled speech. The prosecutor was not required to write the memorandum that resulted in his discipline. Even so, *Garcetti* did not turn on whether the employee's speech was compelled. *Garcetti* turned on whether the speech was part of the employee's official duties. If it is, then the employer may restrict the employee's speech without violating their right to freedom of speech. *See Garcetti*, 547 U.S. at 421–22. As the *Garcetti* Court explained, "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* More recently, the Supreme Court in *Kennedy v. Bremerton School District* confirmed that "[i]f a public employee speaks 'pursuant to [his or her] official duties,' . . . the Free Speech Clause generally will not shield the individual from an employer's control and discipline because that kind of speech is—for constitutional purposes at least—the

---

[7] *Riley*, *Wooley*, and *Becerra* are not government employee speech cases. *See Riley*, 487 U.S. at 803 (restrictions on professional fundraisers violated the First Amendment); *Wooley*, 430 U.S. at 717 (motorist had free speech right not to display state motto on his license plate); *Becerra*, 585 U.S. at 779 (state requirement that crisis pregnancy centers provide certain notices to patients likely violated the First Amendment).

government's own speech." 597 U.S. at 527 (second alteration in original) (quoting *Garcetti*, 547 U.S. at 421).

The speech Polk objects to—even if it is compelled speech—"owes its existence to" Polk's professional responsibilities as a public school teacher. *See Garcetti*, 547 U.S. at 421–22. The Board "commissioned" the Guidelines, and it may "exercise control over" the speech of teachers who are bound by them. *See id.* at 422. For constitutional purposes, the speech Polk challenges is the Board's own speech.[8] The Board, like other government employers, "need[s] a significant degree of control over [its] employees' words and actions; without it, there would be little chance for the efficient provision of public services." *See id.* at 418–19 (citing *Connick*, 461 U.S. at 143 ("[G]overnment offices could not function if every employment decision became a constitutional matter.")). The Board may restrict Polk's speech by requiring her to use student-preferred pronouns and by limiting what she says to parents about their child's desire to transition genders. This speech falls within *Garcetti*'s reach.

If there ever was any doubt about whether *Garcetti* applies to government-compelled speech, the Supreme Court dispelled it in *Janus v. American Federation of State, County, and Municipal Employees, Council 31*, 585 U.S. 878 (2018). In *Janus*, the Court held unconstitutional an Illinois statute that authorized public-sector unions to assess fees from nonmember public employees. 585 U.S. at 885–86. The Court found that the arrangement "violate[d] the free speech rights of nonmembers by compelling them to subsidize private speech on matters of substantial public concern." *Id.* The union argued, unsuccessfully, that *Garcetti* allowed it to assess the fees

---

[8] Polk argues that a child's preferred pronouns are the child's speech, not the Board's speech. True, the child, not the Board, has chosen the pronouns they prefer to use in school, but the Board has chosen to require teachers to use the child's preferred pronouns. The use of preferred pronouns when referring to children in the classroom is the speech of the Board.

on nonmember public employees. *Id.* at 909. The *Janus* Court found *Garcetti* "totally inapposite" because "the union speaks for the *employees,* not the employer," and "if the union's speech is really the employer's speech, then the employer could dictate what the union says"—a result the Court assumed would not please the unions. *Id.* at 910. In reaching this conclusion, the *Janus* Court confirmed that *Garcetti* applies to employer-compelled speech: "Of course, if the speech in question is part of an employee's official duties, the employer may insist that the employee deliver any lawful message." *Id.* at 908 (citing *Garcetti*, 547 U.S. at 421–22, 425–26).[9] So, under *Janus* and *Garcetti*, the Board may "dictate" or "insist" that Polk, as part of her official duties as a substitute teacher, speak in accordance with the Guidelines. *See id.* at 908, 910.

Polk does not dispute that the Board "may insist that [she] deliver any lawful message" as part of her official duties. *See Janus*, 585 U.S. at 908. Yet Polk argues that the message the Board insists she deliver is unlawful. According to Polk, the restrictions on her speech imposed by the Guidelines would require her to deceive (or be complicit in deceiving) parents about their child's desire to transition genders. This deception, in turn, would violate the parents' substantive due process rights to direct the care and upbringing of their children—rights that were recognized a century ago in *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923), and *Pierce v. Society of the Sisters of the Holy Names*, 268 U.S. 510, 534–35 (1925). Polk claims the Board cannot force her to speak in a manner that would result in a violation of the substantive due process rights of the parents of the children she teaches.

