No. 25-1136

# UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

KIMBERLY ANN POLK,
*Plaintiff-Appellant*,
*v.*

MONTGOMERY COUNTY PUBLIC SCHOOLS, *et al.*,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Maryland, No. 8:24-cv-1487 (Boardman, J.)

## BRIEF FOR APPELLEES

BRUCE M. BERMAN
JULIA M. MAY
MEGAN O. GARDNER
WILMER CUTLER PICKERING
    HALE AND DORR LLP
2100 Pennsylvania Ave., NW
Washington, DC 20037
(202) 663-6000

ALAN SCHOENFELD
EMILY BARNET
CASSANDRA MITCHELL
WILMER CUTLER PICKERING
    HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

May 9, 2025

## CORPORATE DISCLOSURE STATEMENT

None of the Defendants-Appellees is a nongovernmental corporation.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ......................................................i

TABLE OF AUTHORITIES .........................................................................iv

ISSUE PRESENTED .................................................................................1

INTRODUCTION .....................................................................................1

STATEMENT OF THE CASE......................................................................3

     A.    Montgomery County Public Schools .......................................3

     B.    The Guidelines For Student Gender Identity .........................4

     C.    Substitute Teachers At MCPS ..............................................5

     D.    Ms. Polk Refuses To Affirm Compliance With The Guidelines...........................................................................8

     E.    The District Court Proceedings ............................................10

SUMMARY OF THE ARGUMENT ...........................................................13

STANDARD OF REVIEW .......................................................................15

ARGUMENT ........................................................................................16

I.    THE DISTRICT COURT CORRECTLY CONCLUDED THAT MS. POLK IS UNLIKELY TO SUCCEED ON HER FREE-EXERCISE CLAIM...........................17

     A.    *Smith* Controls ..................................................................18

     B.    The Guidelines Are Neutral And Generally Applicable ....................20

          1.    The Guidelines are generally applicable...................20

          2.    The Guidelines are neutral .....................................24

     C.    The Guidelines Satisfy Rational Basis Review....................27

II.   THE DISTRICT COURT CORRECTLY CONCLUDED THAT MS. POLK
      IS NOT LIKELY TO SUCCEED ON HER FREE SPEECH CLAIM ...........................32

      A.   Ms. Polk Challenges Speech Made Pursuant To Her
           Official Duties, So It Is Not Protected ................................................34

           1.   Under *Garcetti*, the challenged speech is made
                pursuant to Ms. Polk's job duties and is thus not
                protected ...................................................................................35

           2.   *Garcetti* applies .......................................................................38

                a.   *Garcetti* applies to compelled speech ............................38

                b.   The challenged speech is government
                     speech ...............................................................................42

                c.   *Garcetti* applies to public school teachers .....................44

           3.   The Guidelines are lawful ........................................................45

      B.   Even If *Garcetti* Did Not Apply, Ms. Polk's Claim
           Would Fail Under *Pickering* ................................................................47

      C.   Strict Scrutiny Does Not Apply But If It Did, MCPS
           Would Prevail ......................................................................................50

III.  MS. POLK FAILS TO SATISFY THE OTHER REQUISITE
      PRELIMINARY INJUNCTION FACTORS ...............................................................52

CONCLUSION ....................................................................................................53

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Abdus-Shahid v. Mayor & City Council of Baltimore*,
    674 F. App'x 267 (4th Cir. 2017) ........................................... 25, 26

*Alive Church of the Nazarene, Inc. v. Prince William County,
    Virginia*, 59 F.4th 92 (4th Cir. 2023) ................................... 20, 26

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................... 26

*Bethel World Outreach Ministries v. Montgomery County Council*,
    706 F.3d 548 (4th Cir. 2023) .................................................. 27

*Boring v. Buncombe County Board of Education*, 136 F.3d 364
    (4th Cir. 1998) ....................................................................... 45

*Bradley v. Pittsburgh Board of Education*, 910 F.2d 1172 (3d Cir.
    1990) ....................................................................................... 48

*Brown v. Chicago Board of Education*, 824 F.3d 713 (7th Cir. 2016) ............. 36, 44

*Canaan Christian Church v. Montgomery County*, 29 F.4th 182
    (4th Cir. 2022) .......................................................... 17, 18, 25, 27

*Centro Tepeyac v. Montgomery County*, 722 F.3d 184 (4th Cir. 2013)
    (en banc) ................................................................................ 15

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520
    (1993) .......................................................................... 21, 24, 25

*Connick v. Myers*, 461 U.S. 138 (1983) .................................... 47

*Coomes v. Edmonds School District No. 15*, 816 F.3d 1255 (9th Cir.
    2016) ................................................................................. 35, 36

*Crouse v. Town of Moncks Corner*, 848 F.3d 576 (4th Cir. 2017) ................. 33, 34

*Dewhurst v. Century Aluminum Company*, 649 F.3d 287 (4th Cir.
    2011) ....................................................................................... 16

*Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022) ............... 19

*Doe ex rel. Doe v. Boyertown Area School District*, 897 F.3d 518
    (3d Cir. 2018)................................................................................29

*EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 (2015).........................25

*Employment Division v. Smith*, 494 U.S. 872 (1990) .................................11, 14, 17

*Evans-Marshall v. Board of Education of Tipp City Exempted School
    District*, 624 F.3d 332................................................................37, 45

*Foote v. Ludlow School Committee*, 128 F.4th 336 (1st Cir. 2025) .......................46

*Fox v. Traverse City Area Public Schools Board of Education*,
    605 F.3d 345 (6th Cir. 2010) ...........................................................44

*Fulton v. City of Philadelphia*, 593 U.S. 522 (2021) .................................18, 20, 21

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) ......................................................*passim*

*Geraghty v. Jackson Local School District*, 2024 WL 3758499
    (N.D. Ohio Aug. 12, 2024)...............................................................41

*Grimm v. Gloucester County School Board*, 972 F.3d 586 (4th Cir.
    2020) ....................................................................27, 28, 29, 50

*Henderson for National Labor Relations Board v. Bluefield Hospital
    Company*, 902 F.3d 432 (4th Cir. 2018)........................................52

*Hensley v. Johnston County Board of Education*, 2010 WL 5437240
    (E.D.N.C. Dec. 23, 2010) ................................................................40

*Hill v. Colorado*, 530 U.S. 703 (2000) .................................................................19

*Hines v. California Public Utilities Commission* 2011 WL 2066614
    (N.D. Cal. May 25, 2011) ................................................................40

*Hines v. South Carolina Department of Correction*, 148 F.3d 353
    (4th Cir. 1998) ................................................................................26

*Janus v. AFSCME*, 585 U.S. 878 (2018) .............................................39, 45, 47, 49

*John & Jane Parents 1 v. Montgomery County Board of Education*,
    622 F. Supp. 3d 118 (D. Md. 2022)................................................46

*John & Jane Parents 1 v. Montgomery County Board of Education*,
   78 F.4th 622 (4th Cir. 2023) ........................................................... 46

*Kennedy v. Bremerton School District*, 597 U.S. 507
   (2022) ........................................................ 17, 19, 20, 32, 43, 50

*Kim v. Board of Education of Howard County*, 641 F. Supp. 3d 223
   (D. Md. 2022) ................................................................................ 20

*Kim v. Board of Education of Howard County*, 93 F.4th 733 (4th Cir.
   2024) ................................................................ 18, 20, 24, 28, 31

*Kingsley v. Brundige*, 2011 WL 1043924 (S.D. Ohio Mar, 18, 2011) .................... 40

*Kluge v. Brownsburg County School Corporation*,
   432 F. Supp. 3d 823 (S.D. Ind. 2020) ............................................ 36, 41, 51

*League of Women Voters of North Carolina v. North Carolina*,
   769 F.3d 224 (4th Cir. 2014) ......................................................... 16

*Lee v. York County School Division*, 484 F.3d 687 (4th Cir. 2007) ..... 32, 37, 38, 44, 49

*Lemon v. Kurtzman*, 403 U.S. 602 (1971) ............................................... 19

*Loftus v. Bobzien*, 848 F.3d 278 (4th Cir. 2017) ....................................... 49

*Love-Lane v. Martin*, 355 F.3d 766 (4th Cir. 2004) ................................... 48

*Mayer v. Monroe County Community School Corporation*,
   474 F.3d 477 (7th Cir. 2007) ...................................................... 41, 45

*Meriweather v. Hartop*, 992 F.3d 492 (6th Cir. 2021) ............................. 44

*Miranda v. Garland*, 34 F.4th 338 (4th Cir. 2022) ................................... 52

*Pickering v. Board of Education of Township High School District
   205*, 391 U.S. 563 (1968) ..................................................... 12, 33, 48

*Price v. Howard County Public School System*, 2023 WL 170425
   (D. Md. Jan. 11, 2023) .................................................................. 44

*Prince v. Massachusetts*, 321 U.S. 158 (1944) ....................................... 30

*Roberts v. United States Jaycees*, 468 U.S. 609 (1984) ........................... 28

*Roe v. Department of Defense*, 947 F.3d 207 (4th Cir. 2020) ................................16

*Roswell v. Maylor & City Council of Baltimore*, 671 F. Supp. 3d 607
    (D. Md. 2023) ........................................................................................52

*Seemuller v. Fairfax County School Board*, 878 F.2d 1578 (4th Cir.
    1989) .....................................................................................................48

*Singleton v. Wulff*, 428 U.S. 106 (1976) ................................................46

*Speech First, Inc. v. Sands*, 69 F.4th 184 (4th Cir. 2023)........................16

*Stroman v. Colleton County School Board Distric*, 981 F.2d 152
    (4th Cir. 1992) ......................................................................................48

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard
    College*, 600 U.S. 181 (2023) .............................................................29

*Trump v. Hawaii*, 585 U.S. 667 (2018) ...................................................31

*United States v. Sterling*, 724 F.3d 482 (4th Cir. 2013) .........................20

*Urofsky v. Gilmore*, 216 F.3d 401 (4th Cir. 2000)......................32, 38, 39

*Van Der Linde Housing, Inc. v. Rivanna Solid Waste Authority*,
    507 F.3d 290 (4th Cir. 2007) ..........................................................27, 31

*Vitkus v. Blinken*, 79 F.4th 352 (4th Cir. 2023) ......................................20

