No.  25-1136

———————————————

IN THE UNITED STATES COURT
OF APPEALS FOR THE FOURTH CIRCUIT

———————————————

KIMBERLY ANN POLK,

*Appellant,*

v.

MONTGOMERY COUNTY PUBLIC SCHOOLS, *et al.*,

*Respondents.*

———————————————

*On Appeal from the United States District Court for the
District of Maryland, No. 8:24-cv-1487 (Boardman, J.)*

———————————————

REPLY BRIEF

———————————————

Robert Flores
Gammon & Grange, P. C.
1945 Old Gallows Rd., Ste. 650
Vienna, Va. 22182
jrf@gg-law.com

Frederick W. Claybrook, Jr.
  (Counsel of Record)
Claybrook LLC
655 15th St., NW, Ste. 425
Washington, D.C. 20005
(301) 622-0360
rick@claybrooklaw.com

Steven W. Fitschen
James A. Davids
National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 463-6133
sfitschen@nationallegalfoundation.org
jdavids@nationallegalfoundation.org

Attorneys for Appellant

Table of Contents

Table of Authorities..................................................................................i

Introduction and Summary of Argument ...................................................1

Argument.............................................................................................4

I.    *Smith* Does Not Apply to MCPS's Violations of
      Ms. Polk's Free Exercise Rights ........................................................4

II.   MCPS Violated Ms. Polk's Free Speech Rights ..................................7

      A. *Garcetti*'s "Government Speech" Exception Does
         Not Apply Here ..........................................................................7

      B. *Pickering* Does Not Apply Here ................................................14

III.  MCPS Has No Legitimate Interest in Violating Ms. Polk's
      Constitutional Rights, Much Less a Compelling Interest ................16

IV.   Ms. Polk Is Entitled to Greater Relief Than the
      Tailored Preliminary Injunction She Requested
      Below, but She Is Entitled to at Least That Relief...........................20

Conclusion ...........................................................................................24

Table of Authorities

Cases

*Bray v. Alexandria Women's Health Clinic*,
   506 U.S. 263 (1993)......................................................................6

*Brokaw v. Mercer Cnty.*,
   235 F.3d 1000 (7th Cir. 2000)....................................................16

*Canaan Christian Church v. Montgomery Cnty.*,
   29 F.4th 182 (4th Cir. 2022)........................................................5

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*,
   508 U.S. 520 (1993)..................................................................6, 7

*Clapper v. Amnesty Int'l, USA*, 568 U.S. 398 (2013) ...............................12

*Croft v. Westmoreland Cnty. Children and Youth Servs.*,
   103 F.3d 1123 (3d Cir. 1997) ......................................................16

*Doe v. Heck,* 327 F.3d 492, 521 (7th Cir. 2003) ......................................16

*Doe 1 v. Madison Metro. Sch. Dist.*,
   2022 WI 65, 976 N.W.2d 584 (2022) .........................................12

*EEOC v. Abercrombie & Fitch Stores, Inc.*,
   575 U.S. 768 (2015).................................................................. 6-7

*Employment Division v. Smith*, 494 U.S. 872 (1990) .......................... 4-7

*Foote v. Ludlow Sch. Comm.*,
   128 F.4th 336 (1st Cir. 2025) .................................................. 13-14

*Fulton v. Phila,*, 593 U.S. 522 (2021) .....................................................5

*Garcetti v. Ceballos*, 547 U.S. 410 (2006)................................. 4, 7-10, 14

*Geraghty v. Jackson Local Sch. Dist.*,
   2024 WL 3758499 (N.D. Ohio, Aug. 12, 2024) ...........................8, 9

*Grimm v. Gloucester Cnty. Sch. Bd.*,
   972 F.3d 586 (4th Cir. 2020)........................................................ 19-20

*Harris v. Quinn*, 573 U.S. 616 (2014).....................................................15

*Hurley v. Irish Gay, Lesbian and Bisexual Grp. of Boston, Inc.*,
   515 U.S. 557 (1995)....................................................................18

*Kim v. Bd. of Educ. of Howard Cnty.*,
   93 F.4th 733 (4th Cir. 2024).........................................................5

*Janus v. Am. Fed. of State, Cnty., and Mun. Employees*,
   515 U.S. 878, 908 (2018).................................................. 9, 10, 14-15

*Kluge v. Brownsburg Cnty. Sch. Corp.*,
   432 F. Supp. 3d 823 (S.D. Ind. 2020))...........................................8

*Littlejohn v. Sch. Bd. of Leon Cnty.*,
   132 F.4th 1232 (11th Cir. 2025), *petition*
   *petition for en banc reconsideration pending*............................... 12-13

*Mahmoud v. Taylor*,
   No. 24-297 (Sup. Ct., argued Apr. 22, 2025)....................................6

*Meriwether v. Hartop*,
   992 F.3d 492 (6th Cir. 2021)..................................................9, 19, 20

*Mirabelli v. Olsen*,
   691 F. Supp. 3d 1197 (S.D. Cal. 2023),...........................................14

*Mirabelli v. Olsen*,
   761 F. Supp. 3d 1317 (S.D. Cal. 2025)............................................14

*Parents 1 v. Montgomery Cnty. Bd. of Educ.*,
   78 F.4th 622 (4th Cir. 2023)............................................. 9, 10-12, 16