Polk cites no authority for her novel argument. *Janus* does not recognize a First Amendment cause of action under these circumstances. And no court in the country has held that

---

[9] After this statement, the *Janus* Court observed that "it is not easy to imagine a situation in which a public employer has a legitimate need to demand that its employees recite words with which they disagree." 585 U.S. at 908. Polk's case may be that situation.

31

a school board violates a teacher's right to freedom of speech when it prohibits the teacher from speaking to parents about their child's desire to transition genders without the child's consent. This Court will not be the first to extend the reach of the First Amendment that far.[10]

When Polk refers to students by pronouns in the classroom and when she speaks with parents about their child's conduct at school, she speaks pursuant to her official duties as a teacher. This speech is the speech of her employer, the Board. It is "unprotected" because "it is part of what

---

[10] Polk may believe the Guidelines violate parents' substantive due process rights, but her First Amendment free speech claim is not the proper vehicle to advance that argument. There is no authority to support her expansive view of the First Amendment. One district court has suggested a public school teacher might have a viable free speech claim if the school forces the teacher to lie to parents who ask about their child's preferred pronouns or their child's desire to transition genders. *See Mirabelli v. Olson*, 691 F. Supp. 3d 1197, 1215 (S.D. Cal. 2023) (observing teachers could have a free speech claim if school "policy compels them to violate the law or deliberately convey an illegal message"). Even if Polk had a First Amendment right not to lie to parents, she has not alleged that the Guidelines require her to lie. They require her to keep students' confidences. If the Guidelines violate parents' substantive due process rights, the Board is responsible, not Polk. Another judge in the District of Maryland recently found the Guidelines do not violate parents' substantive due process rights, but that decision was vacated by the Fourth Circuit on other grounds. *John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 622 F. Supp. 3d 118, 139 (D. Md. 2022), *vacated*, 78 F.4th 622, 626 (4th Cir. 2023). Other district courts have held that similar policies do not violate parents' due process rights. *See Doe v. Del. Valley Reg'l High Sch. Bd. of Educ.*, No. 24-00107, 2024 WL 706797, at *8 (D.N.J. Feb. 21, 2024) (finding no "'*constitutional* obligation on state actors to contact parents of a minor' who requests to be recognized by a different gender identity, regardless of the minor's preference as to parental notification" (quoting *Anspach ex rel. Anspach v. City of Phila., Dep't of Pub. Health*, 503 F.3d 256, 262 (3d Cir. 2007)); *Regino v. Staley*, No. 23-00032, 2023 WL 4464845, at *4 (E.D. Cal. July 11, 2023) (holding parent had no substantive due process right to notice of her child's gender transition at school and no right to provide consent before school staff referred to child by their preferred name and pronouns); *cf. Littlejohn v. Sch. Bd.*, 647 F. Supp. 3d 1271, 1283 (N.D. Fla. 2022) (holding school's decision to let student use preferred name and pronouns without parents' consent and failure to include parents in creation of student's gender support plan did not violate parents' substantive due process rights). At least one district court has held that a similar policy likely would violate parents' due process rights. *See Willey*, 680 F. Supp. 3d at 1279–80 (holding parent was likely to succeed on claim that school policy preventing disclosure of student's gender identity to parents without student's consent violated parents' substantive due process rights). This Court need not decide this issue now. Under the Free Speech Clause, Polk has no right to disregard her employer's policy on what she may say to parents concerning their child's gender identity on the ground that Polk believes the policy violates the parents' due process rights.

[Polk] is paid to do." *See Janus*, 585 U.S. at 905; *see also id.* at 910 ("[I]n general when public employees are performing their job duties, their speech may be controlled by their employer."). When Polk decided to enter government service as a public school teacher, she "by necessity" had to "accept certain limitations on . . . her freedom." *See Garcetti*, 547 U.S. at 418 (citing *Waters v. Churchill*, 511 U.S. 661, 671 (1994) (plurality opinion) ("[T]he government as employer indeed has far broader powers than does the government as sovereign." (alteration in original))). Polk "retain[s] the prospect of constitutional protection for [her] contributions to the civic discourse" on transgender and gender nonconforming children, but the "prospect of protection . . . does not invest [her] with a right to perform [her job] however [she sees] fit." *See id.* at 422.