*Vlaming v. West Point School District*, 895 S.E.2d 705 (Va. 2023) .......41

*Wade v. Melton*, 2020 WL 6596720 (S.D. Ala. Oct. 27, 2020) ..............40

*Weintraub v. Board of Education City School Disstrict of New York*,
    593 F.3d 196 (2d Cir. 2010) .................................................................44

*Willey v. Sweetwater County School District #1 Board of Trustees*,
    680 F. Supp. 1250 (D. Wyo. 2023) ......................................................50

*Willey v. Sweetwater County School District #1 Board of Trustees*,
    2023 WL 9597101 (D. Wyo. Dec. 18, 2023) ..........................36, 41, 46

*Winter v. Natural Resource Defense Council, Inc.*, 555 U.S. 7 (2008)....53

*Wozniak v. Adesia*, 932 F.3d 1008 (7th Cir. 2019)...................................................35

## DOCKETED CASES

*Coalition Life v. City of Carbondale*, No. 24-57 (U.S.) ...........................................19

## STATUTORY PROVISIONS

42 U.S.C. § 2000e-2....................................................................................................26

Title VII of the Civil Rights Act of 1964................................................................10

## OTHER AUTHORITIES

Montgomery County Public Schools, *2022-2023 Employee Code of Conduct in Montgomery County Public Schools* (Jan. 2023), https://www.montgomeryschoolsmd.org/siteassets/district/compliance/0439.23_employeecodeofconduct_booklet_eng.pdf .........................1

Montgomery County Public Schools, *About Us—Mission*, https://www.montgomeryschoolsmd.org/about/ (visited May 9, 2025) .....................................................................................................................4

**ISSUE PRESENTED**

Whether the district court acted within its discretion when it concluded that Plaintiff was not entitled to a preliminary injunction requiring Montgomery County Public Schools to retain her as a substitute teacher despite her refusal to affirm that she would comply with Montgomery County Public Schools' policies requiring teachers to use a student's preferred pronoun, and, in certain circumstances, to keep a student's gender identity confidential.

**INTRODUCTION**

Montgomery County Public Schools ("MCPS") has adopted Guidelines for Student Gender Identity (the "Guidelines") that address a range of best practices for supporting students in expressing their gender identity while participating in school life. Among other things, the Guidelines require staff to respect a student's chosen gender identity by addressing all students by their identified name and pronoun, and to make efforts to maintain the confidentiality of a student's transgender status. To provide and maintain a "safe and healthy learning environments for all of [its] students,"[1] MCPS requires all staff, including substitute teachers, to agree to comply with the Guidelines.

---

[1] Montgomery County Public Schools, *2022-2023 Employee Code of Conduct in Montgomery County Public Schools* 1 (Jan. 2023), https://www.montgomeryschoolsmd.org/siteassets/district/compliance/0439.23_employeecodeofconduct_booklet_eng.pdf.

Kimberly Ann Polk, a former substitute teacher at MCPS, refused to do so. At the start of the 2022-2023 school year, she was required, like all MCPS staff, to review training materials relating to the Guidelines and affirm that she had reviewed the materials and understood her obligation to comply with the Guidelines. Ms. Polk refused to do so, stating that the Guidelines' requirements were at odds with her religious beliefs. And when MCPS refused to allow Ms. Polk to substitute teach without agreeing to comply with the Guidelines, she filed suit, arguing that MCPS had violated her First Amendment rights to free exercise and free speech.

Ms. Polk is wrong on both counts. As a government employer, MCPS has broad authority over what its employees say pursuant to their job duties. MCPS was well within that authority to require all of its employees to adhere to the Guidelines in order to create a safe and supportive learning environment for its transgender and gender nonconforming students. Ms. Polk has no free speech right to preside over a classroom without adhering to what MCPS has determined are best practices. She also has no free exercise right not to comply with the Guidelines—a policy that is neutral and generally applicable to all MCPS staff. The district court was correct to deny her motion for preliminary injunction.

On appeal, Ms. Polk asks this Court to ignore Supreme Court precedent and create a new test that would allow her to substitute her own judgment for the judgment of her employer. This Court should reject that request.

- 2 -

## STATEMENT OF THE CASE

### A.    Montgomery County Public Schools

MCPS is the largest school system in Maryland and 14th largest in the United States, serving over 160,000 students across 212 schools.[2]  JA101.  The Montgomery County Board of Education (the "Board"), MCPS's democratically elected policy-making body, oversees the adoption and implementation of policies supporting MCPS's diverse student population.  JA102.  Grace Rivera-Oven, Karla Silvestre, Brenda Wolff, and Julie Yang are current members of the Board of Education; Shebra Evans, Lynne Harris, and Rebecca Smondrowski are former members of the Board of Education; and Dr. Monique Felder is the former Interim Superintendent (the "Individual Defendants").[3]

MCPS has approximately 25,000 employees, including over 13,000 teachers.  JA102.  MCPS's employees are critical to fulfilling its "Mission" to ensure that "[e]*very student* will have the academic, creative problem solving and social-

---

[2] This brief refers to the Montgomery County Board of Education, its members, and the school system collectively as "MCPS," but as the district court recognized, the only proper defendant in this case is the Montgomery County Board of Education.  JA167.  Whether that determination was in error is not before this court on appeal.  *See* Br.43 n.7.

[3] Dr. Thomas Taylor assumed the role of superintendent on June 25, 2024, replacing Dr. Felder.  Rita Montoya, Lauren Stewart, and Natalie Zimmerman were elected to the Board in November 2024, replacing Defendants Evans, Harris, and Smondrowski.

emotional skills to be successful in college and career."[4]  JA133 (emphasis added).

MCPS's "Vision" is to "inspire learning by providing the greatest public education *to each and every student*," *id.* (emphasis added), and its stated "Core Purpose" is to "[p]repare *all students* to thrive in their future[s]," *id.* (emphasis added).

**B.    The Guidelines For Student Gender Identity**

In 2015, the Maryland State Department of Education published guidance and technical support for "Providing Safe Spaces for Transgender and Gender Nonconforming Youth: Guidelines for Gender Identity Non-Discrimination." JA121-130.  In that document, the State Department of Education explained that "Maryland schools have a history of commitment to educating all students to reach their highest potential," and noted that "[s]chool safety is a vital component of that commitment."  JA121.  But many transgender and gender nonconforming students do not feel safe at school.  The State Department of Education Guidelines cite research showing that significant proportions of transgender and gender nonconforming students reported being called names and excluded by peers, had declined to participate in activities "out of fear of discrimination," and felt "unsafe at school because of who they are."  *Id.* The document also cited research showing

---

[4]    Montgomery County Public Schools, *About Us—Mission*, https://www.montgomeryschoolsmd.org/about/ (visited May 9, 2025).

that transgender children have an increased probability of suffering from depression or anxiety, attempting suicide, and otherwise engaging in self-harm.  JA122.

To address these issues, the State Board of Education "provide[d] technical guidance and assistance as each Maryland school system works to support the rights of all students, including those who are transgender and gender nonconforming"— specifically in the form of "guidelines … designed to serve as suggestions for consideration for school systems and administrators who may want to develop their own transgender policy, procedures, and/or guidelines."  JA121.  Among other things, the State Board of Education wrote that "[e]qual education in a non-discriminatory environment may be supported" when staff "[a]ddress every student by a name and pronoun that corresponds to the student's gender identity," JA125, and when students have "the right to keep private one's transgender status or gender nonconforming presentation at school," JA126.

Consistent with this State guidance, MCPS has memorialized its policies relating to transgender and gender nonconforming students in the Guidelines for Student Gender Identity in Montgomery County Public Schools.  JA055-072.  The Guidelines were developed in close consultation with MCPS students, parents, and staff groups.  JA103.  The goals of the Guidelines include:

- Reduc[ing] stigmatization and marginalization of transgender and gender nonconforming students.

- 5 -

- Foster[ing] social integration and cultural inclusiveness of transgender and gender nonconforming students.

- Respect[ing] the right of students to keep their gender identity or transgender status private and confidential.

- Provid[ing] support for MCPS staff members to enable them to appropriately and consistently address matters of student gender identity and expression.

JA065.

In furtherance of these goals, and in line with the recommendations of the State Board of Education, the Guidelines provide that "[a]ll students have the right to be referred to by their identified name and/or pronoun. School staff members should address students by the name and pronoun corresponding to the gender identity that is consistently asserted at school." JA067. And in a section titled "Proactively Working with Transgender and Gender Nonconforming Students," the Guidelines provide that "[t]he principal (or designee), in collaboration with the student and the student's family (if the family is supportive of the student), should develop a plan to ensure that the student has equal access and equal opportunity to participate in all programs and activities at school and is otherwise protected from gender-based discrimination at school." JA066. "[T]he principal or identified staff member" is directed to assess students' needs on a case-by-case basis, and to develop a plan "that works toward inclusion of the family." *Id*. Recognizing that "[a]ll students have a right to privacy," the Guidelines also contemplate circumstances in

- 6 -

which a student's "transgender status or gender nonconforming presentation at school" should not be disclosed to "other students, their parents/guardians, or third parties."  JA066-067.

### C.    Substitute Teachers at MCPS

MCPS considers "[s]ubstitute teachers [to be] vital to the continuity of the instructional program and [] essential to a high-quality education for each student." JA134.  Substitute teachers fill staffing gaps throughout the schools, covering both planned and short-term, last-minute teacher absences.  JA103.  Currently about 3,000 active substitute teachers are qualified to teach in MCPS schools, and on an average day 800 substitute teachers are assigned to classrooms.  *Id.*

To teach in MCPS classrooms, substitute teachers must annually complete the same district-wide compliance training required of all MCPS staff.  JA104.  Since the 2017-2018 school year, the required training has included reviewing materials relating to the Guidelines.  *Id*.  And since the 2022-2023 school year, all staff members have been required to affirm that they understand the contents of the Guidelines and that they are obligated to comply with them.  *Id*.