*Parents Protecting Our Children, UA v. Eau Claire Area Sch. Dist.*,
   145 S. Ct. 14 (2024)...................................................................12

*Parham v. J.R.*, 442 U.S. 584 (1979) ............................................................ 2-3, 17

*Pickering v. Bd. of Educ.*, 391 U.S. 563 (1972) ............................................ 7, 14-15

*Ricard v. USD 475 Geary Cnty. KS Sch. Bd.*,
 2022 WL 1471372 (D. Kan., May 9, 2022) ........................................................14

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
 592 U.S. 14 (2020) ........................................................................................20

*Singleton v. Wulff*, 428 U.S. 106 (1976) ........................................................10

*State v. Loe*, 692 S.W.3d 215 (Tex. 2024) ....................................................1, 6

*Susan B. Anthony List v. Dreihaus*,
 573 U.S. 149 (2014) ......................................................................................12

*Tenn. v. Cardona*,
 2025 WL 63795 (E.D. Ky., Jan. 9, 2025) ............................................................8

*Troxel v. Granville,* 530 U.S. 57 (2000) ........................................................3, 17

*United States v. Skrmetti*,
 No. 23-477 (Sup. Ct., argued Dec. 4, 2024) ......................................................20

*Vlaming v. West Point Sch. Dist.*,
 895 S.E.2d 705 (Va. 2023) ............................................................................8, 9

*Willey v. Sweetwater Cnty. Sch. Dist.*,
 680 F. Supp. 3d 1250 (D. Wyo. 2023) ..............................................................14

*Wyatt v. Fletcher*, 718 F.3d 496 (5th Cir. 2013) ................................................2

Statutes

Family Educational Rights and Privacy Act,
   20 U.S.C. § 1232g.....................................................................................2


Other Authorities

https://www.google.com/search?client=firefox-b-1-d&q=transgender+
pronouns+list (last visited May 13, 2025) ...............................................8

Introduction and Summary of Argument

MCPS in its Opposition views the world through the lens of the

"Transgender Vision." *See generally State v. Loe*, 692 S.W.3d 215, 239-40 (Tex.

2024) (Blacklock, J., concurring).  That is hardly surprising, as MCPS's Gender

Identity Guidelines that lie at the root of this case are activated by that vision.

And, normally, a government entity may act with significant leeway in adopting a

particular vision of things when enacting and enforcing a policy, even when there

is strong evidence demonstrating its inadvisability.  But there are important,

constitutional limits, and those limits have been surpassed here.

Here, MCPS's implementation of its Transgender Vision by requiring

teachers to hide information from parents violates constitutional barriers.  MCPS is

not free to enact and enforce policies that violate parental rights, and its stated

rationales for doing so are no more than statements that the school believes it

knows better than parents how to bring up the parents' children.  That constitutes

an impermissible premise on which to violate the religious freedom and free

speech of teachers who object to being made co-conspirators with MCPS.

Stripped of verbiage, MCPS puts forward two primary interests to support

its policy of keeping secret from parents that their children are exhibiting as

transgender at school.  The first is supposedly derivative of the child's rights:  to

"[r]espect the right of students to keep their gender identity or transgender status

1

private and confidential" from their parents. (JA65.) This states no permissible

interest at all. Minor children have no "right" to keep things secret from their

parents. *See* Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. §

1232g (requiring schools to make available to parents all records regarding their

children);[1] *Wyatt v. Fletcher*, 718 F.3d 496, 505 (5th Cir. 2013).

MCPS's second purported interest is to keep students "safe" at home and in

school and to avoid potential "familial conflict." (JA66.) Transparently, this is

MCPS arrogating to itself the parents' responsibilities by assuming that school

officials, not the child's parents, are in the best position to decide whether, when,

and where the child should exhibit as transgender. It rests on the premise that

school officials, not parents, have the best interests of the child at heart.

These are not acceptable governmental interests. Parents are in primarily in

charge of their children, and the law does not allow their decisions to be overridden

by the State:

> The law's concept of the family rests on a presumption that parents
> possess what a child lacks in maturity, experience, and capacity for
> judgment required for making life's difficult decisions. More
> important, historically it has recognized that natural bonds of affection
> lead parents to act in the best interests of their children. . . . The statist
> notion that governmental power should supersede parental authority in

---

[1] MCPS in the Gender Identity Guidelines relies on FERPA as a "privacy law" to
support its withholding from "unsupportive" parents that their children are
exhibiting as transgender at school. (JA67.) This is wrong as a matter of law, and
MCPS in its Opposition does not rely on FERPA.

> *all* cases because *some* parents abuse and neglect children is repugnant to American tradition.

*Parham v. J.R.*, 442 U.S. 584, 602-03 (1979).  Thus, MCPS's proffered interests in protecting children's "privacy" vis-à-vis their parents and guarding against "conflict" that might ensue if a parent and child disagree on the subject of whether or when a child should exhibit as transgender are illegitimate and entitled to no weight.  *See Troxel v. Granville,* 530 U.S. 57, 80 (2000) (Thomas, J., concurring).  They do not provide support for the policy even under rational basis review.