Because the speech that Polk challenges is part of her official duties as a teacher, it is unprotected by the First Amendment. The Board may require Polk to speak in accordance with the Guidelines. Polk does not state a cognizable free speech claim. The claim is dismissed.[11]

## E. Title VII

Polk's final claim is a Title VII religious discrimination claim. Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a). "Courts have recognized that employees may utilize two theories in asserting religious discrimination claims." *Chalmers v. Tulon Co.*, 101 F.3d

---

[11] Because Polk has no free speech claim under *Garcetti*, the Court need not engage in the *Pickering* balancing test. Polk does not speak as a private citizen when she speaks to students and parents, and even if she did, her speech does not involve a matter of public concern. An elementary school student's gender identity, preferred pronouns, and desire to transition genders cannot "be fairly considered as relating to any matter of political, social, or other concern to the community." *See Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (quoting *Connick*, 461 U.S. at 146). Nor is the speech "a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *See id.* (quoting *Roe*, 543 U.S. at 83–84). The speech at issue here—using a child's preferred pronouns in the classroom and speaking with parents about their child's gender identity—is very much a matter of private concern.

1012, 1017 (4th Cir. 1996). "These theories are denominated as the 'disparate treatment' and 'failure to accommodate' theories." *Id.* Polk alleges a failure to accommodate.

A Title VII failure-to-accommodate claim proceeds in two steps. First, the employee bears the burden of establishing a prime facie case of discrimination. *See id.* at 1019. To show a prima facie failure to accommodate, an employee must prove that (1) they have "a bona fide religious belief that conflicts with an employment requirement"; (2) they "informed the employer of this belief"; and (3) they were "disciplined for failure to comply with the conflicting employment requirement." *EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 141 (4th Cir. 2017). If the employee makes a prima facie case, the burden shifts to the employer to show "*either* (1) that it provided the [employee] with a reasonable accommodation for [their] religious observances *or* (2) that such accommodation was not provided because it would have caused an undue hardship[.]" *EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008). To show undue hardship, "an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Groff v. DeJoy*, 600 U.S. 447, 470 (2023).

To survive a motion to dismiss, a plaintiff need not plead a prima facie case of discrimination under Title VII. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002); *see also Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020). Instead, the plaintiff must "allege[] facts that plausibly state a violation of Title VII 'above a speculative level.'" *Bing*, 959 F.3d at 617 (quoting *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010)).

As the Board concedes, Polk has stated a failure-to-accommodate claim. She alleges that (1) she has a bona fide religious belief that conflicts with the Guidelines; (2) she informed MCPS

that she has a religious opposition to the Guidelines and will not comply with them; and (3) MCPS refused to hire her as a substitute teacher because she refuses to comply with the Guidelines.

The Board's defense to the Title VII claim is that Polk's proposed accommodation would cause it undue hardship. The Court does not consider an affirmative defense on a motion to dismiss unless it "clearly appears on the face of the complaint." *See Andrews v. Daw*, 201 F.3d 521, 524 n.1 (4th Cir. 2000) (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)). An undue hardship defense to a failure-to-accommodate claim rarely appears on the face of the complaint. The defense usually arises at summary judgment. *See Niederberger v. Wegmans Food Mkts., Inc.*, No. JKB-23-2759, 2024 WL 2866609, at *4 (D. Md. June 6, 2024) (declining to decide reasonableness of religious accommodation and hardship on employer because they "are issues of fact more appropriately resolved on summary judgment"); *Dean v. Acts Ret. Life Cmtys.*, No. GLR-23-1221, 2024 WL 964218, at *6 (D. Md. Mar. 6, 2024) ("Whether an undue hardship exists is usually considered an issue of fact to be determined on summary judgment.").

The Board says there is precedent for granting a motion to dismiss a failure-to-accommodate claim on the ground that the accommodation would cause the employer undue hardship. It cites *Lowe v. Mills*, 68 F.4th 706 (1st Cir. 2023). There, the First Circuit affirmed the dismissal of a Title VII failure-to-accommodate claim brought by healthcare workers whose employers, healthcare providers, terminated them after they refused for religious reasons to get COVID-19 vaccinations. 68 F.4th at 709. In their complaint, the employees alleged that the only acceptable accommodation would be a waiver of the vaccination requirement. *Id.* at 719. That accommodation, however, would violate Maine law. *Id.* at 720. In consequence, the proposed accommodation would have caused a significant risk that the healthcare providers would lose their

licenses and be subject to monetary penalties. *Id.* The First Circuit had no trouble concluding that

an undue hardship on the employers was apparent on the face of the complaint. *Id.* at 719–20

(noting that, even though "undue hardship is an affirmative defense," dismissal on a Rule 12(b)(6)

motion is appropriate "if 'the facts establishing the defense [are] clear on the face of the plaintiff[s']

pleadings' and 'there is "no doubt" that the plaintiff[s'] claim[s] [are] barred" (alterations in

original) (quoting *Zenon v. Guzman*, 924 F.3d 611, 616 (1st Cir. 2019))). The First Circuit affirmed

dismissal of the complaint because the employees' only requested accommodation obviously

would have caused the employer an undue hardship. *Id.* at 720.