Substitute teachers also are required to adhere to the Substitute Teacher Handbook ("Handbook"), which they receive as part of their yearly training.  JA132-149.  Among other things, the Handbook explains that MCPS prohibits illegal discrimination, including based on sex, gender, gender identity, gender expression,

and sexual orientation; and it directs substitutes to Board Policy ACA: Nondiscrimination, Equity, and Cultural Proficiency. JA110-119. The Handbook also has a section entitled Guidelines for Student Gender Identity, which explains MCPS's commitment to being "a safe, welcoming school environment where students are engaged in learning and are active participants in the school community because they feel accepted and valued"; provides an overview of some requirements of the Guidelines; and directs teachers to the full document for further information. JA137. The Handbook states that "[a]ll substitutes are expected to maintain the confidentiality of information that they obtain through their work, including employee and student records." *Id.* Finally, reflecting the limited nature of a substitute teaching assignment, the Handbook instructs substitutes that they should "not attempt to contact a parent or guardian directly in a short-term substitute assignment." *Id.*

### D. Ms. Polk Refuses To Affirm Compliance With The Guidelines

Kimberly Ann Polk was a substitute teacher for MCPS during the 2021-2022 school year. JA023. As part of her onboarding process, Ms. Polk was required to review training materials relating to the Guidelines. *Id*. During that school year, Ms. Polk served as a substitute teacher ten times, in eight different elementary schools, where she covered preschool special education, kindergarten, and second through fourth grade classes. *Id*.

- 8 -

To be retained as a substitute for the 2022-2023 school year, Ms. Polk was again required to review training materials relating to the Guidelines. Starting that year, MCPS required staff members to attest that they understood their obligations to comply with the Guidelines. JA023-024. Faced with this requirement, Ms. Polk determined that, based on her religious beliefs, she could not affirm that she would adhere to the Guidelines. JA024. Ms. Polk believes, "based on her understanding of her Christian religion and the Holy Bible," that "she would act unethically if she affirmatively assisted children to present as other than their God-given sex," including by "lying to children by using pronouns for them that do not match their God-given, biological sex." *Id*. Ms. Polk also believes "it would be unethical for her to hide from parents that their child is transitioning genders at school." *Id*.[5]

On November 21, 2022, Ms. Polk submitted a request for a religious accommodation, asking for an exemption from complying with the parts of the Guidelines to which she objected. JA024; *see also* JA083 (Polk's "Employee Request for Religious Accommodation" requesting "to work as a substitute teacher

---

[5] Ms. Polk also challenged the Guidelines' requirement that students be allowed to use restrooms associated with their gender identity, saying "it would be unethical for her to assist a child of one sex to use the restroom of the opposite sex while others of the opposite sex were present." JA024. Ms. Polk does not challenge that aspect of the Guidelines on appeal.

- 9 -

without committing to adhere to the full gender identity guidelines and training provided by the Montgomery County School Board").

On December 2, 2022, Ms. Polk met with an MCPS human resources professional to discuss whether a mutually acceptable agreement could be reached; the parties disagree on what was said in that meeting. *Compare* JA024-025 (alleging proposed accommodations offered by MCPS), *with* JA089 n.3 (noting that "contrary to Complainant's allegation, at no time during the interactive process did [MCPS] state that Complainant should be provided a religious accommodation"). On December 13, 2022, the human resources professional informed Ms. Polk that the Board would be "unable to accommodate" her request because "[c]ompleting the training and adhering to the guidelines" were a "condition of employment." JA087.

On August 10, 2023, Ms. Polk filed a charge of employment discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"). JA025. MCPS filed its Statement of Position on February 5, 2024, and Ms. Polk responded on March 9, 2024. JA026. On April 11, 2024, Ms. Polk requested that the EEOC issue a "right to sue" notice, as more than 180 days had elapsed since she filed her charge, and the EEOC did so on April 12, 2024. JA027.

### E.    The District Court Proceedings

Ms. Polk filed a Complaint asserting claims under Title VII of the Civil Rights Act of 1964 and for violation of her First Amendment rights to free speech and free

- 10 -

exercise. JA015-033. She sought declaratory relief, "[m]ake whole relief," and "[a] preliminary injunction allowing her to continue to substitute teach in classrooms in which students who are transitioning genders are not enrolled." JA031. She also moved for a preliminary injunction on all three of her claims. JA034-045. She asked the court to issue an order enjoining Defendants "from refusing to continue to use Plaintiff as a substitute in MCPS's elementary school classes because she has not affirmed MCPS's gender identity training unless those classes currently have attending a student with a 'gender support plan' as specified in the MCPS Guidelines for Student Gender Identity and MCPS Form 560-80, provided that Plaintiff will obtain assistance from other MCPS personnel promptly if she is confronted with a situation in which she must engage a transitioning student in a way that would violate her religious beliefs." Dist. Ct. ECF No. 4-13.

MCPS opposed Ms. Polk's motion for preliminary injunction and moved to dismiss her Complaint. Dist. Ct. ECF No. 28-1.

The district court denied Ms. Polk's motion for preliminary injunction and granted in part MCPS's motion to dismiss.

*First*, the court held that Ms. Polk had failed to state a claim for violation of her rights under the Free Exercise Clause of the First Amendment. The court held that under *Employment Division v. Smith*, 494 U.S. 872, 879 (1990), the Guidelines

- 11 -

were neutral and generally applicable, and thus subject only to rational basis review, which they "easily pass[ed]." JA180.

*Second*, the court held that Ms. Polk had failed to state a claim for violation of her rights under the Free Speech Clause of the First Amendment. Applying the standard set out in *Garcetti v. Ceballos*, 547 U.S. 410 (2006), the court found that "the speech Polk challenges [was] made pursuant to her official duties as a substitute teacher," and as such, her challenged speech was "not protected by the First Amendment." JA183. Because Ms. Polk's claim failed under *Garcetti*, the court concluded that it did not need to proceed through the balancing test of *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968); the court nonetheless concluded that Ms. Polk's "speech d[id] not involve a matter of public concern," so her claim would fail under *Pickering*, too. JA192 n.11.

*Third*, the court concluded that Ms. Polk had stated a failure-to-accommodate claim under Title VII. JA193. The court noted that MCPS's argument that Ms. Polk's proposed accommodation would cause undue hardship was fact-bound and not appropriate for consideration on a motion to dismiss. JA196.

*Finally*, the court denied Ms. Polk's motion for a preliminary injunction. As to her Title VII claim—the only claim that the court had not already dismissed—the court concluded that Ms. Polk had not established irreparable harm because "[f]inancial harm," such as Ms. Polk's lost income, "generally does not suffice to

- 12 -

establish irreparable harm."  JA198.  As to her constitutional claims, because the court had already held that Ms. Polk had failed to state free exercise or free speech claims, and Ms. Polk was thus unlikely to succeed on the merits of those claims, the court did not reach the remaining preliminary injunction factors.[6]  *Id.*

On appeal, Ms. Polk challenges only the court's denial of her motion for preliminary injunction with respect to her free exercise and free speech claims. Appellant Br.1 ("Br.").  She does not appeal the denial of the preliminary injunction motion with respect to her Title VII claim.

## SUMMARY OF THE ARGUMENT

The district court correctly concluded that Ms. Polk was unlikely to succeed on her free exercise and free speech claims because they fail as a matter of law.  She is also unlikely to be irreparably harmed without the disruptive and unworkable injunction she seeks, and the equities and public interest clearly favor MCPS.

I.    The district court correctly held that Ms. Polk's free exercise claim failed because the Guidelines are neutral and generally applicable.  *Employment Division v. Smith* remains good law and, under *Smith*, "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct

---

[6] The district court also dismissed "Montgomery County Public Schools" and the Individual Defendants as improper defendants, allowing Ms. Polk's Title VII claim to proceed only as against the Board.  JA199.

- 13 -

that his religion prescribes (or proscribes).'"  494 U.S. 872, 879 (1990).  The
Guidelines are neutral and generally applicable.  There is no evidence in the record
that they were adopted based on religious animus, and they apply equally to all
employees, with no exemptions.  As such, rational basis review applies, which the
Guidelines easily satisfy, as they are intended to further MCPS's goals of protecting
student safety and preventing discrimination against students, complying with
MCPS's obligations under federal law, and hiring staff who will nurture transgender
and non-transgender students in equal measure.

II.     The court also correctly held that Ms. Polk's free speech claim failed
because the speech at issue is not that of a private citizen but of a government
employee, which the government may regulate under *Garcetti*.  Ms. Polk would not
be engaged in the speech with either students or parents governed by the Guidelines
but for her role as a substitute teacher and in pursuit of her day-to-day job tasks.
Despite Ms. Polk's attempt to argue otherwise, *Garcetti* applies equally to an
employee's refusal to speak and to her decision to speak.  Because MCPS is
regulating Ms. Polk's speech through the Guidelines, her challenge is to MCPS's
policy even if the specific pronouns at issue are selected by the students.  The
Supreme Court has applied *Garcetti* to a free speech claim brought by a high school
coach, and *Garcetti* is applicable to elementary school teachers just as it is to other
government employees.

- 14 -

Even if the Court were to conclude that *Garcetti* does not apply, Ms. Polk's free speech challenge still would fail under *Pickering*. The speech Ms. Polk challenges is curricular—it is not directed at a matter of public concern because it involves personal interactions with students and parents in the context of her duties as a substitute teacher. Even if the speech could be construed as addressing a matter of public concern, Ms. Polk's claim would fail under *Pickering* because MCPS has a strong interest in the appropriate administration of its schools, particularly by ensuring that all students are free from discrimination and feel safe and comfortable in their classrooms.

Whether Ms. Polk's claim is assessed under *Garcetti* or *Pickering*, strict scrutiny does not apply. But even if it did, MCPS has compelling interests in student safety and preventing discrimination that would defeat Ms. Polk's challenge.

III. Finally, the district court did not address the other preliminary injunction factors necessary for her First Amendment claims. This Court need not address them either. But if it does, it should conclude that the relief Ms. Polk requests presents a heavy, undue burden on MCPS, and remand the case to determine the appropriate scope of any preliminary injunctive relief.

## STANDARD OF REVIEW

The denial of a preliminary injunction is reviewed for abuse of discretion. *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir. 2013) (en banc).

- 15 -

"Securing reversal of a denial of preliminary relief is an uphill battle." *Speech First, Inc. v. Sands*, 69 F.4th 184, 202 (4th Cir. 2023) (alteration omitted). "Indeed, because the law places a thumb on the scale against the issuance of preliminary injunctions, [this Court's] deference should be even greater when the district court denies a preliminary injunction." *Id.* A mandatory injunction—one that changes the status quo between the parties—"in any circumstance is disfavored." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 235-236 (4th Cir. 2014). Only a "'clear error in factual findings or a mistake of law is grounds for reversal.'" *Roe v. Department of Def.*, 947 F.3d 207, 219 (4th Cir. 2020).