Parents, not schools, decide what to name minor children and by what pronouns they should be called.  The fact that a child may desire to be called by different pronouns than the parents have selected is simply not a choice that a school is allowed to disregard, even if the child might feel "better" or "safer" in school.  (JA59.)  Any "discomfort" the child may feel is discomfort the parents believe it best for the child to endure, and governmental actors are not at liberty to override those parental decisions.  *Id.*  These parental rights cannot be overcome by the school asserting that the child will perform better at school if the school "supports" the child's decision, when the parents do not.  And what MCPS cannot do constitutionally, it cannot require its employees to do.

Ms. Polk believes it is wrong to deceive parents about how their child is being treated at school or to lie to children about their true, God-given sex by using inaccurate pronouns.  (JA38.)  MCPS does not contest the district court's

conclusion that, by firing her for being true to these religious convictions, MCPS

burdens her free exercise.  In this context, MCPS violated Ms. Polk's free exercise

rights, whether or not MCPS's actions qualify for rational basis review under

*Employment Division v. Smith*, 494 U.S. 872 (1990), which they do not.  Moreover,

MCPS violated Ms. Polk's free speech rights.  The speech MCPS compels does not

qualify as "government speech" under *Garcetti v. Ceballos*, 547 U.S. 410 (2006),

and, even if the messages MCPS fired her for refusing to deliver were government

speech, the messages are unlawful and illegitimate and so may not be compelled

by MCPS.  Ms. Polk's does not have religious objection to using the preferred

name of a student, and her agreement to avoid use of pronouns with students

exhibiting as transgender avoids any potential violation of MCPS's asserted

interests, even if they were valid.[2]  This Court should reverse and remand for entry

of appropriate injunctive relief.

<u>Argument</u>

I.  *Smith* Does Not Apply to MCPS's
    <u>Violations of Ms. Polk's Free Exercise Rights</u>

MCPS's firing of Ms. Polk because she refused to "check the box" that she

would apply the Gender Identity Guidelines in all respects is neither generally

---

[2] Ms. Polk also objected on religious grounds to taking children to the wrong-sex
bathrooms.  (JA24, JA41.)  MCPS stated below that she would not be required to
perform that task (JA152), and so that objection is not ripe to be presented in this
appeal.

applicable nor neutral.  Thus, it fails the *Smith* test and must satisfy strict scrutiny.[3]

With respect to general applicability, MCPS cannot talk its way around the fact that its own substitute teacher regulation provides it with discretion as to what steps to take, if any, when a teacher refuses to follow the Gender Identity Guidelines.  (JA46-53.)  Under *Fulton*'s elucidation of *Smith*, discretion does not have to be exercised, just available, to disqualify the regulation as "generally applicable."  *See* 593 U.S. at 533.  Thus, it does no good for MCPS to argue (Resp. Br. at 23-24) that it has never exercised its discretion under the regulation to allow a teacher to remain employed if she violated, or refused to follow, the Gender Identity Guidelines or to bemoan that no regulations providing for case-by-case, discretionary enforcement can meet *Snith*'s "generally applicable" prong.  To escape the rule of *Fulton*, all the MCPS regulation needed to say was that any violation of, or reservation concerning, the Gender Identity Guidelines would require termination of the teacher.  It does not.

MCPS also fails the neutrality prong of *Smith*.  While some incidental effect on religious practice does not show a government policy targets religion, a policy

---

[3] While Ms. Polk remains of the view that *Smith* has been abrogated and should not be followed, she acknowledges that, after the Supreme Court's decision in *Fulton v. Philadelphia*, 593 U.S. 522 (2021), in which *Smith* was questioned by five sitting justices and one retired justice, this Court has continued to apply it.  *See Kim v. Board of Education of Howard County*, 93 F.4th 733, 747-48 (4th Cir. 2024); *Canaan Christian Church v. Montgomery Cnty.*, 29 F.4th 182, 199 (4th Cir. 2022). Thus, she will not press the argument further here, while reserving it.

that is facially neutral can do so if it disadvantages religious individuals, and that can be shown by the obvious effects of such a policy.  *See Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 534 (1993).  Here, the Gender Identity Guidelines target "unsupportive" parents, i.e., all those who hold the "Traditional Vision."  Justice Blacklock of the Texas Supreme Court aptly noted that "the core of the matter" between the "Transgender Vision" and the "Traditional Vision" is a moral and religious dispute.  *Loe*, 692 S.W.3d at 239-40.  Those of the "Traditional Vision" predominantly include those holding to traditional religious views.  *See Mahmoud v. Taylor*, No. 24-297 (Sup. Ct., argued April 22, 2025) (suit brought parents of different religious faiths against MCPS's LGBTQ+-affirming curriculum).  That religious parents are those predominantly likely to object to the Gender Identity Guidelines, even though they are not called out specifically, demonstrates a hostility to religious belief and practice.  As the Supreme Court stated in *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 270 (1993), "Some activities may be such an irrational object of disfavor that, if they are targeted, and if they also happen to be engaged in exclusively or predominantly by a particular class of people, an intent to disfavor that class can readily be presumed."[4]  Such is the case here, and for this reason too *Smith* does not apply.

---

[4] MCPS attempts (at 25-26) to distinguish *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 (2015), because it was a disparate impact claim that, it asserts, does not require proof of discriminatory motive (citing as precedent an

Failing to satisfy either of *Smith*'s factors, MCPS must justify the burden on Ms. Polk's free exercise rights by strict scrutiny. *See Lukumi*, 508 U.S. at 546. However, as discussed above and *infra*, MCPS cannot meet even a rational basis test. It pursues no legitimate interests with regard to the parts of the Gender Identity Guidelines that Ms. Polk challenges.