This case is not remotely like *Lowe*. Polk does not allege, as the *Lowe* plaintiffs did, that

she would accept only one accommodation that so obviously would violate the law and cause the

Board an undue hardship. Polk does not demand, as the Board claims she does, that MCPS exempt

her from teaching transgender and gender nonconforming students entirely or grant her permission

to treat those students differently. Even though Polk does not have to plead a specific

accommodation that would be acceptable to her, Polk suggests in her complaint and states her

briefing that she might be amenable to an accommodation along the lines that she and the MCPS

compliance coordinator discussed. *See* ECF 1, ¶ 33; ECF 4-1, at 12–13. That might include an

exemption from using preferred pronouns and extra assistance from school administrators who

would interact with the transgender students in her classroom. Such an accommodation may, as

the Board argues, violate Title IX and thus cause an undue hardship, but at this stage, it is

premature to say that *any* accommodation suitable to Polk would be unreasonable. *See Kluge v.*

*Brownsburg Cmty. Sch. Corp.*, 732 F. Supp. 3d 943, 962–70 (S.D. Ind. 2024), *appeal filed*, No.

24-1942 (7th Cir. May 31, 2024) (evaluating similar religious accommodations for high school

teacher at summary judgment stage).

Even if this case were like *Lowe*, the First Circuit decided *Lowe* before the Supreme Court decided *Groff v. DeJoy*. The *Groff* Court emphasized that undue hardship is a "fact-specific inquiry." 600 U.S. at 468. As *Groff* explained, Title VII requires an employer to consider all possible accommodations—"not merely [to] assess the reasonableness of a particular possible accommodation or accommodations." *Id.* at 473. The Board may prove, after discovery, that every possible accommodation would cause undue hardship, but the Court cannot evaluate that fact-intensive defense now. *See Dodson v. Lutheran Vill. at Millers Grant, Inc.*, No. EA-23-169, 2024 WL 3597201, at *5 (D. Md. July 30, 2024) ("As the *Groff* decision makes clear, however, undue hardship must be assessed on a case-by-case basis. And because it is a fact-bound question, it is better suited for resolution on summary judgment as opposed to a motion to dismiss."); *Phillips v. Rector & Visitors of the Univ. of Va.*, No. 3:22-cv-00075, 2024 WL 1201639, at *8 (W.D. Va. Mar. 20, 2024) ("If not clear before *Groff*, it is certainly clear now that an undue hardship analysis is premature at the motion to dismiss stage.").

Polk's Title VII claim may proceed, but only against the Board, not the Board members and the interim superintendent. As her employer, the Board is the only proper defendant for the Title VII claim. *See* 42 U.S.C. §§ 2000e-2(a), 2000e(b) (defining "employer"); *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 408 (4th Cir. 2015) (explaining that "[a]n entity can be held liable in a Title VII action . . . if it is an 'employer' of the complainant"). Polk does not assert any specific allegations about the individual defendants in their individual capacities. Even if the individual defendants could be considered Polk's supervisors—and Polk does not allege they were—supervisors are not liable under Title VII in their individual capacities. *See Lissau v. S. Food Serv., Inc.*, 159 F.3d 177, 181 (4th Cir. 1998). The claim against the individuals in their official capacities fares no better. A suit against an individual in their official capacity is a suit

against the entity they represent, and that entity here is the Board. *See Adams v. Ferguson*, 884 F.3d 219, 225 (4th Cir. 2018) (stating that suits against government officials in their official capacity "generally represent only another way of pleading an action against an entity of which an officer is an agent" (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978))). Polk's Title VII claim against the individual Board members and the interim superintendent is dismissed because it is duplicative of her claim against the Board. *See Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004) (dismissing § 1983 claim against school superintendent in his official capacity as duplicative of same claim against school board); *see also Windsor v. Bd. of Educ.*, No. TDC-14-2287, 2016 WL 4939294, at *7 (D. Md. Sept. 13, 2016) (dismissing Title VII claims brought against Prince George's County Board of Education members in their individual and official capacities).

The motion to dismiss Polk's Title VII claim is denied as to the Board and granted as to the Board members and the interim superintendent.

### III. Motion for a Preliminary Injunction

Finally, the Court considers whether Polk is entitled to a preliminary injunction on her sole remaining claim, the Title VII failure-to-accommodate claim. She is not.