## ARGUMENT

The district court was correct to deny Ms. Polk's motion for preliminary injunction, "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011). "'[A] party seeking a preliminary injunction … must 'clear[ly] show[]' that [she] is likely to succeed on the merits,'" "'likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest.'" *Id.* The district court correctly determined that Ms. Polk's free speech and free exercise claims failed as a matter of law, and she was thus unlikely to succeed on the merits.

The remaining factors all fall along with the merits.  The district court's decision should be affirmed.

## I.  THE DISTRICT COURT CORRECTLY CONCLUDED THAT MS. POLK IS UNLIKELY TO SUCCEED ON HER FREE-EXERCISE CLAIM

Under Supreme Court precedent, "a plaintiff may carry the burden of proving a free exercise claim in various ways, including by showing that a government entity has burdened [her] sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'"  *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022) (quoting *Employment Div. v. Smith*, 494 U.S. 872, 879-881 (1990)).  "Should a plaintiff make a showing like that," courts "will find a First Amendment violation unless the government can satisfy 'strict scrutiny.'"  *Id.*  But if the challenged policy is neutral and generally applicable, it is, under longstanding Supreme Court precedent, "subject only to rational basis review."  *Canaan Christian Church v. Montgomery Cnty.*, 29 F.4th 182, 198 (4th Cir. 2022).

The district court correctly concluded that the Guidelines are neutral and generally applicable and that they easily pass rational basis review.  To avoid that conclusion, Ms. Polk asks this Court to declare *Smith* "effectively abrogated" and create a new test.  Br.7.  But this Court does not have the authority to overrule Supreme Court precedent, and under that precedent, Ms. Polk's claim fails.

### A.    *Smith* Controls

Ms. Polk says that the district court erred in applying *Smith* "because the Supreme Court has effectively abrogated it." Br.7. But in support, Ms. Polk cites only two separate Supreme Court concurrences in *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021), that do not control. One three-justice concurrence stated that *Smith* should be "reconsider[ed]," *id.* at 553 (Alito, J., concurring), and a separate concurrence on behalf of two other justices stated that "the textual and structural arguments against *Smith* are more compelling" than those in its favor, *id.* at 543 (Barrett, J. concurring).[7]

The fact that five Justices have expressed doubts about *Smith* does not mean that *Smith* is no longer good law. The majority opinion plainly states that the Court was not overruling *Smith.* 593 U.S. at 533 ("[Plaintiff] urges us to overrule *Smith* ... [b]ut we need not revisit that decision here."). Consequently, this Court has stated that *Fulton* "declin[ed] to overrule *Smith*," *Canaan Christian Church*, 29 F.4th at 198, and has continued to apply it, *see, e.g.*, *Kim v. Board of Education of Howard County,* 93 F.4th 733,747 (4th Cir. 2024). Indeed, Ms. Polk has not identified a single court that has ever held that *Smith* has been overruled.

---

[7] Ms. Polk misconstrues this quote, which, in context, stated that the textual and structural arguments against *Smith* were more compelling than the "historical record," which Justices Barrett, Kavanaugh, and Breyer found "more silent than supportive" on that question.

Despite the fact that federal courts are unanimous that *Smith* remains good law, Ms. Polk claims that opinions in two other recent Supreme Court cases have endorsed the "effectively abrogated theory" and invited lower courts to guess whether the Supreme Court will overturn existing precedent in a future decision. That is also wrong. In *Kennedy*, the Supreme Court reviewed prior opinions and observed that the test for Establishment Clause violations, as laid out in *Lemon v. Kurtzman*, 403 U.S. 602 (1971), had been replaced by a different analysis. *Kennedy*, 597 U.S. at 534-536. It did not, as Ms. Polk suggests, say that *Lemon* had been silently overruled because various individual concurrences had noted concerns with it; rather, it cited multiple controlling opinions applying different tests. *Id.* at 534-535.

Justice Thomas's lone dissent from a denial of certiorari in *Coalition Life v. City of Carbondale*, No. 24-57 (U.S. Feb. 24, 2025), is not to the contrary. In that dissent, Justice Thomas described issues with *Hill v. Colorado*, 530 U.S. 703 (2000), and observed that the Court had "long stopped applying" it, citing multiple cases to that effect. Thomas Dissent Op. 1, No. 24-57 (citing *inter alia*, *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 287 (2022)). Justice Thomas then called upon the Court to "set the record straight" on *Hill*. *Id.* But contrary to Ms. Polk's contention, Justice Thomas never suggested that *lower* courts should, on their own, declare *Hill* void based on non-binding concurrences.

- 19 -

In the end, only the Supreme Court has "the prerogative of overruling its own decisions." *United States v. Sterling*, 724 F.3d 482, 501 (4th Cir. 2013). *Smith* controls.

### B.      The Guidelines Are Neutral And Generally Applicable

Under *Smith*, "laws incidentally burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are neutral and generally applicable." *Fulton*, 593 U.S. at 533. Ms. Polk bears the burden of showing that the Guidelines are not neutral or generally applicable.[8] She has not done so.

### 1.      The Guidelines are generally applicable.

"A [policy] is generally applicable if it applies the same across-the-board standard to all people within its scope." *Kim v. Board of Educ. of Howard Cnty.*, 641 F. Supp. 3d 223, 288 (D. Md. 2022), *aff'd*, 93 F.4th 733 (4th Cir. 2024). In

---

[8] Ms. Polk argues that the "*Smith* safe harbor to a state burdening religious exercise is an affirmative defense that must be raised by the government, not rebutted by the plaintiff in her opening complaint." Br.12. But Ms. Polk provides no authority for that proposition, and it is wrong—in this posture, Ms. Polk must show that she is "likely to succeed on the merits" of her claim. *Vitkus v. Blinken*, 79 F.4th 352, 361 (4th Cir. 2023). The burden is hers to make out a free exercise violation, which includes showing that the challenged policy was not neutral and generally applicable. *See Kennedy*, 597 U.S. at 525 (noting that "a plaintiff may carry the burden of proving a free exercise violation" by "showing" that a policy is not neutral and generally applicable); s*ee also, e.g.*, *Alive Church of the Nazarene, Inc. v. Prince William Cnty.*, 59 F.4th 92, 108-110 (4th Cir. 2023) (affirming a district court's grant of a motion to dismiss under rational basis review after concluding that regulation was neutral and generally applicable).

- 20 -

assessing whether a policy is generally applicable, courts look to whether the policy "in a selective manner impose[s] burdens only on conduct motivated by religious belief." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 543 (1993). Courts also look to whether a policy "invites the government to consider the particular reasons for a person's conduct by creating a mechanism for individualized exemptions." *Fulton*, 593 U.S. at 533 (cleaned up).

Under any of these framings, the Guidelines are generally applicable. As the district court recognized, MCPS put in evidence that "[s]ince 2022, MCPS has not permitted any of its staff to work without agreeing to comply with the Guidelines." JA106. All MCPS staff members must agree to follow the Guidelines—and actually follow them—as a condition of employment. Ms. Polk does not point to any evidence to the contrary—no evidence that MCPS has created "a mechanism for individualized exemptions" from the Guidelines requirement, *Fulton*, 593 U.S. at 533, nor any examples of exemptions from the requirement to follow the Guidelines at all, let alone exemptions that "impose burdens only on conduct motivated by religious belief," *Church of Lukumi*, 508 U.S. at 543.

Ms. Polk makes two arguments in response, both of which fail. First, she argues that because MCPS previously did not require staff members to "check the box" affirming they would comply with the Guidelines, and at one point offered to allow her to continue teaching without "check[ing] the box" so long as she

- 21 -

understood that the Guidelines would still apply to her, any policy requiring staff members to "check the box" is not generally applicable. Br.9. It is true that when Ms. Polk first started teaching at MCPS, she was required to review the Guidelines but not make any affirmation that she would comply with them. JA104. But the fact that MCPS previously had one set of requirements for all employees (reviewing the Guidelines) and now has a different set of requirements for all employees (reviewing the Guidelines and affirming compliance) does not mean that the current policy is not generally applicable. Evidence that a policy has not always existed or has changed over time is not evidence that the policy is not generally applicable. Holding otherwise would mean that no policy could ever be modified, or introduced in the first place, without being subject to strict scrutiny review.

In addition, while the requirement to affirm compliance with the Guidelines was new as of the 2022-2023 school year, JA104, the requirement that all staff members comply with the Guidelines remained the same. And as Ms. Polk herself acknowledges, it is the requirement to comply with the Guidelines that burdens her religious exercise, not the physical act of checking a box. Br.2-3, 7 (defining her burden as more than the requirement to "check the box"); JA038-041. Thus, even if MCPS had offered to allow Ms. Polk to resume teaching without "check[ing] the box" so long as she verbally agreed to comply with the Guidelines, that would not

- 22 -

mean that the policy requiring all MCPS staff to comply with the Guidelines is not generally applicable.

Second, Ms. Polk argues that the Guidelines are not generally applicable because MCPS has discretion as to "whether and how to discipline Ms. Polk if she violated the Guidelines while teaching." Br.10. In support, Ms. Polk points to MCPS regulations on the roles and responsibilities of substitute teachers, which say, among other things, that "employees should adhere to expected standards of behavior and failure to do so may constitute 'proper cause' for discipline or discharge from employment," JA048, and that "[i]n some circumstances, the school administrator may determine that the substitute teacher's conduct warrants a clarification as to expectations regarding future conduct rather than formal disciplinary action," JA051-052. Nothing in these regulations says that substitute teachers may receive exemptions from following the Guidelines—they apply to all MCPS staff, and all MCPS staff are required to affirm compliance with the Guidelines before each school year. JA104. That the regulations say the consequences for violating the Guidelines depend on the facts and circumstances of the conduct at issue does not mean that the Guidelines are not generally applicable. If Ms. Polk's rule were adopted, it would effectively mean that no employment policy—even one with no exemptions, like the one at issue here—could ever be considered generally applicable if the employer maintained individualized and fact-

- 23 -

specific disciplinary procedures. How MCPS chooses to discipline employees who violate its policy has no relevance to the fact that MCPS grants no exceptions whatsoever to the policy itself. Ms. Polk has not shown that the Guidelines were not generally applicable.