II.    MCPS Violated Ms. Polk's Free Speech Rights

Neither the "government speech" exception of *Garcetti* nor the balancing test of *Pickering v. Board of Education*, 391 U.S. 563 (1972), save MCPS from its violation of Ms. Polk's free speech rights. MCPS's arguments to the contrary are unavailing.

A. *Garcetti*'s "Government Speech"
   Exception Does Not Apply Here

First, *Garcetti* doesn't apply because the *student*, not the school, generates the speech MCPS compels of Ms. Polk. *See Garcetti*, 547 U.S. at 422 (ruling that the government may only control speech it has "itself . . . commissioned or created"). MCPS argues (Resp. Br. at 42) that, by requiring the teacher to adopt the student's preferred speech, MCPS somehow makes the student's speech its own. But MCPS neither initiates the compelled speech nor controls its duration; it is the

---

unpublished decision). *Abercrombie* was a Title VII, disparate impact claim, but, contrary to what MCPS asserts, the Court found that the store had acted with an unlawful *motivation* against religious practice by refusing to hire the applicant because of her head covering, despite its facially neutral, no-cap policy. *Id.* at 773.

student who does. Having a policy that says a teacher must mouth what the student selects as pronouns, from a list including him/her, they/them, xe/xem, ze/zir, etc.,[5] and give cover to the child's deception of the parents does not convert the student's pronoun selection and secrecy message into government speech. Even in its policy requiring affirmation of the minor's choices, MCPS recognizes that naming is an individual (and, Ms. Polk would add, family) matter, not a school matter, and that it is the student who determines what message to give the parents. (JA66-67.)

Second, *Garcetti* doesn't apply because Ms. Polk is refusing to speak, while *Garcetti* deals with employees who have spoken. MCPS admits (Resp. Br. at 41) that *Vlaming v. West Point School District*, 895 S.E.2d 705 (Va. 2023), and *Geraghty v. Jackson Local School District*, 2024 WL 3758499 (N.D. Ohio, Aug. 12, 2024), so hold, but waves them off as not binding on this Court (Ms. Polk never claimed that they were). MCPS ignores the third precedent Ms. Polk cites, *Tennessee v. Cardona*, 2025 WL 63795 (E.D. Ky., Jan. 9, 2025), and that *Geraghty* followed Sixth Circuit precedent. Ms. Polk acknowledges, as MCPS points out (Resp. Br. at 41), that two courts have come out the other way, although one of those cases (*Kluge v. Brownsburg County School Corp.*, 432 F. Supp. 3d 823 (S.D. Ind. 2020)) is currently on appeal in the Seventh Circuit. The cases Ms. Polk cites

---

[5] *See, e.g.*, https://www.google.com/search?client=firefox-b-1-d&q=transgender+pronouns+list (last visited May 13, 2025).

(Op. Br. at 20-21) are the better reasoned and should be followed by this Court.

Third, *Garcetti* doesn't apply because the speech compelled is not part of a teacher's curricular or administrative duties. In its Opposition, MCPS basically ignores that Ms. Polk focuses her challenge on those parts of the Gender Identity Guidelines that require teachers to dissemble to parents. As Judge Niemeyer stated about this very policy in *Parents 1 v. Montgomery County Board of Education*, 78 F.4th 622, 645 (4th Cir. 2023) (Niemeyer, J., dissenting), MCPS hiding information from parents certainly cannot be categorized as "curricular." Neither can use of a child's pronouns, as both *Vlaming* and *Geraghty* held, as well as the Sixth Circuit in *Meriwether v. Hartop*, 992 F.3d 492 (6th Cir. 2021). Those few decisions that have come down the other way on pronoun usage should not be followed by this Court. A child's names and given and preferred pronouns are not selected by the school. They cannot be made "curricular" or "administrative," as MCPS argues (Resp. Br. at 43), by adopting a policy claiming that adoption of the child's preference is best for a "supportive learning environment."

Fourth, *Garcetti* doesn't apply because MCPS compels speech for an illegitimate purpose. *See Janus v. Am. Fed. of State, Cnty., and Mun. Employees*, 515 U.S. 878, 908 (2018). As discussed earlier, it is simply inappropriate for public schools to hide information from parents and to encourage children to exhibit as transgender without their parents' consent or knowledge. In these

respects, MCPS attempts to compel Ms. Polk to engage with it in improper conduct that undermines the fundamental, constitutional rights of parents.

MCPS in one throwaway line (Resp. Br. at 46) attempts to evade this entire issue by asserting that Ms. Polk lacks standing to assert the rights of parents. Obviously, she has standing to complain that she was fired because she refused to participate in MCPS's improper activities and, in order to assert her own right in her employment, the lawfulness of what she refused to do is directly relevant. *See Garcetti*, 547 U.S. at 426 (message required must not be "unlawful or otherwise inappropriate"); *Janus*, 585 U.S. at 908 (must be a "lawful message").[6]

MCPS also defends (Resp. Br. at 46-47) the constitutionality of the provisions of its Gender Identity Guidelines over which it fired Ms. Polk. For this proposition, MCPS improperly cites as precedent the *district court* opinion in *Parents 1 v. Montgomery County Board of Education*, 622 F. Supp. 3d 118 (D. Md. 2022), even though it acknowledges that that decision was vacated by this Court.