"[P]reliminary injunctions are extraordinary remedies involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (quoting *Direx Isr., Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991)). Polk seeks "a particularly aggressive form of preliminary injunction, one that is 'disfavored' in 'any circumstance.'" *See Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 209 (4th Cir. 2024) (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 235 (4th Cir. 2014)). She seeks a "mandatory injunction," because

JA197

she seeks "an order altering the status quo before the case even begins." *See id.* Such injunctions "are 'warranted only in the most extraordinary circumstances.'" *Id.* (quoting *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994)).

To obtain a preliminary injunction, Polk must establish four factors: (1) that she is likely to succeed on the merits of her claims; (2) that she is likely to suffer irreparable harm without preliminary relief; (3) that the balance of equities favors her; and (4) that an injunction is in the public interest. *See Frazier v. Prince George's County*, 86 F.4th 537, 543 (4th Cir. 2023) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Polk must prove all four factors. *See id.*

Polk has not shown irreparable harm. The harm caused by the alleged Title VII violation is financial. Financial harm generally does not suffice to establish irreparable harm. *See Sampson v. Murray*, 415 U.S. 61, 90, 92 n.68 (1974) (holding that "temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury," nor does "insufficiency of savings or difficulties in immediately obtaining other employment"). Polk conceded as much. ECF 30, at 27 ("Ms. Polk is well aware that requests for financial relief, standing alone, ordinarily do not qualify for injunctive relief."). The irreparable harm that Polk relied on in support of her preliminary injunction motion was the alleged violation of her constitutional rights. Now that her constitutional claims have been dismissed, Polk cannot establish irreparable harm.

Polk is not entitled to a preliminary injunction on her Title VII claim. Her motion for a preliminary injunction is denied.

### IV.    Conclusion

The Board's motion to dismiss Polk's complaint is granted in part and denied in part. Polk's First Amendment claims are dismissed without prejudice. Her Title VII claim survives. The only

proper defendant for the Title VII claim is the Board. The claims against MCPS are dismissed with

prejudice. The claims against the Board members and the interim superintendent are dismissed

without prejudice. Polk's motion for a preliminary injunction is denied. A separate Order follows.


Date: __January 17, 2025__

_____
Deborah L. Boardman
United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **KIMBERLY ANN POLK,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Civ. No. DLB-24-1487** |
| **MONTGOMERY COUNTY PUBLIC SCHOOLS, *et al.*,** | * | |
| | * | |
| **Defendants.** | | |

## ORDER

For the reasons stated in the memorandum opinion issued this same date, it is this 17th day of January, 2025 hereby ORDERED that

1. The defendants' motion to dismiss, ECF 28, is GRANTED IN PART and DENIED IN PART as follows:

   a. Counts Two and Three of the complaint are DISMISSED WITHOUT PREJUDICE;

   b. The claims against Montgomery County Public Schools are DISMISSED WITH PREJUDICE;

   c. The claims against the members of the Montgomery County Board of Education and the interim superintendent, in both their individual and official capacities, are DISMISSED WITHOUT PREJUDICE;

   d. The defendants' motion to dismiss Count One of the complaint against the Montgomery County Board of Education is DENIED; and

2. Kimberly Polk's motion for a preliminary injunction, ECF 4, is DENIED.

3. An answer is due January 31, 2025.

Deborah L. Boardman
United States District Judge

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

Kimberly Ann Polk

      \*

      \*

**v.**                                **Case No.**  8:24-cv-1487-DLB

Montgomery County Public Schools, et al.    \*

      \*

**NOTICE OF APPEAL**

Notice is hereby given that **Kimberly Ann Polk**,

<span style="font-size:small">(fill in names of **all** parties who are appealing)</span>

**Plaintiff** in the above captioned case, hereby appeals to the

<span style="font-size:small">(indicate plaintiff/s or defendant/s)</span>

United States Court of Appeals for the Fourth Circuit the **Denial of Preliminary Injunction**

<span style="font-size:small">(indicate order or judgment)</span>

entered in this case on **January 17, 2024**.

**February 7, 2025**

Date

                          s/ Frederick W. Claybrook, Jr.

                          Signature

                          Frederick W. Claybrook, Jr., Bar # 21604

                          Printed Name and Bar Number

                          655 15th St., NW, Ste. 425, Washington, DC 20005

                          Address

                          rick@claybrooklaw.com

                          Email Address

                          (301) 622-0360

                          Telephone Number

                          N/A

                          Fax Number

<span style="font-size:small">Notice of Appeal (06/2016)</span>