### 2.    The Guidelines are neutral.

A policy is neutral for purposes of free exercise analysis when "it has no object that infringes upon or restricts practices because of their religious motivation." *Kim*, 93 F.4th at 748. A rule fails the neutrality analysis if it discriminates on its face or if its "object … is to infringe upon or restrict practices because of their religious motivation." *Church of Lukumi*, 508 U.S. at 533. Ms. Polk claims that because most of the individuals who disagree with the Guidelines are religious, the Guidelines must have been designed to "target[] primarily religious parents." Br.7. But this contention finds no support in the record.

First, Ms. Polk states that "it is obvious from the face of the Guidelines and their accompanying intake form" that the Guidelines facially target religion. Br.11. But Ms. Polk does not quote what part of the Guidelines or the intake form makes it "obvious" that they target religious exercise. In fact, as Ms. Polk elsewhere concedes, those documents contain no references to religion at all. Br.11. Later, she claims that the word "unsupportive" is code for anti-religious hostility, but again, she provides no support for that bare assertion. And by their plain terms, the

- 24 -

Guidelines apply equally to people who may be considered "unsupportive" for religious or secular reasons. That also makes this case very different from *Church of Lukumi*, where plaintiffs produced significant evidence that "suppression of the central element of the [religion] was the object of the ordinances." 508 U.S. at 534.[9] Ms. Polk has not pointed to any similar evidence of religious hostility here.

Ms. Polk next contends that religious hostility can be presumed because the Guidelines primarily burden people "holding traditional beliefs about sexuality of the major U.S. religions (Christianity, Judaism, and Islam)." Br.11. But Ms. Polk gets the law on neutrality backwards. Neutrality is measured by the motivation of the policy maker, not the impact the rule may have on the individual. *See Canaan Christian Church*, 29 F.4th at 198 (A law is neutral "even where it has the incidental effect of burdening religious exercise."); *Abdus-Shahid v. Mayor and City Council of Baltimore*, 674 F. App'x 267, 271-272 (4th Cir. 2017) (per curiam) (holding that the "test for neutrality" does not depend on its "effect," but on its "motivation"). That is why Ms. Polk's citation of *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575

---

[9] For example, plaintiffs in *Church of Lukumi* provided evidence that the city council had adopted a resolution citing residents' "'concern that certain religions may propose to engage in practices which are inconsistent with public morals,'" 508 U.S. at 535; made statements that "evidence significant hostility … toward the Santeria religion," *id.* at 541 (plurality op.); and specifically gerrymandered each regulation such that "almost the only conduct subject to [the regulations] is the religious exercise of Santeria church members," *id.* at 535.

U.S. 768 (2015), misses the mark. *EEOC* was a Title VII case involving disparate impact analysis, a different test that does not require "proof of discriminatory motive." *Abdus-Shahid*, 674 F. App'x at 271-272; 42 U.S.C. § 2000e-2(a). Showing that a policy is not neutral for purposes of the free exercise clause requires more.

Ms. Polk would have this Court hold that MCPS specifically adopted the policy to target "Christianity, Judaism, and Islam." Br.11. But as the district court correctly held, Ms. Polk "offers no facts from which the Court could plausibly infer that the Board created the Guidelines to target teachers who adhere to traditional religious teachings on gender identity or that the Board was hostile towards any religion when it enacted the Guidelines." JA174. The Guidelines "proscribe[] conduct without regard to whether that conduct is religiously motivated or not," *Hines v. South Carolina Department of Corrections*, 148 F.3d 353, 357 (4th Cir. 1998), and "ha[ve] no object that infringes upon or restricts practices because of their religious motivation," *Alive Church of the Nazarene, Inc. v. Prince William County*, 59 F.4th 92, 108 (4th Cir. 2023) (cleaned up)). Therefore, they are neutral. Having pled no facts otherwise, Ms. Polk is wrong to say the district court should have allowed her claims to proceed to discovery. Br.12; *see Ashcroft v. Iqbal*, 556 U.S. 662, 678-679 (2009) (Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

- 26 -

### C.    The Guidelines Satisfy Rational Basis Review

Because the Guidelines are neutral and generally applicable, rational basis review applies, which the Guidelines easily satisfy.  "Rational basis review 'requires merely that the law at issue be rationally related to a legitimate government interest.'"  *Canaan Christian Church*, 29 F.4th at 199 (quoting *Bethel World Outreach Ministries v. Montgomery Cnty. Council*, 706 F.3d 548, 561 (4th Cir. 2023)).  To succeed under rational basis review, Ms. Polk "bears the heavy burden of negating every conceivable basis which might reasonably support" the Guidelines; the rationality of the Guidelines may not be "judged on the basis of [their] wisdom, fairness, or logic (or lack thereof)."  *Van Der Linde Hous., Inc. v. Rivanna Solid Waste Auth.*, 507 F.3d 290, 293-294 (4th Cir. 2007).

The district court found that MCPS's three proffered bases for the Guidelines were all "legitimate government purposes."  JA178-179.  Specifically, the court found that requiring teachers to "address students by their preferred pronouns is rationally related to [MCPS's] obligations under Title IX, which prohibits discrimination against transgender students at school."  JA179 (citing *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 619 (4th Cir. 2020)).  The court also found that MCPS's "requirement that teachers keep students' gender identities confidential, even from their parents, is rationally related to the Board's goal of supporting and protecting the safety of the students whose parents may object to

- 27 -

their decision to transition." *Id.* And finally, the court found that "the requirement that all teachers must abide by the Guidelines is rationally related to the Board's goal of hiring staff who will treat and nurture every student equally." *Id.* None of Ms. Polk's arguments to the contrary is sufficient to negate "any reasonably conceivable state of facts that could provide a rational basis" for the Guidelines. *Kim*, 93 F.4th at 749.

First, Ms. Polk claims that MCPS's asserted interests cannot justify its policy because the requested preliminary injunction would also "fully satisf[y]" its interests. Br.32. But under rational basis review, MCPS is not required to adopt Ms. Polk's (or anyone else's) preferred policy; it is allowed to adopt any policy that is rationally related to its goals.

Second, Ms. Polk argues that the interests MCPS identifies are "defined overly broadly" and are "too amorphous to be afforded any weight." Br.33. But the interests MCPS identifies are particularized to the relief Ms. Polk seeks, which would involve either refusing to teach transgender and gender nonconforming students, or refusing to use their preferred pronouns and follow MCPS confidentiality policies. The relief Ms. Polk seeks would result in MCPS students being treated differently because of their gender identity, potentially resulting in discrimination, stigma, and violation of federal law. *Roberts v. United States Jaycees*, 468 U.S. 609, 624 (1984) (noting that "commitment to eliminating

discrimination … plainly serves compelling state interests of the highest order"); *Grimm*, 972 F.3d at 619; *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 529 (3d Cir. 2018) (risk of discrimination to transgender students' well-being "cannot be overstated—indeed, it can be life threatening"). And more to the point, Ms. Polk's argument is based on cases that held more general interests "not sufficiently coherent for purposes of *strict scrutiny*." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 214 (2023) (emphasis added). Again, Ms. Polk needs to show that MCPS's policy fails *rational basis review*, not strict scrutiny.

Ms. Polk also argues that MCPS does not have a legitimate interest in either the pronoun policy or the confidentiality policy, but those arguments fail. As to the requirement that MCPS staff use students' preferred pronouns, Ms. Polk argues that "Ms. Polk has agreed *not* to use pronouns[,] but only names," which she says "satisfies any interest MCPS may have." Br.34. But again, under rational basis review, MCPS has its choice of policies that rationally advance its interests in supporting and protecting its transgender and gender nonconforming students; it is not required to choose Ms. Polk's preferred policy. In any event, Ms. Polk's proposed solution is not "neutral on the topic," as she claims. Br.36. In Ms. Polk's declaration she states that she would use pronouns for everyone *except* transgender and gender nonconforming children. JA152 (stating that she would "refer[]to a

- 29 -

transgender student only by preferred name while referring to other students by both their name and [their] pronouns."). This differential treatment on the basis of gender identity is hardly "neutral."

Ms. Polk also claims that "nurturing students equally" and "discrimination" are mere "code words for suggesting that students exhibiting as transgender should not be exposed to what they regard as objectionable speech," which she claims is not a cognizable interest. Br.35. But none of the cases Ms. Polk relies on supports this argument. While the First Amendment protects objectionable speech generally, speech by government employees is subject to the normal *Garcetti* analysis. It is well within the government's rights as an employer to prohibit its employees from speaking in ways it considers objectionable while performing their employment duties. Such interests are especially salient since the Guidelines represent MCPS's judgment as to what is best to support the well-being of its students. *See Prince v. Massachusetts*, 321 U.S. 158, 165 (1944) (holding that state has an interest in ensuring that "children be both safeguarded from abuses and given opportunities for growth into free and independent well-developed men and citizens").

As to the Guidelines' confidentiality provisions, Ms. Polk argues that MCPS's interests in requiring substitute teachers, in certain circumstances, to keep students' gender identity confidential "are illegitimate" and at odds with "the rights of parents to control their minor children's decisions about matters such as this." Br.36-37.

- 30 -

But this argument misstates what the Guidelines actually require. The Guidelines direct "the principal or identified staff member" to assess a student's needs on a case-by-case basis, and to develop a plan "that works toward inclusion of the family," all with the intent of ensuring the safety of the child. JA066. MCPS has an interest in preventing staff members—especially substitute teachers—from circumventing school administrators and sharing students' Gender Support Plans outside of this carefully considered process. Indeed, the substitute teacher handbook specifically says that substitutes should "not attempt to contact a parent or guardian directly in a short-term substitute assignment" at all. JA137. While Ms. Polk may disagree with the "wisdom, fairness, or logic (or lack thereof)" of such a policy, the policy is rationally related to MCPS's interest in protecting students, and that is all that is required. *Van Der Linde Hous.*, 507 F.3d at 293-294.[10]

Courts "hardly ever strike[] down a policy as illegitimate under rational basis scrutiny." *Trump v. Hawaii*, 585 U.S. 667, 705 (2018). This is not one of those rare times. Because Ms. Polk cannot negate "any reasonably conceivable state of facts that could provide a rational basis" for the Guidelines, her free exercise claim must fail. *See Kim*, 93 F.4th at 749.