---

[6] MCPS cites *Singleton v. Wulff*, 428 U.S. 106 (1976), to suggest Ms. Polk lacks standing to assert the rights of parents. *Singleton*, which deals with the standing of a third party to assert the rights of others, does not provide the proper analysis here, as Ms. Polk has suffered her *own* injury by being fired for refusing to participate in delivering an unlawful message, and that, independently, gives her standing to litigate the lawfulness of the message imposed on her. In any event, she would meet the standard set out in *Singleton* even if she were solely championing the rights of the parents. Her rights would "likely be diluted" if she cannot assert the rights of the parents; the teacher-parent relationship is a close, professional one, making her a logical one to assert them; and deceived parents will never know that their rights are being violated if she does not assert them. *See id.* at 114-16.

78 F.4th 622 (4th Cir. 2023).  It is *this Court's* decision in that same case that is due

strong consideration.  While the majority dismissed the case for the purported lack

of standing of the parents to challenge MCPS's policy, Judge Niemeyer in dissent

both disagreed with the majority's standing holding and would have found that the

policy violated parental rights.  *Id.* at 644-47 (Niemeyer, J., dissenting).  In

particular, he addressed the interests on which MCPS here relies (and on which the

district court relied in its vacated opinion) in upholding the policy, finding them

deserving of no weight whatsoever:

> [T]he district court erred in its strict scrutiny analysis by relying on
> the students' well-being and privacy interests to defeat the Parents'
> fundamental substantive due process right.  Just as it is no defense to
> an alleged infringement of a plaintiff's First Amendment right to
> claim a compelling interest in not hearing disagreeable viewpoints, so
> also is it no defense to an alleged infringement of parental substantive
> due process rights to claim a compelling interest that is premised on a
> rejection of that right—in this case, the Board's claimed interest in
> having matters central to the child's well-being kept secret from and
> decided by a party other than the parents.  In other words, the district
> court failed to recognize that its analysis was akin to holding there to
> be a *per se* interest in infringing on the Parents' rights by granting
> students a superior right to privacy and granting the school the
> prerogative to decide what kinds of attitudes are not sufficiently
> supportive for parents to be permitted to have a say in a matter of
> central importance in their child's upbringing.  But that is effectively a
> nullification of the constitutionally protected parental rights.

*Id.* at 646.  While the *Parents 1* majority did not directly address the merits, it went

to some pains to remark that "this does not mean [the parents'] objections are

invalid," *id.* at 626, and that the parents made "compelling arguments" that the

"Parental Preclusion Policy" within the Guidelines is unlawful.  *Id.* at 636.

Moreover, two justices of the Supreme Court, dissenting from the denial of

certiorari in a case involving a similar school policy, identified the constitutionality

of these policies proliferating among public schools as of "great and growing

national importance."  *Parents Protecting Our Children, UA v. Eau Claire Area*

*Sch. Dist.*, 145 S. Ct. 14, 14 (2024) (Alito and Thomas, JJ.).[7]  *See also Doe 1 v.*

*Madison Metro. Sch. Dist.*, 2022 WI 65, 976 N.W.2d 584, 599 (2022)

(Roggensack, J., dissenting) (while the four-member majority avoided addressing

the merits of a similar parental preclusion policy on procedural grounds, three

justices would have reached the merits and ruled that it violated the parents' federal

constitutional rights).

Two circuit courts have recently reached the merits of the constitutionality of

similar school policies.  In *Littlejohn v. School Board of Leon County*, 132 F.4th

1232 (11th Cir. 2025), *petition for en banc reconsideration pending*, the Eleventh

---

[7] The *Eau Claire* case presented another ruling that parents lacked standing to
challenge the school's Parental Preclusion Policy.  The majority in *Parents 1* relied
principally on the Supreme Court's standing decisions in *Susan B. Anthony List v.*
*Dreihaus*, 573 U.S. 149 (2014), and *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398
(2013), the opinions of which were authored by Justice Thomas and Justice Alito,
respectively.  In *Eau Claire* those same justices expressed "concern[ ] that some
federal courts are succumbing to the temptation to use the doctrine of Article III
standing as a way of avoiding some particularly contentious constitutional
questions."  145 S. Ct. at 14-15 (Alito and Thomas, JJ.).

Circuit, in a fractured decision, ruled in favor of the school board.  (*Littlejohn* was not cited by MCPS in its Opposition.)  Two judges found the "shock the conscience" standard applied because the challenge was to executive action in enforcing the policy, rather than a challenge to the policy itself.  *Id.* at 1239-43.  A concurring judge felt constrained by precedent to apply that test, despite his disagreement with it, and labeled the policy "shameful."  *Id.* at 1279-80 (Newsom, J., concurring).  The third judge on the panel disagreed that the "shock the conscience" standard applied, rather than fundamental rights analysis, and would have ruled that the policy violated fundamental parental rights.  *Id.* at 1287-88 (Tjoflat, J., dissenting).