---

[10] Ms. Polk also appears to argue that the confidentiality provisions of the Guidelines fail rational basis because they violate the due process rights of parents. Br.39-40. This is incorrect, as discussed further *infra* at Part II.A.3.

- 31 -

## II. THE DISTRICT COURT CORRECTLY CONCLUDED THAT MS. POLK IS NOT LIKELY TO SUCCEED ON HER FREE SPEECH CLAIM

"When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410 (2006). One such limitation is on a government employee's right to free speech. While teachers do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Kennedy*, 597 U.S. at 527, "certain limitations are placed on the free speech rights of schoolteachers … due to the nature of their employment by government-operated schools," *Lee v. York County School Division*, 484 F.3d 687, 693 (4th Cir. 2007). The Supreme Court has recognized that such limitations are needed because "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti*, 547 U.S. at 418. The Court has also recognized that "when [government employees] speak out, they can express views that contravene government policies or impair the proper performance of governmental functions." *Id.* at 419. For these reasons, courts recognize that "the state, as an employer, undoubtedly possesses greater authority to restrict the speech of its employees than it has as sovereign to restrict the speech of the citizenry as a whole." *Urofsky v. Gilmore*, 216 F.3d 401, 406 (4th Cir. 2000) (en banc).

In assessing whether a government employee's speech is protected under the First Amendment, courts apply the framework set out in *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968), and elaborated on in *Garcetti*. This Court has harmonized the holdings of those two cases into a "three-prong test to determine if the employee's rights under the First Amendment were violated." *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 583 (4th Cir. 2017). The first prong asks "whether the employee 'was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest.'" *Id.* "This prong can in turn be divided into two inquiries: whether the speech was made as a citizen or pursuant to the employee's duties … and whether the content of the speech addressed 'a matter of interest to the community' rather than 'complaints over internal office affairs.'" *Id.* If the challenged "speech was made as a citizen and addressed a matter of public concern," the analysis proceeds to the second prong; if the challenged speech is made "pursuant to the employee's duties" or does not address a matter of public concern, then the restriction on speech does not violate the First Amendment and the inquiry ends. *Id.*

The second prong "requires a court to balance the interest of the employee in speaking freely with the interest of the government in providing efficient services." *Crouse*, 848 F.3d at 583. "If a court determines that the employee's interest

outweighed the government employer's interest, the third prong requires a determination that the employee's speech caused the disciplinary action." *Id.*

As the district court correctly concluded, Ms. Polk's claims fail at the first part of the first prong, or the *Garcetti* test: "whether the speech was made as a citizen or pursuant to the employee's duties." *Crouse*, 848 F.3d at 583. The speech challenged by Ms. Polk—using students' preferred pronouns and communicating with students' parents—"is part of Polk's official duties as a teacher," and is thus "not protected by the First Amendment." JA183. Recognizing that this analysis forecloses her claim, Ms. Polk argues that the *Garcetti* "official duties" inquiry should not apply for a number of reasons, none of which is supported by the law. But even if the "official duties" inquiry did not apply, Ms. Polk's claim would still fail under the *Pickering* test because her challenged speech is not made as a citizen on a matter of public concern. And even if neither framework applied, MCPS's policy would survive strict scrutiny because it is narrowly tailored to serve the compelling interests of preventing discrimination against transgender students and promoting an equitable learning environment.

### A. Ms. Polk Challenges Speech Made Pursuant To Her Official Duties, So It Is Not Protected

Ms. Polk is not likely to succeed on her free speech claim because, as the district court held, the speech she challenges is speech made "pursuant to her official duties as a public school teacher," and is therefore not protected by the First

Amendment. JA181. The challenged speech—"[u]sing pronouns when interacting with and communicating about students" and "communicating with parents about their children's conduct in school"—is "intrinsic to" and "part and parcel of" teaching. JA183 (quoting *Coomes v. Edmonds Sch. Dist. No. 15*, 816 F.3d 1255, 1264 (9th Cir. 2016)). And because both forms of speech are "categories of speech [that] would occur only to fulfill Ms. Polk's responsibilities as a teacher," the district court correctly concluded that the Guidelines do not violate Ms. Polk's rights. *Id.* (citing *Wozniak v. Adesia*, 932 F.3d 1008, 1010 (7th Cir. 2019)).

On appeal, Ms. Polk argues both that the speech she challenges is not made pursuant to her official duties, and that *Garcetti*'s "official duties" framework does not apply to her claims at all. Both arguments fail.

### 1. Under *Garcetti*, the challenged speech is made pursuant to Ms. Polk's job duties and is thus not protected.

Ms. Polk asserts that the speech she challenges is not part of her "curricular or administrative duties" and thus is not susceptible to regulation by MCPS. Br.21. But she takes far too narrow a view of the job that MCPS hires substitute teachers to do.

The two forms of speech that Ms. Polk challenges—the use of preferred names and pronouns, and the requirement to keep Gender Support Plans confidential in certain circumstances—are speech made pursuant to Ms. Polk's duties as a substitute teacher. It is part and parcel of a substitute teacher's job, as set forth in

- 35 -

the MCPS Substitute Teacher Handbook, to foster "a safe, welcoming school environment where students are engaged in learning and are active participants in the school community because they feel accepted and valued," by following the Guidelines, JA137; and to "maintain the confidentiality of information that [she] obtain[s] through [her] work, including employee and student records," *id*. Courts have repeatedly applied *Garcetti* in such circumstances. *See, e.g.*, *Brown v. Chicago Bd. of Educ.*, 824 F.3d 713, 715-716 (7th Cir. 2016) (holding that teacher's use of racial epithet was not protected because it was "pursuant to his official duties," whether curricular or as part of maintaining classroom order); *Coomes* , 816 F.3d at 1264 (holding that communications with parents about students' classroom performance is "part and parcel" of a teacher's job); *Kluge v. Brownsburg Cmty. Sch. Corp.*, 432 F. Supp. 3d 823, 839 (S.D. Ind. 2020) (concluding that referring to students by preferred names and pronouns "was part of [a teacher]'s official duties"), *appeal pending*, No. 24-1942 (7th Cir.); *Willey v. Sweetwater Cnty. Sch. Dist. #1 Bd. of Trs.*, 2023 WL 9597101, at *8-9 (D. Wyo. Dec. 18, 2023) ("Referring to a student by their chosen or preferred names in a classroom, pursuant to a school district policy, is part of a teacher's official duties.").

This Court has taken an expansive view of what speech qualifies as curricular and is therefore not protected by the First Amendment, covering any speech "designed to impart particular knowledge" including "information on social or moral

- 36 -

values that the teacher believes the students should learn or be exposed to." *Lee*, 484 F.3d at 699. Ms. Polk challenges the Guidelines precisely because she believes they require her to advocate for a moral position with which she disagrees. *See* Br.4-5. Such speech, this Court has recognized, is better regulated by school boards than by federal courts. *Lee*, 484 F.3d. at 697 ("Although schoolteachers provide more than academic knowledge to their students, it is not a court's obligation to determine which messages of social or moral values are appropriate in a classroom. Instead, it is the school board, whose responsibility includes the well-being of the students, that must make such determinations."). "Placing the First Amendment's stamp of approval" on debates about classroom management "not only would 'demand permanent judicial intervention in the conduct of governmental operations,' but it also would  transform run-of-the-mine" educational disputes "into constitutional stalemates." *Evans-Marshall v. Board of Educ. of Tipp City Exempted Sch. Dist.*, 624 F.3d 322, 341 (6th Cir. 2010) (quoting *Garcetti*, 547 U.S. at 423)).

Nor, as Ms. Polk contends, is this a case where MCPS is arguing that the speech is made pursuant to Ms. Polk's employment duties based on an "excessively broad job description[]." Br.19 (quoting *Garcetti*, 547 U.S. at 424-425); *see* Br.22. Whether a particular task is included in an employee's job description is "neither necessary nor sufficient to conclude that conducting a task is within the scope of the employee's professional duties for First Amendment Purposes." *Garcetti*, 547 U.S.

at 425. But the tasks at issue here—addressing students in a classroom and communicating with parents about their students—are at the heart of Ms. Polk's job as a substitute teacher. MCPS, as Ms. Polk's employer, is entitled to place "certain limitations" on her "free speech rights" because of the "nature of [her] employment by [a] government-operated school[]." *Lee*, 484 F.3d at 693. The Guidelines are just such a limitation, and MCPS's requirement that Ms. Polk adhere to them does not infringe her First Amendment rights.

### 2. *Garcetti* applies.

#### a. *Garcetti* applies to compelled speech.

Ms. Polk next argues that because the Guidelines "compel[] speech," a separate "compelled speech doctrine" applies, rather than *Garcetti*. Br.14. But in making that argument, Ms. Polk relies almost exclusively on Supreme Court cases that involved government requirements that private parties—not government employees—speak particular messages with which they disagreed. Br.15-16. But courts have long recognized that "the state, as an employer, undoubtedly possesses greater authority to restrict the speech of its employees than it has as sovereign to restrict the speech of the citizenry as a whole." *Urofsky*, 216 F.3d at 406. Indeed, without "a significant degree of [government] control over their employees' words and actions," "there would be little chance for the efficient provision of public services." *Garcetti*, 547 U.S. at 418.

- 38 -

The one Supreme Court case involving government employment that Ms. Polk relies on says as much.  In *Janus v. AFSCME*, the Supreme Court stated: "Of course, if the speech in question is part of an employee's official duties, the employer may insist that the employee deliver any lawful message."  585 U.S. 878, 908 (2018) (citing *Garcetti*, 547 U.S. at 421-422, 425-426).  This is because "[w]hen an employee engages in speech that is part of the employee's job duties, the employee's words are really the words of the employer.  The employee is effectively the employer's spokesperson."  *Id.* at 910.  In *Janus*, the Court noted that the speech in question—requiring employees to pay dues to a union—was not speech made on behalf of an employer because unions speak on behalf of employees, not employers.  And as a result, *Garcetti* did not apply.  But in no way did *Janus* suggest that a different rule would apply to speech the government requires its employees to speak *as part of their official duties*.