The First Circuit in *Foote v. Ludlow School Committee*, 128 F.4th 336 (1st Cir. 2025), rejected the applicability of "shock the conscience" standard to a challenge by parents to a similar school policy, but found the policy, in the circumstances pled, did not violate fundamental parental rights to direct the upbringing of their child.  To reach this conclusion, the court ruled that the policy only implicated "curricular and administrative" decisions at school, which parents had no right to control, *id.* at 350-52, and that the school had no affirmative duty to disclose to parents what was happening at school.  *Id.* at 352-56.  While Ms. Polk believes that both of these rulings are wrong and that this Court should follow better reasoned precedent holding otherwise, the First Circuit recognized that the

school would have violated the parents' fundamental rights if it had affirmatively

misinformed them, *id.*, and that is exactly what Ms. Polk refuses to do.[8]

Fifth, it remains an open question in this Circuit, as MCPS admits (Resp. Br.

at 44-45), whether *Garcetti* applies in an elementary or secondary school setting.

If *Garcetti* is not eliminated for consideration for any of the other reasons Ms. Polk

raises, this Court must decide whether it does.

B. *Pickering* Does Not Apply Here

MCPS when arguing for application of *Pickering* (Resp. Br. at 47-50) fails

to come to grips with either the reasoning or import of *Janus*.  While reserving the

issue, the Court in *Janus* gave a strong signal that *Pickering* should not be applied

by the lower courts in compelled speech situations like this:  "[I]t is not easy to

imagine a situation in which a public employer has a legitimate need to demand

that its employees recite words with which they disagree.  And we have never

applied *Pickering* in such a case."  585 U.S. at 908.  The Supreme Court reserved

---

[8] MCPS also cites in support (at 46) *Willey v. Sweetwater County School District*, 680 F. Supp. 3d 1250 (D. Wyo. 2023).  That court held that, while a school did not have an affirmative duty to tell parents that it was assisting their child to exhibit as transgender while at school, it violated parental rights if parents asked about it and the school misled them.  *Id.* at 1279-80.  This distinction is neither logical nor practical, but *Willey* supports Ms. Polk's refusal to mislead parents.  MCPS does not address either the *Mirabelli v. Olsen* decisions also cited by Ms. Polk in support, 691 F. Supp. 3d 1197 (S.D. Cal. 2023); 761 F. Supp. 3d 1317 (S.D. Cal. 2025), or the decision in *Ricard v. USD 475 Geary County KS School Board*, 2022 WL 1471372 (D. Kan., May 9, 2022).

the issue in *Janus* because it held that, if *Pickering* did apply, the balancing

calculus had to weigh much more strongly than normal in the employee's favor

and, in that case, the employer could not meet that more stringent test. *Id.* at 907.

The *Janus* Court further held that the analysis of speech restrictions by government

employers "more closely resembles exacting scrutiny than the traditional *Pickering*

analysis" when the policies impact multiple employees, as here. *Id.* MCPS simply

doesn't address the implications of these rulings.

MCPS spends much of its effort arguing (Resp. Br. at 47-48) that the speech

Ms. Polk refuses to use as directed by MCPS—to lie to parents and their

children—is private speech without public interest because she would be applying

the policy largely at school and to individual children and their parents. This

argument also fails to give due regard to the rulings in *Janus*. As Ms. Polk pointed

out in her opening brief (Op. Br. at 29-30) and MCPS does not deny, MCPS's

argument tracks that of Justice Kagan in her opinions in *Janus* and *Harris v. Quinn*,

573 U.S. 616 (2014). But Justice Kagan was writing in dissent, and, in both cases,

the majority rejected her argument and held that the speech in question involved

matters of public interest, even though it was applied in particular instances and

regarding particular individuals. *See Harris*, 573 U.S. at 652-55; *Janus*, 585 U.S.

at 910-14. And the Court in *Janus* specified that speech concerning gender identity

topics is of "profound" public interest. *Id.* at 913-14.

III.   MCPS Has No Legitimate Interest in Violating Ms.
       Polk's Constitutional Rights, Much Less a Compelling Interest

MCPS propounds (Resp. Br. at 27-31, 50-51) several, overlapping interests

that it claims would justify its restrictions on Ms. Polk's free exercise and free

speech rights, even if strict scrutiny were applied.  They all fail to provide even a

rational basis.

Interests in keeping students "safe" from parents and avoiding "familial

conflict" and respecting students' "privacy" by keeping from their parents that the

school is facilitating them exhibiting as another gender at school are not legitimate.

They all have at their base the assumption that the schools may override the

judgment of fit parents about how best to raise their children and what is in their

children's best interests.  As Judge Niemeyer observed, this does not advance a

legitimate interest, but instead nullifies parents' fundamental rights.  *Parents 1*, 78

F.4th at 646 (Niemeyer, J., dissenting).  It is entitled to no weight.  *See Doe v.*

*Heck,* 327 F.3d 492, 521 (7th Cir. 2003) (holding that government's second-

guessing of the decision of fit parents about what is best for their children is

illegitimate and entitled to no weight); *Croft v. Westmoreland Cnty. Children and*

*Youth Servs.*, 103 F.3d 1123, 1126 (3d Cir. 1997) (same); *Brokaw v. Mercer Cnty.,*

235 F.3d 1000, 1019 (7th Cir. 2000) (same).

It does not assist MCPS to dress up these same, basic "interests" in other

garb.  MCPS attempts to justify this abrogation of parental rights by claiming

16

students will feel better and do better at school if MCPS takes over these judgment calls for parents. That does not alter the basic point that parents get to make these decisions, not school employees or boards. The law presumes that parents, not school boards, act in their children's best interests and are in the best position to know their children's unique temperaments, circumstances, and needs. *See Parham*, 442 U.S. at 602-03. The Supreme Court in *Troxel* held that courts, even after an evidentiary hearing, have no right to override the determination of fit parents about whether it would be in their children's best interests to see their grandparents; minor children do not get a "vote" on such matters. 530 U.S. at 64-70 (plurality). If that is so, school boards certainly have no right to second-guess the determinations of parents about whether their children should "change genders," a decision with much greater complexity and risk for the children. *See id.* at 80 (Thomas, J., concurring) (stating that the State "lacks even a legitimate governmental interest—to say nothing of a compelling one—in second-guessing a fit parent's decision regarding visitation with third parties").