In an en banc decision that anticipated *Garcetti*, this Court offered a hypothetical in another government employee speech case: "suppose an assistant district attorney, at the District Attorney's direction, makes a formal statement to the press regarding an upcoming murder trial—a matter that is unquestionably of concern to the public.  It cannot seriously be doubted that the assistant does not possess a First Amendment right to challenge his employer's instructions regarding the content of the statement."  *Urofsky*, 216 F.3d at 407-408.  In other words, "it

cannot seriously be doubted" that the government could require its employee to make a statement to the press of its choosing. As one court later explained after analyzing *Garcetti* and this Court's en banc hypothetical, "the more precisely stated rule is that a public employee's refusal to speak is constitutionally protected if her government employer is compelling her to speak as a private citizen, and not as a public employee." *See Hensley v. Johnston Cnty. Bd. of Educ.*, 2010 WL 5437240, at *8 (E.D.N.C. Dec. 23, 2010). There, the court reasoned that a teacher's refusal to send a letter to parents apologizing for how she conducted a class discussion on evolution was a decision made "in her capacity as a teacher" and so was "not protected by the First Amendment." *Id.* at *9. Other courts that have considered the issue agree that an employee's refusal to speak in her official capacity is not protected by the First Amendment.[11]

---

[11] *See, e.g.*, *Wade v. Melton*, 2020 WL 6596720, at *7-8 (S.D. Ala. Oct. 27, 2020) (holding that plaintiff "was speaking as a public employee when she refused to provide financial information about the City to" defendant and concluding that the refusal to speak was "not protected by the First Amendment"); *Hines v. California Pub. Utils. Comm'n*, 2011 WL 2066614, at *5 (N.D. Cal. May 25, 2011) ("[U]nder *Garcetti*, [plaintiff's] speech (or, rather, her refusal to speak) was made in the capacity of a public employee and not a citizen, and her First Amendment claim must fail."); *Kingsley v. Brundige*, 2011 WL 1043924, at *8-9 (S.D. Ohio Mar, 18, 2011) (dismissing First Amendment free speech claim because refusal to speak was in plaintiff's official capacity on a matter of public concern, and noting "the conceptual difficulty of carving out an exception to *Garcetti* in cases where public employees are compelled to speak as part of their official duties"), *aff'd*, 513 F. App'x 492 (6th Cir. 2013).

While Ms. Polk identifies one Virginia Supreme Court case and one unpublished Northern District of Ohio case holding that *Garcetti* does not apply to government employees' refusal to speak, Br.20-21 (citing *Vlaming v. West Point Sch. Dist.*, 895 S.E.2d 705, 750 (Va. 2023); *Geraghty v. Jackson Loc. Sch. Dist.*, 2024 WL 3758499, at *11 (N.D. Ohio Aug. 12, 2024)), those cases are not controlling and are at odds with *Janus* and *Garcetti.* Indeed, other courts have reached the opposite conclusion and applied *Garcetti* to challenges from teachers over whether to use students' preferred names and pronouns. *See, e.g.*, *Kluge*, 432 F. Supp. 3d at 837-840; *Willey*, 2023 WL 9597101, at *8-9. Further, the rule Ms. Polk proposes does not make sense. Any distinction between compelled speech and prohibited speech breaks down in the classroom setting, where the requirement to teach certain materials or speak to students in a particular manner implies a requirement not to teach other materials, and not to speak in a different manner. *See Mayer v. Monroe Cnty. Cmty. Sch. Corp.*, 474 F.3d 477, 479 (7th Cir. 2007) (noting that "[a] teacher hired to lead a social studies class can't use it as a platform for a revisionist perspective that Benedict Arnold wasn't really a traitor, when the approved program calls him one"). If the point of allowing the government to have "a significant degree of control over [its] employees' words and actions" is to ensure "the efficient provision of public services," *Garcetti*, 547 U.S. at 418, such reasoning

- 41 -

applies equally to the government's ability to prevent its employees from speaking an inconsistent message, as it does to require its employees to speak a consistent one.

### b.    The challenged speech is government speech.

Ms. Polk next argues that *Garcetti* should not apply because the speech at issue is "the pronoun preferences of MCPS *students* and *students'* desire to keep what is happening at school secret from their parents."  Br.18.  According to Ms. Polk, then, the speech she challenges is not speech that "the employer itself has commissioned or created."  Br.17-18 (quoting *Garcetti*, 547 U.S. at 422).  That argument makes no sense; it is not the students who are requiring Ms. Polk to adhere to the Guidelines—that is the role of MCPS, as Ms. Polk's employer.  *See, e.g.*, JA137 (substitute teacher handbook requiring compliance with the Guidelines).  As Ms. Polk's employer, MCPS has "itself commissioned or created" the policy—the Guidelines—with which it is requiring Ms. Polk to comply.  *Garcetti*, 547 U.S. at 422.  Thus, Ms. Polk's assertion that "[i]t is not MCPS that is exhibiting as other than its actual sex," Br.18, is irrelevant to the analysis, as the District Court correctly recognized.  "[T]he Board has chosen to require teachers to use the child's preferred pronouns.  The use of preferred pronouns when referring to children in the classroom is the speech of the Board."  JA189 & n.8.

Ms. Polk also argues that the district court inappropriately determined that the challenged speech was "official" merely because MCPS had a written policy

governing it, and argued that such a rule could allow schools to broadly restrict speech with no limiting principle. Br.19. While one could conceive of an overly broad school policy that could restrict teacher speech in a way that is unconnected to a teacher's official duties, this is not such a policy. The Guidelines govern how teachers interact with students and their parents, in a way that MCPS has determined best provides a supportive learning environment for students.

Ms. Polk also argues—though the district court did not hold otherwise, and MCPS does not argue—that the fact her speech would occur at school does not necessarily mean that it is speech that MCPS has commissioned or created. Br.19. While Ms. Polk is correct that where speech occurs is not dispositive, her reliance on *Kennedy v. Bremerton* is misplaced. In *Kennedy*, the Supreme Court concluded that a coach who prayed on the field after football games was engaged in private speech based on "[t]he timing and circumstances." 597 U.S. at 530. The coach's speech was offered after the game, while "coaches were free to attend briefly to personal matters," and it was not directed *at* students and had no relationship to his coaching responsibilities. *Id.* at 529-530. The same cannot be said of Ms. Polk's speech, which would be directed at students, in the classroom, during school hours, and as part of the classroom instruction that substitute teachers are hired to provide. Because MCPS has chosen to require its teachers to provide instruction and manage

- 43 -

classrooms in accordance with the Guidelines, under *Garcetti*, Ms. Polk's refusal to comply with them is not protected speech.

### c. *Garcetti* applies to public school teachers.

Ms. Polk's last attempt to avoid *Garcetti* is to argue that it should not apply "in an academic setting." Br.25. But this goes too far. While some courts have held that *Garcetti* should not apply in the university setting because of the unique interests of "academic freedom and freedom of expression" present there, *Meriweather v. Hartop*, 992 F.3d 492, 505 & n.1 (6th Cir. 2021), every court to consider the issue has held that speech relating to the appropriate management of elementary and secondary school classrooms is governed by *Garcetti*. *See, e.g.*, *Brown*, 824 F.3d at 715-716; *Weintraub v. Board of Educ. of City Sch. Dist. of N.Y.*, 593 F.3d 196, 205 (2d Cir. 2010); *Fox v. Traverse City Area Pub. Schs. Bd. of Educ.*, 605 F.3d 345, 349 (6th Cir. 2010). This Court has not yet decided whether *Garcetti* should apply in the elementary or secondary school setting. *See Lee*, 484 F.3d at 694 n.11. But at least one district court in this Circuit has applied *Garcetti* to bar a First Amendment claim brought by a high school teacher, holding that his inflammatory remarks during instruction were made pursuant to his official duties and dismissing his claims on that basis. *Price v. Howard Cnty. Pub. Sch. Sys.*, 2023 WL 170425, at *5 (D. Md. Jan. 11, 2023), *reconsideration denied*, 2023 WL 4532808 (D. Md. July 13, 2023).

Distinguishing between how speech is regulated in the university setting and in public elementary schools also makes sense. As the Seventh Circuit has explained, unlike university students, public school "pupils are a captive audience," and "[c]hildren who attend school because they must ought not to be subject to teachers' idiosyncratic perspectives." *Mayer*, 474 F.3d at 479; *see also Evans-Marshall*, 624 F.3d at 341-344. Instead, the right to control what happens in elementary and secondary school classrooms is left to members of the boards of education—"someone the people can vote out of office." *Mayer*, 474 F.3d at 480; *see also Boring v. Buncombe Cnty. Bd. of Educ.*, 136 F.3d 364, 371-372 (4th Cir. 1998) (Wilkinson, C.J., concurring). This Court should confirm that *Garcetti* applies in elementary schools, just as every other court to have considered the issue has concluded.

### 3.    The Guidelines are lawful.

Next, Ms. Polk argues that her speech should be protected even if *Garcetti* applies because the message that the Guidelines require her to convey is "unlawful or otherwise inappropriate." Br.23.[12]    Ms. Polk focuses specifically on the

---

[12] Polk bases her argument on a line from *Janus* where the Court noted that "if the speech in question is part of an employee's official duties, the employer may insist that the employee deliver any lawful message," citing *Garcetti*. 585 U.S. at 908. But in the cited passage of *Garcetti*, the Court was grappling with the fact that its holding meant that some speech aimed at "[e]xposing governmental inefficiency and misconduct" would not be protected. 547 U.S. at 425. The Court noted that

Guidelines' confidentiality provisions, saying "[i]t is not lawful or appropriate for MCPS to require teachers to conspire to hide information from parents, who have the constitutional right to such information." Br.23. But Ms. Polk does not have third-party standing to assert the rights of parents hypothetically harmed by the Guidelines. *See Singleton v. Wulff*, 428 U.S. 106, 116 (1976). Further, Ms. Polk is wrong that the Guidelines violate the rights of MCPS parents. *See John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 622 F. Supp. 3d 118, 139 (D. Md. 2022) (concluding that the Guidelines policy regarding informing parents of children's transgender status did not violate parents' constitutional rights), *vacated & remanded on other* grounds, 78 F.4th 622 (4th Cir. 2023); *see also Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 357 (1st Cir. 2025) (per curiam) (rejecting parents' challenge to similar policies). Nor has Ms. Polk identified any other independent source of right that is violated by MCPS as her employer requiring her to do things as part of her job that she disagrees with. *Willey*, 2023 WL 9597101, at *8 (rejecting teacher's claim that "'lying to or deceiving parents regarding their child's gender identity' violate[d] her … right to freedom of speech" because

---

other sources of law would be available to protect government employees, pointing to whistle-blower and labor laws, as well as "other applicable constitutional provisions" and civil and criminal laws. *Id.* at 425-426. But the Court explicitly rejected the notion that the First Amendment "shields from discipline" speech critical of the government that is made as part of an employee's official duties. *Id.* at 426.