MCPS's resort to complying with Title IX and avoiding "discrimination" and stating that teachers should "treat and nurture every student equally" does not avail, either, for several reasons. First, it is, once again, another way of saying that the school should be able to make the decision on whether a child exhibits as transgender rather than the parents. If parents do not desire that for the child, then

that is the decision that controls per the Constitution, whether a school thinks that "discriminatory" or not.  It cannot negate the parents' fundamental rights and responsibilities by rephrasing its own interests in emotionally laden terms.  *See Hurley v. Irish Gay, Lesbian and Bisexual Grp. of Boston, Inc.*, 515 U.S. 557 (1995) (holding that anti-discrimination law cannot prevail over constitutional right).

Second, any implication that Ms. Polk would mistreat students exhibiting as transgender is unfounded and rebutted by the record.  She affirmed that she "would never look down on students who were suffering with gender confusion, and [she] would always treat them with courtesy and respect and stop any bullying or harassment of them that [she] saw."  (JA41, JA152.)

Third, Ms. Polk has agreed not to use pronouns when she interacts with students exhibiting as transgender.  (JA34, JA42-43, JA150-152.)  That fully satisfies any interest of this type that MCPS asserts.  MCPS (Resp. Br. at 50-51) posits the hypothetical that, if she only fails to use pronouns with a given student, it would "stand out" and "risk" disclosing to others that the student is exhibiting as transgender.  When the child is already exhibiting as transgender, it is hard to fathom exactly what "privacy" interest remains at school.  In any event, the record rebuts any such hypothetical suggestion.  Ms. Polk explained that, based on her substantial experience with children, referring to a transgender student only by

preferred name while referring to other students by both their name and by
pronouns would neither be noticed by any of the children nor cause the student
exhibiting as transgender to feel any stigma. (JA152.)

Fourth, MCPS cannot have it both ways. Per MCPS's policy, the student is
mature enough to make the decision as to whether to exhibit as transgender; if that
is so, it must also be true that the student is mature enough to know that some
people, including some teachers, hold to the "Traditional Vision," rather than the
"Transgender Vision." Indeed, one would think that the school's mission
concerning this matter should be to air all views, especially ones that have been
held for thousands of years and continue to be held by the world's major religions,
so that the students could make an informed choice in the matter and continue to
assess their options.

Fifth, Title IX simply is not applicable in this situation. Even if its
provisions concerning sex discrimination applied to transgender behavior, referring
to all students by their preferred names gives them equal treatment, and, by
avoiding the use of pronouns, Ms. Polk could not be accused of "misgendering"
them. *See Meriwether v. Hartop*, 992 F.3d 492, 510-11 (6th Cir. 2021) (referring to
this solution as a "win-win"). This Court's decision in *Grimm v. Gloucester County
School Board*, 972 F.3d 586 (4th Cir. 2020), on which MCPS (Resp. Br. at 50) and
the district court both rely to raise the specter of Title IX noncompliance, does not

reach such a situation. *See Meriwether*, 992 F.3d at 510-11. In any event, MCPS does not dispute that the Supreme Court's upcoming decision in *United States v. Skrmetti*, No. 23-477 (Sup. Ct., argued Dec. 4, 2024), will most likely tell whether this Court's analysis in *Grimm* remains good law. Nor does MCPS dispute that the current Administration is not enforcing Title IX in accord with *Grimm*.

IV.    Ms. Polk Is Entitled to Greater Relief Than the
       Tailored Preliminary Injunction She Requested
       <u>Below, but She Is Entitled to at Least That Relief</u>

MCPS does not contest that the infringement of constitutional rights, even for a short time, results in irreparable harm that demands injunctive relief in all but the most exceptional cases. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020). Ms. Polk has already suffered that harm for three school years, with another school year beginning in August 2025. She is entitled to relief, both preliminary and permanent, that stanches the constitutional harms she continues to suffer.

MCPS nevertheless objects (Resp. Br. at 53) even to this Court entering the tailored preliminary injunction requested by Ms. Polk below, rather than remanding for further consideration by the district court. It attempts several arguments to undercut Ms. Polk's request for tailored preliminary relief.[9] While MCPS's

---

[9] MCPS incorrectly asserts that Ms. Polk did not discuss her tailored relief request in its Opening Brief. It did so at 34-36 and 41.

arguments are unavailing, it is certainly true that Ms. Polk is due even more relief, even on a preliminary basis, than she requested below.