"communicating with parents about a student's progress is part of a teacher's official duties").

### B. Even If *Garcetti* Did Not Apply, Ms. Polk's Claim Would Fail Under *Pickering*

Even if the Court were to determine that *Garcetti* does not apply to Ms. Polk's free speech claim, her claim would still fail under *Pickering*, which permits government employers to restrict employees' private speech that is not on a matter of public concern, *Connick v. Myers*, 461 U.S. 138, 145-146 (1983). That is because "the speech of a public-sector employee may interfere with the effective operation of a government office." *Janus*, 585 U.S. at 908. Indeed, even if the employee's speech does involve matters of public concern, the First Amendment may permit restrictions because of "the government's interest in the effective and efficient fulfillment of its responsibilities to the public." *Connick*, 461 U.S. at 150. Ms. Polk's claim fails because using students' preferred pronouns and keeping student information confidential is speech made pursuant to her employment duties, it is outside the realm of public concern, and it would disrupt the functioning of schools if MCPS could not regulate that speech.

Both the "content and context" of the speech at issue compel the conclusion that Ms. Polk's challenged speech is not that of a private citizen addressing a matter of public concern. The content concerns how Ms. Polk will address individual students within a classroom, as well as hypothetical conversations with individual

- 47 -

parents when necessary to support those students. The names and pronouns a teacher uses with a student are not a matter of public concern and, indeed, a student's gender identity is often an intensely private matter—as the Guidelines recognize, students have "the right to keep private [their] transgender status or gender nonconforming presentation at school." JA066. The topics that courts have recognized as matters of public concern, by contrast, are broad policies such as school funding, *see Pickering*, 391 U.S. at 571-572, management of teacher pay, *see Stroman v. Colleton County School District*, 981 F.2d 152, 159 (4th Cir. 1992), and accusations of gender discrimination among staff, *see Seemuller v. Fairfax County School Board*, 878 F.2d 1578, 1582 (4th Cir. 1989). By contrast, courts have concluded that matters like individual classroom management are not matters of public concern, *see, e.g.*, *Bradley v. Pittsburgh Board of Education*, 910 F.2d 1172, 1176 (3d Cir. 1990). Further, the fact that Ms. Polk's speech would occur in a classroom to students or with parents—not in a letter to the editor of a newspaper, *see Pickering*, 391 U.S. at 566-567, or at a PTA or faculty meeting, *see Love-Lane v. Martin*, 355 F.3d 766, 776 (4th Cir. 2004)—supports the conclusion that her speech is not addressing a matter of public concern.

Even if Ms. Polk's speech could be construed as addressing a matter of public concern, the Guidelines would pass the second step of *Pickering*, wherein a court "consider[s] whether the employee's interest in First Amendment expression

outweighs the public employer's interest in what [it] has determined to be the appropriate operation of the workplace." *Lee*, 484 F.3d at 694 (citation omitted). And here, MCPS has determined that its goals of providing "a safe and supportive space for … LGBTQ+ students, free from discrimination, bullying, and harassment," JA059, are of paramount importance. Likewise, MCPS has determined that some transgender students "may not openly express their gender identity at home because of safety concerns[,] lack of acceptance," or fears of "familial conflict." JA066. Allowing Ms. Polk to disregard the Guidelines would present "an adverse effect" in the "efficient operation of" MCPS's schools, *Loftus v. Bobzien*, 848 F.3d 278, 289 (4th Cir. 2017), so Ms. Polk's claim fails the second prong of *Pickering*.

Because Ms. Polk's claim also fails under *Pickering*, she tries to avoid the test as she does with *Garcetti*. *See* Br.27-29. She first invokes dicta in *Janus* suggesting that *Pickering* "requires modification" in the context of "general rules that affect broad categories of employees." 585 U.S. at 907. But Ms. Polk challenges a restriction on her own speech, not the speech of a class or a union. And though Ms. Polk also contends that *Pickering* should not apply "when the government compels speech," Br.28 (quoting *Janus*, 585 U.S. at 908), the Court in *Janus* added that "if the speech in question is part of an employee's duties, the employer may insist that the employee deliver any lawful message," 585 U.S. at 908. That is precisely the

case here, as discussed above. *See supra* Part II.A.2. And "the clear majority of courts to address the issue have concluded *Pickering* still applies to" claims of compelled speech. *Willey v. Sweetwater Cnty. Sch. Dist. No. 1 Bd. of Trs.*, 680 F. Supp. 3d 1250, 1286-1287 (D. Wyo. 2023) (collecting cases).

### C.    Strict Scrutiny Does Not Apply But If It Did, MCPS Would Prevail

If strict scrutiny applied to Ms. Polk's claims (it does not), MCPS would have to demonstrate that its policy is narrowly tailored to serve a compelling government interest. *See Kennedy*, 597 U.S. at 532. It is.

MCPS's policy of requiring teachers to comply with the Guidelines serves a number of compelling interests, including protecting student safety and preventing discrimination against students, complying with MCPS's obligations under federal law, and hiring staff who will nurture transgender and non-transgender students in equal measure," Dist. Ct. ECF No. 28-1; *see* JA178-179.[13] For all the reasons already discussed, MCPS's interests are critical to the safety and respect of its students.

Consider a hypothetical elementary school classroom where a single teacher refuses to use a transgender student's preferred pronouns, or refuses to use a pronoun

---

[13] Although Title IX's applicability to gender identity is unsettled, MCPS nevertheless has an obligation to protect students under the Equal Protection Clause of the Fourteenth Amendment, *see Grimm*, 972 F.3d at 606-616 (concluding that school board's policy of refusing to allow transgender student to use bathroom of expressed gender violated the student's Equal Protection Rights).

- 50 -

for that student at all. *See* Br.34 (noting that Ms. "Polk has agreed *not* to use pronouns … but only names"). Such a difference in treatment most assuredly would stand out to students and would risk disclosing that a classmate is transgender—private information that Ms. Polk is charged with keeping confidential. *See* JA066-067. As other courts have concluded, a school district has "countervailing interests," including "promoting the efficiency of its public schools," and "protecting the rights of … students." *Kluge*, 432 F. Supp. 3d at 851.

MCPS's policy is also narrowly tailored. Ms. Polk argues that the accommodation she seeks "would avoid any substantial interaction with transgender students and the need to apply the offending policies" by placing her in classrooms that have no students with gender support plans. Br.41. But, as Ms. Polk explained below, the substitute teacher assignment system does not work like that. JA150. Ms. Polk's later suggestion that MCPS could simply provide her with a list of all classrooms with students with gender support plans would be a serious violation of the privacy rights of MCPS's transgender and gender nonconforming students and their families. *See* JA150-151. And in any event, even if MCPS could provide Ms. Polk a list of all classrooms with students who have gender support plans, students are not required to have gender support plans in order to receive an accommodation under the Guidelines. JA107. Even if MCPS had perfect knowledge of what classrooms had transgender and gender-nonconforming students at one point in time,

student rosters are not static throughout the year, nor are students, and issues relating to gender may come up in the classroom at any time.  JA106.  MCPS has a compelling interest in knowing that the teachers it puts in the classroom will be able to handle unexpected situations in ways that conform to what MCPS has determined to be best practices for supporting its students.  Because MCPS has compelling interests in protecting its students and efficiently conducting the business of its schools, and the Guidelines are narrowly tailored to advance those interests, Ms. Polk's claim would fail even under strict scrutiny.

## III.  Ms. Polk Fails To Satisfy The Other Requisite Preliminary Injunction Factors

This Court need not consider the remaining preliminary injunction factors because Ms. Polk has not established she will likely succeed on her free exercise or free speech claims.  *See Henderson for Nat'l Lab. Rel. Bd. v. Bluefield Hosp. Co.*, 902 F.3d 432, 439 (4th Cir. 2018).

In any case, the remaining factors are not met.  Because Ms. Polk has shown no likely constitutional violation—and identifies no other injury—she has not established irreparable harm.  *See Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022).  Nor do the balance of equities and public interest, which merge when the government is opposing injunctive relief, *id.*, favor an injunction where (as here) there is no cognizable injury, *Roswell v. Maylor & City Council of Baltimore*, 671 F. Supp. 3d 607, 618-619 (D. Md. 2023).  On the other hand, "the public

consequences in employing the extraordinary remedy of [an] injunction" are severe. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Requiring MCPS to permit Ms. Polk to ignore the Guidelines would significantly disrupt classroom instruction and undermine MCPS's stated goals to foster an inclusive environment for all students.

If this Court were to determine that the district court erred by denying Ms. Polk's motion for preliminary injunction, the appropriate remedy would be remand to the district court to consider the proper scope of a potential injunction. As MCPS argued below, Ms. Polk's originally requested injunction—assigning her to substitute teach in classrooms with no transgender or gender nonconforming students—would create an extraordinary burden for the government. *See, e.g.*, JA105-107 (affidavit discussing the burdens presented by Ms. Polk's proposed accommodations). Ms. Polk presents no argument about the scope of any injunction that she seeks in this Court, and she has therefore not met her burden of proving that she is entitled to it.

## CONCLUSION

For the foregoing reasons, the district court's denial of Ms. Polk's preliminary injunction should be affirmed.

Respectfully submitted,

/s/  *Alan Schoenfeld*

- 53 -

BRUCE M. BERMAN
JULIA M. MAY
MEGAN O. GARDNER
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Ave., NW
Washington, DC 20037
(202) 663-6000

ALAN SCHOENFELD
EMILY BARNET
CASSANDRA MITCHELL
WILMER CUTLER PICKERING
   HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800

May 9, 2025

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g)(1), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

1.      Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(f), the brief contains 12,911 words.

2.      The brief has been prepared in proportionally spaced typeface using Microsoft Word for Office 365 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(g)(1), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.


/s/ *Alan Schoenfeld*
ALAN SCHOENFELD

May 9, 2025

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of May, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ *Alan Schoenfeld*

ALAN SCHOENFELD