Ms. Polk tailored her specific request at the district court by (a) limiting her work as a substitute to elementary school and below, (b) in classes without known transgender students, and (c) agreeing to use preferred names but not inaccurate pronouns with any transgender children she did encounter. (JA34, JA42-43.) It is only this third restriction that Ms. Polk agrees to continue permanently. (JA42-43.) The first two restrictions she offered preliminarily and temporarily because she had tentatively agreed to them in discussions with MCPS personnel when discussing potential accommodations of her religious beliefs under Title VII. At the same time, she explained that she was entitled to greater relief, including teaching in all grades and in classes including students exhibiting as transgender. (JA42-43.) This Court's rulings on the constitutional issues involved in this appeal may well entitle her to broader preliminary injunctive relief than she initially requested, and the district court should take that into consideration when framing preliminary relief, as appropriate.

Nevertheless, the district court erred in not entering at least the tailored relief requested by Ms. Polk, and MCPS's arguments about the necessity and practicality of the tailored relief all fall short. First, MCPS points out (Resp. Br. at 8) that, as a short-term substitute, Ms. Polk would not be expected "to contact a parent or

21

guardian directly," per its regulation.  (JA137.) But that does not mean that Ms. Polk would be isolated from interaction with parents. Often there is direct interaction with parents at school, especially in the lower grades and in special education classes in which Ms. Polk previously substituted, e.g., when parents drop off and pick up their children. And there is often indirect interaction with parents as well, e.g., by sending completed coursework home to parents, as is often done in the lower grades and kindergarten.  What name (or names) is to be used for a secretly exhibiting student? Presumably, during class, the preferred name would be used when addressing the child orally (unless the parent is present) and the given name would be used on written work to be sent home. Implementing such a double standard would involve Ms. Polk in misleading parents by affirmative action.[10]

Second, MCPS claims (Resp. Br. at 53) that it would be an "extraordinary burden" to implement what Ms. Polk suggested for tailored relief by identifying elementary classrooms with children exhibiting as transgender.  This assertion also falls well short of the mark, as Ms. Polk explained in her second declaration. (JA150-57.)  Per the Gender Identity Guidelines, a support plan should be

---

[10] MCPS ranks how "supportive" parents may be on a scale from 1 (low) to 10 (high).  (JA73.)  Over a six-year period, it ranked 17% of parents of students of all grades exhibiting as transgender in MCPS schools from 0 to 3; 25% from 4 to 7, and 56% from 8 to 10.  (JA155.)  The materials do not disclose what "supportive" rank parents must achieve to be informed by MCPS about their child's behavior at school.

generated for each child exhibiting as transgender. (JA66.) For this past school year, MCPS's statistical report shows that there were 19 elementary school students with gender support plans. (JA155.) MCPS had 3,143 elementary school classrooms that year. (JA157.) Thus, assuming the worst case of one child with a gender support plan per classroom, less than 1% of the elementary and kindergarten classes were attended by such children. It is hardly burdensome for MCPS to find a spot for Ms. Polk somewhere among the 99+% of the MCPS kindergarten and elementary school classrooms.

Third, to MCPS's suggestion (Resp. Br. at 51) that there might be some students who are exhibiting as transgender and do not have a gender support plan, the paucity of such plans for elementary school students, the Guidelines' requirement that such plans should be in place, and the young ages of the students all counsel against it. Ms. Polk also disposed of this suggestion in her second declaration: "In my experience, it would be easy for the principal or another administrator at a school to question the teachers at the school as to whether their class had students exhibiting as transgender. Again in my experience, there would be very few classrooms on my 'off limits' list, and it would take very little trouble to canvass teachers about this matter." (JA151.)

Finally, MCPS protests (Resp. Br. at 51) that to implement Ms. Polk's tailored relief of her not working in classrooms with students exhibiting as

transgender "would be a serious violation of the privacy rights" of MCPS's students exhibiting as transgender and their families. This doesn't even get out of the starting blocks. To implement Ms. Polk's tailored relief, MCPS does not have to provide her a list identifying every *student* with a gender support plan. It just has to identify the *classrooms* in which there is such a student.

<u>Conclusion</u>

This Court should reverse the district court and remand for entry of a preliminary injunction consistent with this Court's opinion pending final resolution of all Ms. Polk's claims.

Respectfully submitted,
This 30th day of May, 2025

/s/ Frederick W. Claybrook, Jr.
Frederick W. Claybrook, Jr.
  (Counsel of Record)
Claybrook LLC
655 15th St., NW, Ste. 425
Washington, D.C. 20005
(301) 622-0360
Rick@claybrooklaw.com

Steven W. Fitschen
James A. Davids
National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 650-9210
sfitschen@nationallegalfoundation.org
jdavids@nationallegalfoundation.org

Robert Flores
Gammon & Grange, P.C.
1945 Old Gallows Rd., Ste. 650
Vienna, Va. 22181
jrf@gg-law.com

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitations of

F.R.A.P. 32(a)7(B)(i) and F.R.A.P. 29(a)(5). Exclusive of the exempted portions,

this brief contains 5,406 words, including footnotes, in 14-point Times New

Roman font.  This total was calculated with the Word Count function of Microsoft

Office Word 365.


s/ Steven W. Fitschen
Steven W. Fitschen
The National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 650-9210
sfitschen@nationallegalfoundation.org

## CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2025, I served the foregoing Reply Brief of the Appellant on all counsel through the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service on those participants will be accomplished by the CM/ECF system.

s/ Steven W. Fitschen
Steven W. Fitschen
The National Legal Foundation
524 Johnstown Road
Chesapeake, Va. 23322
(757) 650-9210
sfitschen@nationallegalfoundation.org